## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA and UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, <br><br> *Plaintiffs*, <br><br> v. <br><br> STATE OF NEW YORK; KATHLEEN HOCHUL, in her official capacity as Governor of New York; LETITIA JAMES, in her official capacity as New York Attorney General; and AMANDA LEFTON, in her official capacity as Acting Commissioner of the New York Department of Environmental Conservation, <br><br> *Defendants*. | Civil Action No. 1:25-cv-03656 |

### COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs United States of America and U.S. Environmental Protection Agency bring this civil action against Defendants and allege as follows:

### INTRODUCTION

1.     The United States is facing an energy crisis. Overly restrictive policies and regulation have caused inadequate development of America's abundant energy resources. Yet "[a]n affordable and reliable domestic energy supply is essential to the national and economic security of the United States, as well as our foreign policy." *Protecting American Energy From State Overreach*, Exec. Order No. 14260, § 1, 90 Fed. Reg. 15,513 (Apr. 8, 2025).

2.     As a result, on January 20, 2025, President Trump declared an energy emergency, concluding that the United States' "insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national

security, and foreign policy." *Declaring a National Energy Emergency*, Exec. Order 14156, § 1, 90 Fed. Reg. 8,433 (Jan. 20, 2025).

3. These problems are "most pronounced in our Nation's Northeast and West Coast, where dangerous State and local policies jeopardize our Nation's core national defense and security needs, and devastate the prosperity of not only local residents but the entire United States population." *Id*. Because of state restrictions and burdens on energy production, the American people are paying more for energy, and the United States is less able to defend itself from hostile foreign actors. *Id*.

4. At a time when States should be contributing to a national effort to secure reliable sources of domestic energy, New York has chosen to stand in the way. In December 2024, New York enacted a so-called Climate Change Superfund Act, S.2129B, Chapter 679, Laws of 2024 as amended by S.824 (the "Superfund Act"), N.Y. Envtl. Conserv. Law §§ 76-0101 to 76-0105 (McKinney's 2025). New York's Superfund Act imposes retroactive strict liability and extraordinary monetary penalties on businesses that extracted and refined fossil fuels worldwide during the period from 2000 through 2024. N.Y. Envtl. Conserv. Law §§ 76-0101(9), (21), 76-0103(3)(a). By purporting to regulate the effect of greenhouse gas emissions on climate change, the Act necessarily reaches far beyond the State of New York. The Superfund Act purports to regulate nationwide airspace and indeed the entire globe.

5. The Superfund Act is a transparent monetary-extraction scheme.  On its face, the statute purports to build a $75 billion nest egg to fund infrastructure projects within New York, paid for by out-of-state businesses. And this $75 billion cost will not be borne solely by the out-of-state entities subject to the Superfund Act but also by ordinary Americans from coast to coast, individuals around the world, and in part directly by the United States Treasury, which receives

royalties from oil leases overseen by the Department of the Interior and the Bureau of Land Management.

6.      New York's Superfund Act attempts to usurp the power of the federal government by regulating national and global emissions of greenhouse gases, violating federal law in multiple ways. *See City of New York v. Chevron Corp.*, 993 F.3d 81, 92 (2d Cir. 2021) (holding that the regulation of global greenhouse gas emissions "is simply beyond the limits of state law). The Superfund Act is preempted by the Clean Air Act, exceeds the territorial reach of New York's legislative power, unlawfully discriminates against interstate commerce, conflicts with federal interstate commerce power, and is preempted by federal foreign-affairs powers.

7.      The Superfund Act is a brazen attempt to grab power from the federal government and force citizens of other States and nations to foot the bill for its infrastructure wish list. Along the way, the Superfund Act intrudes on, and interferes with, the federal government's exclusive role in foreign affairs, which includes sensitive policy questions encompassing environmental concerns, economic and trade policies, and national security. This Nation's Constitution and laws do not tolerate this interference.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1345.

9.      This Court has authority to provide the relief requested under the U.S. Constitution, 28 U.S.C. §§ 1651, 2201, and 2202, and its inherent legal and equitable powers.

10.      The United States has standing to vindicate its sovereign, proprietary, and parens patriae interests. *See*, *e.g.*, *Arizona v. United States*, 567 U.S. 387 (2012). The United States' sovereign interests include ensuring that State laws like the Superfund Act do not interfere with federal law, including the Clean Air Act, or with the federal government's exclusive authority

over interstate and foreign commerce, greenhouse gas regulation, and national energy policy. The United States' proprietary interests include its economic interests in revenue from fossil fuel leasing on federal lands, which generated over $13.8 billion in 2024,[1] and its costs for purchasing fossil fuels, which will increase due to the Superfund Act's $75 billion cost recovery demand. *See City of New York*, 993 F.3d at 103 (observing that holding fossil fuel producers "accountable for purely foreign activity (especially the Foreign Producers) would require them to internalize the costs of climate change and would presumably affect the price and production of fossil fuels abroad."). Additionally, the United States has parens patriae standing to protect the economic well-being of its citizens and the national energy market from the Act's extraterritorial and excessive burdens, which will raise energy costs for consumers nationwide and disrupt the uniform regulation of fossil fuel production. These harms affect a substantial segment of the population, and individual litigants, such as fossil fuel businesses, cannot fully address the nationwide economic and constitutional injuries caused by the Act's overreach.

11.    This Court has personal jurisdiction over Defendants because they reside in, or conduct a substantial portion of their official business in, New York. *See* FED. R. CIV. P. 4(k)(1).

12.    Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391, because at least one Defendant resides in the District and because a substantial part of the acts giving rise to this suit occurred within the District. Defendant James has admitted that the Southern District of New York is a proper venue for cases involving the Attorney General.

---

[1] The Department of the Interior manages land owned by the United States. The Department issues leases to produce fossil fuels from federal lands and for production in areas of the Outer Continental Shelf. Each year, the Department collects substantial revenue from those onshore and offshore leases. In 2024, the Department collected revenue of more than $490 million for coal, $950 million for gas, and $12.4 billion for oil. *See* U.S. DEP'T OF THE INTERIOR, NATURAL RESOURCES REVENUE DATA, https://revenuedata.doi.gov/ (last visited Apr. 30, 2025).

*See e.g.*, Pl.'s Mem. in Opp'n to Def.s' Mot. to Transfer, *New York v. Amazon.com Inc.*, No. 21-cv-01417, 2021 WL 12185065 (S.D.N.Y. Mar. 10, 2021).

## PARTIES

13.     Plaintiff is the United States of America, suing on its own behalf, on behalf of its citizens, and on behalf of its executive departments and other subdivisions, including those listed below.

14.     The U.S. Environmental Protection Agency (EPA) is a federal executive agency with responsibility for administering the Clean Air Act, including decisions involving the regulation of greenhouse gas emissions, and implementing national environmental policies while considering economic growth, trade, and energy implications.

15.     Defendant State of New York is a State of the United States.

16.     Defendant Kathleen Hochul is the Governor of the State of New York. She is sued in her official capacity.

17.     Defendant Letitia James is the Attorney General of the State of New York. She is sued in her official capacity. Attorney General James is authorized to enforce the Superfund Act. N.Y. ENVTL. CONSERV. LAW § 76-0103(8).

18.     Defendant Amanda Lefton is the Acting Commissioner of the New York State Department of Environmental Conservation. She is sued in her official capacity. Acting Commissioner Lefton is authorized to implement the Superfund Act. *Id*.

## ALLEGATIONS AND APPLICABLE LAW

### New York's Climate Change Superfund Act

19.     New York's Climate Change Superfund Act seeks to impose retroactive fines or penalties on major American fossil fuel businesses for what New York alleges are the businesses' purported contribution to greenhouse gas emissions. The Superfund Act then funnels those penalty dollars into a fund for New York infrastructure projects that have allegedly been necessitated by climate change "for purposes of climate change adaptation." N.Y. ENVTL. CONSERV. LAW §§ 76-0101(3), 76-0103(3), (9).

20.     New York's Superfund Act singles out a subset of entities (fossil fuel businesses) that (1) extract fossil fuel, which is defined as coal, petroleum products, fuel gases, and natural gas, or (2) refine oil. *See id.* §§ 76-0101(10), (12), (13), (18); *see also* N.Y. ENERGY LAW § 1-103(7), (8).

21.     The Superfund Act declares fossil fuel businesses strictly liable for their purported indirect contribution to *global* greenhouse gas emissions. N.Y. ENVTL. CONSERV. LAW §§ 76-0103(3), 76-0101(8) ("For the purposes of this article, covered greenhouse gas emissions include those emissions attributable to all fossil fuel extraction and refining worldwide by such entity and are not limited to such emissions within the state.").

22.     The Superfund Act would therefore "regulate . . . behavior far beyond New York's borders." *City of New York*, 993 F.3d at 92. New York "does not seek to hold [fossil fuel businesses] liable for the effects of emissions released in New York, or even in New York's neighboring states. Instead, [New York] intends to hold [fossil fuel businesses] liable, under New York law, for the effects of emissions made around the globe . . . ." *Id.*

23.    The Superfund Act excludes downstream users of fossil fuels and entities. It also excludes fossil fuel businesses that lack "sufficient contacts with the state to satisfy the due process clause of the United States Constitution." N.Y. ENVTL. CONSERV. LAW § 76-0101(21).

24.    As a result of this new strict liability scheme, each fossil fuel business will be required to pay a substantial "cost recovery demand"—effectively a retroactive penalty or fine based on the business's *pro rata* share of fossil fuels extracted and refined worldwide from 2000 through 2024. *Id*. §§ 76-101(7), (9), (21), 76-0103(3)(b).

25.    The Superfund Act sets a "cost recovery amount" of $75 billion dollars, which is to be collected *pro rata* from each fossil fuel business for its "covered greenhouse gas emissions." *Id*. §§ 76-0101(6), (7), (8), 76-0103(3).

26.    "Covered greenhouse gas emissions" means "the total quantity of greenhouse gas emissions, expressed in metric tons of carbon dioxide equivalent . . . attributable to the total amount of fossil fuels extracted by that entity during the covered period, as well as the total amount of crude oil refined by that entity during the covered period. For the purposes of this article, covered greenhouse gas emissions include those emissions attributable to all fossil fuel extraction and refining worldwide by such entity and are not limited to such emissions within the state." *Id*. § 76-0101(8).

27.    The Superfund Act defines "greenhouse gas" to mean "carbon dioxide, methane, nitrous oxide, hydrofluorocarbons, perfluorocarbons, sulfur hexafluoride, and any other substance emitted into the air that may be reasonably anticipated to cause or contribute to anthropogenic climate change." *Id*. § 75-0101(7); *id*. § 76-0103(15) (defining "[g]reenhouse gas" by reference to section 75-0101).

28.     The Superfund Act requires that the New York Department of Environmental Conservation issue a notice to each responsible party in "the same ratio to the cost recovery amount as the responsible party's applicable share of covered greenhouse gas emissions bears to the aggregate applicable shares of covered greenhouse gas emissions of all responsible parties." N.Y. ENVTL. CONSERV. LAW § 76-0103(3)(b).

29.     New York produces only a small amount of natural gas and crude oil. U.S. ENERGY INFO. ADMIN., New York, State Profile and Energy Estimates, https://www.eia.gov/state/analysis.php?sid=NY (updated Jan. 16, 2025) (the "New York Energy Profile"). At the same time, New York is the Nation's fifth-largest consumer of petroleum overall and the sixth-largest natural gas consumer among the States. *Id.*

30.     New York has no coal mines or economically recoverable coal reserves. *See id.*

31.     Historically, New York played a significant role in crude oil production. In the 19th century, it had more than 50 crude oil refineries. *See id.* But all refineries in New York had closed by the end of the 20th century. *See id.* From 2000 to June 2024, New York had no operating oil refineries. *See* U.S. ENERGY INFO. ADMIN., Petroleum & Other Liquids, New York Area, https://www.eia.gov/dnav/pet/pet_pnp_cap1_dcu_sny_a.htm (updated June 14, 2024).

32.     Upon information and belief, nearly all the economic activity and operations that New York's Superfund Act targets from 2000 to 2024—extraction of fossil fuel and refinement of crude oil—occurred outside New York.

33.     New York's Superfund Act imposes liability based on greenhouse gas emissions generated in many States besides New York and in many other countries besides the United States.

34.     New York's Superfund Act imposes liability on fossil fuel businesses for their lawful conduct in extracting and refining fossil fuels in many States besides New York and in many other countries besides the United States.

**The Clean Air Act Comprehensively Regulates Nationwide Air Pollution**

35.     The Clean Air Act, 42 U.S.C. § 7401 et seq., creates a comprehensive program for regulating air pollution in the United States and "displaces" the ability of States to regulate greenhouse gas emissions beyond their borders. *City of New York*, 993 F.3d at 96. The Act improves the Nation's air quality by delegating authority to EPA to prescribe national standards for air pollutants, which States then implement. *See, e.g.*, 42 U.S.C. § 7411.

36.     In *Massachusetts v. EPA*, 549 U.S. 497 (2007), the Supreme Court concluded that greenhouse gases, such as carbon dioxide and methane, are within the Clean Air Act's unambiguous definition of "air pollutant," 42 U.S.C. § 7602(g). *Id*. at 528-29. Thus, the Clean Air Act delegates to EPA authority to set nationwide standards for greenhouse gases. *See Am. Electric Power Co., Inc. v. Connecticut* (*AEP*), 564 U.S. 410, 424-29 (2011).

37.     For in-state stationary sources, the Clean Air Act generally preserves the ability of States to adopt and enforce air pollution control requirements and limitations on in-state sources, so long as those are at least as stringent as the corresponding federal requirements. *See* 42 U.S.C. § 7416. For out-of-state sources, however, the "Act gives states a much more limited role," even if the pollution from those sources causes harm within their borders. *City of New York*, 993 F.3d at 88. Affected States can: (1) comment on proposed EPA rules and certain permits and plans, *see* 42 U.S.C. § 7607(d)(5), § 7475(a)(2), § 7410(a)(2)(C); 40 C.F.R. § 51.102(a); (2) seek judicial review if their concerns are not addressed, *see* 42 U.S.C. § 7607(b); and (3) petition EPA in certain instances, *see id*. § 7410(k)(5).

### The United States' Foreign Policy on
### Greenhouse Gas Regulation and Energy Development

38.     Greenhouse gas emissions "present[] a uniquely international problem of national concern." *City of New York*, 993 F.3d at 85. Regulating these emissions "implicates" not only "the conflicting rights of states" but also "our relations with foreign nations." *Id.* at 92 (cleaned up).

39.     Under the Constitution, foreign-affairs powers are the exclusive domain of the federal government. *Hines v. Davidowitz*, 312 U.S. 52, 62 (1941). Consistent with that structure, the federal government has demonstrated an active and continuous interest in reconciling protection of the environment, promotion of economic growth, and maintenance of national security when regulating greenhouse gas emissions and fossil fuels. *See City of New York*, 993 F.3d at 93 (recognizing responsibility of federal government in striking the right "balance" in promoting these goals). The federal government has been actively exercising its authority here and has been continually evaluating national interests as is its responsibility under the Constitution. It has "in fact . . . addressed" these interwoven issues on many occasions. *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 421 (2003).

40.     In 1987, Congress enacted the Global Climate Protection Act. *See* Pub. L. No. 100-204, Title XI, §§ 1101–1106, 101 Stat. 1331, 1407–09 (1987), reprinted as note to 15 U.S.C. § 2901. Among its other goals, the Global Climate Protection Act provided that the United States should "work toward multilateral agreements" on the issue of greenhouse gas emissions. *Id.* § 1103(a)(4), 101 Stat. at 1408. It assigned to the President and EPA the responsibility for devising a "coordinated national policy on global climate change." *Id.* § 1103(b), 101 Stat. at 1408. And the Protection Act assigned to the President and the Secretary of State the responsibility for coordination of climate change policy in the international arena. *Id.* § 1103(c), 101 Stat. at 1409.

41.    In 1992, President George H. W. Bush signed, and the Senate unanimously approved, the United Nations Framework Convention on Climate Change, May 9, 1992, S. Treaty Doc. No. 102-38, 1771 U.N.T.S. 107 (entered into force Mar. 21, 1994), which has as its "ultimate objective . . . stabilization of greenhouse gas concentrations in the atmosphere at a level that would prevent dangerous anthropogenic interference with the climate system." *Id*., Art. 2.

42.    Under the Framework Convention, "[a]ll Parties," including the United States, "shall . . . .  (b) [f]ormulate, implement, publish and regularly update national and, where appropriate, regional programmes containing measures to mitigate climate change by addressing anthropogenic emissions by sources and removals by sinks of all greenhouse gases not controlled by the Montreal Protocol, and measures to facilitate adequate adaptation to climate change [and] (c) [p]romote and cooperate in the development, application and diffusion, including transfer, of technologies, practices and processes that control, reduce or prevent anthropogenic emissions of greenhouse gases not controlled by the Montreal Protocol in all relevant sectors . . . ." *Id*., Art. 4.1(b), (c).

43.    The Framework Convention does not set binding limits on greenhouse gas emissions for individual countries. It contains no enforcement mechanism. Instead, it includes general obligations addressing climate change and creates a framework for cooperation by its parties. Among other things, it contemplates the possibility of its parties negotiating "protocols" or other specific international agreements in pursuit of its objective.

44.    Since approving the Framework Convention, the United States has engaged in international efforts regarding climate change and greenhouse gas emissions, balancing foreign policy considerations and domestic energy needs. In particular, the United States is also a party

to the Kigali Amendment to the Montreal Protocol. *See* Amendment to the Montreal Protocol on

Substances that Deplete the Ozone Layer, Oct. 15, 2016, S. Treaty Doc. No. 117-1,

C.N.730.2017. The Amendment commits the United States and other signatory countries to

phase down the production and consumption of hydrofluorocarbons, a greenhouse gas. The

Senate ratified the Kigali Amendment in 2022, but only after Congress enacted the American

Innovation and Manufacturing Act, 42 U.S.C. § 7675, in 2020, giving EPA authority under the

Clean Air Act to reduce production and consumption of hydrofluorocarbons.

45.     By contrast, the United States is *not* a party to the Kyoto Protocol of 1997, which

provided for greenhouse gas emission reduction targets on UNFCCC Annex I parties, including

the United States. Though the United States signed the protocol, President Clinton never

submitted it to the Senate for ratification. Instead, the Senate passed a unanimous resolution

expressing disapproval of any protocol or other agreement that provides for disparate treatment

of economically developing countries. S. Res. 98, 105th Cong. (1997).

46.     The United States is similarly not a party to the December 12, 2015 Paris Climate

Accord (the Paris Agreement). Paris Agreement to the United Nations Framework Convention

on Climate Change, Dec. 13, 2015, in Rep. of the Conference of the Parties on the Twenty-First

Session, U.N. Doc. FCCC/CP/2015/10/Add.1, annex (2016). In September 2016, President

Obama signed the Paris Agreement but did not submit it to the Senate for ratification. On March

28, 2017, President Trump described how the United States would seek to reconcile the Nation's

environmental, economic, and strategic concerns. *See* Exec. Order 13,783, 82 Fed. Reg. 16,093

(Mar. 28, 2017). On November 4, 2019, the United States deposited a notification of withdrawal

from the Paris Agreement. Although on February 19, 2021, President Biden announced that he

rejoined this expensive and destructive protocol, on February 13, 2025, President Trump

withdrew the United States from the Paris Agreement. *See Putting America First in International Agreements*, Executive Order 14162, § 3(a), 90 Fed. Reg. 14,162 (Jan. 20, 2025). The President explained that "[i]t is the policy of my Administration to put the interests of the United States and the American people first in the development and negotiation of any international agreements with the potential to damage or stifle the American economy" and that such agreements "must not unduly or unfairly burden the United States." *Id*. § 2. In other words, the President would put the interests of the American people first in negotiating the terms of any future treaty to implement the Framework Convention.

47.    More recently, on April 2, 2025, President Trump invoked his authority under the International Emergency Economic Powers Act of 1977 to strengthen our Nation's international economic position by imposing reciprocal tariffs on U.S. trading partners. *See Regulating Imports With a Reciprocal Tariff To Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits*, Exec. Order 14257, 90 Fed. Reg. 15,041 (Apr. 2, 2025). The Executive Order specifically exempts "energy and energy products" from the tariffs. *Id.* § 3(b); *see also id*. Annex II.

## CLAIMS FOR RELIEF

### COUNT I
### Clean Air Act Preemption

48.     The United States incorporates by reference all allegations stated above.

49.     The Supremacy Clause of the United States Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2.

50.     A state law is preempted under the Supremacy Clause when it intrudes into a field exclusively occupied by federal law (field preemption) or when it conflicts with federal law by standing as an obstacle to the accomplishment of Congress's objectives (conflict preemption). *See City of Milwaukee v. Illinois*, 451 U.S. 304, 316-17 (1981) (field preemption); *Hillsborough County v. Automated Medical Labs., Inc.*, 471 U.S. 707, 713 (1985) (conflict preemption).

51.     The Superfund Act is preempted by the Clean Air Act, 42 U.S.C. § 7401 et seq., because it impermissibly regulates out-of-state greenhouse gas emissions and obstructs the Clean Air Act's comprehensive federal-state framework and EPA's regulatory discretion, *see, e.g.*, *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 500 (1987) ("The [Clean Water] Act pre-empts state law to the extent that the state law is applied to an out-of-state point source."); *Arizona*, 567 U.S. at 399-400.

52.      "The Clean Air Act is a comprehensive statutory scheme that anoints the EPA as the 'primary regulator of [domestic] greenhouse gas emissions.'" *City of New York*, 993 F.3d at 99 (quoting *AEP*, 564 U.S. at 428).

53.     Congress delegated to EPA the authority to determine whether and how to regulate greenhouse gas emissions, thereby displacing federal common law claims and

14

occupying the field of interstate air pollution regulation. *See Massachusetts*, 549 U.S. at 528-29 (holding that greenhouse gases are "air pollutants" under 42 U.S.C. § 7602(g)); *AEP*, 564 U.S. at 426 ("The critical point is that Congress delegated to EPA the decision whether and how to regulate carbon-dioxide emissions; the delegation displaces federal common law."); *City of Milwaukee*, 451 U.S. at 317 (holding that the Federal Water Pollution Control Act's comprehensive regulatory program displaced federal common law of nuisance, as Congress occupied the field of water pollution regulation).

54.     The Clean Air Act's comprehensive framework, which includes specific provisions for regulating emissions from stationary and mobile sources, *see, e.g.*, 42 U.S.C. §§ 7410, 7411, 7521, preempts state laws that attempt to regulate out-of-state greenhouse gas emissions, such as New York's Superfund Act. *See City of New York*, 993 F.3d at 90-100. New York's law, by imposing strict liability and substantial financial penalties on fossil fuel businesses for their global greenhouse gas emissions, *see* N.Y. ENVTL. CONSERV. LAW § 76-0101(8)), usurps this federal authority. The Superfund Act's attempt to regulate emissions worldwide, most of which occur outside New York's borders, is the type of state regulation of out-of-state greenhouse gas emissions preempted by the Clean Air Act.

55.     New York's Superfund Act conflicts with the Clean Air Act's purposes and objectives by undermining its carefully calibrated cooperative federalism scheme and EPA's discretion in regulating greenhouse gas emissions.

56.     The Clean Air Act establishes a structured partnership between the federal government and States, allowing States to regulate in-state stationary sources under specific conditions, *see, e.g.*, 42 U.S.C. §§ 7401(a)(3), 7410(a)(2)(C), 7411(d), 7416, but limiting their role in regulating out-of-state or global emissions, *see, e.g.*, 42 U.S.C. §§ 7410(a)(2)(C),

15

7410(k)(5), 7475(a)(2), 7607(b). *See also City of New York*, 993 F.3d at 88. And the Clean Air

Act contains a citizen-suit savings clause. 42 U.S.C. § 7604(e). When read together, the Clean

Air Act "plainly permit[s] [S]tates to create and enforce their own emissions standards applicable

to in-state polluters." *City of New York*, 993 F.3d at 99. This role "no doubt holds true for both

state legislation and common law claims under state law." *Id*. at 100 (citing *Merrick v. Diageo*

*Americas Supply, Inc.*, 805 F.3d 685, 690-91 (6th Cir. 2015)). "But that authorization is narrowly

circumscribed, and has been interpreted to permit only state lawsuits brought under 'the law of

the [pollution's] *source* [s]tate." *Id*. (citations omitted).

57.     The Superfund Act "does not seek to take advantage of this slim reservoir of state

common law." *Id*. Rather, the Superfund Act seriously interferes with the Clean Air Act's

balance by imposing a $75 billion liability scheme that penalizes fossil fuel extraction and

refining worldwide, *see* N.Y. ENVTL. CONSERV. Law § 76-0103, effectively regulating out-of-

state emissions. This extraterritorial regulation creates a patchwork of state-level penalties that

undermines state authority over pollution sources within state borders and frustrates the Clean

Air Act's goal of efficiency and predictability in the permit system. *See Ouellette*, 479 U.S. at

496; *see also AEP*, 564 U.S. at 426 (holding that the Clean Air Act's delegation to the EPA to

regulate greenhouse gas emissions displaces federal common law, reflecting federal primacy).

Such state encroachment on federal authority is preempted, as it obstructs the Clean Air Act's

integrated approach to air pollution control. *See Ouellette*, 479 U.S. at 497; *see also City of New*

*York*, 993 F.3d at 90-95.

58.     Moreover, New York's Superfund Act obstructs EPA's discretion to balance

environmental, economic, and energy considerations in regulating greenhouse gases. The Clean

Air Act grants EPA broad authority to promulgate regulations based on its expert judgment,

including whether to impose emissions standards for stationary sources under 42 U.S.C. § 7411

and for mobile sources under 42 U.S.C. § 7521. By imposing retroactive liability for lawful

conduct from 2000 to 2024, the Superfund Act second-guesses EPA's regulatory choices and

imposes penalties that Congress did not authorize.

59.     New York's Superfund Act further undermines federal objectives by increasing

energy costs and disrupting the national energy market, contrary to the Clean Air Act's

integration with national energy policy. As noted in Executive Order 14156, § 1, 90 Fed. Reg. at

8,434, insufficient energy production due to restrictive state policies threatens national security

and economic prosperity. By targeting major fossil fuel businesses, many of which operate on

federal lands or supply federal agencies, the Superfund Act raises costs for federal operations

and consumers nationwide, obstructing the Clean Air Act's goal of balancing environmental

protection with economic growth. *See* 42 U.S.C. § 7401(b)(1) (Clean Air Act's purpose includes

protecting air quality "to promote the public health and welfare and the productive capacity of its

population").

60.     If laws like New York's are permitted to stand, other States could enact similar

liability schemes, leading to a chaotic "patchwork" of regulations that undermine the national

interest in readily available and affordable energy and the government's ability to effectively

administer coherent national environmental policy and regulation of global pollution. *City of*

*New York*, 993 F.3d at 86. Vermont's similar legislation imposing strict liability for greenhouse

gas emissions underscores this risk. Such fragmentation would frustrate Congress's intent for a

unified federal approach to global air pollution. *See Hines*, 312 U.S. at 67 (state law preempted

when it obstructs federal objectives).

61.     Thus, New York's Superfund Act is preempted by the Clean Air Act.

## COUNT II
### Unconstitutional Extraterritorial Regulation

62.    The United States incorporates by reference all allegations stated above.

63.    The Constitution's structure and provisions, including the Due Process Clause, as well as concepts of State sovereignty and federalism, prohibit a State from regulating transactions, and imposing liability for conduct, occurring outside its borders. New York's Superfund Act violates the Constitution by imposing extraterritorial liability for primarily out-of-state extraction and refining activities and out-of-state greenhouse gas emissions. The Act is irreconcilable with the Constitution's commitment of such matters to the federal government and the relative rights and obligations of the federal government and the States under the Constitution.

64.    The United States has standing to assert this claim to protect its sovereign, proprietary, and parens patriae interests. New York's extraterritorial regulation interferes with the federal government's authority to regulate interstate and foreign commerce and greenhouse gas emissions, undermining national energy policy. The Superfund Act's financial burdens on fossil fuel businesses increase the United States' costs for purchasing fuels and threaten revenue from federal leasing. In its parens patriae capacity, the United States seeks to protect citizens nationwide from higher energy costs and economic disruption caused by the Superfund Act's overreach, which individual litigants cannot fully address due to the Superfund Act's nationwide impact.

65.    The Due Process Clause of the Fourteenth Amendment provides: "[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ." U.S. CONST. amend. XIV, § 1. The fossil fuel businesses targeted by New York's Superfund Act are persons under the Fourteenth Amendment.

66.     The Constitution's structure and principles of due process mandate that while States are sovereign within their borders, they cannot regulate conduct beyond their borders, such as by imposing liability for pollution from out-of-state sources. "The concept of Due Process constraints on a state legislature's ability to regulate subject matters and transactions beyond the state's boundaries, while perhaps infrequently litigated in those terms, is not new." *Gerling Glob. Reinsurance Corp. of Am. v. Gallagher*, 267 F.3d 1228, 1236-37 (11th Cir. 2001) (discussing Due Process limits on legislative jurisdiction). Indeed, "[t]o resolve disputes about the reach of one State's power," the Supreme Court "has long consulted … the Constitution's structure and the principles of 'sovereignty and comity' it embraces," along with "the Due Process Clause." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 376 (2023) (citation omitted).

67.     It is a well-established "due process principle that a state is without power to exercise 'extra territorial jurisdiction,' that is, to regulate and control activities wholly beyond its boundaries." *Watson v. Emps. Liab. Assur. Corp.*, 348 U.S. 66, 70 (1954) (citing *Home Ins. Co. v. Dick*, 281 U.S. 397 (1930)). "The sovereignty of each State, in turn, implie[s] a limitation on the sovereignty of all of its sister States—a limitation express or implicit in both the original scheme of the Constitution and the Fourteenth Amendment." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 293 (1980).

68.     Indeed, the Due Process Clause embodies "more than a guarantee of immunity from inconvenient or distant litigation" but also imposes "territorial limitations on the power of the respective States." *Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty.*, 582 U.S. 255, 263 (2017) (quoting *Hanson v. Denckla*, 357 U.S. 235, 251 (1958)) (discussing how the sovereignty of each state imposes limitations on sovereignty of other states).

This limits States' legislative power over certain subject matters just as much as it does judicial power. *Herederos De Roberto Gomez Cabrera, LLC v. Teck Res. Ltd.*, 43 F.4th 1303, 1309 (11th Cir. 2022).

69.    No single State can enact policies for the entire Nation, nor can a State "even impose its own policy choice on neighboring States." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 570-71 (1996). "[I]t follows from these principles of state sovereignty and comity that a State may not impose economic sanctions on violators of its laws with the intent of changing the tortfeasors' lawful conduct in other States." *Id*. at 572. "The states are not nations, either as between themselves or towards foreign nations," and "their sovereignty stops short of nationality." *New Hampshire v. Louisiana*, 108 U.S. 76, 90 (1883). And "interstate . . . pollution is a matter of federal, not state, law." *Ouellette*, 479 U.S. at 488.

70.    New York's Superfund Act violates the Constitution's structure and principles of due process by imposing economic sanctions on fossil fuel businesses for economic activities that occurred primarily in other States.

71.    While New York's Superfund Act purports to limit liability to entities with "sufficient contacts with the state to satisfy the due process clause of the United States Constitution," N.Y. Envtl. Conserv. Law § 76-0101(21), this provision fails to satisfy due process because the Act "impose[s] strict liability for the damages caused by fossil fuel emissions no matter where in the world those emissions were released (or who released them)," *City of New York*, 993 F.3d at 93, including activities in other States and in foreign countries with no connection to New York. "Such a sprawling" scope "is simply beyond the limits of state law." *Id.* at 92.

72.    Even if an entity has some contacts with New York, such as in-state sales or operations, the Act's strict liability for fossil fuel extraction and refining and out-of-state greenhouse emissions does not arise from or relate to those contacts, violating the requirement that a State's regulatory authority be limited to conduct with a substantial nexus to the State.

73.    Moreover, the Superfund Act's global scope inherently overreaches, regardless of any nexus provision. By imposing a $75 billion cost recovery demand for emissions attributable to worldwide fossil fuel activities from 2000 through 2024, the Superfund Act regulates conduct far beyond New York's territorial jurisdiction, contravening the Due Process Clause's territorial limitations on state sovereignty.

74.    Accordingly, the "sufficient contacts" provision cannot cure this defect, as the Superfund Act's focus on global emissions lacks any meaningful connection to New York's legitimate regulatory interests, rendering it unconstitutional.

75.    Thus, New York's Superfund Act violates the Constitution's limits on extraterritorial legislation.

## COUNT III
## Violation of the Interstate Commerce Clause

76.    The United States incorporates by reference all allegations stated above.

77.    The Constitution gives Congress "Power . . . [t]o regulate Commerce . . . among the several States." U.S. CONST. art. I, § 8, cl. 3.

78.    State laws that discriminate against interstate commerce are unconstitutional, even in the absence of federal legislation regulating the activity in question. *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995).

79.    New York's Superfund Act discriminates against interstate commerce facially, in practical effect, and in purpose by targeting commercial activity—fossil fuel extraction and

refining—that occurs primarily if not exclusively in States other than New York, including

Texas, New Mexico, Louisiana, West Virginia, Pennsylvania, Oklahoma, and North Dakota. *See*

N.Y. ENVTL. CONSERV. LAW § 76-0103(3)(a); *see also* § 76-0101(8) ("For the purposes of this

article, covered greenhouse gas emissions include those emissions attributable to all fossil fuel

extraction and refining worldwide by such entity and are not limited to such emissions within the

state.").

80.    Because New York's Superfund Act discriminates against interstate commerce,

strict scrutiny applies, and it can be upheld only if "it advances a legitimate local purpose that

cannot be adequately served by reasonable nondiscriminatory alternatives." *New Energy Co. of

Indiana v. Limbach*, 486 U.S. 269, 278 (1988).

81.    New York has no legitimate local public interest in discriminating against

interstate commerce.

82.    But even if the Court were to somehow find that the Superfund Act advances

some legitimate local purpose, it would still fail strict scrutiny because its infrastructure funding

objectives can be adequately served by reasonable, non-discriminatory alternatives. For example,

New York could fund its $75 billion in infrastructure projects through general taxation, such as

state income or sales taxes, or by seeking federal grants, which are commonly used to support

climate-related infrastructure without burdening interstate commerce. These alternatives would

achieve New York's goals without imposing a discriminatory $75 billion cost recovery demand

on out-of-state fossil fuel businesses, rendering the Superfund Act's discriminatory approach

unconstitutional.

83.    Moreover, even if New York's Superfund Act did not facially discriminate

against interstate commerce and did not have non-discriminatory alternatives, it would still

violate the Interstate Commerce Clause under the balancing test articulated in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). Under *Pike*, a state law that regulates evenhandedly and has only incidental effects on interstate commerce is unconstitutional if the burden imposed on interstate commerce is "clearly excessive in relation to the putative local benefits." *Id.*

84.     New York's Superfund Act purports to serve a legitimate local public interest by raising $75 billion to fund infrastructure projects allegedly necessitated by climate change. Regardless of whether environmental protection and infrastructure development are valid state objectives, the benefits of the Act are localized to New York and speculative, and the Act's imposition of retroactive liability for global greenhouse gas emissions does not directly address current or future environmental challenges within the State.

85.     The Superfund Act also imposes substantial burdens on interstate commerce. By targeting fossil fuel businesses for extraction and refining activities occurring primarily in other States and foreign countries, the Act disrupts the national market for fossil fuels. The $75 billion cost recovery demand will increase energy costs for consumers and businesses nationwide, as these costs are passed through the interstate energy market. And the Act's retroactive penalties for lawful conduct from 2000 to 2024 discourage investment and innovation in the fossil fuel industry, further burdening interstate commerce. The potential for other States to adopt similar laws creates a risk of regulatory fragmentation, undermining the uniform national energy market.

86.     New York's Superfund Act imposes a substantial and undue burden on interstate commerce that is clearly excessive in relation to any putative local benefits.

87.     New York seeks to hold the largest American fossil fuel businesses liable for their extraction and refining activities which, upon information and belief, occur almost exclusively in States other than New York. New York's Superfund Act imposes an aggregate liability of $75

billion on those fossil fuel businesses. N.Y. ENVTL. CONSERV. LAW § 76-0101(6). The Act will

raise the cost of energy resources transacted in interstate commerce.

88.    Thus, New York's Superfund Act violates the Interstate Commerce Clause.

**COUNT IV**
**Violation of the Foreign Commerce Clause**

89.    The United States incorporates by reference all allegations stated above.

90.    The Constitution provides that "[t]his Constitution, and the Laws of the United

States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made,

under the Authority of the United States, shall be the supreme Law of the Land; . . . any Thing in

the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl.

2.

91.    The Constitution gives Congress the "Power . . . [t]o regulate Commerce with

foreign Nations . . . ." *Id.*, art. I, § 8, cl. 3.

92.    The Foreign Commerce Clause has a negative application. Thus, for example,

State laws that impose taxes on foreign commerce "will not survive Commerce Clause scrutiny if

the taxpayer demonstrates that the tax" implicates one of the four concerns identified in

*Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 279 (1977). *See Barclays Bank PLC v.*

*Franchise Tax Bd. of California*, 512 U.S. 298, 310 (1994). A State law imposing taxes is

unconstitutional if it (1) applies to an activity lacking a substantial nexus to the State; (2) is not

fairly apportioned; (3) discriminates against interstate commerce; *or* (4) is not fairly related to

the services provided by the State. *See Barclays Bank PLC*, 512 U.S. at 310-11 (citing *Complete*

*Auto*, 430 U.S. at 279). "In the unique context of foreign commerce, a State's power is further

constrained because of the special need for federal uniformity." *Id.* at 311 (cleaned up). Thus,

"[a] tax affecting *foreign* commerce therefore raises two concerns in addition to the four

24

delineated in *Complete Auto*." *Id*. "The first is prompted by the enhanced risk of multiple taxation. The second relates to the Federal Government's capacity to speak with one voice when regulating commercial relations with foreign governments." *Id*. (cleaned up).

93.    New York's Superfund Act is not a state tax. But the same limiting principles that apply to a State's power to impose taxes on foreign commerce also apply to a State's power to impose penalties, fines, and other civil liability on foreign commerce.

94.    New York's Superfund Act discriminates against foreign commerce facially, in practical effect, and in purpose by imposing penalties or fines that directly and substantially burden foreign commerce. The Act imposes strict liability on fossil fuel businesses for activities—extraction and refining of fossil fuels—that occurred "worldwide" in foreign countries. *See* N.Y. ENVTL. CONSERV. LAW § 76-0101(8) ("For the purposes of this article, covered greenhouse gas emissions include those emissions attributable to all fossil fuel extraction and refining worldwide by such entity and are not limited to such emissions within the state."). The Act imposes liability on these foreign activities even though they lack a substantial nexus to New York. The Act does not fairly apportion liability based on commerce in New York. The Act also discriminates against foreign commerce and imposes liability that is not fairly related to the services provided by the State. The Act enhances the risk of multiple States imposing overlapping liability on foreign commerce for the same activities. And the Act harms the federal government's capacity to speak with one voice when conducting commercial relations with foreign governments on issues such as regulation of greenhouse gas emissions, trade policy, exports and imports of fossil fuels, and national security.

95.    The United States does not challenge New York's authority to regulate the local activities of international corporations, such as emissions from in-state facilities or taxes on in-

state sales. Ordinary state regulations that incidentally affect foreign commerce without such extraterritorial scope or federal interference remain permissible under the Foreign Commerce Clause. But New York's Superfund Act does not fall within this permissible role for States. Rather, the Act directly regulates worldwide fossil fuel extraction and refining with minimal nexus to New York, imposes a disproportionate $75 billion burden on foreign commerce, and undermines the federal government's ability to maintain uniformity in regulating environmental, trade, and national security policy.

96.     Thus, New York's Superfund Act violates the Foreign Commerce Clause.

## COUNT V
## Foreign Affairs Preemption

97.     The United States incorporates by reference all allegations stated above.

98.     The Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

99.     Even aside from his military powers as the "Commander in Chief of the Army and Navy," *id*. art. II, § 2, cl. 1, the Constitution vests broad responsibility for the conduct of foreign affairs in the President of the United States.

100.    The President has "Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur." *Id*. art. II, §2, cl. 2.

101.    The President "nominate[s], and by and with the Advice and Consent of the Senate, . . . appoint[s] Ambassadors, other public Ministers and Consuls." *Id*.

102.    The President "receive[s] Ambassadors and other public Ministers." *Id*. art II, § 3.

103.   The Constitution authorizes the President to "take Care that the Laws be faithfully executed." *Id*.

104.   In short, "the supremacy of the national power in the general field of foreign affairs . . . is made clear by the Constitution." *Hines*, 312 U.S. at 62.

105.   The Supreme Court has interpreted the provisions of the Constitution that vest authority over foreign affairs in the President to prohibit actions by the States that lie outside their traditional and localized areas of responsibility and instead interfere with the federal government's foreign policy, or otherwise has more than an incidental effect in conflict with express foreign policy. *See Garamendi*, 539 U.S. at 418-20.

106.   New York's Superfund Act falls outside the area of any traditional state interest. It instead regulates "a uniquely international problem" that is "not well-suited to the application of state law." *City of New York*, 993 F.3d at 85-86.

107.   By adopting the Framework Convention, the federal government undertook to formulate foreign policy with respect to the "stabilization of greenhouse gas concentrations in the atmosphere at a level that would prevent dangerous anthropogenic interference with the climate system."  Framework Convention, Art. 2.

108.   New York's Superfund Act imposes retroactive liability on fossil fuel businesses for their extraction or refining of fossil fuels "worldwide." N.Y. Envtl. Conserv. Law § 76-0101(8).

109.   By attempting to impose liability based on greenhouse gas emissions purportedly attributable to "worldwide" fossil fuel extraction and refining, New York's Superfund Act could undermine the ability of the United States to speak with one voice on a matter of pressing interest around the globe. The Act also could complicate the United States' relations with foreign

countries concerning regulation of greenhouse gas emissions, trade policy, and exports and imports of fossil fuels. The Act also penalizes extraction and refining activities in foreign countries despite the President's explicit judgment that energy imports should be exempt from the tariffs imposed under Executive Order 14257.

110.    New York's Superfund Act interferes with the United States' foreign policy on greenhouse gas regulation, including but not limited to the United States' participation in the Framework Convention and announcement of its intention to withdraw from the Paris Agreement, and is therefore preempted.

111.    This claim does not challenge New York's authority to enact local regulations that incidentally affect international corporations, such as environmental standards for in-state operations. Instead, the United States seeks to invalidate New York's Superfund Act because its imposition of retroactive liability for worldwide greenhouse gas emissions directly intrudes on the federal government's exclusive authority over foreign affairs, including the United Nations Framework Convention on Climate Change and trade policy. This extraordinary extraterritorial reach and conflict with federal foreign policy distinguish the Act from ordinary state regulations that do not undermine the United States' ability to speak with one voice in international relations.

112.    Simply put, New York's attempt "to recover damages for the harms caused by global greenhouse gas emissions may" not "proceed under New York law." *City of New York*, 993 F.3d at 91.

113.    Thus, New York's Superfund Act is preempted by the foreign affairs doctrine.

## PRAYER FOR RELIEF

WHEREFORE, the United States respectfully requests that this Court:

A.      Declare New York's Superfund Act unconstitutional and unenforceable under 28 U.S.C. § 2201, both facially and as applied;

B.      Permanently enjoin Defendants from taking actions to implement or enforce New York's Superfund Act;

C.      Award the United States its costs and disbursements in this action; and

D.      Award such other and further relief as the Court may deem just and proper.

Respectfully submitted,

ADAM R.F. GUSTAFSON
Acting Assistant Attorney General

ROBERT N. STANDER
Deputy Assistant Attorney General

/s/ Justin D. Heminger
JUSTIN D. HEMINGER
RILEY W. WALTERS
CHRISTINE W. ENNIS
Attorneys
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 514-5442
justin.heminger@usdoj.gov