**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA and UNITED
STATES ENVIRONMENTAL PROTECTION
AGENCY,

<em>Plaintiffs</em>,

v.

STATE OF NEW YORK; KATHLEEN
HOCHUL, in her official capacity as Governor of
New York; LETITIA JAMES, in her official capacity
as New York Attorney General; and AMANDA
LEFTON, in her official capacity as Commissioner of
the New York Department of Environmental Conser-
vation,

<em>Defendants</em>.

25 Civ. 3656 (PKC)

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

ADAM R.F. GUSTAFSON
Acting Assistant Attorney General
ROBERT N. STANDER
Deputy Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division
950 Pennsylvania Ave., N.W.
Washington, D.C. 20530
(202) 514-5442

*Of Counsel:*
RILEY W. WALTERS
Counsel to the Acting Assistant Attorney General
JOHN K. ADAMS
Senior Counsel to the Acting Assistant Attorney General
JUSTIN D. HEMINGER
Attorney

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 2

I.      Federal Law Has Traditionally Governed Interstate And Global Pollution,
        Balancing Environmental Protection With Other National Interests .................... 2

II.     New York Enacts A Law Imposing $75 Billion In Penalties On Out-of-
        State Energy Producers For Global Greenhouse Gas Emissions ......................... 6

        A.      The Superfund Act ...................................................................................... 6

        B.      Fossil Fuel Production in New York ............................................................ 8

ARGUMENT .................................................................................................................... 10

I.      The Clean Air Act Preempts The Superfund Act. ............................................... 11

        A.      The Clean Air Act Precludes State-Imposed Liability for Out-of-
                State Greenhouse Gas Emissions. ............................................................ 13

        B.      The Superfund Act Impermissibly Imposes Liability under New
                York Law for Out-of-State Greenhouse Gas Emissions ........................... 15

                1.      The Act impermissibly regulates in the field of interstate
                        greenhouse gas emissions. ............................................................ 15

                2.      The Superfund Act conflicts with the Clean Air Act ................... 16

II.     The Superfund Act Exceeds Constitutional Limits On Extraterritorial
        Regulation. ........................................................................................................... 21

        A.      State Law Cannot Govern Out-of-State Greenhouse Gas
                Emissions. ................................................................................................. 22

        B.      The Constitution Broadly Imposes Territorial Limits on the
                Exercise of State Power. ........................................................................... 23

        C.      The Superfund Act Directly Regulates Conduct Outside New York
                that Bears No Discernible Connection to the State .................................. 24

i

III.    The Foreign Affairs Doctrine Preempts The Superfund Act. .............................................27

        A.    The Superfund Act Conflicts with U.S. Foreign Policy. .......................................28

        B.    The Superfund Act Intrudes into the Field of Foreign Affairs
              Without Addressing a Traditional State Responsibility........................................31

IV.    The Superfund Act Violates The Commerce Clause.........................................................32

CONCLUSION ............................................................................................................................35

CERTIFICATE OF COMPLIANCE ...........................................................................................36

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Am. Booksellers Found. v. Dean*,
    342 F.3d 96 (2d Cir. 2003) ............................................................................ 24, 25

*Am. Elec. Power Co., Inc. (AEP) v. Connecticut*,
    564 U.S. 410 (2011) ........................................................................... passim

*Am. Ins. Ass'n v. Garamendi*,
    539 U.S. 396 (2003) ...................................................................... 27, 28, 31

*Arizona v. United States*,
    567 U.S. 387 (2012) ............................................................................ 10, 12

*Arkansas-Platte & Gulf P'ship v. Van Waters & Rogers, Inc.*,
    981 F.2d 1177 (10th Cir. 1993) .............................................................. 19

*Ass'n for Accessible Medicines v. Ellison*,
    140 F.4th 957 (8th Cir. 2025) ................................................................. 33

*Baldwin v. G.A.F. Seelig, Inc.*,
    294 U.S. 511 (1935) ................................................................................. 23

*Barclays Bank PLC v. Franchise Tax Bd. of Cal.*,
    512 U.S. 298 (1994) ................................................................................. 34

*Bell v. Cheswick Generating Station*,
    734 F.3d 188 (3d Cir. 2013) ................................................................... 14

*BMW of N. Am., Inc. v. Gore*,
    517 U.S. 559 (1996) ................................................................ 20, 21, 24, 27

*Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty.*,
    582 U.S. 255 (2017) ................................................................................. 23

*Carolina Trucks & Equip., Inc. v. Volvo Trucks of N. Am., Inc.*,
    492 F.3d 484 (4th Cir. 2007) ................................................................. 23

*Cayuga Indian Nation of N.Y. v. Seneca County*,
    978 F.3d 829 (2d Cir. 2020) ................................................................... 23

*Cipollone v. Liggett Grp., Inc.*,
    505 U.S. 504 (1992) ................................................................................. 19

iii

*City of New York v. Chevron Corp.*,
993 F.3d 81 (2d Cir. 2021) ........................................................................ passim

*Container Corp. of Am. v. Franchise Tax Bd.*,
463 U.S. 159 (1983) ........................................................................ 34

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000) ........................................................................ 29, 35

*CSX Transp., Inc. v. Easterwood*,
507 U.S. 658 (1993) ........................................................................ 19

*Edgar v. MITE Corp.*,
457 U.S. 624 (1982) ........................................................................ 23, 25, 33

*EPA v. EME Homer City Generation*,
572 U.S. 489 (2014) ........................................................................ 18, 24

*Fuld v. Palestine Liberation Org.*,
606 U.S. 1 (2025) ........................................................................ 23

*Gerling Glob. Reinsurance Corp. of Am. v. Gallagher*,
267 F.3d 1228 (11th Cir. 2001) ........................................................................ 23, 26

*Gibbons v. Ogden*,
22 U.S. (9 Wheat.) 1 (1824) ........................................................................ 26

*Grand River Enters. Six Nations, Ltd. v. Boughton*,
988 F.3d 114 (2d Cir. 2021) ........................................................................ 23, 24, 32

*Healy v. Beer Inst., Inc.*,
491 U.S. 324 (1989) ........................................................................ 23, 32

*Hughes v. Oklahoma*,
441 U.S. 322 (1979) ........................................................................ 26

*Hines v. Davidowitz*,
312 U.S. 52 (1941) ........................................................................ 28, 31

*Illinois v. City of Milwaukee*,
406 U.S. 91 (1972) ........................................................................ 3, 11, 12, 22

*Illinois v. City of Milwaukee*,
731 F.2d 403 (7th Cir. 1984) ........................................................................ 16

iv

*In re Assicurazioni Generali, S.P.A.*,
  592 F.3d 113 (2d Cir. 2010) ............................................................ 27

*Int'l Paper Co. v. Ouellette*,
  479 U.S. 481 (1987) ................................................................ passim

*Japan Line, Ltd. v. County of Los Angeles*,
  441 U.S. 434 (1979) .................................................................. 30, 34

*Kraft Gen. Foods, Inc. v. Iowa Dep't of Revenue & Finance*,
  505 U.S. 71 (1992) .................................................................... 33, 34

*Mallory v. Norfolk S. Ry. Co.*,
  600 U.S. 122 (2023) .................................................................. 22, 23

*Massachusetts v. EPA*,
  549 U.S. 497 (2007) ..................................................................... 4, 17

*Merrick v. Diego Americas Supply, Inc.*,
  805 F.3d 685 (6th Cir. 2015) ............................................................ 14

*Morrison v. National Australia Bank Ltd.*,
  561 U.S. 247 (2010) ...................................................................... 30

*Morrison v. Olson*,
  487 U.S. 654 (1988) ...................................................................... 16

*Movsesian v. Victoria Versicherung AG*,
  670 F.3d 1067 (9th Cir. 2012) .......................................... 27, 30, 31, 32

*N. Carolina, ex rel. Cooper v. TVA*,
  615 F.3d 291 (4th Cir. 2010) ............................................................ 14

*N.Y. Pub. Int. Rsch. Grp. v. Whitman*,
  321 F.3d 316 (2d Cir. 2003) .............................................................. 3

*Nat'l Foreign Trade Council v. Natsios*,
  181 F.3d 38 (1st Cir. 1999) ............................................................. 34

*Nat'l Pork Producers Council v. Ross*,
  598 U.S. 356 (2023) ................................................................ passim

*New Energy Co. of Indiana v. Limbach*,
  486 U.S. 269 (1988) ...................................................................... 33

*Ray v. Atl. Richfield Co.*,
  435 U.S. 151 (1978) ................................................................... 17

*Sprietsma v. Mercury Marine*,
  537 U.S. 51 (2002) ..................................................................... 29

*State Farm Mut. Auto. Ins. v. Campbell*,
  538 U.S. 408 (2003) ................................................................... 24

*Tex. Indus., Inc. v. Radcliff Materials, Inc.*,
  451 U.S. 630 (1981) ................................................... 2, 11, 21, 22

*United States v. Locke*,
  529 U.S. 89 (2000) ..................................................................... 12

*Util. Air Regul. Grp. v. EPA*,
  573 U.S. 302 (2014) ................................................................. 3, 4

*Vermont Agency of Nat. Res. v. United States ex rel. Stevens*,
  529 U.S. 765 (2000) ................................................................... 11

*Von Saher v. Norton Simon Museum of Art at Pasadena*,
  592 F.3d 954 (9th Cir. 2010) ..................................................... 31

*Watson v. Emps. Liab. Assurance Corp.*,
  348 U.S. 66 (1954) ..................................................................... 24

*Young v. Masci*,
  289 U.S. 253 (1933) ................................................................... 25

*Zschernig v. Miller*,
  389 U.S. 429 (1968) ..................................................... 27, 31, 32

**Statutes**

33 U.S.C. § 1370 ............................................................................ 14

42 U.S.C. § 7401 *et seq.* ................................................................. 3

42 U.S.C. § 7401(a)(3) .............................................................. 17, 18

42 U.S.C. § 7410 ............................................................................ 14

42 U.S.C. § 7410(a)(2)(D)(i) ........................................................... 18

42 U.S.C. § 7411(a)(1) .................................................................... 4

42 U.S.C. § 7411(d) ............................................................................ 14

42 U.S.C. § 7416 ............................................................................... 14

42 U.S.C. § 7426(b) ........................................................................... 19

42 U.S.C. § 7506a(a) .......................................................................... 19

42 U.S.C. § 7604(e) ........................................................................... 14

Pub. L. No. 100-204, 101 Stat. 1331 (1987) (reprinted at 15 U.S.C. § 2901 note) ................. 5, 28

N.Y. Energy Law § 1-103(7) .................................................................... 7

N.Y. Energy Law § 1-103(8) .................................................................... 7

S.2129-B, Chapter 679, New York Laws of 2024,
    as amended by S.824 (Feb. 28, 2025) ................................................. passim

2025 N.Y. Laws ch.100, § 1(1) ................................................................. 33

2025 N.Y. Laws ch.100, § 1(6) ................................................................. 33

N.Y. Envtl. Conserv. Law §§ 76-0101 to 76-0105 ................................................ 6

N.Y. Envtl. Conserv. Law § 76-0101(3) ......................................................... 6

N.Y. Envtl. Conserv. Law § 76-0101(8) .................................................... passim

N.Y. Envtl. Conserv. Law § 76-0101(9) ......................................................... 6

N.Y. Envtl. Conserv. Law § 76-0101(10) ........................................................ 7

N.Y. Envtl. Conserv. Law § 76-0101(12) ........................................................ 7

N.Y. Envtl. Conserv. Law § 76-0101(13) ........................................................ 7

N.Y. Envtl. Conserv. Law § 76-0101(18) ........................................................ 7

N.Y. Envtl. Conserv. Law § 76-0101(21) ..................................................... 7, 25

N.Y. Envtl. Conserv. Law § 76-0103(2)(a) ...................................................... 6

N.Y. Envtl. Conserv. Law § 76-0103(3)(a)–(b) .................................................. 6

**Rules**

Fed. R. Civ. P. 56(a) ................................................................................................ 11

**Other Authorities**

*Declaring a National Energy Emergency*,
Exec. Order No. 14156, 90 Fed. Reg. 8,433 (Jan. 20, 2025) ............................... 5, 28

*Putting America First in International Environmental Agreements*,
Exec. Order No. 14162, 90 Fed. Reg. 8,455 (Jan. 20, 2025) ............................... 6, 28

*Protecting American Energy From State Overreach*,
Exec. Order No. 14260, 90 Fed. Reg. 15,513 (Apr. 8, 2025) ............................... 4, 5

*Regulating Imports With a Reciprocal Tariff To Rectify Trade Practices That Contribute to
Large and Persistent Annual United States Goods Trade Deficits,*
Exec. Order No. 14257, 90 Fed. Reg. 15,041 (Apr. 2, 2025) ............................... 6, 29

S. Res. 98, 105th Cong., 1st Sess. (July 25, 1997) .................................................. 5, 29

United Nations Framework Convention on Climate Change, S. Treaty Doc. No. 102-38,
1771 U.N.T.S. 107 .................................................................................................. 5

Framework Convention, Kyoto Protocol (Dec. 10, 1997), 37 I.L.M. 22 (1998) .......................... 5

## INTRODUCTION

The U.S. Constitution and a century of precedent require that federal law govern the control of interstate and global air pollution. In brazen disregard, the State of New York recently enacted its so-called Climate Change Superfund Act. The Act, which New York touted as "a shot that will be heard round the world," imposes retroactive strict liability and extraordinary monetary penalties—$75 billion in total—on foreign and domestic energy companies that allegedly contributed to *global* greenhouse gas emissions over the course of nearly three decades. Press Release, *Governor Hochul Signs Landmark Legislation Creating New Climate Superfund* (Dec. 26, 2024), https://perma.cc/6KMN-H4UU (Statement of Senator Liz Krueger) ("Press Release"). In so doing, the Act seeks to extend New York's regulatory reach far beyond the State's borders, purporting to police nationwide airspace and, indeed, the entire world.

But it is beyond cavil that New York cannot use its own law to impose liability on energy companies for alleged harm caused by greenhouse gas emissions originating in other states and nations. The Second Circuit recently made this clear when it held that the City of New York could not use "state tort law to hold multinational oil companies liable for the damages caused by global greenhouse gas emissions." *City of New York v. Chevron Corp.*, 993 F.3d 81, 85 (2d Cir. 2021). Undeterred, the State tries to evade that holding by swapping out a tort suit with a statute. That makes no difference. The State's statute, like the City's tort suit, seeks to "impose strict liability" on global energy producers under New York law "for the damages caused by fossil fuel emissions no matter where in the world those emissions were released." *Id.* at 93. That is exactly what the Second Circuit—applying longstanding Supreme Court precedent—said states and localities could not do.

1

By regulating global greenhouse gas emissions based on conduct outside New York—and outside the United States—the Superfund Act flouts federal law and our constitutional structure. First, the Clean Air Act preempts it because it regulates domestic greenhouse gas emissions that originate out of state. Second, the Superfund Act transgresses the Federal Constitution's limits on extraterritorial legislation by nationalizing (and even globalizing) New York's legislative power— a problem even more pronounced when, as here, the legislation intrudes into an inherently federal area. Third, the Foreign Affairs Doctrine preempts the Act because it regulates global greenhouse gas emissions that originate in other nations, interfering with U.S. foreign policy. And fourth, the Act violates the Commerce Clause because it directly regulates out-of-state conduct, discriminates against interstate and foreign commerce, and undermines the national government's ability to speak with one voice when conducting commercial relations with foreign nations.

New York has declared war on those responsible for supplying our Nation with reliable and affordable energy, and it is trampling over federal law in the process. The Court should grant the United States' motion for summary judgment, declare the Superfund Act unconstitutional and unenforceable, and permanently enjoin Defendants from taking any actions to implement or enforce it.

## BACKGROUND

## I.    Federal Law Has Traditionally Governed Interstate And Global Pollution, Balancing Environmental Protection With Other National Interests.

**1.** The Supreme Court has long recognized that "our federal system does not permit [certain] controvers[ies] to be resolved under state law." *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 641 (1981). This includes areas in which "the interstate or international nature of the controversy makes it inappropriate for state law to control." *Id.* For these subjects, the "basic

2

scheme of the Constitution . . . demands" a federal rule of decision. *Am. Elec. Power Co., Inc. (AEP) v. Connecticut*, 564 U.S. 410, 421 (2011).

This is why, since the Founding, federal law has applied to disputes involving cross-boundary pollution, which implicate "uniquely federal interests," including "the conflicting rights of states and our relations with foreign nations." *City of New York*, 993 F.3d at 90–92 (cleaned up) (collecting cases). There is no history or tradition of states regulating interstate, much less global, pollution. And for good reason: If each state could apply its own law in this area, the result would be "an irrational system of regulation" that "lead[s] to chaotic confrontation between sovereign states" and "uncertainty" over the governing legal standard, as polluters would have to comply with the laws "of all states potentially affected by" an otherwise "lawful discharge." *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 496–97 (1987) (quotation marks omitted). Because the structure of our Constitution requires "a uniform rule of decision" for "controvers[ies]" involving interstate pollution, it "demands . . . applying federal law and not the varying . . . law of the individual States." *Illinois v. City of Milwaukee*, 406 U.S. 91, 105 n.6, 107 n.9 (1972). Until Congress acted, interstate pollution was governed by federal common law. *See id.* at 103, 105 n.6; *AEP*, 564 U.S. at 421.

In 1963, Congress enacted (and later amended) the Clean Air Act, 42 U.S.C. § 7401 *et seq.*, "the nation's first modern environmental law," *N.Y. Pub. Int. Rsch. Grp. v. Whitman*, 321 F.3d 316, 319 (2d Cir. 2003). The Clean Air Act creates a comprehensive national program for regulating "pollution-generating emissions from both stationary sources, such as factories and powerplants, and moving sources, such as cars, trucks, and aircraft," subject to various statutory standards for regulation that apply to each type of source. *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302,

3

308 (2014).  Beginning in 1970, Congress vested authority to implement the Clean Air Act in the Environmental Protection Agency ("EPA").  *City of New York*, 993 F.3d at 87.

In *Massachusetts v. EPA*, the Supreme Court concluded that four greenhouse gases, including carbon dioxide and methane, are "air pollutant[s]" under the Clean Air Act, 549 U.S. 497, 528–29 (2007), which puts "the decision whether and how to regulate" greenhouse gas emissions "within EPA's regulatory ken," *AEP*, 564 U.S. at 416, 426.  The Clean Air Act generally "permits emissions *until* EPA acts," and entrusts to EPA "in the first instance" the decision whether air pollutant emissions meet one of the statutory standards for regulation and, if so, the "complex balancing" required for any regulation.  *AEP*, 564 U.S. at 426–27; *see also City of New York*, 993 F.3d at 87, 98.

Indeed, environmental protection must be balanced against other economic and national interests.  *See City of New York*, 993 F.3d at 93 (recognizing the "careful balance" that must be struck between environmental protection, on the one hand, and "energy production, economic growth, foreign policy, and national security, on the other").  Chief among these interests is ensuring that the Nation maintains a reliable energy supply—an objective that Congress, the Supreme Court, and the President have all emphasized.  *See* 42 U.S.C. § 7411(a)(1) (requiring stationary source emission standards to reflect "the cost of achieving such [emissions] reduction and any nonair quality health and environmental impact and energy requirements"); *AEP*, 564 U.S. at 427 (explaining that "the environmental benefit potentially achievable" through regulation must be weighed against "our Nation's energy needs and the possibility of economic disruption").  The President recently explained that maintaining "[a]n affordable and reliable domestic energy supply" is "essential to the national and economic security of the United States, as well as our foreign policy."  *Protecting American Energy From State Overreach*, Exec. Order No. 14260, § 1, 90 Fed.

4

Reg. 15,513 (Apr. 8, 2025). And earlier this year he declared a national energy emergency, finding that "[t]he United States' insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy." *Declaring a National Energy Emergency*, Exec. Order No. 14156, § 1, 90 Fed. Reg. 8,433, 8,434 (Jan. 20, 2025).

**2.** Because climate change "is a global problem that the United States cannot confront alone," the federal government "has worked cooperatively with foreign governments through diplomatic channels" to address the issue. *City of New York*, 993 F.3d at 88. Congress directed the executive branch to develop a "coordinated national policy on global climate change" through the Global Climate Protection Act, Pub. L. No. 100-204, Title XI, § 1103, 101 Stat. 1331, 1407–09 (1987) (reprinted at 15 U.S.C. § 2901 note), and the federal government has been carefully coordinating and refining that policy for decades. Since 1992, for example, the United States has been party to the Senate-ratified United Nations Framework Convention on Climate Change, S. Treaty Doc. No. 102- 38, 1771 U.N.T.S. 107, which creates a framework for international cooperation and contemplates protocols and other agreements to address greenhouse gas emissions.

At the same time, the United States has rejected more restrictive measures, recognizing that more regulation does not always serve national interests. The United States is not, for example, party to the Kyoto Protocol of 1997, *see* Framework Convention, Kyoto Protocol (Dec. 10, 1997), 37 I.L.M. 22 (1998), which set binding greenhouse gas emission reduction targets on certain Framework Convention parties, S. Res. 98, 105th Cong., 1st Sess. (July 25, 1997). More recently, in January 2025, the President ordered the withdrawal of the United States from the 2015 Paris Climate Agreement—which also seeks to curb greenhouse gas emissions—because of the unfair

economic burden the Agreement imposed on American workers, businesses, and taxpayers, especially when the United States has already "reduced air and water pollution, and reduced greenhouse gas emissions." *Putting America First in International Environmental Agreements*, Exec. Order No. 14162, §§ 1–3(a), 90 Fed. Reg. 8,455, 8,455 (Jan. 20, 2025). And in April 2025, the President specifically exempted "energy and energy products" from the reciprocal tariffs he imposed on imports from U.S. trading partners. *Regulating Imports With a Reciprocal Tariff To Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits*, Exec. Order No. 14257, § 3(b), 90 Fed. Reg. 15,041, 15,045–46 (Apr. 2, 2025).

## II.    New York Enacts A Law Imposing $75 Billion In Penalties On Out-of-State Energy Producers For Global Greenhouse Gas Emissions.

### A.    The Superfund Act

In December 2024, New York enacted its Superfund Act, which it amended in February 2025. *See* S.2129-B, Chapter 679, Laws of 2024 as amended by S.824 (Feb. 28, 2025), N.Y. Envtl. Conserv. Law §§ 76-0101 to 76-0105 (McKinney's 2025). The Act levies retroactive penalties on major energy companies, under a strict liability standard, for what New York alleges is each company's pro rata contribution to "worldwide" greenhouse gas emissions from 2000 to 2024. S.2129-B § 2(4)–(5); N.Y. Envtl. Conserv. Law §§ 76-0101(8)–(9), 76-0103(3)(a)–(b). It then funnels those penalty dollars—$75 billion in total—into a fund for in-state infrastructure projects that have supposedly been necessitated by climate change. S.2129-B § 2(4), (6)(a); *see* N.Y. Envtl. Conserv. Law § 76-0101(3), (9); *id.* § 76-0103(2)(a) (stating that the Act imposes liability "based on a standard of strict liability to provide a source of revenue for climate change adaptive infrastructure projects within the state"). The Superfund Act is in full effect. *See* S.2129-B, § 8 ("This act shall take effect immediately."), as amended by S.824 (effective same date as the underlying chapter, which is December 26, 2024).

6

New York explains that this scheme "shifts the cost of climate adaption from everyday New Yorkers to the fossil fuel companies most responsible for the pollution," much like the City argued in its related nuisance litigation. Press Release, *supra*; S.824 § 1(5) (explaining that producers should pay for the "historic greenhouse gas emissions attributable to greenhouse gas-producing fossil fuels which they are responsible for extracting and refining, because the use of products derived from fossil fuels caused such pollution"); *compare City of New York*, 993 F.3d at 86 ("[T]he City suggests that a group of large fossil fuel producers are primarily responsible for global warming and should bear the brunt of [mitigation] costs."). Or, as the Act's lead sponsor in the State Assembly put it, "We refuse to let the entire burden of climate change fall on the backs of our taxpayers while Big Oil reaps record profits at the expense of our future." Press Release, *supra* (Statement of Assemblymember Jeffrey Dinowitz).

Those forced to pay are called "responsible parties" and include "any entity . . . , which, during any part of the covered period [2000 to 2024] was engaged in the trade or business of extracting fossil fuel or refining crude oil and is determined by [the New York Department of Environmental Conservation] to be responsible for more than one billion tons of covered greenhouse gas emissions." N.Y. Envtl. Conserv. Law § 76-0101(21). "Covered greenhouse gas emissions" are emissions "attributable to the total amount of fossil fuels extracted by that entity during the covered period, as well as the total amount of crude oil refined[.]" *Id.* § 76-0101(8).

The Act thus targets entities that (1) extract fossil fuel, which is defined as coal, petroleum products, fuel gases, and natural gas, or (2) refine oil. *See id.* §§ 76-0101(10), (12), (13), (18); *see also* N.Y. Energy Law § 1-103(7), (8). And a covered entity is on the hook for "emissions attributable to all fossil fuel extraction and refining *worldwide* by such entity." N.Y. Envtl. Conserv. Law

§ 76-0101(8) (emphasis added).  Covered emissions, therefore, "are *not* limited to such emissions within the state."  *Id.* (emphasis added).

In October 2023—before the Act's passage—the legislative sponsors circulated a memorandum identifying 38 energy producers they expect will owe "an assessment" under the Act.[1] Walters Decl., Ex. A.  Half of the producers listed in the memorandum are foreign companies, including Saudi Aramco, Lukoil (Russia), Suncor (Canada), and BP (United Kingdom), among many others.  Ex. A at 2.  According to the memorandum, Saudi Aramco will owe over $16 billion, Exxon Mobil will owe over $5.5 billion, and BP will owe over $4.5 billion.  Ex. A at 2.

### B. Fossil Fuel Production in New York

The Superfund Act will overwhelmingly burden fossil fuel production outside New York. That is because little-to-no relevant production takes place, or has taken place since 2000, within the State, despite New York's rank as the Nation's fifth-largest consumer of petroleum and its sixth-largest consumer of natural gas.  U.S. Energy Info. Admin., New York, State Profile and Energy Estimates, https://perma.cc/QR57-JU7E (last updated Jan. 16, 2025) ("State Profile").

For instance, according to a U.S. Government publication,[2] New York produces only a "small amount of crude oil," all of which "is shipped to out-of-state refineries."  *Id.*  Although New York was once a heavy producer of crude oil, all in-state refineries closed by the end of the

---

[1] The memorandum was based on a prior but substantially similar version of the Act that contemplated aggregate penalties of $3 billion per year for 25 years.  *See* S.824 § 1, subd. 6(c).

[2] "The U.S. Energy Information Administration (EIA) is the statistical and analytical agency within the U.S. Department of Energy.  EIA collects, analyzes, and disseminates independent and impartial energy information to promote sound policymaking, efficient markets, and public understanding of energy and its interaction with the economy and the environment."  U.S. Energy Info. Admin., About EIA, Mission and Overview, https://www.eia.gov/about/mission_overview.php. EIA's "data, analyses, and forecasts are independent of approval by any other officer or employee of the U.S. government."  *Id.*

20th Century. *Id.*; U.S. Energy Info. Admin., New York Field Production of Crude Oil, https://perma.cc/LZ5M-U86V (last updated June 30, 2025). Thus, from 2000 to 2024—the Act's covered period—New York had zero operating oil refineries. U.S. Energy Info. Admin., New York Number of Operable Refineries as of January 1, 1982-2025, https://perma.cc/DH79-C83D (last updated June 20, 2025). And the crude oil New York does produce pales in comparison to production in other states. For example, in 2020, New York produced 238,000 barrels of crude oil, compared to over 5 million barrels in Pennsylvania, over 19 million barrels in West Virginia, and nearly 2 billion barrels in Texas. U.S. Energy Info. Admin., Crude Oil Production, https://perma.cc/UN9G-KKGC (last updated June 30, 2025). Accordingly, imports supply New York's consumption. State Profile, *supra* ("Crude oil refineries in New Jersey and Pennsylvania, refined product pipelines from the Gulf Coast and the Midwest, and imports, mostly from Canada, provide the petroleum products consumed in New York.").

For natural gas, it is much the same story. "Most of the natural gas consumed in New York is produced in other states." *Id.*; U.S. Energy Info. Admin., International & Interstate Movements of Natural Gas by State (New York), https://perma.cc/H4XL-CZFF (last updated June 30, 2025) (showing that in recent years New York received around 1 trillion cubic feet of natural gas annually from Pennsylvania). That is because, for years, New York has scaled back natural gas production to reduce greenhouse gas emissions. N.Y. State Energy Rsch. & Dev. Auth., *Accelerating the Transition*, https://www.nyserda.ny.gov/Goals-Accelerating-the-Transition (last visited July 1, 2025) ("To achieve New York's climate goals, we're working to move away from our reliance on natural gas—a fossil fuel that contributes to climate change—to heat homes and businesses, generate electricity, and power industrial processes."); State Profile, *supra* ("In 2014, New York's

9

governor banned hydraulic fracturing, and in 2020 the state legislature made the fracking ban permanent. The legislature expanded the fracking ban in 2024 by prohibiting the use of carbon dioxide as a drilling agent to extract crude oil and natural gas from shale rock."). In 2023, in-state natural gas production reached its lowest point since 1975. State Profile, *supra*.

Nor does the State have "any coal mines or economically recoverable coal reserves." *Id.* New York has no real need for them—its "last coal-fired power plant closed in 2020," and in 2023, "New York was one of nine states that did not have any utility-scale coal-fired electricity generation." *Id.*

All told, fossil fuel production in New York is less than production in other states by orders of magnitude. *Compare* U.S. Energy Info. Admin., State Energy Production Estimates 1960 Through 2022 at 80, https://www.eia.gov/state/seds/sep_prod/SEDS_Production_Report.pdf (2023), *with, e.g.*, *id.* at 52 (Louisiana), 92 (Pennsylvania), 102 (Texas), 112 (West Virginia). For example, in 2012, New York produced no coal, 26 billion cubic feet of natural gas, and 362,000 barrels of crude oil. *Id.* at 80. By contrast, in the same year, Pennsylvania produced 55 million short tons of coal, 2 trillion cubic feet of natural gas, and 4 million barrels of crude oil. *Id.* at 92. New York thus depends on imports to meet nearly 85 percent of its energy needs. State Profile, *supra*.

## ARGUMENT

New York's Superfund Act is a transparent attempt to expropriate $75 billion and build a nest egg for in-state infrastructure projects—paid for directly by out-of-state (including foreign) businesses, and indirectly by Americans and individuals across the world who will face higher energy prices. The Superfund Act usurps federal jurisdiction and thus directly impairs the United States' sovereign interest in the recognition of its laws and the preservation of our Nation's federal

structure. *See Arizona v. United States*, 567 U.S. 387, 398 (2012) ("Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect."); *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000) ("It is beyond doubt" that the United States suffers an "injury to its sovereignty arising from the violation of its laws (which suffices to support a criminal lawsuit by the Government)."). And each violation of federal law here stems from the same dispositive fact: The Act, on its face and by design, targets emissions and conduct occurring nationwide and globally, thereby exceeding the State's authority and intruding on areas that the Constitution reserves exclusively for federal law. More than that, New York does all this in service of a destructive scheme that imperils our Nation's energy needs and deepens the national energy crisis. The Court should enter summary judgment for the United States. *See* Fed. R. Civ. P. 56(a).

## I.    The Clean Air Act Preempts The Superfund Act.

The Clean Air Act preempts New York's attempt to impose liability for greenhouse gas emissions originating in other states. Even before the Clean Air Act, federal law occupied the field of interstate air pollution regulation. *City of New York*, 993 F.3d at 98 (interstate air pollution is "not . . . a field in which the states have traditionally occupied" (cleaned up)). Indeed, "[f]or over a century, a mostly unbroken string of cases has applied federal law to disputes involving interstate air or water pollution." *Id.* at 91 (collecting cases). That is because "our federal system does not permit . . . controvers[ies]" involving interstate pollution "to be resolved under state law." *Tex. Indus.*, 451 U.S. at 641. Instead, federal law must govern such controversies because they implicate "an overriding federal interest in the need for a uniform rule of decision" as well as "basic interests of federalism." *Milwaukee*, 406 U.S. at 105 n.6; *id.* at 105 n.6, 107 n.9 (emphasizing that the issue "demands . . . applying federal law," not the "varying . . . law of the individual States").

Absent a statutory rule of decision from Congress, federal common law supplied the governing framework. *Id.* at 103, 105 n.6; *AEP*, 564 U.S. at 421; *City of New York*, 993 F.3d at 90–95.

With the passage of the Clean Air Act, Congress displaced the federal common law that previously governed interstate air pollution. *AEP*, 564 U.S. at 424; *City of New York*, 993 F.3d at 95–96. But that displacement did not suddenly make state law competent to govern in this field— a field "which the states have traditionally *not* occupied." *City of New York*, 993 F.3d at 98; *United States v. Locke*, 529 U.S. 89, 108 (2000) (recognizing that in some areas "there is no beginning assumption that concurrent regulation by the State is a valid exercise of its police powers"). Rather, "resorting to state law on a question previously governed by federal common law is permissible only to the extent authorized by federal statute." *City of New York*, 993 F.3d at 99 (cleaned up). Said another way, "federal legislation now occupie[s] the field" and determines what role, if any, there is for state law in this area. *Ouellette*, 479 U.S. at 489, 492; *City of New York*, 993 F.3d at 99.

And far from authorizing the application of state law, the Clean Air Act "is sufficiently comprehensive to make reasonable the inference that Congress left no room for supplementary state regulation" of out-of-state air pollutants. *Ouellette*, 479 U.S. at 491 (quotation marks omitted); *see Arizona*, 567 U.S. at 399. What is more, state efforts to police such pollutants under their own law conflict with the Clean Air Act's text, structure, and purposes because they obstruct its comprehensive framework and EPA's carefully bounded regulatory discretion. *See Arizona*, 567 U.S. at 399–400; *City of New York*, 993 F.3d at 99–100. Accordingly, the Clean Air Act preempts the Superfund Act.

12

### A.     The Clean Air Act Precludes State-Imposed Liability for Out-of-State Greenhouse Gas Emissions.

The Clean Air Act creates a comprehensive program for regulating air pollutants in the United States—including greenhouse gases such as carbon dioxide and methane—that generally allows emissions until EPA determines that one or more statutory standards for regulatory controls are satisfied.  Because the Clean Air Act operates in a field—interstate air pollution—that state law has "traditionally *not* occupied," New York cannot "resort[] to state law" to regulate greenhouse gas emissions unless specifically "authorized by" the Clean Air Act.  *City of New York*, 993 F.3d at 98–99 (cleaned up); *Ouellette*, 479 U.S. at 492; *AEP*, 564 U.S. at 429.  And under the statute, only a "slim reservoir" of state authority exists in this area:  State-imposed liability must be based on "the law of the pollution's *source* state."  *City of New York*, 993 F.3d at 100 (cleaned up) (quoting *Ouellette*, 479 U.S. at 497); *see also AEP*, 564 U.S. at 429.  Or said differently, at the state level, air pollutants are subject only to *source state* law—the Clean Air Act, like the federal common law that preceded it, occupies the field of *interstate* regulation and preempts any effort by a state to police out-of-state emissions under in-state law.

**1.**  When considering preemption in this context, courts have emphasized that interstate pollution is an inherently federal issue that has historically been governed exclusively by federal law.  *See Ouellette*, 479 U.S. at 487–91; *see generally City of New York*, 993 F.3d 81.  *Ouellette* illustrates the analysis.  There, the Supreme Court addressed whether the Clean Water Act preempted a tort suit under Vermont law seeking relief for injuries caused by pollution emitted in New York.  479 U.S. at 484.  Relying on the Clean Water Act's "comprehensive" and "pervasive regulation" of water pollution, and the reality that "control of interstate pollution is primarily a matter of federal law," the Court framed the inquiry as whether the Clean Water Act "specifically preserved" the application of state law to water pollution that originates in another state.  *Id.* at

13

492.  The Court answered no, holding that the Clean Water Act precluded "applying the law of an affected State" to impose liability on "an out-of-state source."  479 U.S. at 494.  Instead, the Court interpreted the statute's savings clause—which permits states to adopt and enforce stricter standards than required by the Clean Water Act, 33 U.S.C. § 1370—to permit liability under state law only if "pursuant to the law of the source [s]tate," *Ouellette*, 479 U.S. at 497.  A contrary rule, the Court reasoned, would "undermine" the comprehensive "regulatory structure" created by Congress in the Clean Water Act.  *Id.* at 497; *see also id.* at 493 ("if affected States were allowed to impose separate discharge standards on a single point source, the inevitable result would be a serious interference with the achievement of the 'full purposes and objectives of Congress'").

Relying on *Ouellette*, the Court in *AEP* instructed lower courts to determine "the availability *vel non* of" state law liability for greenhouse gas emissions in light of the Clean Air Act's "preemptive effect."  564 U.S. at 429; *Merrick v. Diego Americas Supply, Inc.*, 805 F.3d 685, 692–93 (6th Cir. 2015) ("Clean Water Act precedents are persuasive with respect to the Clean Air Act because many provisions in the Clean Water Act—including the savings clauses—were modeled on the Clean Air Act[.]"); *Bell v. Cheswick Generating Station*, 734 F.3d 188, 196 (3d Cir. 2013) (finding "no meaningful difference between the Clean Water Act and the Clean Air Act for the purposes of [the] preemption analysis"); *N. Carolina, ex rel. Cooper v. TVA*, 615 F.3d 291, 306 (4th Cir. 2010) (*Ouellette*'s "holding is equally applicable to the Clean Air Act").

**2.**  The Second Circuit followed that instruction in *City of New York*, holding that "the Clean Air Act does not authorize" the City to "recover damages for the harms caused by global greenhouse gas emissions . . . under New York law."  993 F.3d at 91, 99.  Rather, as relevant here, the Clean Air Act's "cooperative federalist approach" authorizes application of state law in two "narrowly circumscribed" ways.  *Id.* at 99–100.

14

First, it "permits each state to take the first cut at determining how best to achieve EPA . . . standards *within its domain*." *Id.* at 99 (cleaned up); 42 U.S.C. §§ 7410, 7411(d). And second, its two savings clauses, which are "nearly identical [to the] savings clauses in the Clean Water Act," "permit states to create and enforce their own emissions standards applicable to *in-state polluters*." *Id.* (emphasis added); 42 U.S.C. § 7604(e) ("Nothing in this section shall restrict any right which any person . . . may have under any statute or common law to seek enforcement of any emission standard or limitation or to seek any other relief"); *id.* § 7416 (states may "adopt or enforce" emissions standards so long as they are not "less stringent" than federal standards).

So like the Clean Water Act, the Clean Air Act's savings clauses "permit only [state-imposed liability] under 'the law of the pollution's *source* state.'" *City of New York*, 993 F.3d at 100 (cleaned up) (quoting *Ouellette*, 479 U.S. at 497). And that makes sense, as such regulation would still be *intrastate* in nature—the polluter need only answer to source-state law. Because the City sought to impose "New York nuisance standards on emissions emanating simultaneously from all 50 states and the nations of the world," the court held that the Clean Air Act preempted the claims. *Id.* That result did not turn on the source of law the City was trying to enforce. The court's analysis focused entirely (and correctly) on the shape of *federal* law; it was irrelevant that the case involved liability imposed through a common law tort suit rather than through a statute. *See infra* at 19.

**B.     The Superfund Act Impermissibly Imposes Liability under New York Law for Out-of-State Greenhouse Gas Emissions.**

**1.     The Act impermissibly regulates in the field of interstate greenhouse gas emissions.**

The same analysis and result follow here. Given the inherently federal nature of the issue and the national concerns it implicates, *see supra* at 2–3, 11–12, the Clean Air Act must affirmatively "authorize" state regulation of interstate air pollution, *City of New York*, 993 F.3d at 99

(cleaned up); *see Ouellette*, 479 U.S. at 492; *Illinois v. City of Milwaukee*, 731 F.2d 403, 411 (7th Cir. 1984). And as with the state tort suit in *City of New York*, the Superfund Act "does not seek to take advantage of th[e] slim reservoir of state" regulation authorized by that statute in this area. *City of New York*, 993 F.3d at 100.

The Superfund Act instead openly regulates interstate air emissions, which is a field that has always been occupied by federal law, both before and after the Clean Air Act was enacted, because of our constitutional structure and the inherently interstate (indeed, global) nature of the issue. The Superfund Act's plain text gives away the game by unabashedly targeting "emissions attributable to all fossil fuel extraction and refining *worldwide* by" certain entities and openly declaring that its scope is "*not limited to such emissions within the state*." N.Y. Envtl. Conserv. Law § 76-0101(8) (emphasis added); *see also* Ex. A. New York is thus candid about its "inten[t] to hold [businesses] liable, under New York law, for the effects of emissions made around the globe over the past [three decades]." *City of New York*, 993 F.3d at 92. Simply put, "this wolf comes as a wolf." *Morrison v. Olson*, 487 U.S. 654, 699 (1988) (Scalia, J., dissenting).

Because New York's "sprawling [statute] is simply beyond the limits of state law," it is preempted on this basis alone. *City of New York*, 993 F.3d at 92; *see also id.* at 98 (stressing that state law is not "competent to address" out-of-state greenhouse gas emissions); *Ouellette*, 479 U.S. at 492 ("the control of interstate pollution is primarily a matter of federal law").

### 2.    The Superfund Act conflicts with the Clean Air Act.

The Superfund Act also conflicts with the text, structure, and purposes of the Clean Air Act. *Ouellette*, 479 U.S. at 494. As explained, "[t]he Clean Air Act is a comprehensive statutory scheme that anoints EPA as the 'primary regulator of [domestic] greenhouse gas emissions.'" *City of New York*, 993 F.3d at 99 (quoting *AEP*, 564 U.S. at 428). EPA is thus responsible for deciding

whether and how to regulate such emissions on a nationwide basis. *AEP*, 564 U.S. at 426. This is no small task, as determining the "appropriate amount of regulation in any particular greenhouse gas-producing sector" requires "informed assessment of competing interests." *Id.* at 427. On the one hand is "the environmental benefit potentially achievable," and on the other is "our Nation's energy needs and the possibility of economic disruption." *Id.* Through the Clean Air Act, Congress "entrust[ed] such complex balancing to EPA in the first instance." *Id.*

The Superfund Act thwarts the discretion Congress gave EPA to balance environmental, economic, and energy concerns in regulating air pollutants. *AEP*, 564 U.S. at 427; *City of New York*, 993 F.3d at 93. The Clean Air Act grants EPA authority to set nationwide standards, based on its expert judgment, when it determines that emissions meet applicable statutory standards for regulation. And when EPA makes that determination, the Clean Air Act provides detailed instructions on the nature of resulting regulations and relevant considerations. *See, e.g.*, *AEP*, 564 U.S. at 424. New York, through the Superfund Act, wrests that authority from EPA by imposing its own nationwide standard of retroactive strict liability for harms allegedly tied to global emissions, a standard neither Congress nor EPA authorized. *See* 42 U.S.C. § 7401(a)(3) (specifying "air pollution control at its source," not by imposing retroactive liability for out-of-state emissions).

Importantly, state regulation in this area conflicts with the Clean Air Act even if EPA determines that regulation is *not* appropriate. Under current law, "the decision *whether* and how to regulate" interstate emissions rests with EPA, not individual states. *AEP*, 564 U.S. at 426 (emphasis added); *Massachusetts*, 549 U.S. at 528–29. In fact, "[t]he Clean Air Act . . . permits emissions *until* EPA acts," so even if EPA were "to decline to regulate [greenhouse gas] emissions altogether," states would still "have no warrant . . . to upset the Agency's expert determination." *AEP*, 564 U.S. at 426; *see also Ray v. Atl. Richfield Co.*, 435 U.S. 151, 178 (1978) (state law

17

preempted "where failure of federal officials affirmatively to exercise their full authority takes on the character of a ruling that no such regulation is appropriate or approved pursuant to the policy of the statute" (cleaned up)).

And more fundamentally, even if Congress had *barred* EPA from regulating interstate emissions of carbon dioxide, methane, or other greenhouse gases under the Clean Air Act, state law would still have no role to play. After all, it would be "too strange to seriously contemplate" that state law "suddenly become[s] presumptively competent to address [an] issue[] that demand[s] a unified federal standard simply because Congress" decided not to regulate in that area. *City of New York*, 993 F.3d at 98–99. Again, the control of interstate air pollution is an inherently federal question necessarily governed by federal law, and however one interprets the Clean Air Act, it plainly does not "authorize" resort to *state law* to regulate out-of-state greenhouse gas emissions. *Id.* at 99.

The Superfund Act also squarely conflicts with the Clean Air Act's comprehensive system for regulating cross-boundary air pollution, under which each state is alone responsible for controlling air pollution within its borders. *See* 42 U.S.C. § 7401(a)(3) ("[A]ir pollution control at *its source* is the primary responsibility of States and local governments." (emphasis added)). Congress added to the Clean Air Act's National Ambient Air Quality Standards ("NAAQS") program the "Good Neighbor Provision"—which requires upwind states to reduce emissions that affect air quality in downwind states, *id.* § 7410(a)(2)(D)(i)—precisely *because* downwind states "lack authority to control" the "influx of out-of-state pollution," *EPA v. EME Homer City Generation*, 572 U.S. 489, 495 (2014); *see also id.* (observing that Congress added the Good Neighbor Provision to address "a complex problem: air pollution emitted in one State, but causing harm in other States").

18

The Clean Air Act thus contemplates no role for states reaching out and applying their law in *other* states.  Rather, the Clean Air Act affords affected states specific avenues for voicing their cross-boundary pollution concerns to EPA—for example, by petitioning EPA for action on inter-state pollution after the agency has identified a criteria pollutant under the NAAQs program.  *See, e.g.*, 42 U.S.C. § 7506a(a) (permitting states to petition EPA when "interstate transport of air pol-lutants" from other states contributes to a violation of a NAAQ standard in the petitioning state); *id.* § 7426(b) (similar).  Allowing states to regulate out-of-state emissions in other ways works an end-run around these statutory provisions and clashes with the text, structure, and objectives of the Clean Air Act by "undermin[ing] [its] carefully drawn" terms.  *Ouellette*, 479 U.S. at 494; *City of New York*, 993 F.3d at 100.  And this analysis is the same regardless whether a state imposes liability through a nuisance suit, as in *City of New York*, or by doing the same thing through a statute, as here, because preemption is based on the *federal* laws in question—the source of the preempted state law is irrelevant unless Congress intended otherwise.  *See CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993) (holding that preemption provision applied to both state statutes and common law claims); *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 522 (1992) (same); *Arkansas-Platte & Gulf P'ship v. Van Waters & Rogers, Inc.*, 981 F.2d 1177, 1179 (10th Cir. 1993) (same preemption analysis because "[t]he objectives of the common law duty and a regula-tory statute [we]re the same").  Were it otherwise, evading the Supremacy Clause would turn into little more than an exercise in artful pleading.  *Cf. City of New York*, 993 F.3d at 91.

Consider, too, if laws like the Superfund Act were upheld.  The Act provides a blueprint for other states to enact their own liability regimes—indeed, one of the Act's lead sponsors made clear that New York is "setting a precedent for the nation to follow."  Press Release, *supra* (state-ment of Assemblymember Jeffrey Dinowitz).  Vermont has already enacted a similar law, and

several other states are considering their own legislation.[3] If the fifty states (and the thousands of political subdivisions within them) could apply their own laws in this area, the Nation would be left with a chaotic patchwork of conflicting regulations—some states would regulate more, some less—that undermine the Clean Air Act's integrated approach to air pollution control and regulation. *See Ouellette*, 479 U.S. at 496–97 ("For a number of different states to have independent and plenary regulatory authority over a single discharge would lead to chaotic confrontation between sovereign states" and produce "an irrational system of regulation." (cleaned up)); *City of New York*, 993 F.3d at 90–95.

Such chaos would also enable New York and other states to "do indirectly what they could not do directly—regulate the conduct of out-of-state sources" through the imposition of crippling liabilities, thereby forcing out-of-state companies to "change [their] methods of doing business and controlling pollution to avoid the threat of ongoing liability." *Ouellette*, 479 U.S. at 495. And "these liabilities would attach even though the source had complied fully with its state and federal . . . obligations." *Id.* That dynamic would "undermine [the] regulatory structure" of the Clean Air Act and "effectively override . . . the policy choices made by" the federal government and other states, *id.* at 495–97, not to mention throttle national energy production.

Finally, it is irrelevant that the Superfund Act declares itself "remedial in nature." S.2129-B § 2(8). That is because "regulation can be effectively exerted through an award of damages, and the obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy." *City of New York*, 993 F.3d at 92 (cleaned up); *see also BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 572 & n.17 (1996) ("Regulation can be as effectively exerted through an award of damages as through some form of preventive relief" (cleaned

---

[3] *See Polluters Pay: How States are Filling the Federal Climate Funding Gap in 2025*, NCEL (March 3, 2025), https://perma.cc/82CT-482U (last visited July 11, 2025).

up)).  If anything, the Superfund Act is an "even more ambitious" regulatory scheme than "a stand-ard of care or emission restrictions" because it "impose[s] strict liability for the damages caused by fossil fuel emissions no matter where in the world those emissions were released," requiring producers "to cease global production altogether" if they wish "to avoid all liability."  *City of New York*, 993 F.3d at 93.  So "regardless of whether the" stated "purpose of" the Act is "compensatory or regulatory," it still forces fossil fuel businesses "to adopt different or additional means of pol-lution control from those required by the" Clean Air Act.  *Ouellette*, 479 U.S. at 498 n.19; *City of New York*, 993 F.3d at 93.

*      *      *

Whether conceived as field preemption, conflict preemption, or some other preemption rule specific to interstate pollution, the result is the same:  The Clean Air Act bars the Superfund Act's attempt to police out-of-state greenhouse gas emissions under in-state law.

## II.    The Superfund Act Exceeds Constitutional Limits On Extraterritorial Regu-lation.

Clean Air Act aside, the Superfund Act exceeds the legitimate reach of New York's legis-lative power.  As explained above, New York's extraterritorial regulation of greenhouse gas emis-sions flies in the face of our constitutional structure, which "does not permit" interstate (and global) pollution to be governed "under state law."  *Tex. Indus.*, 451 U.S. at 641; *see supra* at 2–3, 11–12.  And more generally, the Constitution's horizontal separation of powers limits the ability of states to reach beyond their borders and regulate conduct in other jurisdictions.  This conclusion flows from "original and historical understandings of the Constitution's structure and the principles of 'sovereignty and comity' it embraces."  *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 376 (2023) (quoting *Gore*, 517 U.S. at 572).   Indeed, it is "an obvious and necessary result of our constitutional order" that a state may not "reach out and regulate conduct that has little if any

21

connection with the [s]tate's legitimate interests." *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 154 (2023) (Alito, J., concurring in part) (cleaned up).  But New York is doing just that here—directly regulating out-of-state conduct that has no discernible connection to the State.  *Pork Producers*, 598 U.S. at 376 n.1.  That exceeds "the territorial limits of [New York's] authority under the Constitution's horizontal separation of powers."  *Id.*

### A.    State Law Cannot Govern Out-of-State Greenhouse Gas Emissions.

"[T]he basic scheme of the Constitution" forecloses New York's attempt to apply in-state law to emissions emanating beyond its borders.  *AEP*, 564 U.S. at 421.  Again, federal law must govern air pollution in its "ambient or interstate aspects," *Milwaukee*, 406 U.S. at 103, because "a federal rule of decision is necessary to protect uniquely federal interests," including "the conflicting rights of States" and "our relations with foreign nations," *Tex. Indus.*, 451 U.S. at 640–41 (cleaned up); *City of New York*, 993 F.3d at 91–92 (stressing "the overriding need for a uniform rule of decision on matters influencing national energy and environmental policy" (cleaned up)); *see supra* at 2–3, 11–12.  In other words, the "interstate" and "international nature of" global greenhouse gas emissions "makes it inappropriate for state law to control" in this area.  *Tex. Indus.*, 451 U.S. at 641.

It therefore follows, as night follows day, that the Superfund Act is an unconstitutional extraterritorial extension of state law.  New York seeks to penalize "worldwide" emissions emanating "simultaneously across just about every jurisdiction on the planet," not just "emissions within the state."  *City of New York*, 993 F.3d at 92; N.Y. Envtl. Conserv. Law § 76-0101(8).  Under our constitutional structure, that effort "is simply beyond the limits of state law."  *City of New York*, 993 F.3d at 92; *supra* at 2–3, 11–12.

### B.    The Constitution Broadly Imposes Territorial Limits on the Exercise of State Power.

More generally—putting aside the inherently federal nature of interstate pollution—states' retention of "autonomy . . . within their respective spheres" necessarily means that any one state may not deliberately "project its legislation" into the territory of another. *Carolina Trucks & Equip., Inc. v. Volvo Trucks of N. Am., Inc.*, 492 F.3d 484, 489–90 (4th Cir. 2007) (first quoting *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 521 (1935); then quoting *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336–37 (1989)).  Instead, "[s]tate sovereign authority is bounded by the States' respective borders." *Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 14 (2025); *Cayuga Indian Nation of N.Y. v. Seneca County*, 978 F.3d 829, 836 (2d Cir. 2020) ("the boundaries of a state's territory . . . generally limit the reach of the state's sovereign powers").  This rule against extraterritorial regulation flows from the horizontal separation of powers and various constitutional provisions, including the Commerce Clause and the Due Process Clause.  *Pork Producers*, 598 U.S. at 376; *Mallory*, 600 U.S. at 154–55, 157–59 (Alito, J., concurring in part); *Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty.*, 582 U.S. 255, 263 (2017); *Gerling Glob. Reinsurance Corp. of Am. v. Gallagher*, 267 F.3d 1228, 1236–37 (11th Cir. 2001).

For example, the Commerce Clause bars "inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State." *Healy*, 491 U.S. at 336–37.  Or said another way, it "precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." *Edgar v. MITE Corp.*, 457 U.S. 624, 642–43 (1982) (plurality op.).  So state laws are invalid if they have "the practical effect of extraterritorial control of commerce occurring entirely outside the boundaries of the state in question." *Grand River Enters. Six Nations, Ltd. v. Boughton*, 988 F.3d 114, 123 (2d Cir. 2021) (quotation marks omitted).  Moreover, under the Due Process

Clause, "a state is without power to exercise 'extraterritorial jurisdiction,' that is, to regulate and control activities wholly beyond its boundaries," *Watson v. Emps. Liab. Assurance Corp.*, 348 U.S. 66, 70–71 (1954), especially when a state wields its own law to "punish a defendant for conduct that may have been lawful where it occurred," *State Farm Mut. Auto. Ins. v. Campbell*, 538 U.S. 408, 421 (2003); *Gore*, 517 U.S. at 572 ("a State may not impose economic sanctions on violators of its laws with the intent of changing the tortfeasors' lawful conduct in other States"). Still other provisions—such as the Import-Export Clause, the Privileges and Immunities Clause, and the Full Faith and Credit Clause—reflect constitutional limits on extraterritorial lawmaking. *See Pork Producers*, 598 U.S. at 408–09 (Kavanaugh, J., concurring in part and dissenting in part).

### C.    The Superfund Act Directly Regulates Conduct Outside New York that Bears No Discernible Connection to the State.

New York ignores these principles. Far from incidentally affecting extraterritorial activity by regulating in-state sales, *see Pork Producers*, 598 U.S. at 374–76 & n.1, the Superfund Act on its face targets "all fossil fuel extraction and refining worldwide" and holds companies strictly liable for all emissions "attributable to" such "worldwide" conduct—not just "emissions within the state." N.Y. Envtl. Conserv. Law § 76-0101(8); *see EME Homer City Generation*, 572 U.S. at 495 (states "lack authority to control" "out-of-state pollution"). The Act's universal reach necessarily means that New York has "projected its legislation into other States, and *directly regulated* commerce therein," *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 104 (2d Cir. 2003) (cleaned up), even if the activity was legal where it occurred, *see Ouellette*, 479 U.S. at 495. In other words, the Act, on its face, exerts "extraterritorial control" over "commerce occurring entirely outside the boundaries of" New York, *Grand River*, 988 F.3d at 123, which is even more obvious given New York's general lack of in-state fossil fuel production, *see supra* at 8–10. And this extraterritorial

reach is per se unlawful and precluded by the Constitution because it intrudes into an inherently federal area necessarily governed by federal law. *See supra* at 22.

But if more were needed, the regulated conduct here bears no discernible connection to New York. *See Pork Producers*, 598 U.S. at 376 n.1; *Edgar*, 457 U.S. at 642. In part, that is because "[g]reenhouse gases once emitted become well mixed in the atmosphere," *AEP*, 564 U.S. at 422 (cleaned up), and thus "cannot be traced to their source," *City of New York*, 993 F.3d at 92 (quoting the City's amended complaint). Thus, "emissions in New Jersey may contribute no more to flooding in New York than emissions in China." *AEP*, 564 U.S. at 422. Any connection between a company's out-of-state conduct and any alleged injury within New York is thus far too attenuated to support the Act's universal reach. *Cf. Young v. Masci*, 289 U.S. 253, 259 (1933).

Because the Superfund Act penalizes companies for greenhouse gas emissions without any certainty that *those* emissions caused in-state harm, the Act will necessarily "*directly* regulate[] out-of-state [activity] by those with no [relevant] connection to the State." *Pork Producers*, 598 U.S. at 376 n.1; *Edgar*, 457 U.S. at 641–43 (declining to enforce an Illinois law that "directly regulate[d] transactions which [took] place . . . wholly outside the State" and involved individuals "having no connection with Illinois"); *Am. Booksellers*, 342 F.3d at 103–04 (the "boundary-less nature" of an issue "makes state regulation impracticable").

And this is so despite the Act defining responsible parties to "not include any person who lacks sufficient contacts with the state to satisfy the due process clause of the United States Constitution." N.Y. Envtl. Conserv. Law § 76-0101(21). That provision does not solve the problem of the Act's unconstitutional extraterritorial reach, as the Act still "impose[s] strict liability for the damages caused by fossil fuel emissions no matter where in the world those emissions were re-

leased (or who released them)."  *City of New York*, 993 F.3d at 93.  So even if an entity had "sufficient contacts" with New York to satisfy the Due Process Clause's requirements for personal jurisdiction, applying the Act to that entity would still exceed the territorial limits of state authority under the Constitution because the Act by its plain terms imposes liability for out-of-state conduct in violation of the Constitution's horizontal separation of powers.  And in any event, the Act does nothing to limit liability to activities that arise from or relate to a company's New York contacts.  *See Gerling Global*, 267 F.3d at 1238 (noting that the court "must look not only at whether the parties regulated by the Act have contacts with [the forum], but also and more importantly here at whether the *subject* about which this Act [regulates] has a sufficient nexus to [the forum]").

*          *          *

Consider the upshot of New York's position.  If the Superfund Act is permissible, then nothing prevents other states from enacting identical laws.  The ensuing balkanization—whereby states impose crippling costs on lawful energy production in other states—would destroy the national market for energy and nullify Congress's power over interstate commerce, all while bankrupting the Nation's largest energy producers.  *See Hughes v. Oklahoma*, 441 U.S. 322, 325 (1979) (noting that the Framers of the Constitution sought "to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation"); *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 190 (1824) ("The power over commerce . . . was one of the primary objects for which the people of America adopted their government[.]"); *Pork Producers*, 598 U.S. at 404 (Kavanaugh, J., concurring in part and dissenting in part) (explaining that "the Framers . . . adopted a new Constitution" to "create a national economic market and overcome" the "state interference with interstate commerce" that "was cutting off the lifeblood of the Nation").

26

Fortunately, the Constitution does not condemn our Nation to such a fate. True, "our constitutional order . . . allows different communities to live with different *local* standards." *Pork Producers*, 598 U.S. at 375 (cleaned up, emphasis added). But whatever New York's desired energy policy, the Constitution forbids it from imposing its preferences on *other* states. While "Congress has ample authority to enact such a policy for the entire Nation, it is clear that no single [s]tate" like New York can do so. *Gore*, 517 U.S. at 571 (footnote omitted).

## III.    The Foreign Affairs Doctrine Preempts The Superfund Act.

New York's attempt to globalize its regulatory reach also runs afoul of the Foreign Affairs Doctrine. Under that doctrine, a state law is conflict-preempted "when it conflicts with an express federal foreign policy." *Movsesian v. Victoria Versicherung AG*, 670 F.3d 1067, 1071 (9th Cir. 2012) (en banc) (citing *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 421 (2003)); *accord In re Assicurazioni Generali, S.P.A.*, 592 F.3d 113, 117–19 (2d Cir. 2010). And "even in the absence of any express federal policy," a state law is field-preempted "if it intrudes on the field of foreign affairs without addressing a traditional state responsibility." *Movsesian*, 670 F.3d at 1072; *Zschernig v. Miller*, 389 U.S. 429, 441 (1968) (a state cannot "establish its own foreign policy"). That is because "the Constitution entrusts foreign policy exclusively to the National Government." *Garamendi*, 539 U.S. at 419 n.11.

The Act fails on both scores. It clashes with "our nation's foreign policy goals" and "circumvent[s] Congress's" and the President's "own expectations and carefully balanced scheme of international cooperation on a topic of global concern." *City of New York*, 993 F.3d at 103. And it fails to address a traditional state responsibility, instead regulating "a uniquely international problem of national concern" that is "not well-suited to the application of state law." *Id.* at 85–86. The Foreign Affairs Doctrine therefore preempts it.

27

A.     **The Superfund Act Conflicts with U.S. Foreign Policy.**

State law is preempted when there is a "likelihood that state legislation will produce some-thing more than incidental effect in conflict with express foreign policy." *Garamendi*, 539 U.S at 420. Because foreign affairs is the "exclusive responsibility" of the national government, *Hines v. Davidowitz*, 312 U.S. 52, 63 (1941), the threshold for establishing such conflict is low. That threshold is easily met here.

To begin, the Superfund Act is "out of place given that Congress created a comprehensive scheme designed to address greenhouse gas emissions—the Clean Air Act—which it declined to extend beyond our borders." *City of New York*, 993 F.3d at 103. Because "the Clean Air Act contemplates the need for foreign nations to promulgate reciprocal legislation," the Superfund Act "circumvent[s] Congress's own expectations and carefully balanced scheme of international co-operation on a topic of global concern." *Id.* More on that score, in the Global Climate Protection Act, Congress declared that the United States should "work toward multilateral agreements" on greenhouse gas emissions, with a "coordinated national policy," including in the international arena. *See* Pub. L. No. 100-204, Title XI, §§ 1101–1106, 101 Stat. 1331, 1407–09 (1987), re-printed as note to 15 U.S.C. § 2901. The Superfund Act is the antithesis of a "coordinated national policy."

In fact, the Act clashes with national policy on global climate change, greenhouse gas emissions, and energy production. It exacerbates the national energy emergency by imposing crushing penalties on global energy production even though the President has expressly deter-mined that more production is imperative to our national security and foreign policy. 90 Fed. Reg. at 8,434. It undercuts the United States' policy decision to abstain from restrictive measures to reduce global greenhouse gas emissions. *See* 90 Fed. Reg. at 8,455 (directing withdrawal from

the Paris Agreement); S. Res. 98, 105th Cong. (1997) (disapproval of Kyoto Protocol); *cf. Sprietsma v. Mercury Marine*, 537 U.S. 51, 66 (2002) (reasoning that "a federal decision to forgo regulation in a given area may imply an authoritative federal determination that the area is best left *un*regulated"). And it penalizes productive activities in foreign countries despite the President's judgment that energy is such a critical piece of our national security and foreign policy that he exempted it from reciprocal tariffs imposed on U.S. trading partners. 90 Fed. Reg. at 15,045–46.

More generally, when it comes to international cooperation, the Superfund Act "bypass[es] the various diplomatic channels that the United States uses to address" global greenhouse gas emissions, *City of New York*, 993 F.3d at 103, and compromises the Nation's capacity to "speak . . . with one voice" on the world stage, *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 381 (2000). As noted, the Act seeks to regulate global greenhouse gas emissions despite the United States having made foreign policy decisions to address that issue of global concern through a purpose-built international agreement—the Framework Convention—and to refrain from participating in certain other international efforts to do the same. *Supra* at 5. Dissatisfied, New York now seeks to regulate global greenhouse gas emissions by "employ[ing] a different, state system of economic pressure" on energy companies. *Garamendi*, 539 U.S. at 423–24 (cleaned up).

International negotiations on climate change also regularly consider whether and how to share costs among international stakeholders. And "the United States' longstanding position in international climate-change negotiations is to oppose the establishment of liability and compensation schemes at the international level." *City of New York*, 993 F.3d at 103 n.11.[4] Because the

---

[4] *See, e.g.*, Todd Stern, Special Envoy for Climate Change, Special Briefing (Oct. 28, 2015), https://perma.cc/8X4Y-4BRH ("We obviously do have problem with the idea, and don't accept the idea, of compensation and liability and never accepted that and we're not about to accept it now."); Todd Stern, Special Envoy for Climate Change, Press Availability (Dec. 4, 2015), https://perma.cc/LS9M-9D7S ("There's one thing that we don't accept and won't accept in this

Superfund Act effectively establishes such a scheme by penalizing companies of foreign states, it "expresses a distinct political point of view on a specific matter of foreign policy" that contradicts the view of the national government.  *Movsesian*, 670 F.3d at 1076.  This "obviously sow[s] confusion and needlessly complicate[s] the nation's foreign policy."  *City of New York*, 993 F.3d at 103.

Moreover, imposing liability on foreign companies under the Superfund Act could, in turn, cause foreign governments to retaliate by imposing reciprocal penalties, compounding the foreign affairs damage created by the Act.  *See, e.g.*, *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 269 (2010); *Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434, 450 (1979) (explaining that affected foreign nations "may retaliate against American-owned instrumentalities present in their jurisdictions").  Foreign governments may even view penalties based on energy production within their borders as interfering in their own regulatory and economic affairs.  After all, holding companies "accountable for purely foreign activity (especially the [f]oreign [p]roducers) would require them to internalize the costs of climate change and would presumably affect the price and production of fossil fuels abroad."  *City of New York*, 993 F.3d at 103; *see* Ex. A (listing Saudi

---

agreement and that is the notion that there should be liability and compensation for loss and damage. That's a line that we can't cross."); Saeed Shah and Matthew Dalton, "COP27 Talks Weigh Who Should Pay for Climate Damage to Poor Countries," *The Wall Street Journal* (Nov. 16, 2022), https://archive.ph/F1k6I (quoting U.S. Special Presidential Envoy for Climate John Kerry as saying that "[i]t's a well-known fact that the U.S. and many other countries will not establish some sort of a legal structure that is tied to compensation or liability").

This longstanding U.S. position, which is supported by a number of other countries, is also reflected in the decision of the Conference of the Parties to the Framework Convention that adopted the Paris Agreement.  Conf. of the Parties to the Framework Convention, Decision 1/CP.21, para. 51, U.N. Doc. FCCC/CP/2015/10/Add.1 (Dec. 12, 2025), https://unfccc.int/re-source/docs/2015/cop21/eng/10a01.pdf (stating the Framework Convention Parties' express agreement "that Article 8 of the Agreement [that 'recognize[s] the importance of averting, minimizing and addressing loss and damage associated with the adverse effects of climate change'] does not involve or provide a basis for any liability or compensation").

Aramco, BP, and over a dozen other foreign companies as having a "sufficient nexus with New York State such that the state could successfully enforce an assessment issued under the legislation").

In sum, the Superfund Act directly conflicts with our foreign policy, and there is at least a "likelihood" that the Act will have a "more than incidental effect in conflict with express foreign policy." *Garamendi*, 539 U.S at 420.  The Act is thus preempted.

### B.    The Superfund Act Intrudes into the Field of Foreign Affairs Without Addressing a Traditional State Responsibility.

The Act is preempted for another, independent reason:  New York is intruding into a field occupied by federal law without addressing a traditional state responsibility.  The national government enjoys *exclusive* domain over foreign affairs.  *See Zschernig*, 389 U.S. at 436; *Hines*, 312 U.S. at 63.  And global greenhouse gas emissions is a subject that falls squarely within that domain, presenting "a uniquely international problem of national concern" that "is simply beyond the limits of state law."  *City of New York*, 993 F.3d at 85, 92.

The Superfund Act's plain text reveals that it does not address a traditional state responsibility, even though the "general subject area of the statute"—pollution—may fit that bill.  *Movsesian*, 670 F.3d at 1074.  "Courts have consistently struck down state laws which purport to regulate an area of traditional state competence, but in fact, affect foreign affairs."  *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 964 (9th Cir. 2010); *Garamendi*, 539 U.S. at 425–26 (insurance); *Zschernig*, 389 U.S. at 437–38 (descent of property).  And the Superfund Act is no "garden variety" pollution regulation.  *Von Saher*, 592 F.3d at 964.  The greenhouse gas emissions covered by the Act expressly "include those emissions attributable to all fossil fuel extraction and refining *worldwide*," N.Y. Envtl. Conserv. Law § 76-0101(8) (emphasis added), even though global emissions is "a uniquely international problem" that is "beyond the limits of

31

state law," *City of New York*, 993 F.3d at 85, 92.  On its face, then, the Act works "an intrusion by the State into the field of foreign affairs which the Constitution entrusts to the President and the Congress."  *Zschernig*, 389 U.S. at 432.

What is more, the "real purpose" of the Act makes plain that "the state interest actually underlying [it] is concern," *Movsesian*, 670 F.3d at 1074 (cleaned up), about "the planet's largest climate polluters . . . pay[ing] their fair share to help regular New Yorkers deal with the consequences" of the global "climate crisis," Press Release, *supra* (statement of Senator Liz Krueger); *see also id.* (purpose is to "ensur[e] those responsible for historic climate-altering emissions bear the costs") (statement of Interim Commissioner Sean Mahar); S.2129-B § 4 (stating intent is to "require companies that have contributed significantly to the buildup of climate change-driving greenhouse gases in the atmosphere to bear a proportionate share of . . . expenses").  Making energy companies—including foreign ones—pay their "fair share" for the effects of global greenhouse gas emissions is not a traditional state responsibility.

*     *     *

Because the Superfund Act (1) conflicts with the express foreign policy of the United States and (2) intrudes into the field of foreign affairs without addressing a traditional state responsibility, it is preempted under the Foreign Affairs Doctrine.  *Movsesian*, 670 F.3d at 1071–72.

## IV.     The Superfund Act Violates The Commerce Clause.

Finally, the Superfund Act violates the Commerce Clause, as applied to both interstate and foreign commerce.  *See, e.g.*, *Healy*, 491 U.S. at 336–37; *Grand River*, 988 F.3d at 123.  "Because discrimination is not required when a statute has the specific extraterritorial effect of controlling . . . wholly out-of-state transactions," the Commerce Clause violation rests on the same anal-

32

ysis as above. *Ass'n for Accessible Medicines v. Ellison*, 140 F.4th 957, 961 (8th Cir. 2025) (holding that a statute violated the Commerce Clause because it "directly regulate[d] transactions which [took] place . . . wholly outside the State" (quotation marks omitted)); *Pork Producers*, 598 U.S. at 376 n.1 (quoting *Edgar*, 457 U.S. at 641–43); *see supra* at 23–26.

But the Act also defies the "antidiscrimination principle" that "lies at the 'very core' of [the Supreme Court's] dormant Commerce Clause jurisprudence." *Pork Producers*, 598 U.S. at 369; *Kraft Gen. Foods, Inc. v. Iowa Dep't of Revenue & Finance*, 505 U.S. 71, 81 (1992) ("Absent a compelling justification . . . a State may not . . . facially discriminate against foreign commerce."). The Superfund Act discriminates against interstate and foreign commerce by targeting "worldwide" commercial activity that almost exclusively occurs outside of New York and then using its "new revenue source[]" entirely for "huge investments" in its own infrastructure and economy, 2025 N.Y. Laws ch.100, § 1(1), (6). The statute thus runs headlong into the Commerce Clause's prohibition on states "build[ing] up domestic commerce through burdens upon the industry and business of other States." *Pork Producers*, 598 U.S. at 369 (cleaned up).

Because the Act discriminates against interstate commerce, strict scrutiny applies, and it can be upheld only if "it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *New Energy Co. of Indiana v. Limbach*, 486 U.S. 269, 278 (1988). There is no legitimate local purpose here. *See City of New York*, 993 F.3d at 85–86, 92; *supra* at 31–32. But even if the Court were to conclude otherwise, the Superfund Act would still fail strict scrutiny because its infrastructure funding objectives can be adequately served by reasonable, non-discriminatory alternatives. For example, New York could fund its $75 billion in infrastructure projects through general taxation, such as state income or sales taxes. Because these

alternatives would achieve New York's goals without imposing $75 billion in discriminatory penalties on out-of-state fossil fuel businesses, the Superfund Act's discriminatory approach is unconstitutional. *New Energy*, 486 U.S. at 278.

All this is especially problematic as applied to foreign commerce. "In the unique context of foreign commerce, a State's power is further constrained because of the special need for federal uniformity." *Barclays Bank PLC v. Franchise Tax Bd. of Cal.*, 512 U.S. 298, 310 (1994) (cleaned up). Thus, "[t]he scope of the foreign commerce power" is "the greater" of the two. *Japan Line*, 441 U.S. at 448 & n.12 (collecting sources); *Kraft Gen. Foods, Inc. v. Iowa Dep't of Revenue & Finance*, 505 U.S. 71, 79 (1992) (noting that the constitutional protection for foreign commerce "is broader than the protection afforded to interstate commerce, in part because matters of concern to the entire Nation are implicated" (citation omitted)). If the state burden on foreign commerce is enough to "prevent[] the Federal Government from speaking with one voice when regulating commercial relations with foreign governments," it is unconstitutional under the Commerce Clause. *Japan Line*, 441 U.S. at 451 (quotation marks omitted). And a state law "at variance with federal policy will violate the 'one voice' standard if it . . . implicates foreign policy issues which must be left to the Federal Government." *Container Corp. of Am. v. Franchise Tax Bd.*, 463 U.S. 159, 194 (1983).

For reasons explained above, the Superfund Act directly implicates U.S. foreign policy and obscures the federal government's ability to speak with one voice. *Supra* at 28–32. It violates the Commerce Clause on that basis alone. *See Japan Line*, 441 U.S. at 451. But the Act also treats foreign commerce the same way it treats interstate commerce—so it is unconstitutional for all the same reasons. *See Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 67 (1st Cir. 1999) (holding that a state law violated the Foreign Commerce Clause because it "discriminate[d] against foreign

commerce," "impede[d] the federal government's ability to speak with one voice in foreign af-

fairs," and "attempt[ed] to regulate conduct outside [the state] and outside of this country's bor-

ders"), *aff'd sub nom. Crosby*, 530 U.S. 363; *see City of New York*, 993 F.3d at 103 (liability for

foreign producers "would presumably affect the price and production of fossil fuels abroad").

## CONCLUSION

New York is defying federal law, the Constitution, and binding precedent—all so it can

punish "Big Oil" for ill-defined harms, without regard to the real harm to our federal system and

the Nation's energy needs.  The Court should end New York's lawless overreach by granting the

United States' motion for summary judgment, declaring the Superfund Act invalid and unenforce-

able, and permanently enjoining Defendants from taking any actions to implement or enforce it.

Respectfully submitted,

ADAM R.F. GUSTAFSON
Acting Assistant Attorney General

ROBERT N. STANDER
Deputy Assistant Attorney General

/s/ *Riley W. Walters*
RILEY W. WALTERS
Counsel to the Acting Assistant Attorney General
JOHN K. ADAMS
Senior Counsel to the Acting Assistant Attorney General
JUSTIN D. HEMINGER
Attorney
U.S. Department of Justice
Environment and Natural Resources Division
950 Pennsylvania Ave., N.W.
Washington, D.C. 20530
(202) 514-5442
Riley.Walters@usdoj.gov

August 29, 2025
Washington, D.C.

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.1(c), the undersigned counsel of record for Plaintiffs the United States and U.S. Environmental Protection Agency hereby certifies that this memorandum complies with the word-count limitation of this Court's Local Civil Rules, as modified by this Court's Order enlarging the page limit to 40 pages. *See* Dkt. No. 50. As measured by the word processing system used to prepare it, this memorandum contains 11,331 words.

Dated:  August 29, 2025
        Washington, D.C.

/s/ *Riley W. Walters*
RILEY W. WALTERS
Counsel to the Acting Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division
950 Pennsylvania Ave., N.W.
Washington, D.C. 20530
(202) 514-5442
Riley.Walters@usdoj.gov