## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA and UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,<br><br>                    *Plaintiffs*,<br><br>        v.<br><br>STATE OF NEW YORK, KATHLEEN HOCHUL, in her official capacity as Governor of New York, LETITIA JAMES, in her official capacity as New York Attorney General, and AMANDA LEFTON, in her official capacity as Commissioner of the New York Department of Environmental Conservation,<br><br>                    *Defendants.* | No. 1:25-cv-03656-PKC |

## THE STATE'S OPPOSITION TO THE UNITED STATES'
## MOTION FOR SUMMARY JUDGEMENT

LETITIA JAMES
Attorney General of the State of New York
The Capitol
Albany, New York 12224-0341
Attorney for State Defendants

MONICA WAGNER
Deputy Bureau Chief

AYAH F. BADRAN
SABITA KRISHNAN
LAURA MIRMAN-HESLIN
JOYA SONNENFELDT
Assistant Attorneys General

*Of Counsel*
October 27, 2025

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................... iii

PRELIMINARY STATEMENT ....................................................................... 1

STATUTORY BACKGROUND .......................................................................... 2

    The Climate Change Superfund Act .......................................................... 2

    The Clean Air Act .................................................................................. 3

FACTUAL BACKGROUND ............................................................................. 4

    The Economic Impacts of Cost-Recovery Demands ................................... 4

    Greenhouse Gas Emissions ..................................................................... 5

    International Agreements Regarding Climate Change ................................ 6

STANDARD OF REVIEW ............................................................................... 7

ARGUMENT ................................................................................................ 8

    I.    THE UNITED STATES LACKS STANDING. ..................................... 9

        A.   The United States Has Not Demonstrated Injury to Its
            Proprietary Interests. ................................................................ 12

        B.   The United States Has Not Demonstrated Injury to Its *Parens
            Patriae* Interests. ...................................................................... 14

        C.   The United States Has Not Asserted Injury to Its Sovereign
            Interests. .................................................................................. 15

    II.   THE CLEAN AIR ACT DOES NOT PREEMPT THE CLIMATE ACT. ..... 18

        A.   The Climate Act Is an Exercise of Traditional State Responsibility ....... 19

        B.   The Clean Air Act Does Not Preempt the Climate Act by
            Occupying the Same Field. ........................................................ 21

           1.   The Clean Air Act and Climate Act do not occupy the same field. ...... 21

           2.   *City of New York* does not address the preemption of a state
               statute by the Clean Air Act. ................................................ 24

        C.   The Climate Act Does Not Conflict with the Clean Air Act. .................... 26

    III.  THE FOREIGN AFFAIRS DOCTRINE DOES NOT PREEMPT
        THE CLIMATE ACT ..................................................................... 28

        A.   The Climate Act Does Not Conflict with Express Foreign Policy. ............ 28

        B.   The United States' Foreign Affairs Power Does Not Preempt
            the Climate Act Based on Field Preemption. ................................ 34

i

IV.  THE CLIMATE ACT DOES NOT EXCEED CONSTITUTIONAL
LIMITS ON REGULATING EXTRATERRITORIAL CONDUCT.............36

    A.  There Is No Stand-Alone Constitutional Prohibition on
Extraterritorial Regulation. ....................................................................36

    B.  The Climate Act Does Not Violate the Due Process Clause....................38

V.  THE CLIMATE ACT DOES NOT VIOLATE THE DORMANT
INTERSTATE COMMERCE CLAUSE........................................................44

    A.  There Is no Freestanding "Extraterritoriality" Prohibition.....................44

    B.  The Climate Act Does Not Discriminate in Favor of In-State
Economic Interests....................................................................................46

VI.  THE CLIMATE ACT DOES NOT VIOLATE THE DORMANT
FOREIGN COMMERCE CLAUSE. ...........................................................47

CONCLUSION........................................................................................................48

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
    458 U.S. 592 (1982) ................................................................................ 14-15, 17

*Am. Booksellers Found. v. Dean,*
    342 F.3d 96 (2d Cir. 2003) ...................................................................... 44

*Am. Elec. Power Co., Inc. v. Connecticut,*
    564 U.S. 410 (2011) ................................................................................ 20, 22, 38

*Am. Fuel & Petrochemical Mfrs. v. O'Keeffe,*
    903 F.3d 903 (9th Cir. 2018) .................................................................. 21

*Am. Ins. Ass'n v. Garamendi,*
    539 U.S. 396 (2003) ................................................................................ 28-29, 34

*Arizona v. United States,*
    567 U.S. 387 (2012), US Br. 10–11 ...................................................... 17

*Askew v. Am. Waterways Operators, Inc.,*
    411 U.S. 325 (1973) ................................................................................ 21

*Ass'n for Accessible Meds. v. Ellison,*
    140 F.4th 957 (8th Cir. 2025) ................................................................ 45

*Baldwin v. G.A.F. Seelig, Inc.,*
    294 U.S. 511 (1935) ................................................................................ 45

*Barclays Bank PLC v. Franchise Tax Bd. of Cal.,*
    512 U.S. 298 (1994) ................................................................................ 33, 36, 47-48

*Bell v. Cheswick Generating Station,*
    734 F.3d 188 (3d Cir. 2013) .................................................................... 22

*BMW of N. Am., Inc. v. Gore,*
    517 U.S. 559 (1996) ................................................................................ 40-41

*Brennan v. Nassau Cnty.,*
    352 F.3d 60 (2d Cir. 2003) ...................................................................... 11

*Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*,
   582 U.S. 255 (2017) ............................................................................... 37

*Bryant v. Maffucci*,
   923 F.2d 979 (2d Cir. 1991) ................................................................... 7

*Calder v. Jones*,
   465 U.S. 783 (1984) ............................................................................... 39

*Chamber of Commerce of the United States v. James*,
   No. 1:25-cv-01307 (N.D.N.Y.) .......................................................... 15, 39

*Chew v. Dietrich*,
   143 F.3d 24 (2d Cir. 1998) ..................................................................... 43

*City & Cnty. of Honolulu v. Sunoco LP*,
   537 P.3d 1173 (Haw. 2023) .................................................................... 26

*City of Joliet v. New W., L.P.*,
   562 F.3d 830 (7th Cir. 2009) .................................................................. 30

*City of New York v. A-1 Jewelry & Pawn, Inc.*,
   247 F.R.D. 296 (E.D.N.Y. 2007) ........................................................... 40

*City of New York v. Beretta U.S.A. Corp.*,
   315 F. Supp. 2d 256 (E.D.N.Y. 2004) .................................................... 40

*City of New York v. Chevron Corp.*,
   993 F.3d 81 (2d Cir. 2021) ...................................... 13, 19-21, 24-26, 30

*City of New York v. Lexington Ins. Co.*,
   735 F. Supp. 2d 99 (S.D.N.Y. 2010) ....................................................... 8

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) .......................................................................... 10, 12

*Coal. for Competitive Elec. v. Zibelman*,
   906 F.3d 41 (2d Cir. 2018) ..................................................................... 26

*DaimlerChrysler Corp. v. Cuno*,
   547 U.S. 332 (2006) ............................................................................ 9, 17

*Davis v. Passman*,
   442 U.S. 228 (1979) ............................................................................... 38

*District of Columbia v. Exxon Mobil Corp.*,
  89 F.4th 144 (D.C. Cir. 2023) ................................................................ 26

*EPA v. EME Homer City Generation, L.P.*,
  572 U.S. 489 (2014) ........................................................................... 37

*Exxon Shipping Co. v. Baker*,
  554 U.S. 471 (2008) ........................................................................ 23-24

*FDA v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024) ....................................................................... 10, 12

*Ford Motor Co. v. Mont. 8th Jud. Dist. Ct.*,
  592 U.S. 351 (2021) ........................................................................... 42

*Georgia v. Tenn. Copper Co.*,
  206 U.S. 230 (1907) ........................................................................... 20

*Gerling Glob. Reinsurance Corp. of Am. v. Gallagher*,
  267 F.3d 1228 (11th Cir. 2001) ......................................................... 37, 42

*Gerling Glob. Reinsurance Corp. of Am. v. Low*,
  240 F.3d 739 (9th Cir. 2001) ............................................................... 48

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
  564 U.S. 915 (2011) ........................................................................... 43

*Grand River Enters. Six Nations, Ltd. v. Boughton*,
  988 F.3d 114 (2d Cir. 2021) ......................................................... 44-45, 47

*Hartford Enters., Inc. v. Coty*,
  529 F. Supp. 2d 95 (D. Me. 2008) ......................................................... 34

*Healy v. Beer Inst.*,
  491 U.S. 324 (1989) ........................................................................... 45

*Hines v. Davidowitz*,
  312 U.S. 52 (1941) ............................................................................. 29

*In re Assicurazioni Generali, S.P.A.*,
  592 F.3d 113 (2d Cir. 2010) ............................................................. 29, 34

*In re Cnty. Comm'rs of Boulder City. v. Suncor Energy USA, Inc.*,
  No. 24SA206, 2025 WL 1363355 (Colo. 2025) ......................................... 26

v

*In re MTBE Prods. Liab. Litig.,*
    725 F.3d 65 ........................................................................................ 26

*Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.,*
    146 F.3d 66 (2d Cir. 1998)................................................................ 13

*International Paper Co. v. Ouellette,*
    479 U.S. 481 (1987) ............................................................... 19, 23-25

*Japan Line, Ltd. v. L. A. Cnty.,*
    441 U.S. 434 (1979), US Br. 30 ......................................................... 33

*Kansas v. Garcia,*
    589 U.S. 191 (2020) ........................................................................... 22

*Kyocera Doc. Sols. Am., Inc. v. Div. of Admin.,*
    708 F. Supp.3d 531 (D. N.J. 2023)..................................................... 35

*Lighthouse Res. Inc. v. Inslee,*
    429 F. Supp. 3d 736 (W.D. Wash. 2019) ............................................ 33

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ................................................................... 9-10, 12

*Mallory v. Norfolk S. Ry. Co.,*
    600 U.S. 122 (2023) (Alito, J., concurring in part) ............................. 37

*Massachusetts v. EPA,*
    549 U.S. 497 (2007) ....................................................................... 4, 21

*Mayor & City Council of Balt. v. BP, P.L.C.,*
    31 F.4th 178 (4th Cir. 2022).................................................... 26, 28, 36

*Medellín v. Texas,*
    552 U.S. 491 (2008) ..................................................................... 29, 31

*Medtronic, Inc. v Lohr,*
    518 U.S. 470 (1996) ..................................................................... 18, 20

*Merrick v. Diageo Americas Supply, Inc.,*
    805 F.3d 685 (6th Cir. 2015)......................................................... 22-23

*Motor Vehicle Mfrs. Ass'n v. N.Y. State Dep't of Envtl. Conservation,*
    79 F.3d 1298 (2d Cir. 1996)............................................................... 11

*Movsesian v. Victoria Versicherung AG,*
    670 F.3d 1067 (9th Cir. 2012) (en banc) ....................................... 28, 35

*N.Y. Pet Welfare Ass'n, Inc. v. City of New York,*
    850 F.3d 79 (2d Cir. 2017)..................................................................... 46

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo,*
    804 F.3d 242 (2d Cir. 2015)..................................................................... 8

*Nat'l Foreign Trade Council, Inc. v. Giannoulias,*
    523 F. Supp. 2d 731 (N.D. Ill. 2007) ................................................... 35

*Nat'l Pork Producers Council v. Ross,*
    598 U.S. 356 (2023) ................................................................... 37, 44-47

*Nat'l Shooting Sports Found. v. James,*
    144 F.4th 98 (2d Cir. 2025) ..................................................... 18, 26-27

*New York v. Niagara-Wheatfield Cent. Sch. Dist.,*
    119 F.4th 270 (2d Cir. 2024) ............................................................ 14-15

*North Carolina, ex rel. Cooper v. Tenn. Valley Auth.,*
    615 F.3d 291 (4th Cir. 2010) ................................................................. 22

*Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kansas,*
    489 U.S. 493 (1989) ................................................................................ 26

*Pike v. Bruce Church, Inc.,*
    397 U.S. 137 (1970) ................................................................................ 47

*Purdue Pharma L.P. v. Kentucky,*
    704 F.3d 208 (2d Cir. 2013)............................................................... 14-15

*Rest. L. Ctr. v. City of New York,*
    90 F.4th 101 (2d Cir. 2024) ................................................................. 28

*Rice v. Santa Fe Elevator Corp.,*
    331 U.S. 218 (1947) ................................................................................ 22

*Sanitary Dist. v. United States,*
    266 U.S. 405 (1925) ........................................................................... 15-16

*Sprietsma v. Mercury Marine,*
    537 U.S. 51 (2002) ................................................................................. 31

*State Farm Mutual Automobile Insurance Co. v. Campbell*,
　538 U.S. 408 (2003) ........................................................................ 40

*Tachiona v. United States*,
　386 F.3d 205 (2d Cir. 2004) ..................................................... 10, 16-17

*Texas Industries, Inc. v. Radcliff Materials, Inc.*,
　451 U.S. 630 (1981) ........................................................................ 20

*TransUnion LLC v. Ramirez*,
　594 U.S. 413 (2021) .......................................................................... 9

*United States v. City of Phila.*,
　644 F.2d 187 (3d Cir. 1980) ............................................................. 38

*United States v. Iowa*,
　126 F.4th 1334 (8th Cir. 2025) ................................................... 16-17

*United States v. Mattson*,
　600 F.2d 1295 (9th Cir. 1979) .......................................................... 38

*United States v. Missouri*,
　114 F.4th 980 (8th Cir. 2024) ........................................................... 16

*United States v. Monsanto Co.*,
　858 F.2d 160 (4th Cir. 1988) ............................................................ 41

*United States v. Solomon*,
　563 F.2d 1121 (4th Cir. 1977) .......................................................... 38

*Util. Air Regul. Grp. v. EPA*,
　573 U.S. 302 (2014) ....................................................................... 3-4

*Vizio, Inc. v. Klee*,
　886 F.3d 249 (2d. Cir. 2018) ............................................................ 47

*Vt. Agency of Nat. Res. v. United States ex rel. Stevens*,
　529 U.S. 765 (2000) ........................................................................ 16

*Vt. Teddy Bear Co. v. 1-800 BEARGRAM Co.*,
　373 F.3d 241 (2d Cir. 2004) .............................................................. 7

*Wash. State Grange v. Wash. State Republican Party*,
　552 U.S. 442 (2008) .................................................................... 8, 44

*Watson v. Emps. Liab. Assurance Corp., Ltd.,*
348 U.S. 66 (1954) ......................................................................................... 40

*West Virginia v. James,*
No. 1:25-cv-00168 (N.D.N.Y.) ....................................................................... 15

*Whitmore v. Arkansas,*
495 U.S. 149 (1990) ....................................................................................... 10

*Young v. Masci,*
289 U.S. 253 (1933) ....................................................................................... 39

*Youngstown Sheet & Tube Co. v. Sawyer,*
343 U.S. 579 (1952) ....................................................................................... 33

*Zschernig v. Miller,*
389 U.S. 429 (1968) .................................................................................. 34-35

## Constitutions

U.S. Const.
art. I, § 8, cl. 3 ................................................... 1-2, 9, 17, 36-37, 44-48

## Federal Statutes

15 U.S.C.
2901 note ....................................................................................................... 30

30 U.S.C.
226 (b) .......................................................................................................... 14

42 U.S.C.

    7401 (a) (3) ......................................................... 1, 3-4, 8, 11, 16-19, 21-27, 30, 37

    7401 *et seq.* ............................................................................................... 17

    7409 .......................................................................................................... 27

    7410 .......................................................................................................... 17

    7410 (a) ..................................................................................................... 27

    7410 (a) (2) (D) (i) ..................................................................................... 27

    7411 ............................................................................................................ 4

    7411 (b) (1) ................................................................................................. 4

    7411 (d) ................................................................................................. 4, 17

    7416 .......................................................................................................... 17

    7426 (b) ..................................................................................................... 17

    7506a (a) ................................................................................................... 17

    7521 (a) (1) ................................................................................................. 4

    7543 (a) ..................................................................................................... 19

    7543 (e) (1) ................................................................................................ 19

    7604 (e) ..................................................................................................... 17

Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C.

    9601 *et seq.* ............................................................................................... 41

Exec. Order No. 14,257, 90 Fed. Reg. 15,041 ...................................................... 32

Executive Order No. 14,156, 90 Fed. Reg. 8,433 (Jan. 20, 2025) .......................... 32

**State Statutes**

2025 N.Y. Sess. Laws ch. 100 § 1 (1) ................................................................ 40

N.Y. Env't Conserv. Law

    (21) ............................................................................................................. 3

    76-0101 (6) .................................................................................................. 2

    76-0101 (8) ............................................................................................. 3, 23

    76-0101 (9) ............................................................................................. 3, 23

    76-0101 (21) .......................................................................................... 2, 39

    76-0103 ....................................................................................................... 2

    76-0103 (2) .................................................................................................. 2

    76-0103 (3) (b) .......................................................................................... 2-3

    76-0103 (3) (e) (i) ........................................................................................ 3

    76-0103 (4) .................................................................................................. 3

2024 N.Y. Laws
  ch. 679, § 2 (1) ................................... 1-2, 5, 8-9, 11-14, 16-28, 30-36, 38-39, 43-48
  ch. 679, § 7 ............................................................................................... 2

**Federal Regulations**

30 C.F.R.
  part 1206 ................................................................................................ 14

74 Fed. Reg. 66,496 (Dec. 15, 2009) ................................................................ 4

80 Fed. Reg. 64,510 (Oct. 23, 2015) ................................................................ 4

81 Fed. Reg. 35,824 (June 3, 2016) ................................................................ 4

90 Fed. Reg. 36,288 (Aug. 1, 2025) ................................................................ 4

**Rules**

Fed. R. Evid. 201 ................................................................................... 14

Fed. R. of Evid. 201 (b) ............................................................................. 13

## PRELIMINARY STATEMENT

Climate change has had significant impacts—including increased flooding, heat waves, and extreme storms—on New York, and the State of New York will need to spend hundreds of billions of dollars to protect New Yorkers from those harms. New York's Climate Change Superfund Act ("Climate Act") requires fossil fuel companies that profited from extracting and refining the fossil fuels that contribute to climate change to compensate New York for some of those costs. Plaintiffs (together "the United States") challenge the Climate Act and have moved for summary judgment that the Climate Act is preempted by federal law and foreign policy, exceeds limits on extraterritorial regulation, and violates the dormant Commerce Clause.

The summary judgment motion should be denied. First, the United States lacks standing based on its proprietary or *parens patriae* interests because it has not substantiated its allegations that the Act will raise energy prices and lower production. In addition, defendants (together, "the State") have submitted evidence that the Act will not do so. The United States also may not rely on its sovereign interests because it has not asserted that the Climate Act will impede its enforcement of federal law or compliance with international agreements.

Second, even if the United States has standing, its claims fail on the merits. The Climate Act is not preempted by either the Clean Air Act or foreign policy because both focus on controlling the greenhouse gas emissions that cause climate change while the Climate Act provides compensation for climate change harm. There is also no free-standing constitutional prohibition on "extraterritorial regulation," and the

1

Act complies with the Due Process Clause because the Act's cost demands will seek compensation for harm in New York from fossil fuel producers with sufficient contacts with New York. Nor does the Act discriminate against out-of-state or foreign fossil fuel producers in violation of the dormant Interstate or Foreign Commerce Clause.

## STATUTORY BACKGROUND

### The Climate Change Superfund Act

The Legislature adopted the Climate Act in 2024 as "necessary for the general health, safety, and welfare of the people of [New York]" based on its finding that:

> [T]he state must take action to adapt to certain consequences of climate change that are irreversible, including rising sea levels, increasing temperatures, extreme weather events, flooding, heat waves, harmful algal blooms and other climate-change-driven threats .... Meeting that challenge will require a shared commitment of purpose, huge investments in new or upgraded infrastructure, and new revenue sources to pay for those investments.

Ch. 679, §§ 2(1), 7, 2024 N.Y. Sess. Laws.

The Climate Act establishes "the climate change adaptation cost recovery program" to help offset a portion of the costs that New York will incur to address the statewide impacts of climate change. N.Y. Env't Conserv. Law ("ECL") § 76-0103. The program will fund projects designed to address the significant harms from climate change in New York and promote the health and wellbeing of New Yorkers. *Id.* §§ 76-0103(2), 76-0103(3)(b). Fossil fuel companies that meet statutory thresholds, including "sufficient contacts with the state to satisfy the due process clause of the United States Constitution," ("responsible parties") will be required to collectively pay $75 billion into a climate adaptation fund. *Id.* §§ 76-0101(6), (21), 76-0103(3)(b).

A responsible party's share of that assessment will be proportional to its share of "covered greenhouse gas emissions," ECL § 76-0103(3)(b), which will be determined based on historic greenhouse gas emissions "attributable" to the fossil fuels that the company is responsible for having extracted or refined from 2000 to 2024. *Id.* § 76-0101(8)-(9), (21). Those emissions may include both direct emissions from a party's operations and indirect emissions from the use of fossil fuels. Responsible parties can pay the assessment in annual payments over 25 years. *Id.* § 76-0103(3)(e)(i).

The Act directs the New York Department of Environmental Conservation ("DEC") to issue regulations by June 26, 2027, including provisions to (a) gather information to identify responsible parties; (b) determine responsible parties and their shares; and (c) send cost recovery demands by June 30, 2028. *Id.* § 76-0103(4).

**The Clean Air Act**

The Clean Air Act seeks to prevent air pollution by "reduc[ing] or eliminat[ing]" pollutants "produced or created at the source" and recognizes that such prevention is the primary responsibility of States and local governments, 42 U.S.C. § 7401(a)(3). It establishes a cooperative federalism model for EPA and States to regulate "pollution-generating emissions from both stationary sources, such as factories and powerplants, and moving sources, such as cars, trucks, and aircraft," *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 308 (2014), subject to statutory standards for regulation that apply to each type of source. For stationary sources, it requires EPA to determine whether a category of sources "causes, or contributes significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare," and to

establish standards of performance for new sources within such category. 42 U.S.C.
§ 7411(b)(1); *see also id.* § 7521(a)(1). For existing stationary sources, it directs States
to establish standards pursuant to emission guidelines issued by EPA. *Id.* § 7411(d).

The Supreme Court ruled in *Massachusetts v. EPA*, 549 U.S. 497, 528–29
(2007), that greenhouse gas emissions are pollutants under the mobile-source
provisions of the Clean Air Act. EPA then issued an endangerment finding, 74 Fed.
Reg. 66,496 (Dec. 15, 2009),[1] and emission standards for motor vehicles. *See Util. Air
Regul. Grp.*, 573 U.S. at 310–11. EPA subsequently determined that greenhouse gas
emissions from certain stationary sources also endanger public health and welfare
and issued regulations under 42 U.S.C. § 7411. *See, e.g.*, 80 Fed. Reg. 64,510 (Oct. 23,
2015) (power plants); 81 Fed. Reg. 35,824 (June 3, 2016) (oil and gas industry).

## FACTUAL BACKGROUND

### The Economic Impacts of Cost-Recovery Demands

Because the Climate Act's cost demands will be based on greenhouses gases
attributable to fossil fuels extracted or refined in the past, the demands will not affect
the market price for energy. Declaration of Don Fullerton ("Fullerton Decl.") ¶¶ 12-
27. Standard economic models show that a company will continue to produce and sell
additional goods and services if it can earn a profit, that is, if the product is sold at a
price higher than the cost of producing it, which is called the marginal cost of
production. *Id.* ¶ 14. The Act's cost demands impose a fixed cost, not a marginal cost,
because the amount of the demand is unrelated to a company's current decisions

---

[1] EPA has proposed to repeal the 2009 endangerment finding. 90 Fed. Reg. 36,288 (Aug. 1, 2025).

about the quantity of fossil fuels to extract or refine. *Id.* ¶¶ 15, 31. Because the demand does not affect the marginal cost of production, it will not affect the market price. *Id.* ¶¶ 18, 30-32. The demands should be absorbed by fossil fuel companies and will not be passed on to consumers through increased prices. *Id.* ¶ 31.

Indeed, the Climate Act is not an economic regulation, as understood by economists, because it does not change the conduct of fossil fuel companies that will receive cost demands, or any other fossil fuel company inside or outside the United States. *Id.* ¶¶ 28-32. Moreover, because there will be no effect on market prices, demand for energy will not change, and with no change in supply or demand, the Climate Act will not change energy availability in the United States. *Id.* ¶ 34. In addition, because the Act does not change the current or future marginal cost of production or prices, it will not change fossil fuel companies' expectations about future profits from extracting or refining fossil fuels, or the resulting incentive to invest in new infrastructure and innovation. *Id.* ¶ 33. And it will not change the revenue the United States earns from oil and gas leasing. *Id.* ¶ 35.

### Greenhouse Gas Emissions

The advanced state of climate science allows for the attribution of climate damage, including warming and other local climate hazards, to sets of emissions, including emissions of a specific company. Declaration of Justin Mankin (Mankin Decl.) ¶¶ 10, 21–39. In-state climate harms can be attributed to a specific company's greenhouse gas emissions by calculating the warming from cumulative greenhouse gas concentrations with and without the company's emissions, and then using

modeling to link the company's impact on warming to altered in-state hazards such as the likelihood or magnitude of extreme heat. *Id.* ¶¶ 33–38.

The process for this type of attribution begins with identifying the greenhouse gas emissions to be considered. *Id.* ¶¶ 35–37. The emissions attributable to fossil fuel companies are Scope 1 emissions, which are direct emissions from a company's operations, including emissions from flaring, refining and other operations; Scope 2 emissions, which are emissions from energy supplied to the company for its operations, including for heating and cooling; and Scope 3 emissions, which largely consist of emissions from the use of the company's products. *Id.* ¶¶ 14–20.

### International Agreements Regarding Climate Change

For decades, international environmental law and agreements to which the United States is a party have recognized the "polluter pays" principle, pursuant to which a polluting entity is required to pay the costs that its profit-making activities impose on neighboring people and entities, as opposed to benefiting financially from costs it causes others to bear. Declaration of Harold Koh (Koh Decl.) ¶¶ 13–17.

In 1992, many countries, including the United States, signed the United Nations Framework Convention on Climate Change ("Framework Convention"), agreeing to "stabilization of greenhouse gas concentrations in the atmosphere at a level that would prevent dangerous anthropogenic interference with the climate system." *Id.* ¶¶ 18–20. The Framework Convention is implemented through treaties such as the Kyoto Protocol and Paris Agreement. *Id.* ¶ 18.

The United States declined to join the 1997 Kyoto Protocol, which established legally binding obligations to reduce emissions in developed countries, because of the asymmetry in proposed obligations between the United States and China and India, but did not withdraw from the Framework Convention. *Id.* ¶¶ 21–22. The United States joined the 2015 Paris Agreement, which requires members to pursue domestic mitigation measures to meet national emission reduction goals and transparently communicate information on their progress. *Id.* ¶¶ 23–28. Unlike Kyoto, Paris does not have legally binding emissions reduction requirements. *Id.* ¶ 25.

Neither the Framework Convention nor the Paris Agreement addresses intergovernmental liability for past greenhouse gas emissions. *Id.* ¶¶ 19, 31. Nor do they address payments from private companies to subnational government entities like New York, as the agreements apply only to countries and regional economic integration organizations like the European Union. *Id.* ¶ 32. In January 2025, President Trump announced his intention to withdraw from the Paris Agreement, but withdrawal requires at least one year's written notice, so the earliest the withdrawal could become effective is January 2026. *Id.* ¶¶ 29–30.

## STANDARD OF REVIEW

Summary judgment is appropriate "when, based upon facts not in dispute, the moving party is entitled to judgment as a matter of law." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) (citation omitted). Summary judgment must be denied "[i]f the evidence submitted in support of the summary judgment motion does not meet the movant's burden." *Vt. Teddy Bear Co. v. 1-800 BEARGRAM Co.*, 373 F.3d 241,

244 (2d Cir. 2004) (citation omitted). If the moving party meets its initial burden, "the opposing party must set out specific facts showing a genuine issue for trial." *City of New York v. Lexington Ins. Co.*, 735 F. Supp. 2d 99, 107 (S.D.N.Y. 2010) (quotation marks and citation omitted). Even if there is no genuine issue as to any material fact, the movant bears the burden to show entitlement to judgment as a matter of law.

Further, when a plaintiff facially challenges a statute that has not yet been implemented or applied, *see N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 265 (2d Cir. 2015) (noting that pre-enforcement challenge is a facial challenge), it must "'establish that no set of circumstances exists under which the Act would be valid,' *i.e.*, that the law is unconstitutional in all of its applications," *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (alteration and citation omitted). Courts "must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Id.* at 449–50. Facial challenges are "the most difficult challenge[s] to mount successfully." *N.Y. State Rifle*, 804 F.3d at 265 (citation omitted).

## ARGUMENT

The United States does not have standing to challenge the Climate Act because it has not substantiated the alleged injuries to its proprietary and *parens patriae* interests nor has it alleged that the Climate Act will impede its sovereign interests in enforcing its laws and complying with international agreements.

Even if the United States has standing, the Climate Act is not preempted by the Clean Air Act because the Clean Air Act regulates ongoing greenhouse gas

emissions from stationary and mobile sources while the Climate Act only seeks compensation for climate-change harm from past greenhouse gas emissions. Similarly, the Climate Act is not preempted by the foreign affairs doctrine because the United States' foreign policy addresses ongoing greenhouse gas emissions, not the liability of private parties for climate-change harm from past emissions.

The Constitution does not address "extraterritorial legislation" separately from the requirements of the Due Process Clause and the dormant Commerce Clause. The Climate Act ensures compliance with the Due Process Clause by requiring that fossil fuel producers that receive cost demands have sufficient contacts with New York. The Climate Act also does not discriminate against out-of-state or foreign fossil fuel producers in violation of the dormant Commerce Clause.

## I.    THE UNITED STATES LACKS STANDING.

"For there to be a case or controversy under Article III, the plaintiff must have a personal stake in the case—in other words, standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (quotation marks and citation omitted). A plaintiff must establish that: (1) it has "suffered an injury in fact that is concrete, particularized, and actual or imminent"; (2) "the injury was likely caused by the defendant"; and (3) "the injury would likely be redressed by judicial relief." *Id.* (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). At the summary judgment stage, "the plaintiff can no longer rest on ... mere allegations" regarding standing and must set forth facts "supported adequately by evidence." *Lujan*, 504 U.S. at 561 (quotation marks and citations omitted). In addition, "[a] plaintiff must demonstrate standing

for each claim he seeks to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). Each of these requirements apply to the United States as plaintiff. *Tachiona v. United States*, 386 F.3d 205, 210–211 (2d Cir. 2004).

A plaintiff must show that injury is "certainly impending" or there is a "substantial risk that the harm will occur." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 414 n.5 (2013) (emphasis, quotation marks, and citations omitted). "Allegations of possible future injury" are insufficient. *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990). "[W]hen (as here) a plaintiff challenges the government's unlawful regulation (or lack of regulation) of *someone else*, … the plaintiff must show that the third parties will likely react in predictable ways that in turn will likely injure the plaintiffs." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 382–83 (2024) (emphasis added; quotation marks and citation omitted). Where the "existence of one or more of the essential elements of standing depends on the unfettered choices made by independent actors not before the courts," it is the plaintiff's burden to show that "those choices have been or will be made." *Lujan*, 504 U.S. at 562 (quotation marks and citation omitted).

The United States asserts: (1) injury to its proprietary interests due to higher energy costs and decreased revenue from federal oil and gas leasing; (2) injury to its *parens patriae* interests in the economic well-being of the general population and the national energy market; and (3) injury to its sovereign interests based on the interference with federal law and its authority over interstate and foreign commerce, greenhouse gas regulation, and national energy policy. Compl. ¶¶ 10, 64, ECF No. 1.

10

The Court should deny the United States summary judgment because it fails to meet its burden with respect to any of those injuries. The United States fails to adduce facts to show that fossil fuel companies who receive cost demands will raise prices and lower production, and the State submits evidence refuting those allegations. In the absence of evidence that prices will rise, the United States does not have *parens patriae* standing to protect the general public, nor may it protect the interests of fossil fuel companies. Finally, to the extent sovereign interests could support some of its claims, the United States has not alleged that the Climate Act will interfere with its enforcement of the Clean Air Act or cause any concrete, imminent injury to any other sovereign interest. Moreover, none of these alleged injuries could conceivably occur until DEC issues regulations and sends cost demands to specific companies in specific amounts, and for that reason this pre-enforcement challenge is unripe. *See Brennan v. Nassau Cnty.*, 352 F.3d 60, 65 n.9 (2d Cir. 2003) (acknowledging that standing and ripeness are intertwined); *Motor Vehicle Mfrs. Ass'n v. N.Y. State Dep't of Envtl. Conservation*, 79 F.3d 1298, 1306 (2d Cir. 1996) ("Because plaintiffs' arguments depend upon the effects of regulatory choices to be made by New York in the future, the district court properly declined to adjudicate this claim").

Indeed, as the Court indicated it would consider when it denied the State's request to cross-move for summary judgment, ECF 81, the Court should dismiss this action on its own authority based on the United States' failure to establish standing.

Or, if the Court determines that the United States has not established standing with respect only to some claims, the Court should dismiss those claims.

### A.    The United States Has Not Demonstrated Injury to Its Proprietary Interests.

The United States fails to establish that the Climate Act will injure its proprietary interests because it has presented no evidence that fossil fuel producers will raise prices and lower production, leading to increased energy costs for the United States and decreased revenue from oil and gas leases on federal land. Compl. ¶¶ 10, 64. Moreover, those allegations are refuted by the State's evidence.

The United States fails to submit any evidence that fossil fuel companies will raise prices or decrease production, *see All. for Hippocratic Med.*, 602 U.S. at 383 (plaintiff must show third party will likely react in predictable ways), and thus that energy price increases or lower revenue are "certainly impending," *Clapper*, 568 U.S. at 409 (emphasis, quotation marks and citation omitted). This failure is fatal given the United States' burden to set forth facts "supported adequately by the evidence." *Lujan*, 504 U.S. at 561.

The failure is also fatal because, when the State opposed this pre-discovery summary judgment motion, it indicated that the United States' allegations of injury to its proprietary (and *parens patriae*) interests required factual support. ECF 41 at 4. In response, the United States foreshadowed that it would not support these allegations with any facts. First, it claimed that discovery was not necessary because it was "economic reality" that the Climate Act would affect markets and prices. *See* ECF 49 at 5. To the contrary, the State's economics expert explains that cost demands

12

under the Climate Act will impose a fixed cost that will not lead fossil fuel companies to increase prices or decrease production. Nor will it decrease the United States' revenue from federal leases. *See* Fullerton Decl. ¶¶ 18, 30-35. Second, the United States stated that "if Defendants challenged standing at this stage," it would rely solely on its sovereign interest. But when the United States seeks summary judgment, it must either demonstrate injury to proprietary (and *parens patriae*) interests or concede that it does not have standing on those grounds.

The United States relies on *City of New York v. Chevron Corp.*, 993 F.3d 81, 103 (2d Cir. 2021), to argue that the Act will "affect the price and production of fossil fuels," Pls' Mem. of Law in Supp. of Mot. for Summ. J. (US Br.) 11, ECF 74, but that case concerned a state-law nuisance action against oil companies seeking damages for climate change, and the impact of such liability would not necessarily have been the same as the Climate Act. In addition, that case was before the Second Circuit on a motion to dismiss, 993 F.3d at 89, so there was no evidentiary record. Nevertheless, the City conceded that "tort damages could work production-side changes," *id.* at 93 (punctuation omitted), and the court stated only that holding the companies liable for purely foreign activity would "presumably" affect the price and production of fossil fuels abroad, *id* at 103. Even if the court was making a factual finding—which is unlikely—that finding would not be subject to judicial notice here because it is neither "generally known" nor based on a source "whose accuracy cannot reasonably be questioned," as required by Federal Rule of Evidence 201(b). *See Int'l Star Class*

*Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998)
(findings in prior cases do not meet the requirements of Rule 201).

Even if the United States could show that the Climate Act will decrease
production and raise prices, royalties from federal leases are based on the "value of
production." 30 U.S.C. § 226(b); *see also* 30 C.F.R. part 1206. The combined impact of
lower production and increased prices on the value of production is highly uncertain.

## B.    The United States Has Not Demonstrated Injury to Its *Parens Patriae* Interests.

The United States suing as *parens patriae* must establish "(1) [an] injury to a
sufficiently substantial segment of the [United States] population; (2) a quasi-
sovereign interest; and (3) an inability for individual plaintiffs to obtain complete
relief." *New York v. Niagara-Wheatfield Cent. Sch. Dist.,* 119 F.4th 270, 279 (2d Cir.
2024) (quotation marks and citation omitted). The injury to the public must be
"distinct from the interests of particular private parties." *Purdue Pharma L.P. v.
Kentucky,* 704 F.3d 208, 215 (2d Cir. 2013) (quotation marks and citation omitted);
*see also Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 602
(1982) (interests of private parties are not "sovereign interests, and they do not
become such simply by virtue of the State's aiding in their achievement").

The United States alleges it has standing to protect consumers from higher
energy costs and the national energy market from disruption, Compl. ¶¶ 10, 64, but
fails to establish standing based on these interests. The United States may not sue
on behalf of consumers because it has not presented any evidence that prices will
increase and the State has shown that prices will not increase. *See* p. 12 above. All

14

that remains are the interests of fossil fuel companies in the national energy market, but the United States does not have *parens patriae* standing to assert the financial "interests of particular private parties." *Purdue Pharma,* 704 F.3d at 215. Moreover, there is no basis for *parens patriae* standing here, where the United States seeks the same relief that organizations representing fossil fuel companies and a fossil fuel company already seek in *West Virginia v. James*, No. 1:25-cv-00168 (N.D.N.Y.) and *Chamber of Commerce of the United States v. James*, No. 1:25-cv-01307 (N.D.N.Y.). *Cf. Niagara-Wheatfield Cent. Sch. Dist.* 119 F.4th at 279 n.3 (without State asserting claims against school district for failure to respond to sexual harassment, individual students could not obtain meaningful relief for school community).

## C.    The United States Has Not Asserted Injury to Its Sovereign Interests.

A sovereign has an interest in "the exercise of sovereign power over individuals and entities within the relevant jurisdiction," which "involves the power to create and enforce a legal code, both civil and criminal," and in "the demand for recognition from other sovereigns—most frequently this involves the maintenance and recognition of borders." *Snapp*, 458 U.S. at 601. To establish standing, a sovereign plaintiff must show particularized and imminent injury to its "power to create and enforce a legal code" or its "demand for recognition from other sovereigns." *Id.*; *see also Sanitary Dist. v. United States,* 266 U.S. 405, 425 (1925) (United States had standing to enjoin diverting of water from Lake Michigan where it threatened the United States' control over navigable waters that bordered other States and Canada).

Thus, in cases where the United States claimed that a state law was preempted, it showed that the law would interfere with enforcement of federal law. In *United States v. Missouri*, the United States claimed that a state law declaring federal firearm regulations invalid was preempted and demonstrated concrete, imminent injury to its power to enforce federal law because "state officials withdrew resources and manpower that further the enforcement of federal law." 114 F.4th 980, 984 (8th Cir. 2024); *see also United States v. Iowa*, 126 F.4th 1334, 1342 (8th Cir. 2025) (United States had standing to challenge a state law that interfered with the ability of immigrants to participate in federal proceedings).

The United States can also show particularized injury where it asserts a violation of its laws, *see, e.g.*, *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000), or interference with its obligations pursuant to international treaties, *see Tachiona*, 386 F.3d at 212 (United States had standing to appeal a judgment that placed it in breach of treaty obligations); *Sanitary Dist.*, 266 U.S. at 425 (United States had standing to enjoin action that violated a treaty).

The United States has not asserted that the Climate Act interferes with its ability to enforce a federal law or comply with any treaty or international obligation.

*Enforcement of a legal code.* While the United States asserts that its "sovereign interests include ensuring that State laws like the [Climate] Act do not interfere with federal law, including the Clean Air Act, or with the federal government's exclusive authority over interstate and foreign commerce, greenhouse gas regulation, and national energy policy," Compl. ¶ 10, the only federal law it cites are provisions of the

16

Clean Air Act that give States the authority to set and enforce standards for air quality and to petition the Administrator for certain action. *See* US Br. 3–4, 15, 17–19 (citing 42 U.S.C. §§ 7401 *et seq.,* 7401(a)(3), 7410, 7411(d), 7416, 7426(b), 7506a(a), 7604(e)). The United States does not assert the Climate Act violates or interferes with its ability to enforce any of these provisions. Even if it had, that could only support standing to assert its preemption claim. *See DaimlerChrysler,* 547 U.S. at 352.

The United States' reliance on *Arizona v. United States*, 567 U.S. 387 (2012), US Br. 10–11, where it claimed that an Arizona law was preempted, is misplaced because the court did not discuss standing. Moreover, unlike here and like *Iowa*, 126 F.4th at 1342, as discussed above (p. 15-16), the Arizona law implicated the United States' enforcement of federal law because it sought to create state remedies for the violation of federal immigration requirements. 567 U.S. at 409.

*Recognition by other sovereigns or obligations under international agreements.* The United States vaguely asserts that the Climate Act harms the federal government's capacity to speak with one voice with foreign governments and the United States' foreign policy on greenhouse gas regulation. *See* US Br. 2, 28–29. These general interests could only support the United States' standing for its foreign affairs preemption and dormant Foreign Commerce Clause claims, but the United States fails to assert that the Climate Act interferes with either the United States' interest in recognition by other sovereigns, *Snapp*, 458 U.S. at 601, or its ability to comply with its obligations under international agreements, *Tachiona*, 386 F.3d at 212. The United States points to the Framework Convention, the Kyoto Protocol, and

the Paris Agreement, *see* US Br. 28–29, but does not contend that the Climate Act will interfere with its ability to meet any obligation under those agreements. Nor does the United States claim that the Climate Act will require it to participate in any "international efforts" or join in any "restrictive measures to reduce global greenhouse gas emissions." *See* US Br. 28–29.

## II. THE CLEAN AIR ACT DOES NOT PREEMPT THE CLIMATE ACT.

The United States claims that the Clean Air Act preempts the Climate Act. US Br. 11–21. But unlike the Clean Air Act, which authorizes EPA to limit direct air emissions from sources, the Climate Act seeks compensation for harm from past emissions and will not directly or indirectly regulate ongoing emissions.

The preemption of a state statute by a federal statute represents "a serious intrusion into state sovereignty," and courts "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Medtronic, Inc. v Lohr*, 518 U.S. 470, 485, 488 (1996) (quotation marks and citations omitted).

There are three types of preemption:

(1) express preemption, where Congress has expressly preempted local law; (2) field preemption, "where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law"; and (3) conflict preemption, where local law conflicts with federal law such that it is impossible for a party to comply with both or the local law is an obstacle to the achievement of federal objectives.

*Nat'l Shooting Sports Found. v. James*, 144 F.4th 98, 108 (2d Cir. 2025) (citations omitted).

18

As a preliminary matter, the Climate Act is an exercise of New York's police power because it seeks to protect New Yorkers by compensating New York for the harms of climate change. The United States does not argue, nor could it, that the Clean Air Act expressly preempts the Climate Act.[2] Instead, the United States argues that the Clean Air Act preempts the Climate Act because it occupies the field of interstate air pollution, US Br. 13–16, and the Climate Act conflicts with the Clean Air Act, *id. at* 16–21. Neither argument is correct because the Clean Air Act regulates ongoing air pollution while the Climate Act seeks compensation for past pollution.

### A. The Climate Act Is an Exercise of Traditional State Responsibility

The United States argues that "interstate [air] pollution is an inherently federal issue," US Br. 13, but relies on decisions where a plaintiff sought to control cross-border pollution, which the Climate Act does not do either directly or indirectly. In *International Paper Co. v. Ouellette*, Vermont residents sued a New York paper mill for water pollution under Vermont public nuisance law, and the court held that their Vermont claim was preempted by the Clean Water Act and not preserved by the Act's savings clause because the claim sought "to impose separate discharge standards on a single point source." 479 U.S. 481, 493 (1987). In *City of New York*, the Second Circuit ruled that the City's state law public nuisance claim for climate change damages was preempted by federal law and not preserved by the Clean Air Act because a damages award would "regulate cross-border emissions in an indirect

---

[2] The Clean Air Act grants EPA authority to preempt state regulations concerning emissions standards for motor vehicles, 42 U.S.C. §§ 7543(a), 7543(e)(1), but those provisions are not relevant here.

19

and roundabout manner" by causing companies to cease production or develop new ways to control pollution. 993 F.3d at 93. Thus, as the Supreme Court explained in *American Electric Power Co., Inc. v. Connecticut* ("*AEP*"), federal common law has been applied in the context of nuisance actions "brought by one State to abate pollution emanating from another State." 564 U.S. 410, 421 (2011).[3]

In contrast, the Climate Act requires fossil fuel producers to compensate New York for harm from past greenhouse gas emissions, not to limit or otherwise control their ongoing interstate emissions. Nor does the Act indirectly require them to control emissions by forcing them to decrease fossil fuel production or implement additional pollution controls. As explained by the State's economics expert, cost demands under the Climate Act will impose a fixed cost that will not lead companies to decrease production or alter any incentives to invest or innovate, including by implementing additional pollution controls. Fullerton Decl. ¶¶ 18, 30–33.

Because the Act compensates New York for the impacts that climate change poses to health, safety, and well-being, it falls squarely within New York's traditional powers and is presumed constitutional. States have broad police powers to "protect the health and safety of their citizens," *Medtronic*, 518 U.S. at 475. New York has a longstanding interest in "all the earth and air within its domain," *Georgia v. Tenn. Copper Co.*, 206 U.S. 230, 237 (1907) (enjoining industry from discharging noxious

---

[3] The United States asserts that *Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 641 (1981), ruled that "'our federal system does not permit … controvers[ies]' involving interstate pollution 'to be resolved under state law.'" US Br. 11. That decision did *not* address interstate pollution. Instead, the Supreme Court declined to establish a right to contribution under federal common law in an antitrust damages case.

gas into Georgia), and a "legitimate interest in combating the adverse effects of climate change on [its] residents," *Am. Fuel & Petrochemical Mfrs. v. O'Keeffe*, 903 F.3d 903, 913 (9th Cir. 2018) (citing *Massachusetts*, 549 U.S. at 522–23). Although the Climate Act is designed to raise revenue, rather than prevent the harm by regulating emissions, it operates in a field traditionally occupied by the States, *i.e.* protecting its territory and its residents from the adverse impacts of climate change. *See e.g. Askew v. Am. Waterways Operators, Inc.,* 411 U.S. 325, 336 (1973) (sustaining Florida law that imposed no-fault liability for damages caused by oil spills against a preemption challenge, noting "[s]o far as liability without fault for damages to state … interests is concerned, the police power has been held adequate for that purpose").

### B.    The Clean Air Act Does Not Preempt the Climate Act by Occupying the Same Field.

The United States argues that the Climate Act "openly regulates interstate air emissions, which is a field that has always been occupied by federal law, both before and after the Clean Air Act was enacted, because of our constitutional structure and the inherently interstate (indeed, global) nature of the issue." US Br. 16. The Climate Act does not regulate interstate air emissions either openly or indirectly. The United States relies heavily on *City of New York*, but that case does not hold otherwise. The State addresses the constitutional claims in Points IV to VI below (pp. 36-48).

### 1.    The Clean Air Act and Climate Act do not occupy the same field.

The Clean Air Act does not preempt the Climate Act by occupying the field because the Clean Air Act limits ongoing direct emissions from sources, while the Climate Act seeks compensation for harm from past emissions. Field preemption

applies where the "scheme of federal regulation [is] so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," or "federal interest is so dominant" in a field "that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947) (citations omitted). Field preemption is "rare." *Kansas v. Garcia*, 589 U.S. 191, 208 (2020). To determine if Congress "has implicitly ousted the States from regulating in a particular field, [courts] must first identify the field in which this is said to have occurred." *Id*. The Clean Air Act does not occupy the field of controlling emissions of air pollutants from mobile and stationary sources and even if it did, the Climate Act does not regulate those emissions.

As an initial matter, the Clean Air Act does not entirely occupy the field of controlling emissions of air pollutants. Although the United States claims that the Clean Air Act "occupies the field of interstate [greenhouse gas emissions] regulation," U.S. Br. 13, they point to cases that involve only conflict preemption and do not hold that the Clean Air Act occupies the field of interstate pollution. *See Merrick v. Diageo Americas Supply, Inc.*, 805 F.3d 685, 694–695 (6th Cir. 2015); *Bell v. Cheswick Generating Station*, 734 F.3d 188, 196–197 (3d Cir. 2013); *North Carolina, ex rel. Cooper v. Tenn. Valley Auth.*, 615 F.3d 291, 306 (4th Cir. 2010). Instead, as the United States admits, the Clean Air Act allows emissions of air pollutants "*until* EPA acts." US Br. 4 (citing *AEP*, 564 U.S. at 426) (emphasis in original).

But even if the Clean Air Act occupied the field of controlling direct emissions, it does not address "economic loss" or "occupy the entire field of pollution remedies."

*Exxon Shipping Co. v. Baker*, 554 U.S. 471, 489 (2008) (citation omitted). In *Exxon Shipping*, fossil fuel producer Exxon admitted that the Clean Water Act, which was the model for the Clean Air Act, *see* US Br. 14 (citing *Merrick* at 692–93), "does not displace compensatory remedies for consequences of water pollution, even those for economic harms." 554 U.S. at 489. The Supreme Court ruled that the Clean Water Act also does not preempt punitive damages because there is "no clear indication of congressional intent to occupy the entire field of pollution remedies." *Id.* (citation omitted). Like the Clean Water Act, the Clean Air Act does not address compensatory remedies for air pollution. While the remedies at issue in *Exxon Shipping* were common law remedies, there is no reason why the Clean Air Act would have a different preemptive effect on remedies for pollution harm under a state statute.

The United States argues that the Climate Act is field-preempted because the Act regulates greenhouse gas emissions, US Br. 13, but the United States does not contend that the Act does so directly. Nor could it because, while the Act requires fossil fuel companies to compensate New York based on the volume of greenhouse gases attributable to them from 2000 to 2024, ECL § 76-0101(8)–(9), it does not address ongoing emissions. In contrast, in *Ouellette* the Supreme Court found that a state public nuisance claim that sought "to impose separate discharge standards on a single point source" was preempted by the Clean Water Act. 479 U.S. at 493. And as the Supreme Court noted in *Exxon Shipping*, "common law nuisance claims" that sought "effluent-discharge standards different from those provided by the [Clean

23

Case 1:25-cv-03656-PKC    Document 84    Filed 10/27/25    Page 36 of 62

Water Act]" are distinguishable from a claim for "economic injury" which does "not threaten similar interference with federal regulatory goals." 554 U.S. at 489 & n.7.

The United States's argument that the Climate Act indirectly regulates emissions relies on findings in other cases that are not subject to judicial notice, as discussed above (p. 13). The United States may not rely on the finding in *Ouellette*, 479 U.S. at 495, that public nuisance liability under Vermont law would cause a paper mill to "change its methods of doing business and controlling pollution," or the finding in *City of New York*, 993 F.3d at 93, that companies may "cease global production altogether" to "avoid all liability," to argue that the Climate Act will have the same effects. S*ee* US Br. 20–21.

Moreover, the State has shown that the Climate Act's cost demands will not lead to reduced production, implementation of additional controls, or other changes in corporate or consumer conduct. Fullerton Decl. ¶¶ 18, 30–33. And, in any event, the production decreases and other impacts the United States speculates will occur as a result of the Act do not even constitute regulations on greenhouse gas emissions.

Thus, even if the Clean Air Act occupies the field of controlling greenhouse gas emissions—which the State does not concede—it does not preempt the Climate Act because the Climate Act does not regulate those emissions.

2.    *City of New York* **does not address the preemption of a state statute by the Clean Air Act.**

The United States argues that *City of New York* controls, US Br. 13–15, but *City of New York* addressed only whether a state public nuisance claim preempted by federal common law "snap[ped] back into action" when federal common law was

displaced by the Clean Air Act. 993 F.3d at 98. The court did not engage in a "traditional statutory preemption analysis" to answer that question; instead, it reasoned that the City's state common law claim could be revived only by the Clean Air Act's savings clause and found that it was not. *Id.* at 98, 100.

If the United States suggests that the Climate Act is preempted simply because federal common law preempts state common law, US Br. 12, that is incorrect. As discussed above (p. 19), federal common law addresses controls on interstate pollution, not compensation for harm caused by interstate pollution. Nor does the United States provide any authority that, because judicially-created federal common law preempts judicially-created state common law controlling interstate air pollution, a State may not enact a statute that compensates for the harms of interstate air pollution regardless of whether the Clean Air Act preempts that statute. Indeed, in *Ouellette*, the Supreme Court did not rely on the preemption of state common law by federal common law to rule that that the Clean Water Act preempted a state common law claim. *See* 479 U.S. at 491 ("the question presented [is]: whether the [Clean Water] Act pre-empts Vermont common law").

Moreover, the Second Circuit's concerns in *City of New York* are not present here. First, as explained above (p. 19), the court found that the City's nuisance claim would lead to regulation of cross-border emissions, 993 F.3d at 93, and the Climate Act does not do that. The court also ruled that the City's claim "risk[ed] upsetting the careful balance that has been struck between the prevention of global warming" and "energy production, economic growth, foreign policy, and national security." *Id.* at 93.

But as explained above with respect to the Clean Air Act (pp. 22-23) and below with respect to foreign policy (pp. 31-32), the Climate Act requires fossil fuel companies to compensate New York for harm caused by historic greenhouse gas emissions, which neither national nor foreign policy addresses.[4]

## C. The Climate Act Does Not Conflict with the Clean Air Act.

A state statute is conflict-preempted if it is impossible to comply with both state and federal law, or the state statute "is an obstacle to the achievement of federal objectives." *Nat'l Shooting Sports Found.*, 144 F.4th at 108 (citation omitted). The burden to show conflict preemption is "heavy," and a plaintiff must establish an "actual" and "sharp" conflict. *In re MTBE Prods. Liab. Litig.*, 725 F.3d 65, 101–102 (citations omitted). Additionally, courts are reluctant to rely on "incidental effects" to find a state law preempted. *See, e.g., Coal. for Competitive Elec. v. Zibelman,* 906 F.3d 41, 56–57 (2d Cir. 2018) (state emissions credit program was not conflict-preempted because alleged effects on federal program were "(at best) incidental"); *Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kansas*, 489 U.S. 493, 516 (1989) (state law that might have "some impact on purchasing decisions and hence costs … does not without more result in conflict pre-emption"). The United States does not claim that fossil fuel producers cannot comply with both the Clean Air Act and the Climate Act but argues that the Climate Act is an obstacle to the Clean Air Act's objectives.

---

[4] The State reserves the right to argue that *City of New York* was wrongly decided. *See, e.g., Mayor & City Council of Balt. v. BP, P.L.C.*, 31 F.4th 178, 203 (4th Cir. 2022) (noting "legal flaw" in *City of New York*'s analysis); *District of Columbia v. Exxon Mobil Corp.*, 89 F.4th 144, 153 (D.C. Cir. 2023) (stating that *City of New York* "cannot be squared" with Supreme Court precedent); *City & Cnty. of Honolulu v. Sunoco LP*, 537 P.3d 1173, 1200 (Haw. 2023) (finding *City of New York*'s reasoning "not persuasive"); *In re Cnty. Comm'rs of Boulder City. v. Suncor Energy USA, Inc.*, No. 24SA206, 2025 WL 1363355, at *9–10 (Colo. 2025) (declining to follow *City of New York* and criticizing its preemption analysis).

The United States' argument overlooks the difference between the control of ongoing emissions under the Clean Air Act and compensation for harm from past emissions under the Climate Act. The United States contends that the Climate Act conflicts with EPA's authority to "set nationwide standards," US Br. 18, apparently referring to EPA's authority to establish a "national ambient air-quality standard" ("NAAQS") under 42 U.S.C. § 7409. A NAAQS for a pollutant requires States to develop plans to control emissions of that pollutant from sources within the State to meet the standard. *Id.* § 7410(a). EPA has not established a NAAQS for greenhouse gases but even if EPA had, the Climate Act does not control those emissions so the Act does not conflict with EPA's NAAQS authority. Next, the United States claims that the Climate Act conflicts with the Clean Air Act's requirement that upwind States reduce emissions that affect air quality in downwind States, 42 U.S.C. § 7410(a)(2)(D)(i), because that requirement recognizes that States can control only in-state sources. US Br. 18. That requirement only applies to NAAQS pollutants, not greenhouse gases, and anyway the Climate Act compensates New York for the harm from past emissions and does not set an emission reduction standard for any out-of-State sources.

The United States also claims that every State could enact the same law, forcing companies to change their conduct. US Br. 19-20. This claim is speculative (and also unlikely given that over twenty States have challenged the Climate Act in *West Virginia*). Such speculation is not sufficient for the United States to carry its burden at summary judgment. *See, e.g.*, *Nat'l Shooting Sports Found.*, 144 F.4th at

112 (citation omitted) (cautioning against "speculating about hypothetical or imaginary cases in which a law might be invalid"); *Rest. L. Ctr. v. City of New York*, 90 F.4th 101, 117–18 (2d Cir. 2024) (declining to find facial preemption based on a speculative application of the challenged law).

Finally, the United States claims that "it is irrelevant that the [Climate] Act declares itself 'remedial in nature'" because the Act could cause fossil fuel companies to decrease production or increase pollution control. US Br. 20 (citation omitted). As the State has demonstrated (p. 12), the Climate Act will not do so.

## III. THE FOREIGN AFFAIRS DOCTRINE DOES NOT PREEMPT THE CLIMATE ACT.

The United States erroneously contends that the Act is preempted by the foreign affairs doctrine. *See* US Br. 27–32. As with preemption by a federal statute, the foreign affairs power only preempts state law where (1) there is "a clear conflict" (conflict preemption), *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 421 (2003), or (2) a state law "intrudes on the field of foreign affairs without addressing a traditional state responsibility" (field preemption), *Movsesian v. Victoria Versicherung AG*, 670 F.3d 1067, 1072 (9th Cir. 2012) (en banc); *Garamendi*, 539 US at 419 n.11. Courts throughout the country have refused to invalidate state laws unless they have "direct impacts on foreign relations." *Mayor & City Council of Balt.*, 31 F.4th at 214. The Climate Act does not conflict with any express foreign policy and is an exercise of New York's traditional state responsibility that does not intrude on foreign affairs.

### A. The Climate Act Does Not Conflict with Express Foreign Policy.

To preempt state law, an express foreign policy "must stem either from an act of Congress or from the Constitution itself" and thus have the effect of "domestic law." *Medellín v. Texas*, 552 U.S. 491, 523–24 (2008) (citation omitted). Thus, an executive action can preempt only if it was taken pursuant to Article II of the Constitution or, in a "narrow set of circumstances," when there is a "systematic, unbroken, executive practice, long pursued to the knowledge of the Congress and never before questioned," *id.* at 531 (citation omitted).

Even where there is an express foreign policy, it preempts only a state law that "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941), or "stands in the way" of an express foreign policy, *Garamendi*, 539 U.S. at 398, 421, 427 (holding California law imposing disclosure obligation on insurers conflicted with "consistent Presidential foreign policy" to resolve Holocaust-era insurance claims through international commission); *accord In re Assicurazioni Generali, S.P.A.*, 592 F.3d 113, 118–19 (2d Cir. 2010) (affirming dismissal of Holocaust-era claims under laws of various States against Italian insurers). The mere existence of an international agreement in a given area is not sufficient to preempt valid state law. If it could, the proliferation of a wide range of international agreements addressing traditionally domestic concerns—ranging from labor to anti-discrimination—would obliterate much of States' traditional powers and responsibilities.[5]

---

[5] *See, e.g.*, Canada-Mexico-United States: North American Agreement on Labor Cooperation, Sept. 14, 1993, 32 I.L.M. 1499; International Convention on the Elimination of All Forms of Racial Discrimination, Jan. 4, 1969, 660 U.N.T.S. 195.

The United States has not identified any statute, international agreement, or long-standing executive position with which the Climate Act conflicts. The United States argues that the Climate Act conflicts with generalized executive concerns, but those concerns are not sufficient to preempt the Act.[6]

*Statutes.* The United States fails to identify any statute that precludes States from enacting laws to recover climate change costs from fossil fuel producers. As explained above (pp. 21-28), the Clean Air Act does not do so.[7] The United States also points to the Global Climate Protection Act, US Br. 28, but that statute declares only that the United States "should 'work toward multilateral agreements' on greenhouse emissions with a 'coordinated national policy,' including in the international arena.'" 15 U.S.C. § 2901 note. Congressional aspiration is not sufficient to preempt state law. *Cf. City of Joliet v. New W., L.P.*, 562 F.3d 830, 837 (7th Cir. 2009) (noting in statutory preemption case that "a conflict between a local law and legislative aspirations does not displace another jurisdiction's law").

*International agreements and long-standing executive positions.* The United States argues that the Climate Act conflicts with the Framework Convention, the United States' position on agreements issued pursuant to that convention, and the

---

[6] The United States' reliance on *City of New York* in support of its foreign affairs claim, *see* US Br. 28–31, is misplaced. The court's discussion of "the need for judicial caution in the face of delicate foreign policy considerations" there, relied solely on federal common law cases, 993 F.3d at 103, and, as demonstrated by the State's foreign affairs expert, the Climate Act will not trigger serious foreign policy consequences or improperly result in the bypassing of diplomatic channels such as the Framework Convention and Paris Agreement, Koh Decl. ¶ 33.

[7] The United States' reliance on the concerns about the impact of a public nuisance claim on foreign nations expressed in *City of New York*, US Br. 28, is also misplaced because, as discussed above (p. 25), the Second Circuit determined that that claim would regulate cross-border emissions, which the Climate Act will not do.

United States' purportedly long-standing position on liability for harm from climate change. US Br. 28–31. The Climate Act conflicts with none of those.

First, the Climate Act does not conflict with the Framework Convention and executive decisions to not join the Kyoto Protocol and to leave the Paris Agreement. US Br. 28–30. As the United States admits, Compl. ¶ 41, the Framework Convention—and the agreements under it—are aimed at the "stabilization of greenhouse gas concentrations in the atmosphere at a level that would prevent dangerous anthropogenic interference with the climate system." In contrast, the Climate Act establishes compensation for harms from past greenhouse gas emissions.

Moreover, the Framework Convention and Paris Agreement, which do not set limits on greenhouse gas emissions, *see id.* ¶ 43; Koh Decl. ¶ 25, and the Kyoto Protocol which does, Koh Decl. ¶ 21, only bind countries and regional entities like the European Union, *id.* ¶¶ 32. The Climate Act obligates private companies, not governments, to pay compensation for past emissions.[8]

Second, while the United States suggests the Act conflicts with its longstanding opposition to "the establishment of liability and compensation schemes

---

[8] The United State fails to show that exempting fossil fuel companies from liability is at issue in international negotiations. Even if it had, the relevant case law does not suggest that anything that is the subject of international negotiations is necessarily preempted. *See Medellín*, 552 U.S. at 529–530 (Congress's authorization to represent the U.S. before international bodies spoke only to the "President's *international* responsibilities, not any unilateral authority to create domestic law" sufficient to preempt a state law). Similarly, even if the Kyoto Protocol and the Paris Agreement regulated emissions by private companies, the executive's decision to not join Kyoto and withdraw from Paris is not a clear federal law, Article II executive action, or long-standing executive decision to leave "unregulated" fossil fuel companies' liability for climate damages, *contra* US Br. 29 (citing *Sprietsma v. Mercury Marine*, 537 U.S. 51, 66 (2002)), that is sufficient to preempt state law. Moreover, in *Sprietsma*, the Court held that a federal agency decision not to regulate propeller guards did not preclude States from imposing regulations. 537 U.S. at 67.

at the international level," US Br. 29 and n.4, the United States has opposed any requirement that *it*—not private entities—compensate foreign governments for the impacts of historical emissions from sources in the United States. *See* Koh Decl. ¶¶ 31–32. The Climate Act does not address that intergovernmental liability.

Moreover, the United States and other countries have long recognized a "polluter pays" principle, *id.* ¶¶ 13–17, with which the Climate Act is consistent. To the extent the United States argues more broadly that the Climate Act impermissibly "bypasses diplomatic channels," US Br. 29 (punctuation and citation omitted), the United States fails to demonstrate that the executive is using any diplomatic channels to address compensation of States for climate damages. *See* Koh Decl. ¶ 33.

*Generalized concerns and speculation.* The United States speculates that the Climate Act will interfere with various executive interests but none of those are Article II agreements or long-standing practices that are fit to preempt state law. The United States speculates that cost demands issued under the Act will amount to "crushing penalties" that will reduce energy affordability and availability on a global scale, US Br. 28, 30, thereby exacerbating the "national energy emergency" the President declared in Executive Order No. 14,156, 90 Fed. Reg. 8,433 (Jan. 20, 2025). US Br. 28. The United States also relies on the President's exemption of fossil fuel production from tariffs imposed on US trading partners. US Br. 29 (citing Exec. Order No. 14,257, 90 Fed. Reg. 15,041, 15,045–46). Those concerns are speculative and, as discussed above (p. 12), disproven by the State's economics expert.

Moreover, such "generalized remarks" in favor of energy availability and affordability are not a basis for conflict preemption. *See Lighthouse Res. Inc. v. Inslee*, 429 F. Supp. 3d 736, 740–41 (W.D. Wash. 2019) ("generalized remarks favoring the development of the coal industry and the export of coal are not in clear conflict with the State's decision" to deny a water permit for a proposed coal export terminal); *cf. Barclays Bank PLC v. Franchise Tax Bd. of Cal.*, 512 U.S. 298, 328 n.29 (1994) (the executive's "preference" for a certain policy approach, without more, does not preempt a state law that utilizes a different approach). Additionally, treating mere market effects as a "clear conflict" would give the executive branch power to preempt any number of state laws that may influence energy production, from workplace safety to consumer protection law. Such expansive authority is counter to the Constitution's delegation of domestic lawmaking authority to Congress. *Cf. Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952) ("[T]he President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker.").

The United States further speculates that, by imposing liability on foreign companies, the Act could result in retaliation by foreign countries, thereby interfering with foreign affairs and jeopardizing national security.[9] US Br. 30. The United States fails to adduce any evidence in support of this speculation, and it is even further afield

---

[9] In support of this speculation about potential retaliation, the United States cites *Japan Line, Ltd. v. L. A. Cnty.*, 441 U.S. 434, 450 (1979), US Br. 30, where the Supreme Court held unconstitutional a state property tax on "instrumentalities of foreign commerce … used constantly and *exclusively* for the transportation of cargo for hire *in foreign commerce.*" *Id.* at 446 n.9 (emphasis added). Here, as already discussed, the Climate Act does not purport to regulate wholly extraterritorial activity.

from executive actions courts deemed fit to preempt state law. The United States fails

to demonstrate that the Act is conflict-preempted under the foreign affairs doctrine.

### B. The United States' Foreign Affairs Power Does Not Preempt the Climate Act Based on Field Preemption.

In the absence of a conflict, the foreign policy power preempts state law only if

it intrudes on foreign policy without addressing a traditional state interest. The

United States fails to demonstrate that the Climate Act does so.

As discussed above (pp. 19–21), the Climate Act addresses a traditional state

responsibility by seeking to redress *in-state* injuries due to historic emissions,

distinguishing New York's interest from situations in which courts have described a

State's interest in redressing injuries that occurred wholly outside the United States

as "weak." *Contra Garamendi*, 539 U.S. at 425; *Generali*, 592 F.3d at 119.

The United States' speculation that other countries may retaliate, US Br. 30,

does not amount to field preemption. *See, e.g.*, *Hartford Enters., Inc. v. Coty*, 529 F.

Supp. 2d 95, 103 (D. Me. 2008) (rejecting challenge to state employment law as

applied to temporary foreign workers based on "speculation about what could happen

if every state enacted such a law and foreign countries retaliated"). As the Supreme

Court emphasized in *Zschernig v. Miller*, a state law is preempted in the absence of

a clear conflict only if it "impair[s] the effective exercise of the Nation's foreign policy."

389 U.S. 429, 440 (1968) (citation omitted). The state statute at issue invited state

judges to undertake "minute inquiries concerning the actual administration of foreign

law, into the credibility of foreign diplomatic statements" and to disparage certain

foreign regimes. *Id.* at 434–435. Therefore, the Supreme Court held, the state law

34

impermissibly had "more than 'some incidental or indirect effect in foreign countries,' and [a] great potential for disruption or embarrassment." *Id.*

Other state laws that were invalidated because foreign affairs occupied the same field have taken positions on actions by foreign nations. *See, e.g.*, *Kyocera Doc. Sols. Am., Inc. v. Div. of Admin.*, 708 F. Supp.3d 531 (D. N.J. 2023) (preempting state law imposing restrictions on Russian-affiliated entities broader than those imposed by Congress and President); *Nat'l Foreign Trade Council, Inc. v. Giannoulias*, 523 F. Supp. 2d 731 (N.D. Ill. 2007) (preempting state statute prohibiting investment in Sudan). For example, *Movsesian*, upon which the United States relies, US Br. 27, 30–31, held that a California statute was preempted because it expressed a political point of view by referring to the Armenian conflict as a "genocide" and compelled a "highly politicized inquiry into the conduct of a foreign nation." 670 F.3d at 1076.

The Climate Act does not intrude on foreign affairs by requiring judges to consider foreign law or taking a position on actions taken by other countries. The Act does not interject "foreign policy attitudes" or "criticism[s]" of foreign governments merely by identifying responsible parties and calculating their liability, *Zschernig*, 389 U.S at 437, 440, particularly where it applies objective criteria equally to domestic and foreign-owned companies. And it does not "adversely affect the power of the central government to deal with [foreign relations]." *Id.* at 441.

Nor does the Climate Act "express[] a distinct political point of view" by seeking compensation for in-state injuries by "companies of foreign states." US Br. 29–30 (quotation marks and citation omitted). Courts have long upheld state laws imposing

35

such obligations. *See, e.g., Mayor and City Council of Balt.*, 31 F.4th at 213–15 (declining to apply foreign affairs doctrine in suit against energy companies involving "intersection between Maryland law and private, international companies"); *cf. Barclays*, 512 U.S. at 329–30 (upholding law calculating state taxes using method foreign companies claimed burdened them against "one voice" challenge because Congress was aware of the issue and declined to preempt States from using method).

In short, there is no field preemption because the United States fails to demonstrate that the Superfund Act will have a direct effect on foreign relations.

## IV.   THE CLIMATE ACT DOES NOT EXCEED CONSTITUTIONAL LIMITS ON REGULATING EXTRATERRITORIAL CONDUCT.

The United States claims that the Climate Act exceeds constitutional limits by "directly regulating out-of-state conduct that has no discernible connection to the State." US Br. 22 (citation omitted). First, there is no stand-alone prohibition on "extraterritorial regulation," nor does "our constitutional structure" prohibit the Act. *See* US Br. 21, 22. Second, to the extent the United States bases this claim on alleged violations of the Fourteenth Amendment's Due Process Clause, the United States does not have a cause of action based on the due process rights of fossil fuel companies and, in any event, the Climate Act complies with the Due Process Clause. Finally, to the extent the United States bases this claim on violations of the dormant Commerce Clause, the State responds in Point V below (pp. 44–47).

### A.   There Is No Stand-Alone Constitutional Prohibition on Extraterritorial Regulation.

36

The United States asserts a cause of action for "unconstitutional extraterritorial regulation," Compl. 18, and contends that "the Constitution's horizontal separation of powers limits the ability of states to reach beyond their borders and regulate conduct in other jurisdictions," US Br. 21. However, it does not cite a single case that supports a per se ban on extraterritorial regulation under the Constitution or an independent cause of action for "unconstitutional extraterritorial regulation." Instead, it relies on either Due Process Clause or dormant Commerce Clause cases. *See* US Br. 23. *See, e.g.*, *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 376 (2023) (dormant Commerce Clause); *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 150 (2023) (Alito, J., concurring in part) (dormant Commerce Clause); *Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 582 U.S. 255, 263 (2017) (Due Process Clause); *Gerling Glob. Reinsurance Corp. of Am. v. Gallagher*, 267 F.3d 1228, 1235 (11th Cir. 2001) (Due Process Clause). [10] Accordingly, to the extent the United States asserts an independent cause of action for "unconstitutional extraterritorial regulation," it fails to state a claim upon which relief can be granted.

To the extent the United States also argues that the "basic scheme of the Constitution" prevents New York from applying state law to "worldwide emissions" because federal law must govern interstate air pollution, it relies entirely upon decisions about federal common law. *See* US Br. 22 (punctuation and citations

---

[10] The United States also quotes the statement in *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 495 (2014), that States "lack authority to control" out-of-state pollution. US Br. 24. That statement was made in the context of discussing the "Good Neighbor" provisions of the Clean Air Act, which address cross-border pollution. *See EME Homer City Generation*, 572 U.S. at 495. But, the Climate Act does not control out-of-state pollution.

omitted). As discussed above (p. 19) and as the Supreme Court explained in *AEP*, 564 U.S. at 421, federal common law has been applied in the context of nuisance actions "brought by one State to abate pollution emanating from another State," which the Climate Act does not do.

### B.    The Climate Act Does Not Violate the Due Process Clause.

The United States' extraterritoriality claim appears to assert that the Climate Act violates the Fourteenth Amendment's Due Process Clause. *See* US Br. 23–24. The United States lacks a cause of action to bring a due process claim on behalf of fossil fuel companies who may receive cost demands and even if it had a cause of action, the Climate Act does not violate the Due Process Clause.

A plaintiff must identify a cause of action allowing it to "judicially enforce the statutory rights or obligations" at issue. *See Davis v. Passman*, 442 U.S. 228, 239, 239 n.18 (1979). Courts have declined to find that the United States has a cause of action to vindicate private parties' rights pursuant to the Fourteenth Amendment. *See United States v. City of Phila.*, 644 F.2d 187, 201 (3d Cir. 1980) ("The fourteenth amendment does not implicitly authorize the United States to sue to enjoin violations of its substantive provisions.); *United States v. Mattson*, 600 F.2d 1295 (9th Cir. 1979) ("the United States may not bring suit to protect the constitutional rights of the [disabled] without express statutory approval"); *United States v. Solomon*, 563 F.2d 1121 (4th Cir. 1977) (same). The United States' arguments under the Due Process Clause—that the Climate Act regulates out-of-state conduct and does not limit liability to activities related to a company's contacts with New York—seek to

vindicate the due process rights of fossil fuel companies, which the United States lacks a cause of action to do (and need not do because, as discussed above (p.14) those companies, or organizations to which they belong, have sued in *Chamber of Commerce* and *West Virginia*).

Even if the United States had a valid cause of action, the Climate Act complies with the Due Process Clause because the plain language of the Act limits liability to parties whose contacts with New York satisfy the Due Process Clause. ECL § 76-0101(21). The United States argues that provision "does not solve the problem of the Act's unconstitutional extraterritorial reach" since the Act "imposes liability for out-of-state conduct in violation of the Constitution's horizontal separation of powers." US Br. 26. However, the Constitution at large does not impose a per se ban on extraterritorial regulation, as explained above (pp. 36–37).

The United States also argues that a State lacks power "to regulate and control activities wholly beyond its boundaries." US Br. 23–24 (quotation marks and citation omitted). As discussed above (pp. 23-24), the Climate Act does not regulate or control the activities of fossil fuel companies. Moreover, the companies who will receive cost demands have caused injury in New York. Courts have long recognized that States may apply their laws to out-of-state actors whose actions have in-state consequences, *see e.g., Young v. Masci*, 289 U.S. 253, 258–59 (1933) ("a person acting outside the state may be held responsible according to the law of the state for injurious consequences within it"); *Calder v. Jones*, 465 U.S. 783, 789 (1984) (citations omitted) ("Jurisdiction over petitioners is therefore proper in California based on the 'effects'

of their Florida conduct in California."); *City of New York v. Beretta U.S.A. Corp.*, 315 F. Supp. 2d 256, 286 (E.D.N.Y. 2004) (relief sought by City would not violate Due Process Clause by attempting to regulate conduct outside its borders because City seeks relief for harm imposed on itself and on those within its borders); *City of New York v. A-1 Jewelry & Pawn, Inc.*, 247 F.R.D. 296, 354 (E.D.N.Y. 2007) (same).

Here, New York has determined that climate change, resulting from the fossil fuels produced by fossil fuel companies, "is an immediate, grave threat to the state's communities, environment, and economy," 2025 N.Y. Sess. Laws ch. 100, § 1(1), and has obligated fossil fuel companies to pay a share of the costs that New York will incur to adapt to climate change. Accordingly, New York's "statute is not a mere intermeddling in affairs beyond her boundaries which are no concern of hers." *Watson v. Emps. Liab. Assurance Corp., Ltd.*, 348 U.S. 66, 72 (1954). To the contrary, New York has a vital interest in taking "action to adapt to certain consequences of climate change that are irreversible." 2025 N.Y. Sess. Laws ch. 100 § 1(1).

The United States relies on *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 421 (2003), which ruled that a State may not "punish a defendant for conduct that may have been lawful where it occurred" but *State Farm*, as well as *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 572 (1996), on which the United States also relies, concerned punitive damages. *See* US Br. 24. In *Gore*, the Court found that a large punitive damages award violated due process because it was grossly excessive in relation to legitimate state interests where the purpose of the award was to induce BMW to change its nationwide disclosure policy concerning new

vehicles damaged prior to sale. 517 U.S. 572–73. But the Climate Act does not punish conduct at all, rather, it requires companies to compensate New York for the costs of adapting to climate change within New York. The Act also does not impose cost demands for the purpose of changing lawful conduct in other States or elsewhere and the costs it imposes are only for past emissions. Thus, the Act has neither the intent nor the effect of deterring future conduct.

Indeed, the Act is modeled after the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601 *et seq.*, which makes responsible parties strictly liable for the government's costs to remediate contamination caused by releases of hazardous substances. Courts have found that this compensation is not a form of punishment. *See, e.g., United States v. Monsanto Co.*, 858 F.2d 160, 174–75 (4th Cir. 1988) ("The restitution of cleanup costs was not intended to operate, nor does it operate in fact, as a criminal penalty or a punitive deterrent."). Like CERCLA, the purpose of the Act is to recover costs from fossil fuel companies, not to punish them.

Moreover, *Gore* recognized that a State avoids encroaching on the policy choices of other States when its damage award is "supported by the State's interest in protecting its own consumers and its own economy." 517 U.S. at 572. So even if cost demands under the Act were punitive in nature, they would be supported by the State's interest in protecting its residents, economy, and environment from the harm caused by emissions from fossil fuel that has been produced by fossil fuel companies.

41

Furthermore, the Climate Act does not seek compensation for conduct wholly outside New York. As discussed above (p. 6), the greenhouse gas emissions that are attributable to fossil fuel producers include downstream (scope 3) emissions resulting from the use of the fossil fuels they produce as well as direct (scope 1) emissions during the process of extracting or refining fossil fuels. While the United States is correct that there is limited production of fossil fuels in New York, US Br. 8–10, the United States does not contend—nor could it—that fossil fuels produced by companies who will pay cost demands are not distributed and used in New York.[11]

The United States argues that the Act "penalizes ... greenhouse gas emissions without any certainty that *those* emissions caused in-state harm," US Br. 25 (emphasis in original), but the State's expert has explained that local harms can be attributed to specific sets of emissions, including emissions attributable to a specific company. Mankin Decl. ¶¶ 10, 21–39. Moreover, due process does not always require "proof that the plaintiff's claim came about because of the defendant's in-state conduct," and "some relationships will support jurisdiction without a causal showing." *Ford Motor Co. v. Mont. 8th Jud. Dist. Ct.*, 592 U.S. 351, 362 (2021) (finding jurisdiction proper in a State where vehicle caused injury even though defendant sold the vehicle in a different State).

---

[11] The United States' reliance on *Gerling Glob. Reinsurance Corp.*, 267 F.3d at 1238, is misplaced. US Br. 26. That court found "no connection between the State of Florida and … insurance transactions involving Plaintiffs' German affiliates that took place years ago in Germany, among German residents, under German law, relating to persons, property, and events in Germany." *Id.* at 1238. In contrast, greenhouse gases emitted from the use of fossil fuels extracted and refined by the responsible parties have caused harm in New York. So even if the Act regulated conduct—which it does not—that conduct has a sufficient nexus to New York to satisfy due process.

The United States also contends that "the Act does nothing to limit liability to activities that arise from or relate to a company's New York contacts." US Br. 26. Due process requires New York to make that showing to establish specific jurisdiction over an out-of-state corporate defendant.[12] A plaintiff must "show that his claim arises out of or relates to defendant's contacts with the forum state." *Chew v. Dietrich*, 143 F.3d 24, 28 (2d Cir. 1998) (cleaned up). The United States has not identified a responsible party over which New York will be unable to exercise specific jurisdiction. Therefore, as a matter of law, the United States fails to show that the Climate Act facially violates the principles of due process regarding personal jurisdiction. And to the extent the United States speculates that DEC may nonetheless issue cost demands to fossil fuel producers who do not satisfy the minimum contacts requirement of due process, Compl. ¶¶ 71–72, that claim is premature and will involve fact-intensive determinations regarding the recipients of demands. Moreover, the prospect that the cost demands may not violate the Due Process Clause is sufficient standing alone to defeat the United States' due process argument in a facial challenge like this one.

The United States also argues that other States may enact laws similar to the Climate Act, which would lead to the destruction of the national energy market and the bankruptcy of the country's largest energy producers, US Br. 26, but relies on

---

[12] In contrast, a court may only exercise general jurisdiction over "foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations are so 'continuous and systematic' as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). The United States alleges that the Act will exclusively target "out-of-state (including foreign) businesses." US Br. 10. If the United States' allegation is true, New York will need to establish specific jurisdiction for the responsible parties and therefore, show that their contacts with New York relate to the claims under the Act.

multiple levels of implausible speculation that should not be credited. *Wash. State Grange*, 552 U.S. at 449–50 ("In determining whether a law is facially invalid, we must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases.").

## V.    THE CLIMATE ACT DOES NOT VIOLATE THE DORMANT INTERSTATE COMMERCE CLAUSE.

The United States asserts that the Climate Act violates the dormant Commerce Clause "by targeting 'worldwide' commercial activity that almost exclusively occurs outside of New York," US Br. 33 (citation omitted); *see id.* 23–26, 32–35, but the dormant Commerce Clause does not prohibit state laws merely because they may have an extraterritorial effect. It prohibits laws that discriminate in favor of in-state commercial interests either on their face or in effect, which the Act does not do.

### A.    There Is no Freestanding "Extraterritoriality" Prohibition.

The United States argues that the Climate Act violates the dormant Commerce Clause because it "'controls ... wholly out-state transactions.'" US Br. 32–33 (citation omitted). But in *Pork Producers*, the Supreme Court ruled that a state law does not run afoul of the dormant Commerce Clause simply because it has "the practical effect of controlling commerce outside the State."[13] 598 U.S. at 371 (quotation marks and

---

[13] The United States cites *American Booksellers Found. v. Dean*, 342 F.3d 96, 104 (2d Cir. 2003), for a "per se" rule against "universal reach," US Br. 24-25, but the *Pork Producers* court rejected that rule, 598 U.S. at 371. The United States' reliance on *Grand River Enters. Six Nations, Ltd. v. Boughton*, 988 F.3d 114, 123 (2d Cir. 2021), US Br. 23–24, 32, is also misplaced as that case *upheld* a state law against a dormant Commerce Clause challenge. The Second Circuit held that requiring a Canadian company's domestic importers to disclose their interstate transactions to sell into the State did not violate the dormant Commerce Clause because these requirements were "indirect [and] incidental to

citation omitted); *see id.* at 374 (noting "many (maybe most) state laws have the 'practical effect of controlling extraterritorial behavior,' without raising constitutional concerns). *Pork Producers* thus held that a California law barring sales of pork from animals confined in a way inconsistent with California standards did not violate the dormant Commerce Clause. *Id.* at 364, 370–371.

As in *Pork Producers*, where "California imports almost all of the pork it consumes," *id* at 367, the State does not contest that most of the fossil fuels consumed in New York are extracted and refined out-of-state. *See* US Br. 8–10. This alone is insufficient for a dormant Commerce Clause violation. Moreover, the Climate Act does not apply to wholly out-of-state transactions because, as discussed above (p. 42), the consumption of fossil fuels produced elsewhere has caused greenhouse gas emissions in New York that are attributable to the production of those fuels.

The United States also claims that New York "deliberately project[s] its legislation" onto other States but unlike the cases it cites, the Climate Act does not regulate out-of-state prices. *See* US Br. 23–24 (punctuation omitted). In *Healy v. Beer Inst.*, a state law setting a maximum price for beer sales by reference to the price in neighboring states effectively fixed the price at which beer could be sold in those states. 491 U.S. 324, 337(1989); *accord Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 521 (1935) (rejecting New York statute with effect of regulating price of milk sold in Vermont); *Ass'n for Accessible Meds. v. Ellison*, 140 F.4th 957, 961 (8th Cir. 2025)

---

the purpose of the statute," to prevent smuggling and tax evasion. *Id.* at 124–25. As in *Grand River*, that the Act authorizes DEC to require companies to document past practices, including emissions, does not violate the Commerce Clause because the Climate Act "neither regulates nor precludes" fossil fuel companies' emissions. *See id.* at 125.

(enjoining a state law prohibiting out-of-state drug manufacturers from imposing excessive price increases on out-of-state transactions). Additionally, and as explained above, the Act will not increase prices or reduce availability of fossil fuels.  Fullerton Decl. ¶¶ 30–34.

### B. The Climate Act Does Not Discriminate in Favor of In-State Economic Interests.

The United States also contends that the Act "defies the antidiscrimination principle" of the Commerce Clause, US Br. 33 (quotation marks and citation omitted), but in *Pork Producers*, the Supreme Court stated that a state law violates the dormant Commerce Clause only if it "seeks to advantage in-state firms or disadvantage out-of-state rivals." 598 U.S. at 370. A statute is not "discriminatory because it will apply most often to out-of-state entities in a market that has more out-of-state than in-state participants." *N.Y. Pet Welfare Ass'n, Inc. v. City of New York*, 850 F.3d 79, 91 (2d Cir. 2017) (quotation marks and citation omitted).

The Climate Act does not discriminate on its face or in effect. All fossil fuel producers—in-state and out-of-state—are equally subject to the Act's requirements.[14] As in *Pork Producers*, the fact that the Act would primarily impact entities that are

---

[14] Even if the Act did discriminate, it would survive strict scrutiny. The United States suggests New York could pay for climate change-related infrastructure projects solely through taxes, US Br. 33–34, but the purpose of the Climate Act is to shift part of that financial burden to fossil fuel producers who contributed significantly to climate-change harms in New York. Imposing the entire burden on taxpayers would defeat that purpose and thus is not a reasonable alternative.

46

located out-of-state but sell products in-state does not in and of itself violate the dormant Commerce Clause. 598 U.S. at 376, 376 n.1.[15]

## VI.    THE CLIMATE ACT DOES NOT VIOLATE THE DORMANT FOREIGN COMMERCE CLAUSE.

The Foreign Commerce Clause, grants Congress the power "[t]o regulate Commerce with foreign Nations," U.S. Const. art. I, § 8, cl. 3, and "provide[s] protection from state legislation inimical to the national commerce," *Barclays*, 512 U.S. at 310 (1994) (citation and quotation marks omitted). The United States' claim that the Climate Act violates the dormant Foreign Commerce clause, US Br. 34–35, is redundant of its infirm foreign affairs preemption and dormant interstate Commerce Clause claims.[16]

The United States frames its interstate and foreign commerce claims identically, US Br. 32–33, and the claims fail for the same reason: the Act does not discriminate against out-of-state commerce. *See* pp. 46-47.

---

[15] The United States appears to have abandoned its claim under *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). *See* Compl. ¶ 83. That claim is, in any event, meritless. Under *Pike*, a law "will be upheld unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." 397 U.S. at 142. *Pork Producers* clarified that *Pike* still requires discrimination, 598 U.S. at 377, and that a plaintiff must demonstrate "that a challenged law imposes 'substantial burdens' on interstate commerce *before* a court may assess the law's competing benefits," *id.* at 383. The Act *will not* impose a "substantial burden" on the price or availability of fossil fuels, nor will it have more than indirect impact on prices, *see* Fullerton Decl. ¶¶ 30-32; *see also, e.g.*, *Grand River*, 988 F.3d at 124; *Vizio, Inc. v. Klee*, 886 F.3d 249, 256 (2d. Cir. 2018) (upholding state e-waste law that fined manufacturers with reference to national market share as "one of innumerable valid state laws affect[ing] pricing decisions in other States" because it "does nothing to control interstate commerce, but rather merely considers out-of-state activity in imposing in-state charges").

[16] The United States admits that the Act is not a tax, Compl. ¶ 93, but still relies on *Barclays*, 512 U.S. at 310, for the general point that there is a "special need for federal uniformity" in the foreign commerce context, US Br. 34. But in *Barclays*, the Supreme Court rejected a challenge to a State's method for calculating corporate franchise taxes disfavored by the Executive, emphasizing that Congress, not the Executive, needs to act to preempt state commerce laws. 512 U.S. at 328–29.

The United States's "one voice" argument repeats its foreign affairs preemption claim and both fail because the United States does not identify a conflicting foreign policy. *See* pp. 29–34. The failure of the this claim is even more stark because an express *Congressional* policy is required. U.S. Const. art. I, § 8, cl. 3; *see Barclays*, 512 U.S. at 329–30 (rejecting dormant Foreign Commerce Clause claim where Congress declined to enact a federal policy bearing on the statute).

Even if the United States had identified a foreign policy with which the Act could conflict, all it can assert now is that the Climate Act may apply to foreign entities, thereby causing effects outside of the United States. This speculation, including that cost demands will influence prices or other behavior of those entities, who will influence foreign countries' policy positions on greenhouse gases, or raise global oil or gas prices, is unsubstantiated (p. 12) and implausible, and therefore inadequate for a facial challenge. *See, e.g.*, *Gerling Glob. Reinsurance Corp. of Am. v. Low*, 240 F.3d 739, 753 (9th Cir. 2001) (declining to preempt facial challenge to state statutes involving foreign commerce not directed at a particular country).

## <u>CONCLUSION</u>

For the reasons stated above, the State respectfully requests that the Court deny the United States' motion for summary judgment.

Dated:          October 27, 2025
                Albany, New York

                          LETITIA JAMES
                          Attorney General of the State of New York
                          *Attorney for Defendants*

48

By:  */s/ Joya Sonnenfeldt*

Ayah F. Badran
Assistant Attorney General
Office of the New York State Attorney General
Environmental Protection Bureau
The Capitol
Albany, NY 12224
(518) 776-2394

Monica Wagner
Deputy Bureau Chief

Sabita Krishnan
Laura Mirman-Heslin
Joya Sonnenfeldt
Assistant Attorneys General
Office of the New York State Attorney General
Environmental Protection Bureau
28 Liberty Street
New York, NY 10005
(212) 416-8184
Joya.Sonnenfeldt@ag.ny.gov

49

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.1(c), the undersigned counsel of record for the State hereby certifies that this memorandum complies with the word-count limitation of this Court's Local Civil Rules, as modified by this Court's Order enlarging the page limit for this memorandum to 48 pages. ECF Nos. 50, 83. As measured by the word processing system used to prepare it, this memorandum contains 14,083 words.

Dated:      October 27, 2025
            New York, New York

                              Joya Sonnenfeldt
                              Assistant Attorney General
                              Office of the New York State Attorney General
                              Environmental Protection Bureau
                              28 Liberty Street
                              New York, NY 10005
                              Joya.Sonnenfeldt@ag.ny.gov
                              (212) 416-8184