## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA and UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,<br><br>*Plaintiffs*,<br><br>v.<br><br>STATE OF NEW YORK; KATHLEEN HOCHUL, in her official capacity as Governor of New York; LETITIA JAMES, in her official capacity as New York Attorney General; and Amanda Lefton, in her official capacity as Commissioner of the New York Department of Environmental Conservation,<br><br>*Defendants*,<br><br>and<br><br>FOOD & WATER WATCH, WEST HARLEM ENVIRONMENTAL ACTION, INC., CITIZENS CAMPAIGN FOR THE ENVIRONMENT, CATSKILL MOUNTAINKEEPER, FRIDAYS FOR FUTURE NYC, and THIRD ACT INITIATIVE, INC.,<br><br>*Proposed Defendant-Intervenors.* | Civil Action No. 1:25-cv-3656 (PKC) |

## [PROPOSED] BRIEF OF PROPOSED DEFENDANT-INTERVENORS IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................................ii

INTRODUCTION ............................................................................................................. 1

ARGUMENT ..................................................................................................................... 2

I.      The Act is a constitutional exercise of traditional state authority....................... 2

        A.      The Act raises revenue to protect health and safety................................. 2

        B.      The Supreme Court and the courts of appeal have
                consistently affirmed cost reallocation laws like this one........................ 4

II.     The Act does not regulate emissions.................................................................... 7

III.    Federal law does not preempt the Act.................................................................. 8

        A.      *City of New York v. Chevron* does not control the
                preemption analysis ............................................................................... 10

                1.      The New York Act does not fall within the scope of,
                        or conflict with, previously recognized federal
                        common law.................................................................................. 11

                2.      None of the concerns raised by the Second Circuit
                        in *City of New York* are implicated by the New York
                        Act................................................................................................. 13

        B.      The Clean Air Act does not preempt the New York Act ........................ 15

                1.      The Clean Air Act does not occupy the field
                        addressed by the New York Act .................................................. 17

                2.      The New York Act poses no obstacle to the Clean
                        Air Act's regulation of greenhouse gas emissions ..................... 19

CONCLUSION................................................................................................................ 24

# TABLE OF AUTHORITIES

## Cases

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
    458 U.S. 592 (1982) ................................................................................... 4

*Am. Elec. Power Co., Inc. v. Connecticut*,
    564 U.S. 410 (2011) ....................................................................... 10, 11, 12

*Am. Fuel & Petrochemical Mfrs. v. O'Keeffe*,
    903 F.3d 903 (9th Cir. 2018) .................................................................... 6

*ASARCO LLC v. Goodwin*,
    756 F.3d 191 (2d Cir. 2014) ..................................................................... 6

*Bell v. Cheswick Generating Station*,
    734 F.3d 188 (3d Cir. 2013) .............................................................. 18, 23

*Boyle v. United Techs. Corp.*,
    487 U.S. 500 (1988) ....................................................................... 9, 11, 12, 13

*City of Honolulu v. Sunoco LP*,
    537 P.3d 1173 (Haw. 2023) ..................................................................... 10

*City of New York v. Chevron Corp.*,
    993 F.3d 81 (2d Cir. 2021) .................................................................... 9-15

*Cnty. Comm'rs v. Suncor Energy USA, Inc.*,
    -- P.3d --,2025 CO 21 (Colo. 2025) ........................................................ 10

*Coal. for Competitive Elec., Dynergy Inc. v. Zibelman*,
    906 F.3d 41 (2d Cir. 2018) ...................................................................... 21

*Commonwealth Edison Co. v. Montana*,
    453 U.S. 609 (1981) ........................................................................... 16, 22

*Copart Indus., Inc. v. Consol. Edison Co. of New York*,
    362 N.E.2d 968 (N.Y. 1977) ................................................................... 15

*Cronin v. Aetna Life Ins. Co.*,
    46 F.3d 196 (2d Cir. 1995) ....................................................................... 8

*D'Amico v. Waste Mgmt. of New York, LLC*, No. 6:18-CV-06080 EAW, 2019 WL 1332575
    (W.D.N.Y. Mar. 25, 2019) ....................................................................... 23

*Dep't of Revenue of Or. v. ACF Indus., Inc.*,
    510 U.S. 332 (1994) ................................................................................. 4

*District of Columbia v. Exxon Mobil Corp.*,
89 F.4th 144 (D.C. Cir. 2023) ........................................................................... 10

*English v. Gen. Elec. Co.*,
496 U.S. 72 (1990) ............................................................................................ 17

*Espinal v. AFNI, Inc.*, No. 17 CIV. 3439 (KPF),
2018 WL 2733366 (S.D.N.Y. June 7, 2018) .................................................... 18

*Exxon Corp. v. Maryland*,
437 U.S. 117 (1978) ............................................................................................ 6

*Exxon Shipping Co. v. Baker*,
554 U.S. 471 (2008) ......................................................................................... 23

*Georgia v. Tenn. Copper Co.*,
206 U.S. 230 (1907) ......................................................................................... 12

*Hillsborough Cnty. v. Automated Med. Lab'ys, Inc.*,
471 U.S. 707 (1985) ............................................................................................ 4

*Illinois v. City of Milwaukee*,
406 U.S. 91 (1972) ........................................................................................... 12

*In re Gaston & Snow*,
243 F.3d 599 (2d Cir. 2001) ............................................................................ 11

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*,
725 F.3d 65 (2d Cir. 2013) .................................................................. 9, 17, 19

*In re NOS Comm.*,
495 F.3d 1052 (9th Cir. 2007) ......................................................................... 18

*International Paper Co. v. Ouellette*,
479 U.S. 481 (1987) ...................................................................... 14, 15, 18, 22

*Kansas v. Garcia*,
589 U.S. 191 (2020) ......................................................................................... 17

*LeClair v. Saunders*,
627 F.2d 606 (2d Cir. 1980) .............................................................................. 4

*Madeira v. Affordable Hous. Found., Inc.*,
469 F.3d 219 (2d Cir. 2006) ............................................................................ 19

*Marcus v. AT&T Corp.*,
138 F.3d 46 (2d Cir. 1998) .............................................................................. 11

*Massachusetts v. EPA*,
  549 U.S. 497 (2007)......................................................................................... 6

*Mayor & City Council of Baltimore v. BP P.L.C.*,
  31 F.4th 178 (4th Cir. 2022)........................................................................... 10

*Medtronic, Inc. v. Lohr*,
  518 U.S. 470 (1996)......................................................................................... 3

*Merrick v. Diageo Americas Supply, Inc.*,
  805 F.3d 685 (6th Cir. 2015).................................................................... 18, 23

*Metro. Life Ins. Co. v. Massachusetts*,
  471 U.S. 724 (1985)......................................................................................... 3

*Milwaukee v. Illinois*,
  451 U.S. 304 (1981)....................................................................................... 11

*Minneci v. Pollard*,
  565 U.S. 118 (2012)....................................................................................... 14

*Murphy v. NCAA*,
  584 U.S. 453 (2018)....................................................................................... 16

*N. Carolina, ex rel. Cooper v. TVA*,
  615 F.3d 291 (4th Cir. 2010)......................................................................... 18

*N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
  514 U.S. 645 (1995)....................................................................................... 21

*Nat'l Shooting Sports Found. v. James*,
  144 F.4th 98 (2d Cir. 2025).................................................................... 15, 23

*New York v. Nat'l Serv. Indus., Inc.*,
  460 F.3d 201 (2d Cir. 2006)......................................................................... 13

*North Carolina, ex rel. Cooper v. Tenn. Valley Auth.*,
  615 F.3d 291 (4th Cir. 2010)......................................................................... 23

*NRDC v. NHTSA*,
  894 F.3d 95 (2d Cir. 2018).............................................................................. 8

*Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kan.*,
  489 U.S. 493 (1989)....................................................................................... 21

*Oneok, Inc. v. Learjet, Inc.*,
  575 U.S. 373 (2015)....................................................................................... 17

*Overnite Transp. Co. v. Tianti*,
   926 F.2d 220 (2d Cir. 1991) ............................................................... 18

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
   461 U.S. 190 (1983) ........................................................................... 24

*Rest. L. Ctr. v. City of New York*,
   90 F.4th 101 (2d Cir. 2024) ............................................................... 23

*Sensational Smiles, LLC v. Mullen*,
   793 F.3d 281 (2d Cir. 2015) ................................................................. 6

*Starr Int'l Co. v. Fed. Rsrv. Bank of New York*,
   742 F.3d 37 (2d Cir. 2014) ................................................................. 12

*Steel Inst. of New York v. City of New York*,
   716 F.3d 31 (2d Cir. 2013) ................................................................... 4

*United States v. Bass*,
   404 U.S. 336 (1971) ............................................................................. 4

*United States v. Lopez*,
   514 U.S. 549 (1995) ............................................................................. 4

*United States v. Monsanto Co.*,
   858 F.2d 160 (4th Cir. 1988) ............................................................... 6

*United States v. Morrison*,
   529 U.S. 598 (2000) ............................................................................. 4

*United States v. Ne. Pharm. & Chem. Co.*,
   810 F.2d 726 (8th Cir. 1986) ............................................................... 6

*Usery v. Turner Elkhorn Mining Co.*,
   428 U.S. 1 (1976) ......................................................................... 5, 6, 7

*Va. Uranium, Inc. v. Warren*,
   587 U.S. 761 (2019) ............................................................................. 9

*Woodward Governor Co. v. Curtiss Wright Flight Sys., Inc.*,
   164 F.3d 123 (2d Cir. 1999) ............................................................... 13

*Wyeth v. Levine*,
   555 U.S. 555 (2009) ......................................................................... 8, 9

## Statutes

2024 N.Y. Sess. Laws Ch. 679 (S. 2129-B) (McKinney) ............................. 2-6

42 U.S.C. § 7410 ................................................................................................... 20

42 U.S.C. § 7411 ................................................................................................... 20

42 U.S.C. § 7521 ................................................................................................... 20

42 U.S.C. § 7543 ............................................................................................. 16, 21

N.Y. Env't Conserv. Law § 76-0101(3)(a) ...................................................... 3, 4

N.Y. Env't Conserv. Law § 76-0101(6) ................................................................. 4

N.Y. Env't Conserv. Law § 76-0101(21) ............................................................... 4

N.Y. Env't Conserv. Law § 76-0103(3)(e)(i) ........................................................ 4

**Other Authorities**

Dan B. Dobbs et al., The Law of Torts § 57 (2d ed. 2025) ........................................ 14

Jonathan H. Adler, *Displacement and Preemption of Climate Nuisance Claims*, 17 J.L. Econ. and Pol'y 217 (2022) ........................................................................ 10

Restatement (Second) of Torts § 821B (1979) .......................................................... 15

Restatement (Second) of Torts § 901 (1979) ............................................................. 14

# INTRODUCTION[1]

Climate change jeopardizes the health, safety, and well-being of all New Yorkers. As temperatures rise and extreme weather events become more frequent and severe, the cost of dealing with climate change continues to increase. In December 2024, the New York Legislature enacted the Climate Change Superfund Act (the "New York Act" or "Act") to raise revenue to meet a portion of its climate adaptation needs. The Act requires large fossil fuel companies with a sufficient connection to the State to make one-time payments—payable over 25 years—to a fund for climate adaptation projects in proportion to the emissions attributable to fossil fuels they extracted or refined from 2000 to 2024. The statute thereby shifts part of the mounting cost of climate adaptation from New York taxpayers to companies that bear significant responsibility for climate harm.

Plaintiffs allege that the Act intrudes into exclusively federal affairs, but their arguments rest on misguided assumptions and lack evidentiary support. They seek to portray the Act as an attempt to "police nationwide airspace and, indeed, the entire world." Pls. Mem. 1. That narrative is false. The Act does not regulate emissions, punish fossil fuel companies, or intrude on federal climate policy. As courts have repeatedly confirmed, there is nothing improper about government efforts to spread public health and safety costs among parties that contributed to the problem— rather than exclusively burdening taxpayers. Contrary to Plaintiffs' narrative, the Act is a constitutional exercise of New York's traditional state authority to raise revenue to protect the

---

[1] On August 15, Proposed Defendant-Intervenors (hereinafter "Environmental Groups") filed a motion for permissive intervention, ECF No. 57, representing that they would adhere to the existing summary judgment briefing schedule to avoid delaying the litigation, ECF No. 58 at 10. Consistent with that commitment, Environmental Groups are filing this proposed brief. If Environmental Groups are allowed to intervene, they request that the Court accept this brief. Alternatively, if not allowed to intervene, Environmental Groups request that the Court consider this brief as an amicus brief. If the Court prefers a separate motion for leave to file an amicus brief, Environmental Groups will file one at the Court's direction.

health, safety, and well-being of its residents from the devastating effects of climate change. The Court should deny Plaintiffs' motion for summary judgment.

**ARGUMENT**

Environmental Groups agree with the State Defendants that the Court should deny Plaintiffs' motion for summary judgment for the reasons stated in the State's brief and accompanying declarations. ECF Nos. 84, 85, 86, 87. To minimize duplication, this brief focuses solely on the following three arguments: the Act is a constitutional exercise of traditional state authority to raise revenue and protect public health and safety; it does not regulate emissions; and federal law does not preempt it. Environmental Groups adopt the State's discussion of the applicable standard of review, as well as its substantive arguments opposing Plaintiffs' motion.

## I.      The Act is a constitutional exercise of traditional state authority

### A.      The Act raises revenue to protect health and safety

The New York Legislature found that climate change poses "an immediate, grave threat to the state's communities, environment, and economy." 2024 N.Y. Sess. Laws Ch. 679 (S. 2129-B), § 2(1) (McKinney). Its "irreversible" consequences include "rising sea levels, increasing temperatures, extreme weather events, flooding, [and] heat waves." *Id.* These findings are borne out by the painful and costly experiences of New Yorkers—including Environmental Groups' members and supporters—whose lives have been disrupted by extreme storms, flooding, wildfires, and climate-related health impacts. *See* Mem. Supp. Mot. Intervene ("Int. Mem.") 12-13, ECF No. 58.

Because of the threats posed by climate change, the Legislature concluded that maintaining New Yorkers' "quality of life into the future" would require "huge investments" in infrastructure and "new revenue sources to pay for those investments." S. 2129-B, § 2(1). It deemed those investments "necessary to protect the public safety and welfare in the face of the

2

growing impacts of climate change." *Id.* § 6(a). These findings, too, are reinforced by the experiences and expertise of Environmental Groups, who have designed, advocated for, and implemented climate adaptation solutions, *see* Int. Mem. 12-13, and who know that government funding levels are currently inadequate to support the adaptation efforts required to protect their communities, *see* Int. Mem. at 13-14.

The Act changes that. The funds it generates will help safeguard New Yorkers and their communities from the consequences of climate change. For example, the funds could be used to restore coastal wetlands, N.Y. Env't Conserv. Law § 76-0101(3)(a), and better protect communities along Long Island and the Great Lakes. They could be used to upgrade storm water drainage systems, roads, bridges, subways, and transit systems throughout the State, *id.*, to better withstand extreme storms and flooding. They could be used to install energy efficient cooling systems and other weatherization and energy efficiency upgrades, including in schools and public housing, *id.*, to protect New Yorkers from extreme heat. And they could be used to prepare for and recover from hurricanes and other extreme weather events. *Id.* These investments will help protect New Yorkers—including Environmental Groups' members and supporters, *see* Int. Mem. at 12-15—from climate harm.

The Act's core purpose—raising revenue to protect the health and safety of New York residents from climate harm—falls squarely within the scope of the state's traditional powers. New York, like all sovereign states, has broad police powers to "protect the health and safety of [its] citizens." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996); *see also Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985) (states have "great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort and quiet of all persons" (cleaned up)). These are "primarily, and historically, . . . matter[s] of local concern." *Hillsborough Cnty. v.*

*Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 719 (1985). And New York, like all sovereign states, has the power to raise revenue. *Cf. Dep't of Revenue of Or. v. ACF Indus., Inc.*, 510 U.S. 332, 345 (1994) (the "taxation authority of state government" is "central to state sovereignty"). Thus, "economic regulation concerned with public health is squarely within the state's police power." *LeClair v. Saunders*, 627 F.2d 606, 608 (2d Cir. 1980); *see also Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 609 (1982) (recognizing that a state's interest in the well-being of its residents extends to economic interests).

The police power was "reposed in the States" and "denied the National Government" by design. *United States v. Morrison*, 529 U.S. 598, 618-19 (2000); *see also United States v. Lopez*, 514 U.S. 549, 566 (1995) (the Constitution "withhold[s] from Congress a plenary police power"). In recognition of that balance, there is a "strong presumption" that state laws "within the scope of the States' historic police powers" are not preempted "unless it is the clear and manifest purpose of Congress to do so." *Steel Inst. of New York v. City of New York*, 716 F.3d 31, 36 (2d Cir. 2013) (citation omitted); *see also United States v. Bass*, 404 U.S. 336, 349 (1971) (to change the balance of state and federal power, Congress must "convey[] its purpose clearly").

### B.    The Supreme Court and the courts of appeal have consistently affirmed cost reallocation laws like this one

To accomplish its goal of raising revenue for climate adaptation, the Act requires fossil fuel companies that are responsible for more than one billion tons of covered greenhouse gas emissions—and that have the requisite nexus to the State—to pay a collective $75 billion over 25 years. N.Y. Env't Conserv. Law §§ 76-0101(6), (21); 76-0103(3)(e)(i). This amount represents a fraction of the several hundred billion dollars in costs that New York will incur through 2050 to adapt to climate change. S. 2129-B, § 2(6)(b)-(c). It is also less than the profits of the three largest domestic oil and gas producers in 2023 alone. *Id.* § 2(6)(c). The Act thereby shifts a

portion of New York's climate adaptation costs from taxpayers to the companies that profited from—and bear greatest responsibility for—the climate pollution that drives the need for adaptation. *See id.* § 2(4)-(5).

The Supreme Court has recognized that there is nothing impermissibly punitive or "expropriative," *contra* Pls. Mem. 10, 35, about laws that impose cost-sharing on entities that profited from actions that created harm. In upholding the Black Lung Benefits Act, which required coal operators to pay retroactive health benefits to miners, the Supreme Court endorsed the legislative decision to require contributions from coal companies that had known "for at least 20 years" about the health dangers their operations posed. *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 17 (1976). The Court explained it was not upholding "the retrospective imposition of liability" based "on any theory of deterrence." *Id.* While the government would continue to bear "a substantial portion of the burden," it could also impose liability on coal companies to "spread the costs of the employees' disabilities to those who have profited from the fruits of their labor." *Id.* at 18. There was nothing improper about "legislation readjusting rights and burdens" to reflect increased costs borne by society; such retrospective cost-sharing "is not unlawful solely because it upsets otherwise settled expectations," even if it "impose[s] a new duty or liability based on past acts." *Id.* at 16.

Similarly, courts have uniformly upheld the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA, commonly known as Superfund)—which imposes strict and retroactive statutory liability on companies to clean up hazardous waste sites— reasoning that it was appropriate to place financial responsibility on companies that profited from activities that generated pollution. *See, e.g.*, *United States v. Ne. Pharm. & Chem. Co.*, 810 F.2d 726, 734 (8th Cir. 1986), *cert. denied*, 484 U.S. 848 (1987) ("Congress acted in a rational

manner in imposing liability for the cost of cleaning up such sites upon those parties who created and profited from the sites and upon the chemical industry as a whole. . . ."); *see also id.* at 732-33, 743 (describing nature and scope of CERCLA liability). In doing so, courts have also rejected arguments that CERCLA's liability scheme "exact[s] punishment": CERCLA "was not intended to operate, nor does it operate in fact, as a criminal penalty or a punitive deterrent." *United States v. Monsanto Co.*, 858 F.2d 160, 174-75 (4th Cir. 1988); *see also ASARCO LLC v. Goodwin*, 756 F.3d 191, 200 (2d Cir. 2014) (retroactive liability "does not convert CERCLA into a bill of attainder or an ex post facto law").[2]

The Act fits neatly within these precedents. The State has a "legitimate interest in combating the adverse effects of climate change on [its] residents." *Am. Fuel & Petrochemical Mfrs. v. O'Keeffe*, 903 F.3d 903, 913 (9th Cir. 2018); *cf. Massachusetts v. EPA*, 549 U.S. 497, 518-23 (2007) (recognizing state's interest in protecting its territory from climate change impacts). New York faces hundreds of billions of dollars of climate costs in the coming decades. S. 2129-B, § 2(6)(b). Faced with that financial burden, the Legislature elected to shift a portion of those costs from the State's taxpayers to fossil fuel companies that profited from and contributed to the problem. The Act is neither punitive nor expropriative; it is a reasonable exercise of the State's traditional powers to raise revenue, protect health and safety, and "adjust[] the benefits and burdens of economic life." *Usery*, 428 U.S. at 15.

---

[2] While the Black Lung Benefits Act and CERCLA are both federal statutes, the cases upholding them are instructive because courts evaluate state and federal legislation governing economic matters pursuant to the same deferential standard of review. *Compare Ne. Pharm. & Chem. Co.,* 810 F.2d at 733-34 (applying rational basis review to CERCLA), *with, e.g., Exxon Corp. v. Maryland*, 437 U.S. 117, 124 (1978) (applying rational basis review to Maryland statute); *Sensational Smiles, LLC v. Mullen*, 793 F.3d 281, 284 (2d Cir. 2015) (same for Connecticut statute).

## II.    The Act does not regulate emissions

Plaintiffs' motion rests on a mistaken premise that the New York Act "regulates" interstate greenhouse gas emissions. *E.g.*, Pls. Mem. 2, 15-16, 19-21. Plaintiffs are wrong as a matter of law. And to the extent Plaintiffs' claim that the Act will affect future greenhouse gas emissions is deemed an issue of fact, it is disputed. The Court should deny summary judgment on both grounds.

The Act does not regulate emissions. It imposes no emissions limits or pollution control standards. It does not require or incentivize fossil fuel producers to alter their behavior in any way, as it only requires payment of a one-time fixed assessment based entirely on past conduct. As the Chamber of Commerce and American Petroleum Institute conceded in their own challenge to the Act, whatever fossil fuel producers choose to do going forward will have no effect on their liability under the Act, which will derive entirely from their historical production of fossil fuels from 2000 to 2024.[3] While the Act looks to emissions attributable to the fossil fuels previously produced and refined by responsible parties to determine the amount of each assessment, that methodology does not direct or encourage anyone to reduce or otherwise alter future emissions. Rather, it is a rational legislative choice concerning how to calculate and allocate responsibility among fossil fuel producers for the consequences of their past activity. The Supreme Court embraced this same logic in upholding the Black Lung Benefits Act, observing that a cost-sharing law aimed at "retrospective imposition of liability" would not necessarily further "any theory of deterrence." *Usery*, 428 U.S. at 17.

Plaintiffs nonetheless speculate that the Act may have an indirect effect on future emissions—and assert that it therefore amounts to a regulation. *See, e.g.*, Pls. Mem. 20. Not so. A

---

[3] Compl. ¶ 161, *Chamber of Com. v. James*, No. 1:25-cv-1738-MKV (S.D.N.Y. Feb. 28, 2025), ECF No. 1 ("Nothing energy producers can do today can affect their liability under the Act.").

statute that requires certain parties to emit less of a particular substance is plainly an emissions regulation. *See Regulate*, Merriam-Webster, https://www.merriam-webster.com/dictionary/ regulate (last visited Oct. 22, 2025) (to "regulate" means to "govern or direct according to rule"). Ongoing fines covering future conduct may also amount to regulation. *See NRDC v. NHTSA*, 894 F.3d 95, 105 (2d Cir. 2018). But the Act—a one-time statutory assessment based solely on past activity—is not an emissions regulation. It does not impose any ongoing duties and does not subject responsible parties to future liability under any circumstances. Plaintiffs cite no authority for the proposition that a one-time, retroactive statutory assessment is a form of regulation.

Even if a statute's alleged indirect effects on behavior could in theory amount to regulation, Plaintiffs have not met their burden to show the Act will affect future emissions. *See Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir. 1995) ("The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment."). Plaintiffs have submitted no evidence that the Act will have such an effect. Their theory appears to be that fossil fuel producers may react to the Act's assessment by producing and refining fewer fossil fuels; that this diminished supply could cause the price of fossil fuels to rise; and that consumers of fossil fuels could choose to purchase fewer fossil fuels, resulting in lower greenhouse gas emissions. Pls. Mem. 4, 8, 10-11. But Defendants have submitted persuasive evidence establishing that, under basic and widely accepted economic principles, the Act imposes a fixed cost on fossil fuel producers that will not change their conduct or cause the price of fossil fuels to rise. Declaration of Don Fullerton ¶¶ 11, 30-32, 38-39, ECF No. 85.

## III.    Federal law does not preempt the Act

In all preemption cases, courts must "start with the assumption that the historic police powers of the States were not to be superseded by [a] Federal Act unless that was the clear and manifest purpose of Congress." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (citation omitted).

While typically only acts of Congress may preempt state law, *see id.* (the "purpose of Congress is the ultimate touchstone in every preemption case" (citation omitted)), the Supreme Court has also recognized narrow circumstances in which federal common law may preempt state law, *see Boyle v. United Techs. Corp.*, 487 U.S. 500, 504 (1988).

The presumption against preemption is "particularly strong" where, as here, the challenged state law "falls well within the state's historic powers to protect the health, safety, and property rights of its citizens." *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 96 (2d Cir. 2013). Plaintiffs therefore bear a heavy burden to establish preemption. *See id.* at 96, 101-02; *supra* Argument I.A (explaining that the Act is an exercise of traditional state authority). To meet that burden, they may not "[i]nvok[e] some brooding federal interest or appeal[] to a judicial policy preference"; instead, they "must point specifically to a constitutional text or a federal statute" that displaces or conflicts with the state act. *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (plurality opinion) (cleaned up).

Plaintiffs have not met their burden. They ask the Court to disregard longstanding preemption standards established by the Supreme Court, asserting that the Second Circuit's decision in *City of New York v. Chevron Corp.*, 993 F.3d 81 (2d Cir. 2021), dictates a different analysis. But *City of New York*'s holding does not control this case. That decision concerned the preemption of state *tort* claims in an area historically governed by a limited body of federal common law created to address actions by one state to abate pollution in another. It did not address the preemption of a *non-tort state statute* that focuses on economic concerns never previously addressed by federal common law and that creates no ongoing tort liability. And Plaintiffs' argument that the Clean Air Act preempts the New York Act lacks merit.

A.    *City of New York v. Chevron* **does not control the preemption analysis**

In *City of New York*, the Second Circuit concluded that New York City's tort claims for

nuisance and trespass against five fossil fuel companies could be brought—if at all—under the

federal common law historically applied in certain disputes over interstate pollution, not state

common law. *City of New York*, 993 F.3d at 91-93, 99. That federal common law, the court

explained, was in turn displaced by the Clean Air Act. *Id.* at 96. But the court then declined to

apply a "traditional statutory preemption analysis," instead holding that "resorting to state law on

a question previously governed by federal common law is permissible only to the extent

authorized by federal statute." *Id*. at 98-99 (cleaned up). Because the court concluded the Clean

Air Act did not "authorize" the state tort claims, the court found them preempted. *Id.* at 100.[4]

*City of New York*'s narrow holding does not control this case for two reasons. First, unlike

the tort claims in *City of New York*, the Act neither falls within the domain of nor conflicts with

the previously recognized federal common law applicable to some interstate pollution disputes.

Second, *City of New York* did not hold that *all* liability related to greenhouse gas emissions was

preempted, *contra* Pls. Mem. 13-15, 19, but that *tort* liability was preempted because it operated

---

[4] *City of New York*'s departure from settled statutory preemption law has been widely criticized and Environmental Groups contend it was wrongly decided. *See, e.g.*, *Mayor of Baltimore v. BP P.L.C.*, 31 F.4th 178, 203 (4th Cir. 2022) (explaining *City of New York*'s "legal flaw"); *District of Columbia v. Exxon Mobil Corp.*, 89 F.4th 144, 153 & n.5 (D.C. Cir. 2023) (*City of New York's* reasoning "cannot be squared" with Supreme Court precedent); *City of Honolulu v. Sunoco LP*, 537 P.3d 1173, 1200 (Haw. 2023), *cert. denied*, 145 S. Ct. 1111 (2025); *Cnty. Comm'rs v. Suncor Energy USA, Inc.*, -- P.3d --, 2025 CO 21, ¶ 57 (Colo. 2025); Jonathan H. Adler, *Displacement and Preemption of Climate Nuisance Claims*, 17 J.L. Econ. & Pol'y 217, 253-57 (2022). As the decision's critics have pointed out, the federal common law previously applicable to some interstate pollution has been displaced by the Clean Air Act, and the Supreme Court has clearly held that the availability of state law to address such issues now depends "on the preemptive effect of the federal [Clean Air] Act." *Am. Elec. Power Co., Inc. v. Connecticut*, 564 U.S. 410, 429 (2011); *see also infra* Argument III.B (explaining that, under ordinary statutory preemption principles, the Clean Air Act does not preempt the New York Act). But even assuming *City of New York* was correctly decided, it does not govern the preemption question Plaintiffs present.

as an ongoing de facto emissions regulation. The court's animating concerns are not present here, and *City of New York* should not be extended to this distinct context.

> **1.    The New York Act does not fall within the scope of, or conflict with, previously recognized federal common law**

Courts narrowly define the scope of federal common law and its consequent preemption of state law. "The Supreme Court has cautioned against the broad use of federal common law," *Marcus v. AT&T Corp.*, 138 F.3d 46, 53 (2d Cir. 1998), and "[t]he ability of the federal courts to create federal common law and displace state-created rules is severely limited." *In re Gaston & Snow*, 243 F.3d 599, 606 (2d Cir. 2001). This is because "[t]he enactment of a federal rule in an area of national concern, and the decision whether to displace state law in doing so, is generally made not by the federal judiciary, purposefully insulated from democratic pressures, but by the people through their elected representatives in Congress." *Milwaukee v. Illinois*, 451 U.S. 304, 312-13 (1981) (*Milwaukee II*). Federal common law thus applies only in highly "limited situations." *Marcus*, 138 F.3d at 53. And without a "significant conflict" between federal common law and "the [operation] of state law," federal common law cannot displace state law. *See Boyle*, 487 U.S. at 507-08 (alteration in original).

As Plaintiffs acknowledge, Pls. Mem. 12, *City of New York*'s departure from traditional preemption analysis applies only where a state legislates in an area "previously governed by federal common law." *City of New York*, 993 F.3d at 99. The New York Act does not do so. While a limited body of federal common law historically governed disputes to abate interstate pollution, *see Am. Elec. Power Co., Inc. v. Connecticut*, 564 U.S. 410, 421 (2011) ("*AEP*"), the New York Act does not fall within this sphere because it does not regulate pollution at all. *See supra* Argument II. State common law nuisance, at issue in *City of New York*, created the same duty not to pollute as federal common law nuisance, and thus operated in an area "previously governed by

11

federal common law." *City of New York*, 993 F.3d at 99. The New York Act, by contrast, imposes no ongoing duty whatsoever, let alone one to abate pollution. *See also infra* Argument III.A.2 (explaining why nuisance imposes ongoing duties but the Act does not). The Act presents no "significant conflict" with federal common law for the same reason: it imposes no conflicting duty of care. *See, e.g.*, *Boyle*, 487 U.S. at 509, 512; *Starr Int'l Co. v. Fed. Rsrv. Bank of N.Y.*, 742 F.3d 37, 42 (2d Cir. 2014).

That conclusion is reinforced by the historical context of this limited body of federal common law. Contrary to Plaintiffs' characterization, Pls. Mem. 2-3, this federal common law did not govern *all* "interstate and global pollution," but instead was only applied in a narrow context: when a state brought a nuisance action "to abate pollution emanating from another State." *AEP*, 564 U.S. at 421. This body of law arose because of a specific need for an alternative to armed conflicts between states seeking to abate pollution from a specific source in another state. Before entering the union, out-of-state pollution harming a state would have given that state a "casus belli" (e.g., a legal justification) to send armed forces into the upstream state and stop the discharge. *See Illinois v. City of Milwaukee*, 406 U.S. 91, 107 (1972) (*Milwaukee I*). But "[w]hen the states by their union made the forcible abatement of outside nuisances impossible," they did not "thereby agree to submit to whatever might be done." *Georgia v. Tenn. Copper Co.*, 206 U.S. 230, 237-38 (1907). To provide an "alternative to force," *id.*, the Court recognized a federal common law nuisance action as a "more peaceful means" to serve the same end, *Milwaukee I*, 406 U.S. at 107 (citation omitted). The Supreme Court has observed in dicta that these interstate disputes warranted federal common law because a "uniform rule of decision" was needed to adjudicate states' "alleged federal rights" in the quality of interstate waters. *Id.* at 105 n.6, 107 n.9. But it has never applied this federal common law outside the context of nuisance

suits by one state to abate pollution originating in another. *Contra* Pls. Mem. 2-3. The Act is far removed from that context.

Plaintiffs assert that the Act implicates "national concerns," Pls. Mem. 15-16, and thus must yield to federal common law. But "a mere federal interest in uniformity is insufficient to justify displacing state law in favor of a federal common law rule." *New York v. Nat'l Serv. Indus., Inc.*, 460 F.3d 201, 208 (2d Cir. 2006) (cleaned up); *see also Woodward Governor Co. v. Curtiss Wright Flight Sys., Inc.*, 164 F.3d 123, 129 (2d Cir. 1999) ("vague assertions about the need for uniformity" are insufficient to displace state law).

The Act does not fall within an area "previously governed by federal common law," *City of New York*, 993 F.3d at 99, or present any "significant conflict" with federal common law, *Boyle*, 487 U.S. at 507. And Plaintiffs have not asked the Court to create *new* federal common law to displace the New York Act. Accordingly, *City of New York* is not controlling here.

> **2.    None of the concerns raised by the Second Circuit in *City of New York* are implicated by the New York Act**

The panel in *City of New York* did not hold that *all* financial liability for past fossil fuel production amounts to a de facto regulation of emissions. *Contra* Pls. Mem. 15, 19. Nor did it "focus[] entirely . . . on the shape of federal law," with no regard to the type of state law at issue. *Contra id*. at 15, 19. Rather, as detailed below, it identified specific concerns with the effects of specific state law tort claims and focused on how those claims would operate. The court concluded that *tort* liability (which imposes ongoing duties) may be tantamount to imposing pollution control standards, and that courts might be forced to apply vague or conflicting rules to determine whether those standards were violated. By contrast, the New York Act cannot be considered a de facto emissions regulation: It imposes no duty regarding future emissions at all,

much less a vague nuisance standard, and no ongoing financial obligations. The *City of New York* court's animating concerns are not present here.

Notably, the *City of New York* plaintiffs sought both damages and an injunction to abate the nuisance and trespass in the event defendants failed to pay any court-awarded damages. 993 F.3d at 88. The Second Circuit relied on this fact as part of its finding that the City's claims sought to "regulate emissions." *Id*. at 92-93 & n.5. By contrast, the New York Act seeks to recover only a one-time payment. This is a material difference.

Nor does the Act's imposition of a retroactive assessment indirectly regulate emissions. In *City of New York*, the court observed that the only way for the defendants to avoid future tort liability for their fossil fuel production "would be to cease global production altogether." *Id.* at 93. But here, liability under the Act is entirely retroactive: there is no future liability to avoid. And nothing fossil fuel producers choose to do going forward would affect their liability, which derives exclusively from past production. *Supra* p. 7 & n.3.

The court in *City of New York* observed that retroactive *tort* damages can influence behavior going forward. *Id*. at 92-93. That is because a finding of tort liability recognizes that the tortfeasor violated an ongoing legal duty. Once found liable for a nuisance, a tortfeasor can only "avoid the threat of ongoing liability" by "chang[ing] its methods of doing business and controlling pollution" or in some cases "ceas[ing] operations" altogether. *Ouellette*, 479 U.S. at 495; *see also* Dan B. Dobbs et al., The Law of Torts § 57 (2d ed. 2025) (after a trespass plaintiff recovers damages once, "she may sue again for damages that have occurred since the first suit"). Tort law thus has a deterrent as well as compensatory purpose. *See, e.g.*, *Minneci v. Pollard*, 565 U.S. 118, 127 (2012); Restatement (Second) of Torts § 901 cmt. c (1979) ("[U]nlike the law of contracts or of restitution, the law of torts . . . has within it elements of . . . deterrence."). And

14

New York City conceded that the damages it sought could work "production-side changes." *City of New York*, 993 F.3d at 93. By contrast, a one-time statutory assessment based on past activity does not impose an ongoing duty and does not subject responsible parties to liability for future fossil fuel production.[5]

Finally, unlike the tort claims in *City of New York*, the Act does not require courts to apply any "vague" or "indeterminate standards" to adjudge liability. *See City of New York*, 993 F.3d at 97 (quoting *Ouellette*, 479 U.S. at 496). The *City of New York* court was concerned that courts were ill-suited to enforce a state nuisance remedy related to greenhouse gas emissions. *Id*. at 97-98. But unlike tort law, the New York Act does not require courts to balance the reasonableness of emissions, the impact of those emissions on other parties, or to craft a remedy, much less to engage in this type of analysis on an ongoing basis. *See Copart Indus., Inc. v. Consol. Edison Co. of New York*, 362 N.E.2d 968, 971 (N.Y. 1977) (court assessing private nuisance claim must determine whether conduct was intentional and unreasonable, negligent or reckless, or abnormally dangerous); Restatement (Second) of Torts § 821B (1979) (public nuisance requires an "unreasonable" interference with public rights). Thus, *City of New York*'s holding does not control the preemption analysis in this case.

### B. The Clean Air Act does not preempt the New York Act

Congress may preempt state law in three ways: (1) express preemption, (2) field preemption, where Congress "occupies an entire field of regulation and leaves no room for state law"; or (3) conflict preemption, where state law makes compliance with both federal and state law "impossible" or poses "an obstacle to the achievement of federal objectives." *Nat'l Shooting Sports Found. v. James*, 144 F.4th 98, 108 (2d Cir. 2025) (citation omitted). Plaintiffs claim that

---

[5] Nor have Plaintiffs met their burden to show, as a matter of undisputed fact, that the Act will actually cause fossil fuel producers or users to alter their behavior. *Supra* Argument II.

the New York Act is preempted because Congress has occupied the field of interstate air pollution regulation (field preemption) and because it poses an obstacle to implementation of the Clean Air Act (conflict preemption). Pls. Mem. 11-21.[6] Both theories fail for the same reason: the Clean Air Act directs the United States Environmental Protection Agency (EPA) to set pollution control standards for greenhouse gas emissions for certain sources, and the New York Act sets no emission standards at all. Plaintiffs have not identified a single pollution source that would have to change its emission controls because of the New York Act.

Plaintiffs argue that because the Act's assessments on some fossil fuel producers may have an indirect effect on greenhouse gas emissions at some point in the future, the Clean Air Act must preempt it. But even if the Act would have this effect, which Plaintiffs have not established, preemption requires more: there must be an *actual* conflict between the state law and "rights" or "restrictions" created by federal law. *See Murphy v. NCAA*, 584 U.S. 453, 477 (2018) (articulating this test for express, field, and conflict preemption). If the Clean Air Act preempted every state law with the *potential* to affect greenhouse gas emissions, myriad state policies with that potential—such as gasoline taxes, highway tolls, and fossil fuel subsidies—might be preempted as well. There is no evidence that Congress intended such an extreme result. *See Commonwealth Edison Co. v. Montana*, 453 U.S. 609, 633 (1981) (rejecting argument that congressional policy favoring the use of coal over other fuels "demonstrate[s] a congressional intent to pre-empt all state legislation that may have an adverse impact on the use of coal").

---

[6] Plaintiffs do not (and could not) claim that the Clean Air Act expressly preempts the New York Act. The Clean Air Act has only two express preemption provisions, both of which concern state emission standards for motor vehicles. *See* 42 U.S.C. §§ 7543(a), 7543(e)(1).

1.     **The Clean Air Act does not occupy the field addressed by the New York Act**

Plaintiffs' field preemption theory rests on the premise that the Clean Air Act "occupies the field of interstate [greenhouse gas] regulation." Pls. Mem. 13 (emphasis omitted). That is not a basis for preemption because, as described above, the New York Act does not regulate emissions. *Supra* Argument II. Even if Plaintiffs had submitted undisputed evidence that the Act's one-time assessment on some fossil fuel producers will indirectly affect future greenhouse gas emissions (they have not), "tangential" effects are not sufficient for field preemption. *Cf. English v. Gen. Elec. Co.*, 496 U.S. 72, 85 (1990) (holding that "not every state law that in some remote way may affect" nuclear safety falls within that preempted field). "[N]o one could claim" that EPA's regulation of interstate air pollution "forecloses every other form of state regulation that affects" that pollution. *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 386-87 (2015). If it did, countless state policies that affect interstate emissions—including those that *encourage* fossil fuel production—might be preempted as well. Plaintiffs have not identified any federal statute that occupies the actual field addressed by the Act: raising revenue to address harm from past greenhouse gas production.

Plaintiffs' underlying premise is wrong for an additional reason: the Clean Air Act does not govern all matters related to interstate pollution such that courts "may infer from the federal legislation that Congress intended to preempt state law in that entire subject area." *MTBE*, 725 F.3d at 97. The Clean Air Act is not one of the "rare cases" in which "Congress 'legislated so comprehensively' in a particular field that it 'left no room for supplementary state legislation.'" *Kansas v. Garcia*, 589 U.S. 191, 208 (2020) (citation omitted). To the contrary, the Clean Air Act is a model of cooperative federalism: it explicitly retains a significant role for states in the regulation of air pollution sources, including pollution that crosses state borders. *See*, *e.g.*, 42

17

U.S.C. § 7401(a)(3) ("air pollution control at its source is the primary responsibility of States and local governments"); *id*. § 7416 (explicitly retaining state authority to set pollution standards more stringent than those set under the Clean Air Act); *see also infra* p. 18 (explaining courts have upheld the application of source-state law to interstate pollution). These savings clauses alone are "fundamentally incompatible with complete field preemption." *Espinal v. AFNI, Inc.*, No. 17 CIV. 3439 (KPF), 2018 WL 2733366, at *8 (S.D.N.Y. June 7, 2018) (quoting *In re NOS Comm.*, 495 F.3d 1052, 1058 (9th Cir. 2007)); *see also, e.g.*, *Overnite Transp. Co. v. Tianti*, 926 F.2d 220, 222 (2d Cir. 1991) (per curiam) (finding that a savings clause was evidence of "Congress' intent to allow state regulation to coexist with the federal scheme"). Indeed, based on identical savings clauses, the Supreme Court has held that the Clean Water Act does not occupy the field of interstate water pollution. *Ouellette*, 479 U.S. at 492; *see also Merrick v. Diageo Americas Supply, Inc.*, 805 F.3d 685, 692 (6th Cir. 2015) (the Clean Air Act and Clean Water Act "feature nearly identical savings clauses").

Plaintiffs do not cite a single case finding that the Clean Air Act occupies the field of interstate pollution. Instead, they rely exclusively on a series of conflict preemption cases. Pls. Mem. 11-16. But these cases uniformly held that the Clean Air Act does *not* occupy the field of interstate pollution, and instead permits the application of source-state law to pollution that crosses state lines. *See Merrick*, 805 F.3d at 690-95; *Bell v. Cheswick Generating Station*, 734 F.3d 188, 193-97 (3d Cir. 2013); *N. Carolina, ex rel. Cooper v. TVA*, 615 F.3d 291, 306 (4th Cir. 2010); *accord Ouellette*, 479 U.S. at 492.

Plaintiffs' field preemption theory is also inconsistent with positions the federal government has taken elsewhere. While Plaintiffs insist that the Clean Air Act comprehensively regulates greenhouse gases, *see* Pls. Mem. 13, the federal government recently stated in a

proposed rule that Clean Air Act section 202(a) "does not authorize the EPA to prescribe standards for [greenhouse gas] emissions based on global climate change concerns," *Reconsideration of 2009 Endangerment Finding and Greenhouse Gas Vehicle Standards*, 90 Fed. Reg. 36,288, 36,298 (Aug. 1, 2025). The statutory interpretation advanced by the government there—if true—would contradict its position on preemption here, as it posits that, at least in one context, the Clean Air Act does *not* empower (much less direct) the federal government to regulate greenhouse gases.[7] Under any of the government's theories, there is no field preemption here.

### 2.    The New York Act poses no obstacle to the Clean Air Act's regulation of greenhouse gas emissions

To show that the New York Act poses an obstacle to implementation of the Clean Air Act, Plaintiffs must establish that it presents an "actual" and "sharp" conflict with "the overriding federal purpose and objective" of the federal statute. *MTBE*, 725 F.3d at 101 (cleaned up). "The mere fact of tension between federal and state law" is insufficient. *Id*. The "repugnance or conflict" must be "so direct and positive that the two acts cannot be reconciled or consistently stand together." *Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 241 (2d Cir. 2006). Since Congress's purpose is the "ultimate touchstone," *Medtronic*, 518 U.S. at 485, courts must "examin[e] the federal statute as a whole and identif[y] its purpose and intended effects." *MTBE*, 725 F.3d at 101 (cleaned up).

The Act does not conflict with the Clean Air Act. While the Clean Air Act's "overriding federal purpose and objective," *MTBE*, 725 F.3d at 101 (cleaned up), is to "prevent and control air pollution," 42 U.S.C. § 7401(a)(4); *see id*. § 7401(b), it does not give EPA unlimited

---

[7] Many scientific, public health, and environmental organizations have commented in opposition to EPA's proposed rule. Environmental Groups reserve the right to address the purported justification for, and any impact of, the proposed rule when it is finalized.

discretion to "decid[e] whether and how to regulate [greenhouse gas] emissions on a nationwide basis," Pls. Mem. 16-17. The Clean Air Act does not direct EPA, for example, to identify and achieve an overall level of national greenhouse gas emissions. Instead, it directs EPA to identify specific stationary and mobile sources that, in EPA's judgment, contribute to harmful air pollution, and set pollution control standards for some of those sources. *See* 42 U.S.C. §§ 7411, 7521. Even as to those sources, EPA's standards do not set an overall cap on greenhouse gas emissions.

Nor does the Act provide a regime for addressing harms from greenhouse gas emissions, *contra* Pls. Mem. 18-19, or adapting to climate change. While the Clean Air Act's "Good Neighbor Provision" requires upwind states to reduce emissions affecting air quality in downwind states, it applies only to specific smog- and soot-forming air pollutants, none of which are greenhouse gases. *See* 42 U.S.C. § 7410(a)(2)(D)(i); Cross-State Air Pollution, Environmental Protection Agency, https://perma.cc/N3F9-LNKS (last visited Oct. 27, 2025). And that provision—where it applies—requires states to reduce their emissions going forward, not to address harm from past emissions. The New York Act does not control air pollution (let alone sources regulated by the Clean Air Act); its purpose is to address the effects of air pollution inside New York.

In the absence of any actual conflict between the New York Act and the Clean Air Act's pollution control standards for greenhouse gas emissions, Plaintiffs fall back on an argument that the Act "thwarts" EPA's "discretion . . . to balance environmental, economic, and energy concerns," Pls. Mem. 17, and will lead to higher energy costs, *id.* at 10. But Plaintiffs have submitted no evidence that the Act will affect energy production, prices, or emissions, *supra*

Argument II, let alone emissions from the limited categories of sources whose emissions EPA may regulate.

Moreover, courts have repeatedly held that such indirect effects do not amount to conflict preemption. In the context of express Clean Air Act preemption, where Congress has explicitly barred state standards "relating to the control of emissions" from new motor vehicles and nonroad engines or vehicles, 42 U.S.C. §§ 7543(a), 7543(e)(1), courts are reluctant to find that state laws that indirectly affect emissions amount to control of those emissions. *See, e.g., Jensen Fam. Farms, Inc. v. Monterey Bay Unified Air Pollution Control Dist.*, 644 F.3d 934, 940 (9th Cir. 2011) (requirement to register and pay fees for certain kinds of diesel engines was not a "standard[] or other requirement[] relating to the control of emissions"). In other statutory contexts, too, "incidental effect[s]" on matters governed by federal statute are not a basis for obstacle preemption. *See, e.g.*, *Coal. for Competitive Elec., Dynergy Inc. v. Zibelman*, 906 F.3d 41, 55-57 (2d Cir. 2018) (state law that indirectly decreased energy costs was not preempted by the Federal Power Act because it did "not amount to a regulation of the interstate wholesale electricity market" (cleaned up)); *Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kan.*, 489 U.S. 493, 517-18 (1989) (state law that might have increased the cost of natural gas was not preempted by the Natural Gas Act, which gave Congress exclusive authority over the interstate sale of natural gas, where there was no showing that the impact on "matters within federal control" would be "so extensive and disruptive" as to justify preemption); *see also, e.g.*, *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 661-62, 664-65 (1995) (rejecting a broad theory of federal preemption, premised on a state law's potential indirect and downstream effects, that would disturb swaths of traditional state authority). Plaintiffs speculate that the Act may influence owners of EPA-regulated sources to make choices

as independent economic actors that result in fewer fossil fuel emissions, but Congress did not intend for the Clean Air Act to preempt every state law—from zoning standards to highway tolls—with the potential to generate ancillary effects on the emission of greenhouse gases. *See Commonwealth Edison*, 453 U.S. at 633.

Plaintiffs' reliance on the source-state rule—the principle that the Clean Air Act preempts the application of state common law claims to limit pollution from out-of-state sources, Pls. Mem. 13-14—does not help their case. This rule is not an independent preemption doctrine, but merely an application of settled conflict preemption principles when federal and state law seek to apply different pollution control standards to the same source. The rule originated in *International Paper Co. v. Ouellette*, in which Vermont residents brought a nuisance suit under Vermont law over a New York paper mill's discharges into interstate waters. 479 U.S. 481, 483-84 (1987). The mill was operating under the terms of a Clean Water Act permit that set limits on how much waste it could release. *Id*. at 489, 490 n.10. Looking to the text, structure, and purpose of the Clean Water Act, the Court concluded that Congress intended to permit only two pollution control standards for the mill and other point sources it regulated: a federal standard set pursuant to the Clean Water Act and a standard enforced by the law of the source state. *Id*. at 490-99. The residents' nuisance suit, by seeking to apply a third standard (Vermont nuisance law) to the same point source, would have interfered with Congress's intent to permit only two standards and was thus preempted. *Id*. at 495-96.[8]

Courts that have imported *Ouellette's* source-state rule to the Clean Air Act have followed the same reasoning. Those cases recognize that, as in the Clean Water Act, Congress intended

---

[8] Notably, the relief requested in *Ouellette* included punitive damages and injunctive relief that would have forced the defendant to restructure part of its water treatment system. *Id*. at 484.

only two permissible pollution control standards for Clean Air Act-regulated sources: the federal standard and the source-state standard. *See Bell*, 734 F.3d at 196-97; *Merrick*, 805 F.3d at 690-92; *Cooper*, 615 F.3d at 306; *D'Amico v. Waste Mgmt. of N.Y., LLC*, No. 6:18-CV-06080 EAW, 2019 WL 1332575, at *9-11 (W.D.N.Y. Mar. 25, 2019). In these cases, the out-of-state law at issue had the same purpose as the Clean Air Act—to limit pollution from a certain point source—and sought to use the same means—imposing a pollution control standard. The federal and state laws thus could not be reconciled. By contrast, the New York Act does not "threaten similar interference with federal regulatory goals." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 489 n.7 (2008), because it does not impose standards to limit pollution from *any* source.

Plaintiffs speculate that the Act could lead to "a chaotic patchwork of conflicting regulations" over the same pollution sources. Pls. Mem. 20. That other states may adopt laws similar to New York's Act does not transform this permissible exercise of state power into a preempted one. Such speculation should not be credited in the context of a facial preemption challenge. *Rest. L. Ctr. v. City of New York*, 90 F.4th 101, 117 (2d Cir. 2024) (declining to find facial preemption based on a speculative application of the challenged law); *Nat'l Shooting Sports Found.*, 144 F. 4th at 112 (cautioning against "speculating about hypothetical or imaginary cases in which a law might be" preempted). In any event, the Act does not regulate pollution sources. *Supra* Argument II. Plaintiffs fail to explain how multiple state statutes assessing fees for past fossil fuel production could result in conflicting pollution control standards for future emissions from a regulated source. If Congress were to someday determine that permitting other states to follow New York's lead would "undercut a federal objective," the Constitution gives Congress alone the authority to craft its preferred solution. *Pac. Gas & Elec.*

*Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 223 (1983). "The courts should not assume the role which our system assigns to Congress." *Id*.

## CONCLUSION

For the reasons set forth above and in the papers filed by the State Defendants, the Court should deny Plaintiffs' motion for summary judgment.

Dated: October 28, 2025                    Respectfully submitted,

/s/ Michelle Wu
Michelle Wu
Mitchell S. Bernard
Natural Resources Defense Council, Inc.
40 West 20th Street, 11th Floor
New York, NY 10011
(646) 889-1489
michellewu@nrdc.org
mbernard@nrdc.org

/s/ Dror Ladin
Dror Ladin
Earthjustice
48 Wall Street, 15th Floor
New York, NY 10005
(917) 410-8701
dladin@earthjustice.org

*Counsel for Proposed Defendant-Intervenors West Harlem Environmental Action, Inc., Citizens Campaign for the Environment, and Catskill Mountainkeeper*

/s/ Todd D. Ommen
Todd D. Ommen
Pace Environmental Litigation Clinic
78 North Broadway
White Plains, NY 10603
(914) 422-4343
tommen@law.pace.edu

*Counsel for Proposed Defendant-Intervenors Food & Water Watch, Fridays For Future NYC, Third Act Initiative, Inc.*

/s/ Erin E. Doran
Erin E. Doran*
Senior Staff Attorney
Food & Water Watch
1616 P St NW Suite 300
Washington, DC 20036
(202) 683-2451
edoran@fwwatch.org
*Admitted pro hac vice*

*Counsel for Proposed Defendant-Intervenor Food & Water Watch*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the word limitation of Local Rule 7.1(c) because it contains 7,281 words, excluding the parts of the brief exempted under Local Rule 7.1(c), according to the word count of Microsoft Word.

/s/  Michelle Wu