UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

UNITED STATES OF AMERICA and UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

                              *Plaintiffs*,

                          v.

STATE OF NEW YORK; KATHLEEN HOCHUL, in her official capacity as Governor of New York; LETITIA JAMES, in her official capacity as New York Attorney General; and AMANDA LEFTON, in her official capacity as Acting Commissioner of the New York Department of Environmental Conservation,

                              *Defendants*.

-------------------------------------------------------------------x

Case No.: 1:25-cv-03656 (PKC)

## BRIEF OF THE CITY OF NEW YORK AS AMICUS CURIAE IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

MURIEL GOODE-TRUFANT
*Corporation Counsel*
*of the City of New York*
100 Church Street
New York, New York 10007
212-356-1000

ALICE R. BAKER
   *of Counsel*

November 3, 2025

## TABLE OF CONTENTS

**Table of Authorities** ................................................................................................................. ii

**INTEREST OF AMICUS CURIAE** ............................................................................................1

**BACKGROUND** ..........................................................................................................................2

**ARGUMENT** ................................................................................................................................5

    **I.**    **Plaintiffs' reliance on *City of New York* is misplaced.** ..............................................5

        A.  *City of New York* applied a different, "less rigorous" analysis than that required for federal preemption of a state statute. ........................................6

        B.  *City of New York* evaluated claims that operated as cross-border emissions regulations; New York Climate Change Superfund Act is not a regulations at all. ........................................................................................8

**CONCLUSION** ..........................................................................................................................12

# TABLE OF AUTHORITIES

**Cases**

*Am. Elec. Power Co. v. Connecticut,* 564 U.S. 410 (2011) ....................................................... 8, 9
*Atherton v. FDIC*, 519 U.S. 213 (1997)............................................................................................ 6
*Bianco v. Erkins (In re Gaston & Snow)*, 243 F.3d 599 (2d Cir. 2001) ........................................ 6
*BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996) ..................................................................... 11
*California v. BP P.L.C.*, 2018 U.S. Dist. LEXIS 32990 (N.D. Cal. Feb. 27, 2018)....................... 3
*City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304 (1981)............................................ 6, 7, 9
*City of New York v. BP P.L.C,* 325 F. Supp. 3d 466 (S.D.N.Y. 2018) ....................................... 3, 4
*City of New York v. Chevron*, 993 F.3d 81 (2d Cir. 2021)...................................................... passim
*Erie R. Co. v, Tompkins*, 304 U.S. 64 (1938) ................................................................................. 6
*Georgia v. Tennessee Copper Co.*, 206 U.S. 230 (1907)............................................................... 10
*Illinois v. City of Milwaukee*, 406 U.S. 91 (1972) .......................................................................... 9
*Kivalina v. ExxonMobil Corp.*, 696 F.3d 84 (9th Cir. 2012) .......................................................... 3
*Missouri v. Illinois*, 200 U.S. 496 (1906) ..................................................................................... 10
*Native Village of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849 (9th Cir. 2012) ............................ 8
*New Jersey v. City of New York*, 283 U.S. 473, 476–77 (1931) ..................................................... 9
*New York v. New Jersey*, 256 U.S. 296 (1921) ............................................................................. 10
*North Dakota v. Minnesota*, 263 U.S. 365 (1923) ........................................................................ 10
*Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218 (1947).................................................................... 8

**Statutes**

N.Y. Envtl. Conserv. Law § 76-0101(20)...................................................................................... 10
N.Y. Envtl. Conserv. Law § 76-0101(6)........................................................................................ 10
N.Y. Envtl. Conserv. Law § 76-0101(7)........................................................................................ 10
N.Y. Envtl. Conserv. Law § 76-0103 ............................................................................................ 10
N.Y. Envtl. Conserv. Law § 76-0103(2)........................................................................................ 10

**INTEREST OF AMICUS CURIAE**[1]

*Amicus* the City of New York ("City"), a political subdivision of the State of New York, has an interest in combatting global warming and its myriad significant impacts on the City. Specifically, implementation of the New York Climate Change Superfund Act will benefit the City in its efforts to adapt to the impacts of climate change that the City is already experiencing. Climate change is already causing the City to suffer more extreme heat, flooding of low-lying areas, increased shoreline erosion, and higher threats of extreme weather events and catastrophic storm surge flooding. The City has and will continue to spend significant financial resources to adapt to climate change and build resilient infrastructure to protect the health and quality of life of New York City residents.

As outlined in New York City's Climate Budgeting publication, New York City is investing nearly $12 billion in capital projects that address flood risk and more than $2 billion in projects that address extreme heat risk, inclusive of more than $1 billion for projects that address both. *See* The City of New York Executive Budget, Fiscal Year 2026, New York City Climate Budgeting, *available at* https://www.nyc.gov/assets/omb/downloads/pdf/exec25/exec25-nyccb.pdf. However, the overall costs of climate change in New York City will far exceed this amount. Implementation of the New York Climate Change Superfund Act will provide support for the City to address the significant financial needs of responding to the impacts of climate change on its neighborhoods, infrastructure, and people.

Equally important, the City has an interest in the ability of state and local governments, like itself, to implement laws, policies, and practices that mitigate emissions of

---

[1] Amicus states: counsel for Amicus authored this brief in its entirety, and no person or entity other than Amicus and its representative made any monetary contribution to the preparation or submission of this brief.

greenhouse gases and its effects, without regulating cross-border emissions in any manner that conflicts with the Federal Clean Air Act. The City, along with many other municipalities and numerous states including New York, has passed laws, regulations, and policies—including state laws that directly regulate emissions—to combat global warming. Extending the broad and brazen arguments advanced by Plaintiffs to their furthest point flies in the face of longstanding principles of federalism and upends the ability of states to create and enforce their own emissions standards within appropriate domains. The City has an interest in the Court's recognition that state and local governments retain appropriate authority to take action to mitigate greenhouse gas emissions and fight the effects of climate change.

That interest is only heightened here, where plaintiffs' argument that the Clean Air Act preempts the New York Climate Change Superfund Act largely relies on a case that the City brought and lost. In this amicus brief, the City explains that Plaintiffs' reliance on the Second Circuit's decision in *City of New York v. Chevron*, 993 F.3d 81 (2d Cir. 2021) (*City of New York*), for that preemption argument is misplaced. As the City was the plaintiff in that case, it is uniquely able to address how the circumstances and reasoning underlying that decision are starkly different from those presented by the matter currently before this Court, rendering that decision of little relevance to the appropriate outcome here.

The City respectfully urges this Court to deny the Plaintiffs' motion for summary judgment.

## BACKGROUND

In *City of New York*, the City brought public nuisance, private nuisance, and trespass claims under New York common law against five of the largest fossil fuel producers. The City alleged that "individually and collectively the defendants' production, marketing, sale, and

2

promotion of fossil fuel products [were] responsible for climate change impacts which harm New York City." Am. Compl. at 77, Dk No. 80, *City of New York v. BP P.L.C.,* No. 18-182 (S.D.N.Y. March 16, 2018). The City further alleged that that conduct was ongoing, causing continuous and recurring injuries to the City in part because the use of the producers' fossil fuel products continues to emit greenhouse gases. Am. Compl. at 129-131, Dk No. 80, *City of New York v. BP P.L.C.,* No. 18-182 (S.D.N.Y. March 16, 2018).

Defendants moved to dismiss all of the City's claims, arguing that even though the City's claims were labeled as "state-law" claims, they arose under federal common law; that federal common law had been displaced by the Clean Air Act; and, alternatively, that the City failed to plead a viable federal common law claim.[2]

The Southern District of New York granted defendants' motion and dismissed the City's complaint, finding that the widespread dispersal of greenhouse gas emissions were exactly the type of "transboundary pollution" to which federal common law should apply, and that "because the Clean Air Act has spoken 'directly to the question' of domestic greenhouse gas emissions, the City's claims are displaced." *City of New York v. BP P.L.C,* 325 F. Supp. 3d 466, 474 (S.D.N.Y. 2018) (*citing Kivalina v. ExxonMobil Corp.*, 696 F.3d 849, 855-58 (9th Cir. 2012) and *California v. BP P.L.C.*, 2018 U.S. Dist. LEXIS 32990, at *8 (N.D. Cal. Feb. 27, 2018)).

In affirming the District Court's decision, the Second Circuit analyzed whether federal common law governed the City's nuisance claims. "[F]ederal common law exists in only the few and restricted enclaves where a federal court is compelled to consider federal questions

---

[2] Defendants also argued that the City's claims were independently barred by federal doctrines, Defs.' Br. in Supp. of Mot. to Dismiss at 16-26, Dk. No. 100, *City of New York v. BP P.L.C.*, No. 18-00182 (S.D.N.Y. May 4, 2018), that the City did not allege viable state law claims, *id.* at 26-30, and that the claims are not justiciable, *id.* at 31-34.

3

that cannot be answered from federal statutes alone." *City of New York*, 993 F.3d at 89 (cleaned up). One such restrictive enclave is present when a federal rule of decision is necessary because federal interests conflict with the operation of a state rule of decision. *Id.* at 90. In evaluating if such a conflict was present for the City's claims, the court framed the question as "whether a nuisance suit seeking to recover damages for the harms caused by global greenhouse gas emissions may proceed under New York law." *Id.* at 91. In answering this question in the negative, the court highlighted the regulatory effect of allowing the City's claims to advance—effectively altering defendants' behavior far beyond New York's borders. *Id.* at 93.

The court reasoned that the lawsuit "effectively impose[d] strict liability for the damages caused by fossil fuel emissions. . . " *Id*. The defendants would therefore need to "cease global production [of fossil fuels] altogether" if they "want[ed] to avoid all liability." *Id.* And because the threat of "ongoing liability" would "no doubt compel the [defendants] to develop new means of pollution control," the court concluded that the City's lawsuit "would regulate cross-border emissions." *Id.* (cleaned up).

That the City's lawsuit would regulate cross-border emissions, even if "in an indirect and roundabout manner," was the linchpin of *City of New York's* conclusion that federal common law governed the City's claims analysis. Indeed, the court said as much, observing that the defendants' arguments "demand[ed] at the outset" that the court determine whether the "the City's lawsuit . . . [was] a clash over regulating worldwide greenhouse gas emissions and slowing global climate change." *Id.* at 90–91.

Having found that federal common law applied to the City's claims, the court in turn analyzed whether the Clean Air Act displaced federal common law "concerned with domestic greenhouse gas emissions." *Id.* at 95. This displacement happens if Congress passes a statute that

4

speaks directly to the question; that is, Congress provides a solution to the particular issue to warrant a conclusion that the legislation has occupied the field. *Id*. Since the court had found the City's claims related to transboundary emissions, it concluded that Congress had "spoken directly to [the issue of greenhouse gas emissions] by empowering EPA to regulating those very emissions." *Id.* at 96 (cleaned up). Thus, the Clean Air Act displaced the City's common law damages claims. *Id.*[3]

## ARGUMENT

### I. Plaintiffs' reliance on *City of New York* is misplaced.

Plaintiffs' reliance on the Second Circuit's decision in *City of New York v. Chevron* is entirely misplaced. By its terms and its logic, *City of New York* applies to one and only one type of claim: tort claims that operate to "regulate cross-border emissions" by imposing liability for "damages caused by fossil fuel emissions no matter where in the world those emissions were released (or who released them)." *City of New York,* 993 F.3d at 93 (cleaned up). Nothing in that decision suggests that either federal common law or the Clean Air Act might preempt a state statute that does not regulate emissions.

*City of New York* is of little relevance to the issues currently before this Court. Unlike the state statute at issue here, the claims in *City of New York* were based on state common law and the court's analysis of whether the Clean Air Act displaced federal common law is less rigorous than the traditional statutory preemption analysis that is required here. *City of New York's* finding that federal common law displaced the City's state tort claims hinged on the cross-border

---

[3] The court broadly concluded that foreign policy concerns foreclosed the City common law claim targeting emissions emanating from beyond our national borders. *City of New York*, 993 F.3d at 101.

regulatory effect that the City's claims would impose. In contrast, the New York Climate Change Superfund Act does not regulate emissions—cross border or otherwise.

**A.  *City of New York* applied a different, "less rigorous" analysis than that required for federal preemption of a state statute.**

To start, *City of New York* evaluated whether the City's nuisance claims arose under federal common law, rather than New York common law, and then assessed whether federal common law claims were displaced by the Clean Air Act. No common law claims are at issue here. Rather, Plaintiffs argue that the Clean Air Act preempts state statutory law. *City of New York* does not speak to preemption of a state statute, and the standard governing such preemption differs from the standards applied in *City of New York*.

*City of New York does* speak to the scope of federal common law to displace state rules of decision in specific areas of the common law. The general power to develop and apply a federal rule of decision is not one courts possess. *City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304, 312 (1981) (*Milwaukee II*) (*citing Erie R. Co. v, Tompkins*, 304 U.S. 64, 78 (1938)). Instead, it is primarily for Congress to decide whether to "displace state law" by enacting a "federal rule." *Id*. at 312-13. In the limited instances in which a federal statute alone cannot answer the federal question, federal common law may fill the gap. *City of New* York, 993 F.3d at 89. But, before federal courts may create federal common law, "a significant conflict between some federal policy or interest and the use of state law must first be specifically shown." *Atherton v. FDIC*, 519 U.S. 213, 218 (1997) (cleaned up); *see also Bianco v. Erkins (In re Gaston & Snow)*, 243 F.3d 599, 606 (2d Cir. 2001). The Second Circuit stressed, however, that the conflict "need not be as sharp as that which must exist for ordinary pre-emption when Congress legislates in a field which the states have traditionally occupied." *City of New York*, 993 F.3d at 90 (cleaned up). Courts have found a sufficiently significant conflict in certain claims involving an attempt to abate point-

6

source pollution emanating from different states. *Id.* at 91 (collecting cases). According to the Second Circuit, the City's tort claims in *City of New York* were related to the "harms caused by global greenhouse gas emissions," "no matter where in the world those emissions were released (or who released them)." *Id.* at 91. The Court found that the City's claims would "regulate" cross-border emissions on a going forward basis, either forcing the defendants to cease operations or pressuring them to develop pollution control measures to manage the "ongoing liability". *Id.* at 93. The Court further observed that, for similar reasons, the claims would risk disrupting the federal balance between preventing global warming, on the one hand, and other goals, such as economic growth and energy production, on the other. *Id*. After making these finding, the court held that the case was governed by federal common law, consistent with existing precedent involving tort claims addressing interstate pollution. *Id.* at 91 (collecting cases).

        The second step in the Circuit's analysis addressed whether the Clean Air Act preempted the City's federal common-law nuisance claims. Here, too, the Circuit applied a less demanding standard than would apply to determine whether the Clean Air Act preempts a state statute. Once the court in *City of New York* determined that federal common law applied to the City's claims, it evaluated the displacing effect of the Clean Air Act on the specialized federal common law that had developed to address cross-border pollution disputes. *Id.* at 95-98. In its analysis, the court acknowledged that it applied a "less rigorous standard" than that necessary to decide if federal law preempts state law. *Id.* at 95 (quoting *Milwaukee II,* 451 U.S. at 316); *see also Milwaukee II,* 451 U.S. at 316 ("…the appropriate analysis in determining if federal statutory law governs a question previously the subject of federal common law is not the same as that employed in deciding if federal law pre-empts state law."). And that difference makes sense, as the determination whether a federal statute displaces court-made rules of decision developed under

federal common law presents none of the structural or federalism concerns that the preemption of state statutes does. Because preemption of a statute was not at issue, *City of New York* never took on the more rigorous preemption analysis.

In sidestepping the need for a traditional preemption analysis here, Plaintiffs repeatedly cite *City of New York* for language about the "comprehensive statutory scheme" created by the Clean Air Act, seemingly in an effort to establish field preemption. Pls.' Mem. of Law at 16-17 (Dk. No. 74); *see also e.g. City of New York,* 993 F.3d at 99. But the Clean Air Act's extensive scheme has limits. State law is not to be superseded by a federal statutes unless that was the clear and manifest purpose of Congress evidenced by federal regulation "so pervasive as to make reasonable the inference that Congress left no room for the states to supplement it" or "the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230 (1947). Without actually evaluating the breadth of the Clean Air Act's field and instead relying heavily on the analysis in *Am. Elec. Power Co. v. Connecticut,* 564 U.S. 410 (2011) and *Native Village of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849 (9th Cir. 2012)*,* (both addressing common law claims), *City of New York* concluded that the "City's federal common law claims concerning domestic greenhouse gas emissions [were] displaced by [the Clean Air Act]." *City of New York* 993 F.3d at 98. Thus, it provides no guidance on the proper analysis of the Clean Air Act's preemptive scope over state statutory law, such as the New York Climate Change Superfund Act.

> **B.** ***City of New York*** **evaluated claims that operated as cross-border emissions regulations; New York Climate Change Superfund Act is not a regulation at all.**

The less stringent framework of analysis is not the only major difference between *City of New York* and this case. Rather, the core considerations that drove the Second Circuit's

8

analysis of the nuisance theories presented there are not presented by the Climate Change Superfund Act at issue here.

    The linchpin of *City of New York's* analysis of the federal common law rested on the court's conclusion that "the City's lawsuit would regulate cross-border emissions in an indirect and roundabout manner." *Id.* at 93. That determination hinged on the potential for a substantial damages award, effectively regulating defendants' conduct. *Id.* at 92-93. Although the City acknowledged that its claims might lead to production-side changes, *id.* at 93, it argued that they would not operate as a regulation but rather reallocate the costs imposed by the defendants' activity. Br. for Appellant at 19, Dk. No. 89, *City of New York*, No. 18-2188, 2018 (2d Cir. Nov. 8, 2018). The City emphasized that it neither sought an injunction requiring abatement of emissions nor sought damages based on the theory that defendants were violating a standard of care concerning the level of emissions caused by their activities. The court rejected these arguments, noting that while the City was not expressly imposing a standard of care of emissions restriction on defendants but pursuing a "perhaps even more ambitious" goal by imposing strict liability on defendants' activity. *City of New York,* 993 F.3d at 93. Noting that to avoid liability, defendants "only solution would be" to change their behavior, *id.*, the court found that the City's claims "operate[d] as a *de facto* regulation on greenhouse gas emissions," *id.* at 96, and followed precedent applying federal common law of interstate pollution to tort lawsuits that have the purpose and effect of regulating cross-border pollution.[4]

---

[4] *See Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 419 (2011) (seeking "injunctive relief" that would "require[e] each defendant to cap its carbon dioxide emissions and then reduce them by a specified percentage each year for at least a decade" (cleaned up)); *Milwaukee II*, 451 U.S. at 311 (seeking an order requiring "petitioners to eliminate all overflows and to achieve specified effluent limitations on treated sewage"); *Illinois v. City of Milwaukee*, 406 U.S. 91, 94 (1972) (same); *New Jersey v. City of New York*, 283 U.S. 473, 476–77 (1931) (seeking "an injunction" that would "restrain[] the city from dumping garbage into the ocean or waters of the United States

In crucial ways, the New York Climate Change Superfund Act differs sharply from the nuisance theories advanced in *City of New York*. Despite Plaintiffs' announcement that the New York Climate Change Superfund Act "openly regulates interstate air emissions," Pls.' Mem. of Law at 16 (Dk. No. 74), it does not seek to govern the conduct of responsible parties—they may continue their business practices in New York and around the world. The New York Climate Change Superfund Act does not regulate greenhouse gas emissions, either directly or in a roundabout manner.

The most salient distinction is that New York's statute seeks funding to remediate the effects of solely past activities; it in no way governs or affects fossil fuel companies' ongoing operations. Rather, the New York Climate Change Superfund Act imposes an obligation on responsible parties, as defined by the statute, to contribute to a climate adaptation fund that will address significant harms from climate change in New York. N.Y. Envtl. Conserv. Law §§ 76-0101(20), 76-0103(2). The amount a responsible party must contribute is proportional to historic greenhouse gas emissions attributable to the fossil fuels that it is responsible for having extracted or refined from 2000 to 2024. N.Y. Envtl. Conserv. Law §§ 76-0101(6), (7), 76-0103. The Act does not seek to change responsible parties' behavior going forward, and it cannot do so because the calculation of the contribution amount is determined solely based on past events.[5] *Cf. BMW*

---

off the coast of New Jersey and from otherwise polluting its waters and beaches"); *New York v. New Jersey*, 256 U.S. 296, 298 (1921) (seeking to "permanently enjoin[]" defendant from "discharge[ing] . . . sewage" into the New York harbor); *Georgia v. Tennessee Copper Co.*, 206 U.S. 230, 236 (1907) (seeking "to enjoin the defendant Copper Companies from discharging noxious gas"); *Missouri v. Illinois*, 200 U.S. 496, 517 (1906) (seeking "to restrain the discharge of . . . sewage"); *see also North Dakota v. Minnesota*, 263 U.S. 365, 371–72 (1923) (seeking "an order enjoining the continued use of [certain] ditches" that were causing floods in neighboring state).

[5] As Defendants here point out in their opposition brief, the New York Climate Change Superfund Act cost demands "will not lead companies to decrease production or alter any incentives to invest

*of N. Am., Inc. v. Gore*, 517 U.S. 559, 572 (1996) ("…a State may not impose economic sanctions … with the intent of changing the tortfeasors' lawful conduct in other States."). The New York Climate Change Superfund Act does not, even indirectly, impose any emissions restriction. *See City of New York,* 993 F.3d at 93 ("…while the City is not expressly seeking to impose a standard of care or emission restriction[]…, the goal of its lawsuit is perhaps even more ambitious…"). Instead, mirroring the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), on which the New York Climate Change Superfund Act was modeled, it seeks to recover the costs to address the significant harms from climate change in New York based on past activities. There is no change in behavior or pollution control measure a responsible party could implement to limit or avoid its obligations under the Act.

New York Climate Change Superfund Act does not regulate emissions, cross-border or otherwise, presenting an additional distinction between this case and other decisions, including *City of New York*, involving of interstate pollution arising common law claims.

---

or innovate, including by implementing additional pollution controls." Defs.' Mem. of Law at 20 (Dk. No. 84).

## CONCLUSION

Plaintiffs' reliance on the Second Circuit's decision in *City of New York v. Chevron* is misplaced. The City respectfully urges this Court to deny the Federal Government's motion for summary judgment.

Dated: November 3, 2025

                                           Respectfully submitted,

                                           **MURIEL GOODE-TRUFANT**
                                           Corporation Counsel of the City of New York

By:  */s/ Alice R. Baker*
       Alice R. Baker
       Senior Counsel
       albaker@law.nyc.gov
       100 Church Street
       New York, New York 10007
       (212) 356-2314
       *Attorney for the City of New York*

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing memorandum of law complies with the Court's formatting rules and that the portions of the memorandum that must be included in a word count contain approximately 3626 words. I relied on the word count of the Microsoft Word program used to prepare this memorandum.


Dated: November 3, 2025         By:   _/s/ Alice R. Baker_
                                      Alice R. Baker