**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA and UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,<br><br>        *Plaintiffs*,<br><br>   v.<br><br>STATE OF NEW YORK; KATHLEEN HOCHUL, in her official capacity as Governor of New York; LETITIA JAMES, in her official capacity as New York Attorney General; and AMANDA LEFTON, in her official capacity as Commissioner of the New York Department of Environmental Conservation,<br><br>        *Defendants*. | 25 Civ. 3656 (PKC) |

**PLAINTIFFS' REPLY IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*
ROBERT N. STANDER
*Deputy Assistant Attorney General*
JUSTIN D. HEMINGER
*Acting Deputy Assistant Attorney General*
U.S. Department of Justice
Environment and Natural Resources Division
950 Pennsylvania Ave., N.W.
Washington, D.C. 20530
(202) 514-5442

*Of Counsel:*
RILEY W. WALTERS
*Counsel*
JOHN K. ADAMS
*Senior Counsel*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... iii

INTRODUCTION ............................................................................................... 1

ARGUMENT ..................................................................................................... 2

I.  The United States Has Standing To Seek Redress For New York's
    Usurpation Of Federal Authority. ............................................................... 2

II. The Clean Air Act Preempts The Superfund Act. ........................................ 5

    A.  The Clean Air Act Does Not Authorize New York to Impose
        Liability under New York Law for Out-of-State Greenhouse Gas
        Emissions. ....................................................................................... 6

        1.  The law does not recognize New York's purported
            distinction between regulation and compensation, but the
            Superfund Act regulates ongoing emissions in any event. ........... 8

        2.  Because federal law must govern interstate air emissions,
            both state common law and state statutes are preempted. .......... 13

    B.  The Superfund Act Unlawfully Intrudes into the Field of Interstate
        Emissions and Conflicts with the Clean Air Act. ................................. 15

III. The Superfund Act Defies Constitutional Limits On Extraterritorial
     Regulation. ........................................................................................... 18

    A.  The Constitution Precludes the Superfund Act Because It Imposes
        Liability for Greenhouse Gas Emissions Originating Out of State ......... 19

    B.  The Superfund Act Exceeds the Territorial Limits of New York's
        Legislative Power .................................................................................. 20

IV. The Foreign Affairs Doctrine Preempts The Superfund Act. ....................... 25

    A.  The Superfund Act Intrudes into the Field of Foreign Affairs
        Without Addressing a Traditional State Responsibility .......................... 26

    B.  The Superfund Act Conflicts with U.S. Foreign Policy. ......................... 27

V.  The Superfund Act Violates The Commerce Clause. ................................... 31

i

VI.    The Superfund Act Is Facially Invalid...................................................................32

CONCLUSION.................................................................................................................33

## TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
    458 U.S. 592 (1982) ................................................................................................................ 2

*Am. Booksellers Found. v. Dean,*
    342 F.3d 96 (2d Cir. 2003) ................................................................................................. 32

*Am. Elec. Power Co., Inc. (AEP) v. Connecticut,*
    564 U.S. 410 (2011) ...................................................................................................... passim

*Am. Ins. Ass'n v. Garamendi,*
    539 U.S. 396 (2003) ............................................................................................. 26, 27, 28

*Arizona v. United States,*
    567 U.S. 387 (2012) .................................................................................................. 2, 3, 21

*Ass'n for Accessible Meds. v. Ellison,*
    140 F.4th 957 (8th Cir. 2025) ............................................................................................ 31

*BMW of N. Am., Inc. v. Gore,*
    517 U.S. 559 (1996) ............................................................................................................. 9

*Boyle v. United Techs. Corp.,*
    487 U.S. 500 (1988) ............................................................................................. 16, 19, 28

*Calder v. Jones,*
    465 U.S. 783 (1984) .......................................................................................................... 23

*City of Charleston v. Brabham Oil Co.,*
    2025 WL 2269770 (S.C. Ct. Com. Pl. Aug. 6, 2025) ...................................................... 20

*City of New York v. A-1 Jewelry & Pawn, Inc.,*
    247 F.R.D. 296 (E.D.N.Y. 2007) ..................................................................................... 23

*City of New York v. Beretta U.S.A. Corp.,*
    315 F. Supp. 2d 256 (E.D.N.Y. 2004) ............................................................................. 23

*City of New York v. Chevron Corp.,*
    993 F.3d 81 (2d Cir. 2021) ........................................................................................... passim

*Crosby v. Nat'l Foreign Trade Council,*
    530 U.S. 363 (2000) ............................................................................................. 28, 29, 32

*Ctr. for Biological Diversity v. EPA*,
    141 F.4th 153 (D.C. Cir. 2025) ................................................ 15

*Edgar v. MITE Corp.*,
    457 U.S. 624 (1982) ................................................................ 32

*EduMoz, LLC v. Republic of Mozambique*,
    968 F. Supp. 2d 1041 (C.D. Cal. 2013) ................................ 31

*EPA v. EME Homer City Generation*,
    572 U.S. 489 (2014) ................................................................ 18

*EEOC v. Day & Zimmerman NPS, Inc.*,
    265 F. Supp. 3d 179 (D. Conn. 2017) ...................................... 3

*Exxon Shipping Co. v. Baker*,
    554 U.S. 471 (2008) ................................................................ 16

*FEC v. Cruz*,
    596 U.S. 289 (2022) .................................................................. 4

*Franchise Tax Bd. v. Hyatt*,
    587 U.S. 230 (2019) ................................................ 19, 20, 21

*Fuld v. Palestine Liberation Org.*,
    606 U.S. 1 (2025) ................................................................... 20

*Grand River Enters. Six Nations, Ltd. v. Boughton*,
    988 F.3d 114 (2d Cir. 2021) .................................................. 31

*Haight v. NYU Langone Med. Ctr., Inc.*,
    2016 WL 29628 (S.D.N.Y. Jan. 4, 2016) .............................. 31

*Illinois v. City of Milwaukee*,
    406 U.S. 91 (1972)......................................................... passim

*Illinois v. City of Milwaukee*,
    731 F.2d 403 (7th Cir. 1984) ................................................ 22

*In re Assicurazioni Generali, S.P.A.*,
    592 F.3d 113 (2d Cir. 2010).................................................. 26

*In re Debs*,
    158 U.S. 564 (1895) ............................................................... 21

iv

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*,
725 F.3d 65 (2d Cir. 2013)..................................................................... 5

*Int'l Paper Co. v. Ouellette*,
479 U.S. 481 (1987)................................................................... passim

*Kentucky v. Yellen*,
54 F.4th 325 (6th Cir. 2022) ............................................................... 4

*Kurns v. R.R. Friction Prods. Corp.*,
565 U.S. 625 (2012) ........................................................................... 9

*La Union Pueblo Entero (LUPE) v. Abbott*,
604 F. Supp. 3d 512 (W.D. Tex. 2022)............................................ 3, 4

*Lab. Council for Latin Am. Advancement v. EPA*,
12 F.4th 234 (2d Cir. 2021) ............................................................... 4

*Mallory v. Norfolk S. Ry. Co.*,
600 U.S. 122 (2023)......................................................................... 21

*Mayor and City Council of Baltimore v. BP P.L.C.*,
31 F.4th 178 (4th Cir. 2022) ............................................................ 27

*Movsesian v. Victoria Versicherung AG*,
670 F.3d 1067 (9th Cir. 2012) .................................................... 26, 27

*N.Y. Pet Welfare Ass'n, Inc. v. City of New York*,
850 F.3d 79 (2d Cir. 2017)............................................................... 32

*Nat'l Foreign Trade Council v. Natsios*,
181 F.3d 38 (1st Cir. 1999).............................................................. 32

*Nat'l Pork Producers Council v. Ross*,
598 U.S. 356 (2023).......................................................... 20, 21, 31

*Nat. Res. Def. Council (NRDC) v. NHTSA*,
894 F.3d 95 (2d Cir. 2018)................................................................ 9

*New York by James v. Pa. Higher Educ. Assistance Agency*,
2020 WL 2097640 (S.D.N.Y. May 1, 2020) ...................................... 3

*New York Life Ins. Co. v. Head*,
234 U.S. 149 (1914)......................................................................... 21

*Stauffer v. Brooks Bros., Inc.*,
   619 F.3d 1321 (Fed. Cir. 2010) ............................................................... 3

*Tex. Indus., Inc. v. Radcliff Materials, Inc.*,
   451 U.S. 630 (1981) ...................................................................... 13, 14

*Texas v. Yellen*,
   105 F.4th 755 (5th Cir. 2024) ................................................................ 4

*United States v. Articles of Banned Hazardous Substances Consisting of an Undetermined*
   *Number of Cans of Rainbow Foam Paint*, 34 F.3d 91 (2d Cir. 1994) ..................................... 31

*United States v. California*,
   2020 WL 8183945 (E.D. Cal. Feb. 26, 2020) ................................................... 3

*United States v. Idaho*,
   623 F. Supp. 3d 1096 (D. Idaho 2022) ........................................................ 3

*United States v. Locke*,
   529 U.S. 89 (2000) ........................................................................... 6

*United States v. Missouri*,
   114 F.4th 980 (8th Cir. 2024) ............................................................... 21

*Vt. Agency of Nat. Res. v. United States ex rel. Stevens*,
   529 U.S. 765 (2000) ....................................................................... 2, 4

*Wachovia Bank, N.A. v. Burke*,
   414 F.3d 305 (2d Cir. 2005) .................................................................. 6

*Young v. Masci*,
   289 U.S. 253 (1933) .................................................................. 22, 23, 25

*Zschernig v. Miller*,
   389 U.S. 429 (1968) ......................................................................... 27

**Statutes**

42 U.S.C. § 7407(a) ............................................................................ 17

42 U.S.C. § 7408(a) ............................................................................ 17

42 U.S.C. § 7409 .............................................................................. 17

42 U.S.C. § 7411 .............................................................................. 17

42 U.S.C. § 7521 .................................................................................................. 17

42 U.S.C. § 7521(a) ............................................................................................ 14

42 U.S.C. § 7545 ........................................................................................... 15, 17

42 U.S.C. § 7546 ........................................................................................... 15, 17

42 U.S.C. § 7675 .................................................................................................. 17

Pub. L. No. 100-204, 101 Stat. 1331 (1987), reprinted as note to 15 U.S.C. § 2901 ............ 28, 29

S.2129-B, Chapter 679, New York Laws of 2024 (Dec. 26, 2024), as amended by S.824
    (Feb. 28, 2025), N.Y. Envtl. Conserv. Law §§ 76-0101 to 76-0105 (McKinney's 2025) ....... 12

N.Y. Envtl. Conserv. Law § 76-0101(8) ............................................................... passim

N.Y. Envtl. Conserv. Law § 76-0103(3)(e)(i) ............................................................... 5

N.Y. Envtl. Conserv. Law § 76-0103(4)(a)(iv) ............................................................. 5

N.Y. Envtl. Conserv. Law § 76-0103(10)(a)(i) ............................................................. 5

N.Y. Envtl. Conserv. Law § 76-0103(10)(b) ................................................................ 5

Vt. Stat. Ann. tit. 10, §§ 596–599c ........................................................................ 12

**Other Authorities**

*Putting America First in International Environmental Agreements*,
    Exec. Order 14162, 90 Fed. Reg. 8,455 (Jan. 20, 2025) ........................................... 29

Louis Kaplow, *An Economic Analysis of Legal Transitions*,
    99 Harv. L. Rev. 509 (1986) ...................................................................... 12

# INTRODUCTION

New York cannot hold fossil-fuel producers "liable, under New York law, for the effects of [greenhouse gas] emissions made around the globe." *City of New York v. Chevron Corp.*, 993 F.3d 81, 92 (2d Cir. 2021). But it is undisputed that New York's Climate Change Superfund Act does exactly that. That resolves this case. The Clean Air Act and Foreign Affairs Doctrine preempt the Superfund Act, and the Constitution precludes it.

In New York's view, states *can* impose liability on energy producers under state law for alleged damages caused by global emissions—so long as they do so by enacting *statutes* rather than by filing *tort suits*. The question here is whether the Superfund Act's liability regime, which could not be imposed through a tort suit, is somehow revived because New York codified it in a statute. Law and logic confirm that the intuitive answer is the right one: States cannot use in-state law to impose liability for out-of-state emissions, regardless of the source of in-state law.

New York's contrary position rests (mostly) on a supposed distinction that *City of New York* rejected as illusory: controlling emissions, on the one hand, and compensating for harm caused by emissions on the other. That rejection is binding here, notwithstanding New York's futile attempt to turn this legal issue into a factual one. More than that, New York offers no cogent explanation for how the tort suit in *City of New York* could be about emissions control, while the Superfund Act—a carbon copy of that tort suit—is only about compensation for harm. Nor does New York ever explain why this assumed difference even matters in the first place. In the end, the State's arguments for distinguishing *City of New York* are really arguments for *overruling* it.

This legal error taints not only New York's position on Clean Air Act preemption, but also its constitutional and foreign affairs arguments. Once the error is corrected, New York's case unravels, because all it has left are cramped statements of law and misuses of expert declarations.

1

Again, common sense is decisive here: New York may not do by statute what it cannot do by tort suit.

The stakes couldn't be higher. If, as New York insists, laws like this one can stand, energy producers around the globe will be subject not only to billions (perhaps even trillions) of dollars in liability, but to a patchwork of rules governing their conduct in any location, as one state (or city) after another seeks to hold companies strictly liable for lawful fossil-fuel activities that take place across the world. Our federal system does not tolerate such an irrational regulatory regime, one that would also imperil the Nation's energy needs. The Court should enter summary judgment for the United States and end New York's lawless experiment in state overreach.

## ARGUMENT

### I.   The United States Has Standing To Seek Redress For New York's Usurpation Of Federal Authority.

**A.** The United States is suffering a current and ongoing injury because the Superfund Act usurps its authority to regulate in exclusively federal areas, thus impairing the United States' sovereign interest in the recognition of its laws and the preservation of our Nation's federal structure. *See* Dkt. No. 74 at 10–11 ("MSJ"). The federal government, like each state, has cognizable "sovereign interests," not only in its "power to create and enforce a legal code," but also in "recognition [of that code] from other sovereigns," including from individual states. *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982); *Arizona v. United States*, 567 U.S. 387, 398 (2012) ("Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect.").

The Supreme Court has thus held "[i]t is beyond doubt" that the United States has standing when it suffers an "injury to its sovereignty arising from violation of its laws." *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000); *see also Arizona*, 567 U.S. 387

2

(pre-enforcement preemption challenge to state law, where the Court reached the merits without questioning the United States' standing). In other words, "[w]hen state governments enact laws that impugn the United States' sovereignty, a personal injury to the United States arises." *La Union del Pueblo Entero (LUPE) v. Abbott*, 604 F. Supp. 3d 512, 527 (W.D. Tex. 2022).

Courts have repeatedly and uniformly applied this principle to hold that "the United States' sovereign interests are harmed when its laws are violated." *United States v. Idaho*, 623 F. Supp. 3d 1096, 1107 (D. Idaho 2022); *see, e.g.*, *Stauffer v. Brooks Bros., Inc*., 619 F.3d 1321, 1326 (Fed. Cir. 2010) ("From the government's perspective, a harm arises from an injury to its sovereignty arising from violation of its laws." (cleaned up)); *New York by James v. Pa. Higher Educ. Assistance Agency*, 2020 WL 2097640, at *11 (S.D.N.Y. May 1, 2020) ("a sovereign is injured by a violation of its law"); *United States v. California*, 2020 WL 8183945, at *3 (E.D. Cal. Feb. 26, 2020) (recognizing "the usurpation of federal authority to conduct foreign affairs" as a cognizable injury); *EEOC v. Day & Zimmerman NPS, Inc.*, 265 F. Supp. 3d 179, 192 (D. Conn. 2017) (The United States suffers an "injury to its sovereignty . . . from violation of its laws.").

Here, the Superfund Act—which is in full effect, *see* MSJ at 6—injures U.S. sovereignty by violating federal law and usurping authority to regulate interstate and global air emissions, which are areas of exclusive federal control under the Constitution and relevant provisions of the Clean Air Act. *See, e.g.*, MSJ at 10–35 (arguing that the Superfund Act usurps federal authority by violating the Constitution and Clean Air Act); Compl. ¶¶ 6–7, 10, 35–36, 48–113 (alleging same). Because the requested relief will fully redress that harm, the United States has standing.

Not only does New York fail to cite a single case rejecting this basis for standing—or a case denying standing to the United States on any basis—it *concedes* that the United States has a "particularized injury where it asserts a violation of its laws." Dkt. No. 84 at 16 ("Opp.") (citing

*Vt. Agency*, 529 U.S. at 771).  In the next breath, however, New York pivots and argues that the United States lacks standing because it hasn't asserted *other* theories of injury, such as additional interference with enforcement of federal law.  Opp. at 16.  But as New York itself acknowledges, interference with on-the-ground enforcement is unnecessary; when a state violates federal law, it works "a concrete harm to [U.S.] sovereignty," which suffices for standing.  *LUPE*, 604 F. Supp. 3d at 526; *Vt. Agency*, 529 U.S. at 771.  At any rate, the Superfund Act concretely interferes with "the United States' enforcement of federal law because it" (Opp. at 17) imposes $75 billion in liability for interstate and global greenhouse gas emissions, which conflicts with the regulatory regime imposed by the federal government.

Of course, the United States' injury here—New York's usurpation of federal authority stemming from the violation of federal law—overlaps with the merits of the case.  But "[f]or standing purposes," courts must "accept as valid the merits of [the plaintiff's] legal claims."  *FEC v. Cruz*, 596 U.S. 289, 298 (2022); *Kentucky v. Yellen*, 54 F.4th 325, 349 n.16 (6th Cir. 2022).  That means assuming as true the United States' claims that the Superfund Act usurps federal authority by violating the Clean Air Act, the Constitution's restrictions on extraterritorial regulation and allocation of foreign affairs power, and the Commerce Clause.  And that arrogation of federal authority, taken as true, injures the United States and gives it standing to pursue each claim.

**B.**  New York also challenges the United States' suit on constitutional ripeness grounds.[1] *See* Opp. at 11.  "The doctrine of constitutional ripeness prevents a federal court from entangling itself in abstract disagreements over matters that are premature for review because the injury is

---

[1] New York does not challenge prudential ripeness, and for good reason.  The validity of the doctrine is in doubt, *see Lab. Council for Latin Am. Advancement v. EPA*, 12 F.4th 234, 253 & n.2 (2d Cir. 2021), but the case is prudentially ripe anyway:  The claims are fit for review because they present purely legal questions, and the United States would suffer hardship if New York could continue implementing a preempted law that usurps federal authority.  *Cf. Texas v. Yellen*, 105 F.4th 755, 774 (5th Cir. 2024).

merely speculative and may never occur." *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 110 (2d Cir. 2013) (quotation marks omitted). Generally, a determination "that a plaintiff has Article III standing is enough to render its claim constitutionally ripe." *Id.*

The United States' claims are constitutionally ripe for the same reasons it has standing to sue. This dispute is not an "abstract disagreement[]" in which the United States' "injury is merely speculative and may never occur." *Id.* Rather, the United States is suffering injury *now* because the Superfund Act, which has been in full effect since December 2024, usurps federal authority and violates federal law. In fact, implementation is underway: By January 1, 2026, New York's Department of Environmental Conservation, which administers the Act, must publish an evaluation that includes (among other things) "a list of all responsible parties and their respective cost recovery demands." N.Y. Envtl. Conserv. Law §§ 76-0103(10)(a)(i), 76-0103(10)(b).

New York is thus wrong to call this suit an ordinary "pre-enforcement challenge." Opp. at 11. But even if the United States' injury to its sovereignty hinged on the incoming cost recovery demands that will issue to fossil-fuel producers (it does not), New York forgets that the cost demands are *certainly impending*—New York *will issue* the demands, and it will do so by a *date certain*, because that is what the Act *requires*. N.Y. Envtl. Conserv. Law § 76-0103(3)(e)(i) (mandating that "[t]he department *shall* issue notices of cost recovery demand to all responsible parties" by June 2028 (emphasis added)); *id.* § 76-0103(4)(a)(iv). So even the cost demands are not "merely speculative" actions that "may never occur." *MTBE*, 725 F.3d at 110. This suit is ripe.

## II. The Clean Air Act Preempts The Superfund Act.

On the merits, this case is equally clear-cut. The Clean Air Act preempts the Superfund Act because, as the Second Circuit made clear in *City of New York*, it "does not authorize" the recovery of "damages for the harms caused by global greenhouse gas emissions . . . under New

York law." 993 F.3d at 91, 99–100 (citing *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 492, 497 (1987)). That is enough to decide this case. But the Superfund Act also intrudes on a field occupied by the Clean Air Act and conflicts with the statute's text, structure, and purpose by undermining its comprehensive regulatory scheme.

### A.    The Clean Air Act Does Not Authorize New York to Impose Liability under New York Law for Out-of-State Greenhouse Gas Emissions.

The core holding in *City of New York*, which flows from *Ouellette*, is straightforward and dispositive here. Since the beginning, federal law, not state law, has governed interstate air pollution because it implicates "uniquely federal interests." *City of New York*, 993 F.3d at 90–91; *Ouellette*, 479 U.S. at 487–91; MSJ at 2–3, 11–13, 22. Until the Clean Air Act, federal common law governed. *Illinois v. City of Milwaukee*, 406 U.S. 91, 103, 105 n.6 (1972); *Am. Elec. Power Co., Inc. (AEP) v. Connecticut*, 564 U.S. 410, 421 (2011); *City of New York*, 993 F.3d at 90–95. And "resorting to state law on a question previously governed by federal common law is permissible only to the extent authorized by federal statute." *City of New York*, 993 F.3d at 99 (cleaned up).

This preempted-unless-authorized rule applies because the Clean Air Act operates in a field—interstate air pollution—that state law has "traditionally *not* occupied." *Id.* at 98. After all, "[t]he presumption against federal preemption disappears . . . in fields of regulation that have been substantially occupied by federal authority for an extended period of time." *Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 314 (2d Cir. 2005); *United States v. Locke*, 529 U.S. 89, 108 (2000) (recognizing that in some areas "there is no beginning assumption that concurrent regulation by the State is a valid exercise of its police powers"); MSJ at 11–13.

As the Second Circuit explained, the Clean Air Act authorizes only a "slim reservoir" of state action in this area: State-imposed liability for out-of-state emissions must be based on "the law of the pollution's *source* state." *City of New York*, 993 F.3d at 100 (cleaned up) (quoting

*Ouellette*, 479 U.S. at 497). The tort suit in *City of New York*, however, did not seek to "take advantage" of this "narrowly circumscribed" authorization. *Id.* It instead sought to impose "New York nuisance standards on emissions emanating simultaneously from all 50 states and the nations of the world"—true *interstate* regulation. *Id.* Because the Clean Air Act does not authorize such use of state law, the Second Circuit held that the claims were preempted. *Id.*

So too here. The Superfund Act explicitly targets "emissions attributable to all fossil fuel extraction and refining *worldwide* by" certain entities and declares that its scope is "*not limited to such emissions within the state*." N.Y. Envtl. Conserv. Law § 76-0101(8) (emphasis added). In other words, the State, like the City before it, seeks to impose billions of dollars in liability for greenhouse gas emissions originating in every state and nation of the world. Under *City of New York*, the Superfund Act is therefore preempted.

New York resists this inescapable conclusion for two reasons, neither of which has merit. First, New York asserts that *City of New York* forecloses only state efforts to control interstate emissions, not efforts to seek compensation for harm caused by such emissions. *See* Opp. at 19–20, 25. According to New York, this distinction makes all the difference because it means that *City of New York* has no relevance (Opp. at 19, 24–26); that the Superfund Act falls within the State's traditional police powers (Opp. at 19–21); that the Clean Air Act and the Superfund Act operate in different fields (Opp. at 21–24); and that there is no conflict between the statutes (Opp. at 27). Second, New York claims that *City of New York* does not apply because federal common law never supplanted state *statutes* like the Superfund Act in the first place. *See* Opp. at 24–25.

But the Second Circuit ruled out New York's first argument when it rejected the City's similar attempt to characterize its tort suit as compensatory rather than regulatory. The State cannot skirt that holding—that *legal* conclusion—by recasting it as a *factual* finding and purporting

to rebut it with an expert declaration. Nor can New York justify treating the Superfund Act, which seeks damages for past harm, differently than the City's tort suit, which sought the same type of relief. As for New York's second argument, when a federal rule of decision is required, the source of state law is irrelevant—state common law and state statutes must both give way.

> 1.    **The law does not recognize New York's purported distinction between regulation and compensation, but the Superfund Act regulates ongoing emissions in any event.**

**a.**  New York's first stab at evading *City of New York* is to frame the tort suit there as an effort to "control cross-border pollution," Opp. at 19, and the Superfund Act as an effort to "compensate New York for harm from past greenhouse gas emissions," Opp. at 20. Because New York assumes that the regulatory nature of the Act is a question of fact, it relies on a declaration from an economics professor stating that the Act's $75 billion in liability will have zero impact on the market or firm behavior—despite not even knowing the size of any company's cost demand—and thus is "not an economic regulation, as understood by economists." Opp. at 5 (citing Declaration of Don Fullerton ("Fullerton Decl.") ¶¶ 28–34, Dkt. No. 85).

This argument—on which New York pins nearly its whole response—runs directly into the teeth of *City of New York*. There, the City made the same argument: that "because it [sought] damages—not abatement or the imposition of pollution standards—its claims d[id] not threaten to regulate emissions at all[.]" *City of New York*, 993 F.3d at 92. But the Second Circuit said this "ignores economic reality" and held that "regulation can be effectively exerted through an award of damages, and the obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy." *Id.* (cleaned up). The court thus recognized, as a matter of law, that "a substantial *damages award* like the one requested by the City would effectively *regulate* the Producers' behavior far beyond New York's borders." *Id.* (emphasis

8

added). If anything, the court noted, imposing "strict liability for the damages caused by fossil fuel emissions no matter where in the world those emissions were released (or who released them)" is "even more ambitious" than regulating emissions through "a standard of care" or "emission restrictions." *Id.* at 93; *cf. id.* at 95–96 (holding that the Clean Air Act displaces federal common law actions for both "abatement of future emissions" and "damages for past emissions").

New York tries to reframe these legal conclusions as inapposite factual findings. *See* Opp. at 24 (disputing the "finding in *City of New York*"); Opp. at 25 ("the court found that the City's nuisance claim would lead to regulation of cross-border emissions," which "the [Superfund] Act does not do"). But the Second Circuit, as an appellate court, did not make any findings of fact—as New York acknowledges (Opp. at 13), the appeal was "on a motion to dismiss," so there was "no evidentiary record," and all inferences would have favored the City.

In rejecting the City's argument, the Second Circuit instead *held as a matter of law* that a damages award is an effective means of regulation, relying not on a factual record but on "economic reality" and multiple Supreme Court decisions holding the same on purely legal grounds. *City of New York*, 993 F.3d at 92–93; *see, e.g.*, *Ouellete*, 479 U.S. at 495, 498 n.19 (refusing to "draw a line between the types of relief sought" and thus rejecting plaintiffs' argument that they were "seeking to be compensated for a specific harm rather than trying to 'regulate'"); *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 637 (2012) ("regulation can be . . . effectively exerted through an award of damages"); *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 572 & n.17 (1996) ("Regulation can be as effectively exerted through an award of damages as through some form of preventive relief." (cleaned up)); *Nat. Res. Def. Council (NRDC) v. NHTSA*, 894 F.3d 95, 104–05 (2d Cir. 2018) (reasoning that "[t]he notion that financial incentives deter environmental miscon-

9

duct is hardly novel" as "common sense and basic economics tell us that increased cost of . . . con-duct will make that conduct less common" (cleaned up)).  The upshot:  Whether the Superfund Act regulates emissions is a legal question, not a factual one.  And the law is clear that seeking compensation for harm caused by past emissions is an effective means of regulation.

New York cannot duck this precedent by invoking the Fullerton Declaration—an expert declaration is not a get-out-of-law-free card.  Indeed, Fullerton does not (and could not) opine on whether the Superfund Act is a *legal* regulation; he instead claims that "the Act is not an '*economic* regulation,' *as defined and understood by economists*, because it does not intervene in the private actions of firms and individuals to change their behavior."  Fullerton Decl. ¶ 11(d) (emphasis added).  This statement clashes with what the Second Circuit called "economic reality" and "common sense."  *City of New York*, 993 F.3d at 93; *NRDC*, 894 F.3d at 104–05.  In any event, what is and is not an "economic regulation, as defined and understood by economists," is legally irrelevant.

**b.**  New York's only counter is that the Superfund Act imposes a one-time, purely retroac-tive assessment and thus is not regulatory because it does not explicitly control ongoing emissions.  Opp. at 8, 18–21, 23, 27; Fullerton Decl. ¶¶ 30–32.  This response fails for two reasons.

*First*, New York never explains the *legal* significance of its alleged distinction between controlling ongoing emissions and imposing liability for past emissions.  The latter method is also a way to regulate emissions—it's just an *ex post* standard ("you emitted too much") rather than an *ex ante* one ("your emissions shall not exceed 'x' amount").  Indeed, if anything, retroactive stand-ards are more burdensome than prospective ones because they do not give parties notice of how to conduct their affairs.  Worse still, merging retroactive strict liability with extraterritoriality—as the Superfund Act does—forces parties to pay for past acts taken in jurisdictions across the world, even if a party fully complied with the standard that governed in the home jurisdiction.

10

This is perhaps why New York fails to muster a single citation for its claim that retroactive standards do not implicate the concerns discussed in *City of New York*. Just the opposite is true: By imposing retroactive strict liability and extraordinary penalties on energy producers for out-of-state emissions, the Superfund Act (if allowed to stand) will effectively lead to the imposition of "separate discharge standards on a single point source," *Ouellette*, 479 U.S. at 493—New York's retroactive liability standard, plus whatever standard might exist in the source state, plus whatever standards other states may impose. The Act thus "implicates the conflicting rights of states" regardless of whether it controls ongoing emissions, which means that federal law must govern. *City of New York*, 993 F.3d at 92 (cleaned up); *see also Ouellette*, 479 U.S. at 496–97 (multistate authority "over a single discharge would lead to chaotic confrontation between sovereign states" and make it "virtually impossible to predict the standard for a lawful discharge").

*Second*, the fact that the Superfund Act seeks damages for past emissions does not distinguish it from the tort suit in *City of New York*, which sought the same type of relief. New York is therefore forced to contend that *tort* liability is somehow different from *statutory* liability. *Amici* pick up on this point by arguing that tort law creates ongoing duties and subjects parties to potential liability in the future. But this supposed lesson from *City of New York*—that tort liability is unique because it creates ongoing duties—is nowhere to be found in the court's opinion.

More to the point, New York is wrong to insist that there is no ongoing liability under the Superfund Act. The energy producers in *City of New York* would have faced ongoing liability only because they faced the prospect of future tort suits seeking to impose liability for future emissions. So too, if the Superfund Act is permissible, then energy producers would be subject to future amendments of the Act extending the covered period to reach future emissions. In five years, for example, New York could expand the covered period to reach emissions up to 2030—and New

York would have free rein to do so again in perpetuity, so long as the Act always ties liability to *past* emissions. Such action is reasonably foreseeable, as New York already amended the Act once to expand the covered period from 2000–2018 to 2000–2024. *See* S.2129-B § 3 (Dec. 26, 2024); S.824 § 3 (Feb. 28, 2025). Fossil-fuel producers are therefore on notice that their future operations could expose them to the same liability.[2]

New York may object to this concern as speculative (*cf.* Opp. at 27–28), but it is no more speculative than the prospect of future tort suits. And besides, this consideration goes to whether the Superfund Act regulates conduct on its face; the Court need not speculate about whether New York will *in fact* amend the Act (again), because it is the present-day *risk* of future liability that matters. *See* Louis Kaplow, *An Economic Analysis of Legal Transitions*, 99 Harv. L. Rev. 509, 600 (1986) ("[T]he expectation that future evolution in the law will be made applicable to harms arising . . . prior to the announcement of new rules will have a[n] . . . effect on behavior."); Org. for Econ. Coop. & Dev., *The Polluter Pays Principle: Definition Analysis Implementation* 16 (2008), https://perma.cc/A25U-7XE4 (the "polluter pays" principle "provide[s] a continuing incentive for improved pollution abatement"). So even if the Fullerton Declaration were relevant (it isn't, because the Act regulates emissions as a matter of law), it is fatally flawed. Fullerton assumes that the Act imposes a one-time assessment based on purely past conduct. Fullerton Decl. ¶¶ 30–31. By ignoring the risk of further expansions of the covered period, he necessarily ignores how firms will respond to that risk.

---

[2] Producers must also consider the full regulatory environment, which includes the risk of other states enacting similar laws if New York's is upheld. Fullerton dismisses this concern as not "validated by evidence," Fullerton Decl. ¶ 25, but Vermont has already enacted a climate change superfund statute, *see* Vt. Stat. Ann. tit. 10, §§ 596–599c, while California and at least nine other states are considering their own legislation, *see Polluters Pay: How States are Filling the Federal Climate Funding Gap in 2025*, NCEL (Mar. 3, 2025), https://perma.cc/82CT-482U.

Put simply, if producers wish "to avoid all liability," they would have to "cease global production altogether." *City of New York*, 993 F.3d at 93. "And even if some level of ongoing liability were deemed palatable, a significant damages award would no doubt 'compel' the Producers to develop new 'means of pollution control.'" *Id.* (cleaned up) (quoting *Ouellette*, 479 U.S. at 498 n.19); *see Ouellette*, 479 U.S. at 495 (holding that a damages award would force a company to "change its methods of doing business and controlling pollution to avoid the threat of ongoing liability"). So although the Superfund Act "would regulate cross-border emissions in an indirect and roundabout manner, it would regulate them nonetheless." *City of New York*, 993 F.3d at 93.

### 2. Because federal law must govern interstate air emissions, both state common law and state statutes are preempted.

As explained in the United States' opening brief, our constitutional structure "does not permit" certain subjects "to be resolved under state law." *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 641 (1981). One of those subjects is interstate air pollution. *City of New York*, 993 F.3d at 91 (collecting cases). Federal law must govern the issue because it implicates "an overriding federal interest in the need for a uniform rule of decision" as well as "basic interests of federalism." *Milwaukee*, 406 U.S. at 105 n.6; *id.* at 105 n.6, 107 n.9 (emphasizing that the issue "demands . . . applying federal law," not the "varying . . . law of the individual States"). Until Congress acted, interstate air pollution was governed by federal common law. *See id.* at 103, 105 n.6; *AEP*, 564 U.S. at 421. That is why the Second Circuit, in *City of New York*, did not perform a "traditional statutory preemption analysis"—because "federal common law [would have] governed" the City's tort suit "in the first place." *City of New York*, 993 F.3d at 98.

New York cannot resurrect that tort suit by writing it into a statute. Because federal law, absent the Clean Air Act, still would have preempted a statute like the Superfund Act, the "traditional statutory preemption analysis" does not apply. *Id.* In arguing otherwise, New York claims

that federal common law preempts only state common law, not state statutes, so *City of New York* does not control.  *See* Opp. at 25.

But New York fails to cite a single case holding—or even suggesting—that the source of state law matters to whether "our federal system . . . permit[s] the controversy to be resolved under state law." *Tex. Indus.*, 451 U.S. at 641.  That is no surprise, as the "overriding federal interest in the need for a uniform rule of decision" on interstate emissions, *Milwaukee*, 406 U.S. at 105 n.6, does not vanish when dealing with state statutes rather than common-law rules.  To the contrary, "varying" state statutory law, no less than "the varying common law of the individual States," undermines the substantial federal interest in a "uniform standard" in this area.  *Id.* at 107 n.9 (cleaned up).  So when federal common law applies, "*state statutes* or decisions are not conclusive." *Id.* at 105 (emphasis added); *see also City of New York*, 993 F.3d at 89 ("whether the water of an interstate stream must be apportioned between two states is a question of federal common law upon which neither the statutes nor the decisions of either state can be conclusive" (cleaned up)).  Or, in New York's own words, "while the remedies at issue in [*City of New York*] were common law remedies, there is no reason why the Clean Air Act would have a different preemptive effect on remedies for pollution harm under a state statute."  Opp. at 23.

*        *        *

In the end, there is no daylight between this case and *City of New York*.  The Superfund Act, like the tort suit, regulates out-of-state emissions.  The Superfund Act, like the tort suit, operates in an area that the Constitution reserves exclusively for federal control.  And the Superfund Act, like the tort suit, is not authorized by the Clean Air Act.  It is therefore preempted.[3]

---

[3] The United States' position here is not at odds with EPA's proposed rescission of greenhouse gas emissions standards for motor vehicles under Clean Air Act section 202(a).  *See* Environmental Groups Br., Dkt. No. 88 at 18–19.  To begin, the question under *City of New York* is whether the Clean Air Act authorizes *states* to regulate interstate emissions, not whether specific provisions of

**B.     The Superfund Act Unlawfully Intrudes into the Field of Interstate Emissions and Conflicts with the Clean Air Act.**

The Superfund Act is also unlawful under traditional principles of field and conflict preemption.  To begin, the Act does not "fall[] squarely within New York's traditional powers," and so it is not "presumed constitutional." Opp. at 20.  For reasons given above, there is no starting assumption that states' historic police powers govern interstate pollution.  *City of New York*, 993 F.3d at 98.  And that is true even though New York asserts that the Act promotes public "health, safety, and well-being" by "protecting its territory and its residents from the adverse impacts of climate change." Opp. at 20–21.  The City relied on the same ends-justify-the-means reasoning to support its tort suit in *City of New York*, but the Second Circuit was not swayed.  *See City of New York*, 993 F.3d at 88 ("The City requested compensatory damages for the past and future costs of climate-proofing its infrastructure and property[.]"); *see also id.* at 91, 97 & n.8.

**Field preemption.**  The field preemption analysis largely tracks the analysis above—the Clean Air Act creates a comprehensive regulatory scheme for interstate emissions and leaves no room for states to regulate out-of-state emissions under their own law.  *See id.* at 100.  Instead, the Clean Air Act limits the reach of state law to emissions originating *within* the state's borders.  *Id.* at 99.  As for *interstate* regulation, the Clean Air Act occupies the field.  *Id.* at 98–99.

_____

the Clean Air Act authorize EPA to do so.  MSJ at 18.  And *City of New York* aside, the Clean Air Act vests EPA with exclusive authority to determine "*whether* and how" to regulate emissions. *AEP*, 564 U.S. at 426 (emphasis added).  The preemptive effect of federal law here turns on the nature of interstate emissions and Congress' choice to vest regulatory authority in EPA, not on how EPA chooses to exercise that authority.  MSJ at 17–18.  The Superfund Act also purports to regulate fossil-fuel production, and nothing in EPA's proposed rule would change the agency's separate regulation of fuels or fuel production under distinct Clean Air Act authorities.  *See* 42 U.S.C. §§ 7545, 7546; *see also Ctr. for Biological Diversity v. EPA*, 141 F.4th 153, 162 (D.C. Cir. 2025).

15

In contending otherwise, New York first claims that the Clean Air Act and the Superfund Act occupy different fields (Opp. at 21), but this argument turns on the erroneous distinction between control and compensation. *See supra* at 7–13. New York next argues that "the Clean Air Act does not entirely occupy the field of controlling emissions of air pollutants," Opp. at 22, but it cites no authority for state control of *out-of-state* emissions, *see City of New York*, 993 F.3d at 100.

New York finds no firmer ground in redefining the field as "pollution remedies" and claiming that the Clean Air Act does not occupy *that* field. Opp. at 22–23. In doing so, New York relies on a case that held the Clean Water Act does not bar punitive damages imposed under federal maritime law. Opp. at 22–23 (citing *Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008)). The case did not address whether a state could seek relief, under its own law, for injuries caused by pollution from another state. The Supreme Court decided *that* question in *Ouellette*, holding that the Clean Water Act precludes "applying the law of an affected State" in seeking damages from "an out-of-state source." 479 U.S. at 484, 494. For that reason, and because "damages here would effectively control [energy producers'] behavior beyond New York's borders," the State's "reliance on *Exxon Shipping Co. v. Baker* is . . . misplaced." *City of New York*, 993 F.3d at 96–97; *see Exxon Shipping*, 554 U.S. at 489 n.7 (noting that a claim would be preempted if it "amounted to arguments for [regulatory] standards different from those provided by [federal statute]").

**Conflict preemption.** The Superfund Act also conflicts with the text, structure, and purpose of the Clean Air Act by undermining its comprehensive framework and EPA's carefully bounded regulatory discretion. *See City of New York*, 993 F.3d at 100; *see also Ouellette*, 479 U.S. at 493–494; MSJ at 16–21. Because the relevant field is not one that states have traditionally occupied, "[t]he conflict with federal policy need not be as sharp as that which must exist for ordinary pre-emption." *Boyle v. United Techs. Corp.*, 487 U.S. 500, 507 (1988).

16

Aside from arguing that there is no conflict because the Superfund Act does not control emissions, New York claims that the Act does not conflict with EPA's authority to set nationwide standards because it comports with the National Ambient Air Quality Standards ("NAAQS") program. Opp. at 27. But unlike the Superfund Act, the NAAQS program is premised on states having responsibility for emissions originating *within their own borders*. *See* 42 U.S.C. § 7407(a). Even in that context, EPA is responsible for setting national standards for pollutants it determines meet the statutory standard for regulation, *see id.* §§ 7408(a), 7409, and for approving state plans implementing those standards or promulgating federal plans for noncompliant states, *see, e.g.*, *id.* §§ 7407, 7410(k). And EPA's authority to set nationwide standards is not limited to establishing NAAQS. EPA also sets nationwide emission standards under distinct Clean Air Act authorities, including section 111 (stationary sources), section 202 (motor vehicles), section 211 (regulation of fuels), and section 212 (renewable fuel). *Id.* §§ 7411, 7521, 7545, 7546; *cf. also id.* § 7675 (hydrofluorocarbons). The Superfund Act conflicts with Congress's chosen methods for controlling emissions by imposing a disparate system of control based on retroactive strict liability.

Moreover, New York's point that "EPA has not established a NAAQS for greenhouse gases" is irrelevant. Opp. at 27. EPA decides "whether and how to regulate" greenhouse gases on a nationwide basis, and the Clean Air Act "permits [such] emissions *until* EPA acts." *AEP*, 564 U.S. at 426. So the lack of regulation under a specific Clean Air Act authority does not give New York "warrant . . . to upset [EPA's] expert determination" in "declin[ing] to regulate." *Id.* Rather, "[i]f EPA does not set emissions limits for a particular pollutant or source of pollution, States and private parties may petition [EPA] for a rulemaking on the matter," but there is "no room for a parallel track." *AEP*, 564 U.S. at 425. And although the Good Neighbor Provision applies only to NAAQS pollutants (*see* Opp. at 27), it reflects a broader reality: Under the Clean Air Act, states

"lack authority to control" the "influx of out-of-state pollution." *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 495 (2014). The Superfund Act blows past that reality and the "limited role" the Clean Air Act gives states in this context, which is generally confined "to commenting on proposed EPA rules or on another state's emission plan." *City of New York*, 993 F.3d at 88.

New York rounds out its errors by asserting that the Court cannot consider the effect of a state-by-state regulatory regime because to do so would be "speculative." Opp. at 27–28. But similar reasoning informed the Supreme Court's preemption holding in *Ouellette*. 479 U.S. at 496 ("For a number of different states to have independent and plenary regulatory authority over a single discharge would lead to chaotic confrontation between sovereign states." (cleaned up)). There is no need to speculate about *whether* other states will enact similar laws—Vermont already has. The point is that upholding New York's law would greenlight an "irrational system of regulation" in which each state has independent authority over nationwide emissions. *Id.* And allowing fifty states to impose fifty standards on the same conduct is simply incompatible with the Clean Air Act's integrated approach to air pollution control. *Cf. id.* at 496–97.

## III.   The Superfund Act Defies Constitutional Limits On Extraterritorial Regulation.

For two reasons, the Superfund Act also flouts constitutional limits on extraterritorial regulation. First, the Act seeks to regulate interstate air emissions, a uniquely federal interest that the Constitution commits exclusively to the federal government. *See* MSJ at 22. Second, and more generally, the Act exceeds the territorial bounds of state authority under the Constitution's horizontal separation of powers. *See* MSJ at 23–27.

A.    **The Constitution Precludes the Superfund Act Because It Imposes Liability for Greenhouse Gas Emissions Originating Out of State.**

Federal law must govern air pollution in its "ambient or interstate aspects." *Milwaukee*, 406 U.S. at 103. That is because it "implicate[s] two federal interests that are incompatible with the application of state law: (i) the overriding need for a uniform rule of decision on matters influencing national energy and environmental policy, and (ii) basic interests of federalism." *City of New York*, 993 F.3d at 91–92 (cleaned up); MSJ at 2–3, 11–13, 22. This is why *City of New York* ditched the "traditional statutory preemption analysis"—state law is not "competent to address" the issue because it "demand[s] a unified federal standard." 993 F.3d at 98.

In arguing that the United States wrongly relies on "decisions about federal common law" to deduce this constitutional rule (Opp. at 37), New York overlooks the reason those cases applied federal common law: because "the Constitution implicitly forbids" applying state law when the "interstate nature of the controversy makes it inappropriate for state law to control." *Franchise Tax Bd. v. Hyatt*, 587 U.S. 230, 246 (2019) (cleaned up); *AEP*, 564 U.S. at 421 (federal common law applies "where the basic scheme of the Constitution so demands"); *Boyle*, 487 U.S. at 504 (certain subjects involve "uniquely federal interests" and are "so committed by the Constitution . . . to federal control that state law is pre-empted and replaced" by "federal common law").

New York's only other retort rehashes its meritless claim that the Superfund Act is permissible because it is not a "nuisance[] action brought by one State to abate pollution emanating from another State." Opp. at 38 (quotation marks omitted). That argument fails for the reasons given above. *See supra* at 7–13; *Milwaukee*, 406 U.S. at 105 ("state statutes" are "not conclusive" under federal common law); *City of New York*, 993 F.3d at 90–95 & n.7 (holding that federal common law would govern tort suit for compensatory damages in the absence of the Clean Air Act).

19

In short, our constitutional structure precludes the Superfund Act, which (like the tort suit in *City of New York*) targets emissions emanating "simultaneously across just about every jurisdiction on the planet," not just emissions within the state. *City of New York*, 993 F.3d at 92. That effort "is simply beyond the limits of state law." *Id.*[4]

**B.    The Superfund Act Exceeds the Territorial Limits of New York's Legislative Power.**

Even if interstate pollution were not an inherently federal issue that the Constitution commits to the federal government, the Superfund Act would still exceed the "territorial limits" on "state authority under the Constitution's horizontal separation of powers." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 376 n.1 (2023); *Hyatt*, 587 U.S. at 245 ("Each State's equal dignity and sovereignty under the Constitution implies certain constitutional limitations on the sovereignty of all of its sister States." (cleaned up)); *Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 14 (2025) ("State sovereign authority is bounded by the States' respective borders."). This rule against extraterritorial regulation is "implicit in [the Constitution's] structure," *Hyatt*, 587 U.S. at 247; *Pork Producers*, 598 U.S. at 376 & n.1, but it also finds expression in certain constitutional provisions, including the Commerce Clause and the Fourteenth Amendment's Due Process Clause, *see* MSJ at 23–24.[5]

New York disputes the propriety of a "stand-alone prohibition on 'extraterritorial regulation'" or an "independent cause of action" for such a claim. Opp. at 36–37. But "[t]o resolve

---

[4] This conclusion echoes the "growing chorus of state and federal courts across the United States" holding that the Constitution requires that federal law govern liability for out-of-state emissions. *City of Charleston v. Brabham Oil Co.*, 2025 WL 2269770, at *2 (S.C. Ct. Com. Pl. Aug. 6, 2025) (collecting cases) (quotation marks omitted).

[5] The United States does not bring a standalone due process claim, and minimum contacts principles are irrelevant because the Superfund Act exceeds the territorial limits of state authority under the Constitution's horizontal separation of powers. MSJ at 25–26.

disputes about the reach of one State's power," the Supreme Court often invokes "the Constitution's structure and the principles of sovereignty and comity it embraces," rather than relying solely on "the Constitution's express provisions." *Pork Producers*, 598 U.S. at 376 (cleaned up); *see Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 154 (2023) (Alito, J., concurring in part); *accord New York Life Ins. Co. v. Head*, 234 U.S. 149, 161 (1914).

In fact, New York's position "proves too much." *Hyatt*, 587 U.S. at 247. "There are many other constitutional doctrines that are not spelled out in the Constitution but are nevertheless implicit in its structure and supported by historical practice—including, for example, judicial review, intergovernmental tax immunity, executive privilege, executive immunity, and the President's removal power." *Id.* at 247–48 (citations omitted). "Like these doctrines, the [rule against extraterritorial regulation] is a historically rooted principle embedded in the text and structure of the Constitution." *Id.* at 248; *Pork Producers*, 598 U.S. at 376 & n.1. And the United States can sue in equity to enjoin unconstitutional actions by state actors. *See Arizona*, 567 U.S. 387; *In re Debs*, 158 U.S. 564, 584, 599 (1895); *United States v. Missouri*, 114 F.4th 980, 986 (8th Cir. 2024).

To sum up, under the Constitution's horizontal separation of powers, a state cannot directly regulate out-of-state conduct unless that conduct has a sufficient connection to the state. *See Pork Producers*, 598 U.S. at 376 n.1; MSJ at 24–26. New York flunks this test.

**Direct regulation**. On its face, the Superfund Act *directly* regulates extraterritorial conduct by targeting "all fossil fuel extraction and refining *worldwide*" and holding companies strictly liable for emissions "attributable to" such "*worldwide*" conduct—not just "emissions *within the state*." N.Y. Envtl. Conserv. Law § 76-0101(8) (emphasis added). The Act does not merely have *incidental effect* on extraterritorial conduct by regulating in-state sales. *Cf. Pork Producers*, 598 U.S. at 374–76 & n.1.

New York responds with the mistaken belief that the Superfund Act "does not seek com-
pensation for conduct wholly outside New York" because some of the targeted fossil fuels will be
"distributed and used in New York." Opp. at 42. Although some covered emissions may originate
in New York, the State does not dispute—nor could it—that the Act also reaches wholly
out-of-state emissions and extraction and refining activity. The Act, for example, targets oil that
is extracted in Texas, refined in Louisiana, purchased in Tennessee, and used in Kentucky. N.Y.
Envtl. Conserv. Law § 76-0101(8). Unless (1) *all* fossil-fuel extraction and refining activities of
*all* responsible parties occur in New York and (2) *all* fossil fuels extracted or refined by those
entities stay in New York so that *all* emissions from their use originate in the State, the Superfund
Act necessarily sweeps in conduct that occurs wholly outside New York.

**Nexus to New York**. The extraterritorial conduct targeted by the Superfund Act—both
out-of-state emissions *and* extraction and refining activity—lacks a sufficient connection to New
York to justify the law's extraterritorial reach. Although courts have sometimes said that "a person
acting outside the State may be held responsible according to the law of the State for injurious
consequences within it," *Young v. Masci*, 289 U.S. 253, 259 (1933); Opp. at 39–40 (citing cases),
this is not one of those situations for two independent reasons.

First, this case, unlike the ones cited by New York, does not concern an "ordinary interstate
tort" dispute but rather "the determination of liability and remedy for [emissions] within one
state . . . into [the] interstate [air], which by [its] nature implicate[s] uniquely federal concerns."
*Illinois v. City of Milwaukee*, 731 F.2d 403, 411 n.3 (7th Cir. 1984). Thus, the cases relied on by
New York are "not applicable" here. *Id.*

Second, when courts have allowed states to apply their laws to out-of-state actors, there
has been a direct and traceable connection from the out-of-state conduct to the in-state harm. For

22

example, in *Young*, the defendant owned a car in New Jersey and allowed a person to drive the car into New York, where the driver struck a man with the car. 289 U.S. at 256. The other cases cited by New York also involved a direct and easily traceable connection. *See Calder v. Jones*, 465 U.S. 783, 784 (1984) (California plaintiff sued Florida defendants for publishing allegedly defamatory article in national magazine with large circulation in California); *City of New York v. Beretta U.S.A. Corp.*, 315 F. Supp. 2d 256, 262 (E.D.N.Y. 2004) (City brought nuisance suit against out-of-state manufacturers and distributors of firearms that were possessed and used illegally in the City); *City of New York v. A-1 Jewelry & Pawn, Inc.*, 247 F.R.D. 296 (E.D.N.Y. 2007) (City brought tort suit against out-of-state firearm retailers that facilitated illegal possession in the City).

Here, no direct and traceable connection exists. Rather, New York imposes liability based on alleged in-state injuries caused by fossil-fuel activities all around the world. And the medium transmitting New York's alleged injuries is the Earth's entire atmosphere, where "[g]reenhouse gases once emitted 'become well mixed'" and can remain for "hundreds of years," making it impossible to trace any particular activity outside New York to any particular injury within it. *AEP*, 564 U.S. at 422 (citation omitted); *City of New York*, 993 F.3d at 86, 92 ("Greenhouse gas molecules cannot be traced to their source, and greenhouse gases quickly diffuse and comingle in the atmosphere." (record citation omitted)). Indeed, New York cannot trace its asserted injuries to specific greenhouse gas molecules—let alone to the specific extraction and refining activity that is even further down the alleged causal chain. After all, the mixing of greenhouse gases in the atmosphere means that "emissions in New Jersey may contribute no more to flooding in New York than emissions in China." *AEP*, 564 U.S. at 422. Any connection between a company's out-of-state conduct and any alleged injury within New York is therefore far too attenuated to support the Superfund Act's universal reach. If such an indirect and untraceable chain of causation

23

were enough to justify applying a state's laws extraterritorially, there would be no real limit on state authority to reach out-of-state conduct.

New York tries in vain to solve this problem with an expert declaration that claims "in-state climate harms" can be traced "to the emissions from individual fossil fuel companies." Declaration of Justin S. Mankin ("Mankin Decl.") ¶ 39, Dkt. No. 86.[6]  This effort fails out of the gate because, on Mankin's own description, the most "attribution science" purports to offer is some connection between climate-related injuries and a particular *producer*, based on that producer's alleged contribution to aggregate emissions worldwide.  *See* Opp. at 5 ("In-state climate harms *can be attributed to a specific company's greenhouse gas emissions* . . . ." (emphasis added)), 42 ("local harms can be attributed to specific *sets of emissions*," such as "emissions *attributable to a specific company*" (emphasis added)); Mankin Decl. ¶ 21 (attribution science purports to "link *company-level emissions* to in-state harms" (emphasis added)).

New York and Mankin thus fail to link the right elements.  To reach conduct in another jurisdiction, New York must trace in-state injury to *specific conduct in that jurisdiction*, not to a specific company's contribution to aggregate global emissions.  For example, New York must trace in-state climate harm (*e.g.*, flooding) to oil extraction in Texas or emissions originating in New Jersey.  But neither New York nor Mankin dispute that it is impossible to link in-state harm to specific out-of-state emissions and production—after all, greenhouse gas molecules quickly diffuse and mix in the atmosphere, where they can remain for centuries.  *See AEP*, 564 U.S. at 422;

---

[6] Mankin has described his attribution work as "central to informing climate litigation" and "empowering claims of restitution," while also calling "climate liability" efforts a "moral obligation." CNN, *Study looks at how specific countries can be linked to the climate crisis* (July 12, 2022), https://www.cnn.com/videos/world/2022/07/12/greenhouse-gas-emissions-report-intv-chatterley-fm-intl-ldn-vpx.cnn.  And he testified in support of Vermont's nearly identical climate superfund statute.  *See* Vermont's Mem. of Law in Support of Mot. to Dismiss, *United States v. Vermont*, No. 2:25-cv-00463 (D. Vt.), Dkt. No. 35-1 (Aug. 15, 2025) at 5 (relying on Mankin testimony).

24

*City of New York*, 993 F.3d at 86, 92.  Attribution science, as described by Mankin, therefore lacks the specificity required for extraterritorial regulation.

Even if New York could trace climate-related injuries to specific greenhouse gas molecules—and those specific molecules to a specific company's production in a specific location—there still would not be a sufficiently *direct* link between out-of-state conduct and in-state harm.  Just consider Mankin's Rube-Goldberg-esque description of the "chain of causality":  New York must "connect[] changes in emissions to changes in greenhouse gas concentrations; changes in such concentrations to changes in warming; changes in warming to changes in extremes and hazards; and changes in hazards to consequent damages."  Mankin Decl. ¶ 33; *see also id.* ¶ 31 (Figure 1).  And not only that, New York must also (among much else) "compar[e] the observed world to a counterfactual one" through "observational data and physics-based models" (Mankin Decl. ¶ 24); conduct controlled experiments that disentangle contributions of "internal variability" from "external forcings" (Mankin Decl. ¶ 30); and employ "Climate or Earth System Models" to "simulate the global temperature response to greenhouse gas emissions" (Mankin Decl. ¶ 37).

In short, climate attribution science is worlds away from the type of direct and traceable connection present in cases upholding the application of state law to out-of-state conduct.  *See, e.g.*, *Young*, 289 U.S. at 256 (owner of car in one state allowed person to drive car into another state, where driver struck man with car).  Permitting extraterritorial regulation on this basis—one that turns on a daisy chain of events, requires the use of complex scientific methods, and needs a 25-page expert declaration to explain—would eviscerate the territorial limits on state authority.

## IV.    The Foreign Affairs Doctrine Preempts The Superfund Act.

The Superfund Act is both field and conflict preempted under the Foreign Affairs Doctrine. New York's arguments to the contrary are unavailing.

25

### A.    The Superfund Act Intrudes into the Field of Foreign Affairs Without Addressing a Traditional State Responsibility.

Like the tort suit in *City of New York*, the Superfund Act addresses "a uniquely international problem of national concern" that is "not well-suited to the application of state law." 993 F.3d at 85–86. Or to say the same thing in terms of foreign affairs preemption, the Act "intrudes on the field of foreign affairs without addressing a traditional state responsibility." *Movsesian v. Victoria Versicherung AG*, 670 F.3d 1067, 1072 (9th Cir. 2012); *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 419 n.11 (2003). It is thus preempted regardless "whether the National Government ha[s] acted" and "without reference to the degree of any conflict." *Garamendi*, 539 U.S. at 419 n.11.

The Second Circuit all but resolved this question when it rejected the City's federal common-law claims concerning foreign greenhouse gas emissions. *See City of New York*, 993 F.3d at 101. In so holding, the court made clear that foreign affairs considerations barred such claims, *id.* at 101–03—or said otherwise, the City had intruded on the field of foreign affairs. And it reached this conclusion despite the City's asserted interest in recovering damages for local harm allegedly caused by global emissions, *id.* at 88, 91—or said otherwise, the City had no serious claim to be addressing a traditional state responsibility. So it is no response to say the Superfund Act "addresses a traditional state responsibility by seeking to redress *in-state* injuries due to historic emissions." Opp. at 34; *see* MSJ at 31–32; *Movsesian*, 670 F.3d at 1073–74 (collecting cases that "struck down state laws which purport[ed] to regulate an area of traditional state competence, but in fact, affect[ed] foreign affairs" (quotation marks omitted)); *In re Assicurazioni Generali, S.P.A.*, 592 F.3d 113, 119 (2d Cir. 2010); *cf. City of New York*, 993 F.3d at 91 (rejecting the City's attempt to frame the dispute as "merely a local spat about the City's eroding shoreline").

Nor is the Superfund Act permissible simply because it does not expressly weigh in "on actions by foreign nations." Opp. at 35. What the Act does is far worse—it imposes billions of

dollars in liability on foreign companies, including state-owned entities, based on overseas energy production and use.  *See* Dkt. No. 75-1 (memorandum identifying companies that will likely owe penalties under the Act, which include Saudi Aramco, Shell, BP, Petrobas, Equinor, and many others).  The Act thus has far "more than some incidental or indirect effect in foreign countries." *Movsesian*, 670 F.3d at 1072 (quoting *Zschernig v. Miller*, 389 U.S. 429, 434 (1968)); *see also id.* at 1077 (holding that state law "ha[d] a direct impact upon foreign relations" because it "subject[ed] foreign insurance companies to suit in California" (quotation marks omitted)).  Reaching conduct in foreign countries is the entire point.  *See* N.Y. Envtl. Conserv. Law § 76-0101(8).

Finally, New York's reliance on *Mayor and City Council of Baltimore v. BP P.L.C.*, 31 F.4th 178 (4th Cir. 2022), is misplaced.  That case arose in the removal context and thus carried a "heightened [preemption] standard unique to the removability inquiry."  *City of New York*, 993 F.3d at 94.  The court added that it was "unclear whether" the private defendants even "intend[ed] to invoke the foreign-affairs doctrine," so it had no trouble holding that they failed to carry their "removal burden." *Mayor and City Council of Balt.*, 31 F.4th at 212 n.13, 213–14.  Here, by contrast, the federal government—which holds the foreign affairs power—has squarely invoked the Foreign Affairs Doctrine, and the question is before the Court "on its own terms, not under the heightened" removal standard.  *City of New York*, 993 F.3d at 94.

### B.    The Superfund Act Conflicts with U.S. Foreign Policy.

New York fares no better in arguing that the Superfund Act does not conflict with U.S. foreign policy.  State laws "must give way if they impair the effective exercise of the Nation's foreign policy."  *Zschering*, 389 U.S. at 440.  And because the Constitution vests the federal government with plenary authority over foreign affairs, state law is preempted if there is even a "likelihood that [it] will produce something more than [an] incidental effect in conflict with express

foreign policy of the National Government." *Garamendi*, 539 U.S. at 420. Or put another way, "the fact that the area in question *is* one of unique federal concern changes what would otherwise be a conflict that cannot produce pre-emption into one that can." *Boyle*, 487 U.S. at 507.

**1.** The Act not only directly conflicts with U.S. foreign policy; it short-circuits the means by which federal law addresses global greenhouse gas emissions—through a coordinated national policy in cooperation with other nations. New York's contrary position turns largely on its assumption that the Act does not control global emissions. *See* Opp. at 1, 9, 30 & n.7, 31. As explained, that assumption is wrong. *See supra* at 7–13.

New York also contends that the Superfund Act does not directly conflict with the express provisions of any statute, international agreement, or longstanding executive position. Opp. at 30. But the Foreign Affairs Doctrine does not require conflict with the express terms of federal law. Rather, preemption arises when state law, by its very existence, poses an "obstacle to the accomplishment of [the United States'] full objectives." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000). Thus, in *Crosby*, the Supreme Court held that a state law was preempted because it imposed a parallel sanctions regime on a foreign nation that differed from the policies and objectives of Congress and the President. *Id.* at 373–86. Indeed, the state law was preempted even though it shared the same goals as federal law. *Id.* at 379–80.

New York's arguments thus miss the mark. Start with the federal statutes it cites. The Superfund Act's global reach conflicts with the Clean Air Act because Congress "declined to extend" that statute "beyond our borders" and "contemplate[d] the need for foreign nations to promulgate reciprocal legislation." *City of New York*, 993 F.3d at 103. It also conflicts with the Global Climate Protection Act, which reflects not mere "aspiration" (Opp. at 30), but U.S. foreign policy on the need for "multilateral agreements" and a "coordinated national policy." Pub. L. No.

100-204, Title XI, § 1103, 101 Stat. 1331, 1408 (1987), reprinted as note to 15 U.S.C. § 2901. The Superfund Act—and the state-by-state regulatory regime it fosters—is the inverse of a "coordinated national policy." In both these ways, the Superfund Act "risk[s] jeopardizing our nation's foreign policy goals" and "circumvent[ing] Congress's own expectations and carefully balanced scheme of international cooperation on a topic of global concern." *City of New York*, 993 F.3d at 103; *Crosby*, 530 U.S. at 374 (state law preempted because it undermined Congress's "directive to the President to proceed diplomatically in developing a comprehensive, multilateral strategy").

Turning to international agreements, the United States addresses global greenhouse gas emissions through a framework for international cooperation—the U.N. Framework Convention on Climate Change. The Superfund Act "bypasses" that framework and regulates global emissions directly under state law. *City of New York*, 993 F.3d at 103; *Crosby*, 530 U.S. at 380. In so doing, it also undermines concrete U.S. foreign policy on energy and climate change, which has been marked by efforts to *de*regulate emissions. *See Putting America First in International Environmental Agreements*, Exec. Order No. 14162 § 3(a)–(b), 90 Fed. Reg. 8,455, 8,455 (Jan. 20, 2025) (directing withdrawal from Paris Agreement and other pacts under the Framework Convention).

As for the United States' longstanding opposition to international liability and compensation schemes, New York misses the point by stressing that this opposition has been about the liability of the United States government—and of state governments—to foreign countries for past emissions. Opp. at 31–32. The Superfund Act still puts the United States in the untenable position of opposing liability for itself and individual states, while one of those states (two, counting Vermont) freely imposes liability on foreign companies, including state-owned entities. The Act thus foments new frictions in climate negotiations, undercuts "effective diplomacy," and compromises the Nation's capacity to "speak . . . with one voice" on the world stage. *Crosby*, 530 U.S. at 381.

29

No wonder, then, that the Second Circuit relied on the United States' opposition to such liability schemes in holding that the City's tort suit would "sow confusion" and "needlessly complicate the nation's foreign policy." *City of New York*, 993 F.3d at 103 & n.11.

Finally, New York claims that the Superfund Act is consistent with the "polluter pays" principle present in other international agreements to which the United States is a party. *See* Opp. at 6, 32. Not so. For one thing, New York fails to identify a single polluter-pays agreement that covers greenhouse gas emissions, which is a far more complex issue than other matters covered by such agreements. For another, even if the Superfund Act is generally consistent with the polluter-pays principle, it still conflicts with U.S. foreign policy and intrudes on foreign affairs because it is an effort by an *individual state* to impose liability for global emissions. That the *United States* may adopt a global polluter-pays law consistent with international agreements does not mean *New York* may do so on its own accord, without the concurrence of the federal government.

**2.** In making its foreign affairs argument, New York relies heavily on an expert declaration from Harold Koh, a professor at Yale Law School. *See* Declaration of Harold Hongju Koh ("Koh Decl."), Dkt. No. 87. The declaration, for the most part, describes and interprets international legal obligations and applies that law to the facts here. *See, e.g.*, Koh Decl. ¶¶ 10 (admitting that New York retained him "to opine on international law, multilateral agreements, and United States climate policy" as relevant to the Superfund Act), 34 ("In sum, the Framework Convention, the Paris Agreement, and whatever climate policy the Trump Administration may seek to put in place . . . do not conflict with any requirement of the [Superfund Act]."), 35 ("I conclude that the [Superfund Act] is consistent with international environmental law and agreements[.]"). What is more, despite his current employment as a professor—not as a government official—Koh pronounces that the Superfund Act does not "complicate ongoing diplomacy and foreign affairs respecting climate

30

change" because "there are no ongoing negotiations for New York's actions to disrupt."  Koh Decl.

¶ 33.  But Koh does not purport to have personal knowledge, much less expertise, concerning the

Trump Administration's foreign policy or conduct of foreign affairs.

The Court should accordingly disregard the Koh Declaration in full "because it contains

impermissible legal conclusions and factual assertions not based on personal knowledge."  *Haight*

*v. NYU Langone Med. Ctr., Inc.*, 2016 WL 29628, at *5 (S.D.N.Y. Jan. 4, 2016); *United States v.*

*Articles of Banned Hazardous Substances Consisting of an Undetermined Number of Cans of*

*Rainbow Foam Paint*, 34 F.3d 91, 96 (2d Cir. 1994) ("It is a well-established rule in this Circuit

that experts are not permitted to present testimony in the form of legal conclusions."); *EduMoz,*

*LLC v. Republic of Mozambique*, 968 F. Supp. 2d 1041, 1050 (C.D. Cal. 2013) (disregarding in-

ternational law professor's expert declaration because "[i]nterpreting the [relevant law] and apply-

ing it to the facts are functions that the court is competent to perform without the aid of an expert").

## V.    The Superfund Act Violates The Commerce Clause.

The Superfund Act violates the Commerce Clause for the same reason it exceeds constitu-

tional limits on extraterritorial regulation.  *See supra* at 20–25.  A state law violates the Commerce

Clause if it exerts direct "extraterritorial control of commerce occurring entirely outside the bound-

aries of the state in question."  *Grand River Enters. Six Nations, Ltd. v. Boughton*, 988 F.3d 114,

123 (2d Cir. 2021).  In such cases, "discrimination is not required."  *Ass'n for Accessible Meds. v.*

*Ellison*, 140 F.4th 957, 961 (8th Cir. 2025).

Contrary to New York's claim, the United States is not advocating for a per se rule against

laws that have extraterritorial effect.  *Pork Producers* rejected such a rule, 598 U.S. at 375, but it

did not disturb the settled principle that states cannot "*directly* regulate[] out-of-state transactions"

that lack a sufficient connection to the state, *id.* at 376 n.1.  That is precisely what the Superfund

Act does, *see supra* at 21–25, and there is no requirement under the extraterritoriality doctrine that it regulate prices (Opp. at 45), *see Edgar v. MITE Corp.*, 457 U.S. 624, 641–43 (1982) (securities regulation); *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 104 (2d Cir. 2003) (internet regulation).

The Superfund Act also discriminates against out-of-state commerce by imposing crippling costs on fossil-fuel extraction and refining in other states (and nations) and redistributing the funds for in-state projects. *See* MSJ at 33. The Act does not incidentally affect more out-of-state entities because there happen to be fewer in-state participants. *Cf. N.Y. Pet Welfare Ass'n, Inc. v. City of New York*, 850 F.3d 79, 91 (2d Cir. 2017). To the contrary, it *directly* targets "worldwide" commercial activity for the express purpose of shifting infrastructure costs away from New Yorkers and onto out-of-state fossil fuel producers. N.Y. Envtl. Conserv. Law § 76-0101(8); Opp. at 46 n.14 (admitting that "the purpose of the [Superfund Act] is to shift part of th[e] financial burden to fossil fuel producers" so that New Yorkers don't bear "the entire burden").

As applied to foreign commerce, the constitutional defects are even greater. MSJ at 34–35; *Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 67 (1st Cir. 1999) (state law unconstitutional because it "discriminate[d] against foreign commerce," "impede[d] the federal government's ability to speak with one voice in foreign affairs," and "attempt[ed] to regulate conduct . . . outside of this country's borders"), *aff'd sub nom. Crosby*, 530 U.S. 363.

## VI.    The Superfund Act Is Facially Invalid.

The United States easily meets its burden of showing that the Superfund Act is unlawful in every application, because there is no world in which the Act could be cabined to purely in-state emissions and conduct. Based on the United States' claims, the Act could not be applied lawfully unless at least two conditions were met: (1) All fossil-fuel extraction and refining activities of all responsible parties would have to occur in New York alone; and (2) the fossil fuels extracted or

refined by those entities would have to stay in New York, such that all emissions from their use originate in the State. But neither of these conditions will ever hold true.

First, New York is home to minimal fossil-fuel extraction and refining—and certainly not *all* extraction and refining by responsible parties during the covered period—which is why the Act is explicit about reaching "*all* fossil fuel extraction and refining *worldwide*." *See* MSJ at 8–10; N.Y. Envtl. Conserv. Law § 76-0101(8) (emphasis added). Second, even if the Act applied solely to in-state extraction and refining (which again it doesn't), it still imposes liability based on all "emissions attributable to" that extraction and refining, which include emissions resulting from the end use of fossil fuels (*i.e.*, "scope 3 emissions"), no matter *who* uses them or *where* they use them. So liability based on out-of-state emissions is baked into the statutory scheme—thus, covered emissions are "not limited to . . . emissions within the state." N.Y. Envtl. Conserv. Law § 76-0101(8). In fact, New York does not dispute (and the Court can take judicial notice) that the small amount of crude oil produced in the State is shipped to out-of-state refineries, *see* MSJ at 8, so emissions from the use of that oil necessarily include out-of-state emissions.

The upshot is that this case can be decided based on what we know the Superfund Act does, without speculating about what it might do. And what we know is that the Act necessarily sweeps in out-of-state conduct and emissions, making it unlawful in every application—or facially invalid.

## CONCLUSION

For the reasons given above and in its opening brief, the Court should grant the United States' motion for summary judgment, declare the Superfund Act invalid and unenforceable, and permanently enjoin Defendants from taking any actions to implement or enforce it.[7]

---

[7] New York does not dispute that the United States would be entitled to a permanent injunction if it prevails on the merits.

Respectfully submitted,

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*
ROBERT N. STANDER
*Deputy Assistant Attorney General*
JUSTIN D. HEMINGER
*Acting Deputy Assistant Attorney General*

/s/ *Riley W. Walters*
RILEY W. WALTERS
*Counsel*
JOHN K. ADAMS
*Senior Counsel*
U.S. Department of Justice
Environment and Natural Resources Division
950 Pennsylvania Ave., N.W.
Washington, D.C. 20530
(202) 514-5442
Riley.Walters@usdoj.gov

November 19, 2025
Washington, D.C.

34

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.1(c), the undersigned counsel of record for Plaintiffs the

United States of America and U.S. Environmental Protection Agency hereby certifies that this

memorandum complies with the word-count limitation of this Court's Local Civil Rules, as mod-

ified by this Court's Order enlarging the page limit to 33 pages. *See* Dkt. Nos. 50, 83. As measured

by the word processing system used to prepare it, this memorandum contains 11,523 words.

Dated:  November 19, 2025
      Washington, D.C.

                                           /s/ *Riley W. Walters*
                                           RILEY W. WALTERS
                                         *Counsel*
                                         U.S. Department of Justice
                                         Environment and Natural Resources Division
                                         950 Pennsylvania Ave., N.W.
                                         Washington, D.C. 20530
                                         (202) 514-5442
                                         Riley.Walters@usdoj.gov