**U.S. Department of Justice**
Environment and Natural Resources Division

***Office of the Assistant Attorney General***
***950 Pennsylvania Avenue, N.W.***
***Washington, DC 20530-0001***

***Telephone (202) 514-2701***
***Facsimile (202) 514-0557***

August 26, 2026

VIA CM/ECF

The Honorable P. Kevin Castel
United States District Judge
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Re: *United States of America v. State of New York*, No. 1:25-cv-03656

Dear Judge Castel,

The United States provides this Notice of Supplemental Authority to inform the Court of recent assertions by defendants Letitia James, in her official capacity as the Attorney General of New York, and Amanda Lefton, in her official capacity as acting Commissioner of the New York State Department of Environmental Conservation (together, "Defendant Officials") regarding *City of New York v. Chevron Corporation*, 993 F.3d 81 (2nd Cir. 2021). In another case challenging the New York Climate Superfund Act, N.Y. Envtl. Conserv. Law § 76-0101 *et seq*. ("Climate Act"), Defendant Officials have conceded that if a court holds that the public nuisance suit at issue in *City of New York* is not distinguishable from the Climate Act, then there are no set of facts that would make the Climate Act lawful and there is no additional preemption analysis for a Court to conduct before holding the Climate Act unlawful. As the United States explained in its Motion for Summary Judgment, under *City of New York*, Defendants cannot use "state tort law to hold multinational oil companies liable for the damages caused by global greenhouse gas emissions." Dkt. No. 74 at 1 (quoting *City of New York*, 993 F.3d at 85). Because Defendants seek to use a state statute—the Climate Act—to hold energy companies strictly liable for global greenhouse gas emissions, *City of New York* is on all fours with this case. The Court should declare the Climate Act unlawful and enjoin its implementation.

The Plaintiffs in *West Virginia v. Letitia James*, No. 1:25-cv-168 (N.D.N.Y.) challenge the Climate Act with materially similar claims to the ones the United States has asserted in this case. The *West Virginia* Plaintiffs assert that, under *City of New York*, the Climate Act is unconstitutional "because it seeks to regulate matters

that the U.S. Constitution commits exclusively to the federal Government and exceeds the territorial bounds of the State's constitutional authority." *West Virginia*, No. 1:25-cv-168, Dkt. No. 216-1 at 10 (N.D.N.Y.). *See also West Virginia*, No. 1:25-cv-168, Dkt. No. 217-1 at 23. The *West Virginia* Plaintiffs further assert that the Climate Act is preempted by the Clean Air Act and the United States' conduct of foreign affairs. *West Virginia*, No. 1:25-cv-168, Dkt. No. 216-1 at 15-23 (N.D.N.Y.). *See also West Virginia*, No. 1:25-cv-168, Dkt. No. 217-1 at 36-50. The United States submitted a Statement of Interest in support of the *West Virginia* Plaintiffs' Motions for Summary Judgment. *West Virginia*, No. 1:25-cv-168, Dkt. No. 222.

The Northern District of New York scheduled a hearing on the parties' cross-motions for summary judgment for July 30, 2026. *See West Virginia*, No. 1:25-cv-168, Dkt. No. 289. The Court also entered a text order directing the parties to "be prepared to address the following questions" at oral argument:

> (1) If the Court finds that *City of New York v. Chevron Corp.*, 993 F.3d 81 (2d Cir. 2021), is not distinguishable, is there any set of facts under which the Climate Change Superfund Act is constitutional? *See Antonyuk v. James*, 120 F.4th 941, 983 (2d Cir. 2024); and
>
> (2) If the Court finds that *City of New York* is not distinguishable, does the Court need to engage in any additional preemption analysis?

*West Virginia*, No. 1:25-cv-168 at Dkt. No. 300.

At the hearing, Defendant Officials acknowledged that if "the Court finds that the *City of New York* is not distinguishable from" Plaintiffs' case challenging the Climate Act then "there are no set of facts that would make the Climate Act constitutional, and there's no additional preemption analysis before the Court to conduct." Ex. A, *West Virgina* Tr. at 7:4-14. Defendant Officials' concessions are directly applicable to the Parties' positions here on the United States' Motion for Summary Judgment and support granting the United States' requested relief.

Sincerely,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General

ROBERT N. STANDER
Deputy Assistant Attorney General

JUSTIN D. HEMINGER
Acting Deputy Assistant Attorney General

/s/ *Ian M. Swenson*
Ian M. Swenson
Counsel
Andrew M. Darlington
Counsel
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, D.C. 20530
Ian.Swenson@usdoj.gov
(202) 532-5139

Ex. A: Transcript of Hearing Conducted July 30, 2026, *State of West Virginia, et al. v. Letitia James, et al.*, No. 1:25-cv-168 (N.D.N.Y.)

# EXHIBIT A

Transcript of Hearing Conducted July 30, 2026,
*State of West Virginia, et al. v. Letitia James, et al.*, No. 1:25-cv-168 (N.D.N.Y.)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-----------------------------------------------x
STATE OF WEST VIRGINIA, et al.,

Plaintiffs,

vs. 1:25-cv-168

LETITIA JAMES, et al.,

Defendants.
-----------------------------------------------x

**TRANSCRIPT OF ORAL ARGUMENT**
**BEFORE THE HONORABLE BRENDA K. SANNES**
**held on July 30, 2026**
**100 South Clinton Street, Syracuse, NY**

APPEARANCES

For State of West Virginia:

WEST VIRGINIA ATTORNEY GENERAL'S OFFICE
1900 Kanawha Blvd. East
Charleston, WV 25305
BY: JOHN B. McCUSKEY, ESQ., Attorney General
CALEB B. DAVID, ESQ.
CALEB ALLEN SECKMAN, ESQ.

For Chamber of Commerce of the USA:

LEHOTSKY COHN LLP
200 Massachusetts Avenue NW
Washington, DC 20001
BY: STEVEN P. LEHOTSKY, ESQ.

LEHOTSKY COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305
BY: JARED B. MAGNUSON, ESQ.

BARCLAY DAMON LLP
80 State Street
Albany, NY 12207
BY: YVONNE E. HENNESSEY, ESQ.

For Letitia James:

NYS Office of the Attorney General
28 Liberty Street
New York, NY 10005
BY: SABITA KRISHNAN, ESQ.
LAURA MIRMAN-HESLIN, ESQ.

NYS Office of the Attorney General
The Capitol
Albany, NY 12224
BY: AYAH FADI BADRAN, ESQ.

For the United States:

U.S. DEPARTMENT OF JUSTICE
Energy and Natural Resources Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
BY: IAN M. SWENSON, ESQ.

(1:03 p.m.)

COURTROOM DEPUTY: State of West Virginia, et al. versus James for oral argument. Counsel, please state your appearances for the record.

MR. DAVID: Caleb David for the plaintiffs. I also have with me Caleb Seckman and Attorney General John B. McCuskey.

THE COURT: Good afternoon.

MR. DAVID: Good afternoon, your Honor.

MR. LEHOTSKY: Good afternoon, your Honor. Steven Lehotsky for the plaintiffs Chamber of Commerce of the United States of America, American Petroleum Institute, the National Mining Association, the Business Council of the State of New York. With me at counsel table I have Jared Magnuson and Yvonne Hennessey.

THE COURT: Good afternoon.

MS. KRISHNAN: Good afternoon, your Honor. Sabita Krishnan on behalf of the State of New York. And with me I have Ayah Badran and Laura Mirman-Heslin.

THE COURT: Good afternoon to you all.

MR. SWENSON: Good afternoon. Ian Swenson on behalf of the United States.

THE COURT: Good afternoon to everyone.

We're here today for oral argument on the pending summary judgment motions and the motions related to the

summary judgment motions. And I'll start with New York State, and then I assume both counsel for West Virginia and the Chamber of Commerce would like an opportunity to argue, so we'll turn to them, and then last we'll hear from counsel for the United States. And I'll give New York a brief rebuttal as well.

Let me just say before New York starts, it would be helpful to start with the issue of standing. It would seem to me that Alpha and several of the members of the Chamber of Commerce associations have standing here, specifically Alpha, Exxon Mobil and Chevron, at least. It seems to me that the standard, it's enough if those entities show that they face a credible threat of enforcement.

And if I consider the memorandum, the October 2023 memorandum written by two of the Act sponsors, which has a list, an approximate list of covered companies, including Alpha, Exxon and Chevron, and also if I consider the U.S. Energy Information Administration reports, and considering all of this information just for the fact that these things were said and their effect on the entities here, that report says Alpha was the fourth largest producer of coal in the United States during the relevant period.

So my question about standing is doesn't Alpha and don't these entities have, given this information which I'm only considering for the fact that it was said and not for

the hearsay, not for hearsay but not for the truth of the matter asserted, but given that, don't they have a credible fear that they will face enforcement of the statute? It's my understanding that if at least one plaintiff has standing, the suit may proceed. So I'll let New York State argue.

MS. KRISHNAN: Good afternoon, your Honor. Let me start with standing as you suggested.

The key issue on standing is whether plaintiffs have met their burden to show injury. And I'm going to turn to the Chamber plaintiffs and Alpha since that's where it seems like you're interested in hearing more about.

The Chamber plaintiffs, the Chamber of Commerce plaintiffs and Alpha Metallurgical Resources, which I'm going to call Alpha, they bear the burden of establishing that at least one association member faces imminent injury or at least a substantial risk of injury or a credible threat of injury.

And the associations and Alpha, as you indicated, they rely on the statements of legislators to assert that it's certainly impending or that there is a substantial risk that they will receive a cost demand. But, your Honor, it's not up to those legislators to determine which entities will receive -- which entities will be responsible parties or will receive the cost demand.

It's the New York Department of Environmental

Conservation who will determine in two years from now and only after it issues its regulations setting out how it's going to determine those responsible parties, they're going to determine, they're going to set out the regulations for that, and none of that has happened yet. So we really don't think there is any evidence that shows a substantial risk or a credible threat that DEC will identify these specific particular parties as a responsible party.

Turning to the states, the states argue injury in several ways.

THE COURT: And I think, isn't your understanding that if one plaintiff has standing, the suit may proceed?

MS. KRISHNAN: Yes, your Honor. It is our understanding that if one of the plaintiffs has standing, we can move on. And so I can move on to the merits and maybe I'll address the state standing if there is anything that I want to address in rebuttal.

THE COURT: Thank you, Counsel.

MS. KRISHNAN: As to the merits of the summary judgment motion, I'm going to be addressing the plaintiffs' claims that the New York Climate Change Superfund Act, which I'm going to call the Climate Act, I'm going to address the claims that the Climate Act is preempted, and then I'm going to turn this over to my colleague Ms. Mirman-Heslin who is going to address their arguments that the Act is

unconstitutional extraterritorial regulation and that it's preempted by the Foreign Affairs Doctrine.

I want to start by answering the Court's questions that were set out in the text order last week. To the extent the Court finds that the *City of New York* is not distinguishable from this case, and we take that to mean that the Court finds that there is no meaningful or significant difference between the city's public nuisance claim in that case and New York's Climate Act, that what the New York legislature did was to implement the city's public nuisance claim through a statute, then we think there are no set of facts that would make the Climate Act constitutional, and there's no additional preemption analysis before the Court to conduct.

But we do think the *City of New York* is distinguishable for two reasons. First, the Climate Act is meaningfully and significantly different from the public nuisance claim that the *City of New York* was considering in that case.

And second, because the Climate Act is different from the public nuisance claim, the Second Circuit's legal analysis in that case cannot be applied here. Instead, the Court must look at whether the Clean Air Act field preempts or conflict preempts the Climate Act.

Turning to my first point, the Second Circuit's

decision was limited to the public nuisance claim at issue in that case. The Court did not hold more broadly, as I think the plaintiffs assert, that any liability related to greenhouse gas emissions must be governed by federal law.

So I'm going to start by spending some time explaining what the Climate Act does and how it was modeled after the federal Superfund Act. And then I'm going to turn to what federal law with the Clean Air Act does, and then I will get to why the city's public nuisance claim in the Second Circuit case, why it's different from the Climate Act.

The consequences of climate change, rising sea levels, increasing temperatures, extreme weather events, all of that has harmed New York and New Yorkers, and there's no doubt that New York has to take steps to adapt to climate change and to mitigate that harm. The legislature determined that in order to do that, New York will have to make significant investments in new and upgraded infrastructure, and that it needs revenue to do that. This is at the heart of the state's traditional police powers, identifying threats to the health and well-being of residents, figuring how to respond to those threats, and how to pay for that response.

Here the legislature passed the Climate Act to collect $75 billion over 25 years from responsible parties. The legislature determined that this was a small percentage of the total cost New York will face to mitigate the harms

from climate change. Responsible parties are those that extracted and refined fossil fuels between 2000 and 2024 that resulted in more than 1 billion metric tons of greenhouse gas emissions globally.

The legislature focused on fuels extracted and refined during that period because they found that there was a marked increase in the rate of greenhouse gas emissions after 2000. And it focused on worldwide greenhouse gas emissions because it is the cumulative impact of greenhouse gas emissions across the globe that is causing harm in New York.

Responsible parties must also have sufficient contact with New York to satisfy due process, so New York can only issue cost demands to parties that have enough of a connection to New York. Each responsible party's share of the $75 billion will be proportional to their share of the total greenhouse gas emissions attributable to all responsible parties. Responsible parties will not receive these cost demands until 2028 and, as we discussed, only after the Department of Environmental Conservation issues regulations.

The legislature explicitly stated that there was no finding of wrongdoing by responsible parties and there is no finding of illegal activity. The Act does not tell fossil fuel companies anything about what they can or can't do in

the future in terms of extracting or refining fossil fuels. It's 2026, so there is nothing that a fossil fuel company can do today to change the amount of fossil fuels it extracted or refined in the past. Changing its future production levels or implementing new technology, it's not going to change the amount of the cost demand.

And the Chamber of Commerce plaintiffs, they concede this in their complaint. This is paragraph 161, they say, quote, "Nothing energy producers can do today can affect liability under the Act." The Act also does not impose any emission limits or require the abatement of any greenhouse gases anywhere.

What it does is it identifies that greenhouse gases from fossil fuels extracted and refined in the first two decades of this century have contributed significantly to the global buildup of greenhouse gas emissions that is largely responsible for climate change and the harm it's causing in New York. And it identifies the fossil fuel companies that extracted and refined those fossil fuels as a source of revenue to fund a small portion of the infrastructure needed to mitigate the harm, and in this way it is modeled after the federal Superfund Act, or CERCLA.

CERCLA establishes strict no-fault liability for the costs to respond to and remediate the discharges of hazardous waste on certain categories of responsible parties

who are involved with hazardous waste. CERCLA does not itself regulate or set standards for those hazardous wastes; that's covered by a different statute.

The First Circuit explained in *Dedham Water Company v. Cumberland Farms Dairy*, 805 F.2d 1074, at 1008, the First Circuit said Congress, quote, "intended that those responsible for problems caused by the disposal of chemical poisons bear the cost and responsibility for remedying the harmful conditions they created."

So CERCLA, like the Climate Act, does not involve the finding of illegal conduct or wrongdoing. The discharges of hazardous waste that are being remediated may have been legal at the time of their discharge and parties can be held responsible for the cost of cleanup even if they were not involved in the discharge itself but are owners of a site where the discharge occurred previously.

The Second Circuit has explained, quote, "CERCLA is not a regulatory standard setting statutes such at the Clean Air Act, rather, the government generally undertakes pollution abatement and polluters pay for such abatement through tax and reimbursement liability." This is *New York versus Shore Realty Corp.*, 759 F.2d 1032, at 1041.

So, the Second Circuit opinion makes clear that just because CERCLA and the Climate Act require responsible parties to pay money to the government to offset some of the

government's costs in responding to harm, that does not mean the government is setting regulatory standards for those responsible parties.

Now I'm going to talk about the other side of this, what does federal law do?

At a high level the Clean Air Act imposes standards and restrictions on pollution. It places limits on pollution generating sources. So it says to stationary sources such as power plants and factories, and to the manufacturers of cars and trucks and aircrafts, it says you can only emit X amount of pollution from your power plant or from the car that you manufacture. And by limiting pollution emanating from each of these individual sources, the Clean Air Act works to limit overall pollution.

Now, until very recently the EPA has regulated greenhouse gas emissions pursuant to the Clean Air Act. But the EPA now says that the Clean Air Act does not give it authority to regulate greenhouse gas emissions for motor vehicles based on climate change impacts. We think that's wrong, and New York State and other states and other parties have challenged that in the DC Circuit, and it's going to be up to that court to decide that issue. But that is the scope of the Clean Air Act with regard to the greenhouse gas emissions.

Prior to the Clean Air Act the federal common law

also operated in this same sphere. Federal courts applied a specialized federal common law of nuisance to disputes involving interstate pollution. These are cases where a plaintiff, usually a state, brought a nuisance claim to impose limits on pollution emanating from another state. And in 1972 the Supreme Court had one of these cases before it, this is *Illinois v. Milwaukee*, 406 U.S. 91. In that case Illinois asserted that four Wisconsin cities had created a public nuisance by dumping sewage into Lake Michigan.

The Supreme Court held that federal courts have jurisdiction over the claims because the federal common law of nuisance had to be applied to such claims. The court explained that until federal laws or regulations preempted the field of the federal common law of nuisance, which eventually happened with the Clean Water Act and the Clean Air Act, but until that point federal courts would set the standards of care for suits alleging the creation of a public nuisance through interstate pollution.

So, in summary, the Climate Act sets up a source of revenue to offset some of New York's costs. It does not reflect any judgment about the appropriate overall level of greenhouse gas emissions or setting new standards for that. The Clean Air Act does place limits on the amount of greenhouse gas emissions coming out of power plants, cars, factories, and by doing so it addresses overall greenhouse

gas limits.

Now I want to turn to the city's public nuisance claim in the State of New York and where that fits. The city brought a state common law public nuisance claim against a group of large fossil fuel producers seeking damages for harms caused by global greenhouse gases, and also seeking an injunction to abate the public nuisance if defendants fail to pay any court-ordered damages. The Second Circuit held that the city could not bring that public nuisance claim regarding interstate greenhouse gas emissions under state law, and it had to do so, it could only bring that claim under the federal common law of nuisance, that's the common law we were just talking about. But the Clean Air Act displaced that federal common law and with it the city's claim.

The Second Circuit relied on decades of Supreme Court cases holding that this kind of claim had to be brought under federal common law because it would set standards for interstate pollution and that had to be done by federal law. That federal common law of nuisance that the Second Circuit relies on has its roots in English common law.

I'm going to be very brief but I want to talk about the public nuisance claim a little bit more generally. Public nuisance developed in English common law as a principle that the infringement of the rights of the crown was a crime. This is explained in Prosser and Keeton on the

law of torts. So public nuisance is therefore rooted in a judgment of wrongdoing. The criminal roots of public nuisance remain and many jurisdictions, including New York, retain nuisance as a crime.

The civil asset of the common law of nuisance eventually developed after tort damages were awarded as an incidental remedy. And that's explained in the introductory note to Chapter 40 of the Restatement Second of Torts. And that restatement explains, a public nuisance is an unreasonable interference with the right common to the general public. So the public nuisance claim requires a judge or a jury to determine what is an unreasonable interference with the public right. It requires a court to set a standard and determine what side of that standard the defendant is on. And once a judge or a jury sets that standard, the defendants and other similarly situated parties must comply with that standard going forward or they'll face the possibility of liability through an injunction or damages.

And I think the Supreme Court's decision in *AEP versus Connecticut* is helpful here. There the plaintiffs brought public nuisance claims under federal common law seeking an injunction requiring power plants to cap and reduce their greenhouse gas emissions over time. And the Supreme Court explained there that through the public

nuisance claim plaintiffs were asking federal judges to determine what amount of carbon dioxide emissions is unreasonable. This is 564 U.S. at 428. And the Supreme Court held that this is what the Clean Air Act does, it sets the standards for greenhouse gas emissions.

The city's public nuisance claim asked the Second Circuit to do the same thing, to determine what amount of greenhouse gas emissions attributable to the defendant was an unreasonable interference with the public right. The Second Circuit held that this is exactly what is covered by the Clean Air Act.

Now, I understand that plaintiffs and the United States describe the Second Circuit's holding in a way that is not limited to the public nuisance claim that was at issue in that case. They say that the Second Circuit held more broadly that any liability associated with greenhouse gas emissions will regulate those emissions nationally and only federal law can do that. And I think that potentially they go farther and say that anything at all related to greenhouse gas emissions, whether it regulates them or not, must be governed by federal law.

But the Supreme Court explained in *National Pork Producers*, again a case that the parties have cited and discussed in their briefs, the Supreme Court said there, quote, "Our opinions dispose of discrete cases and

controversies and they must be read with a careful eye to context." That's at 598 U.S. 374.

The Second Circuit in *City of New York v. Chevron* was clear it was answering a specific question about the claim before it. At page 91, the Court says, "Stripped to its essence, then, the question before us is whether a nuisance suit seeking to recover damages for the harms caused by global greenhouse gas emissions may proceed under New York law." The Court did not hold that compensation, a form of relief, was preempted, it held that the city's public nuisance claim was preempted.

Now, the Second Circuit did focus on damages as a remedy, but that was because the city had argued it was only seeking damages and therefore did not seek to impose any standards of care or emissions restrictions. The Second Circuit rejected that argument finding that it was economic reality that a nuisance action seeking damages would have that same effect. This is at page 92 of the opinion. And at page 96 the court put it simply, "So whether styled as an action for injunctive relief against the producers to stop them from producing fossil fuels, or an action for damages that would have the same practical effect, the city's claims are barred by the Clean Air Act."

The Second Circuit did rely on two Supreme Court cases in discussing damages, but neither of those cases held

that damages are always regulation. The Second Circuit relied upon *Kurns v. Railroad Friction Products Corp*. And that case involved state common law tort claims, which, like a nuisance claim, imposes common law duties and standards of care. And the Supreme Court held there that an award of damages for those tort claims was a potent method of regulation. Again, the damages awarded there, like in a nuisance claim, enforces the standard of care.

The Second Circuit also cited to *San Diego Building Trades Council*, another Supreme Court case. But in that case the Supreme Court held only that California courts could not enjoin conduct in a tort of unfair labor practices case, it also could not award damages in that situation. It did not hold that damages are a regulation as a matter of law.

And the Second Circuit was clear throughout its opinion in the *City of New York v. Chevron* that it was focused on the impact of nuisance claims and the standards they would require a court to set. So at page 95 in discussing the public nuisance claim in *AEP versus Connecticut*, the Second Circuit says federal judges may not set limits on greenhouse gas emissions in the face of a law empowering the EPA to do the same.

At page 97, discussing the Supreme Court decision in *Exxon Shipping*, the Second Circuit says, a common law nuisance claim seeking damages is preempted where it amounts

to arguments for regulatory standards different from those provided by the applicable federal standards. At page 97 to 98, the court discusses the vague and often indeterminate standards attached to nuisance law and how it is ill-suited to be administered by judges, particularly in the complex area of environmental law.

THE COURT: Wouldn't you agree that the Climate Act, like the nuisance common law claim in the *City of New York*, implicates conflicting rights of states and our relations with foreign nations, and so it involves uniquely federal interests?

MS. KRISHNAN: Your Honor, I think the Second Circuit held in that case that the public nuisance claim by setting the standards, the standards for greenhouse gas emissions through what the public nuisance claim requires, it requires the court to make that determination about what amount of greenhouse gas emissions is an unreasonable interference with the public's right. By setting that standard the public nuisance claim does interfere with the interest of the federal government as set forth in the Clean Air Act.

But the Climate Act does not set any standards, it does not tell fossil fuel producers anything about what they can or can't do in the future with respect to producing fossil fuels or greenhouse gas emissions.

THE COURT: But the Second Circuit, and I do have to follow the Second Circuit law, in the *City of New York* the Second Circuit said that this common law cause of action implicates the conflicting rights of states and our relations with foreign nations, so it poses the quintessential example of when federal common law is most needed. Isn't that the case with the Climate Act as well?

MS. KRISHNAN: Could you point me to --

THE COURT: It's at 92, 993 F.3d at 92. The Court says, therefore, it implicates the conflicting rights of states and our relations with foreign nations, this case poses the quintessential example of when federal common law is most needed.

MS. KRISHNAN: Yes, your Honor. So the Court there in this section the Court is discussing why the city's common law public nuisance claim cannot be brought under state law and it has to be brought under federal law. And here it says that that claim, the city's public nuisance claim, it implicates the conflicting rights of states and it's an example of, quintessential example of where federal common law is most needed.

As I think, as I've been talking about the public nuisance claim, and that's what was at issue here, that's what the Second Circuit is saying had to be brought under the federal common law of nuisance, what it does is it sets the

standard of what is an unreasonable amount of greenhouse gas emissions, so the defendants and others in similar situations, they would then have to follow that standard.

And that is exactly what the Clean Air Act does, and prior to the Clean Air Act that is what this federal common law did. But the Climate Act does not set those standards. It does not set standards for what fossil fuel producers in terms of greenhouse gas emissions or in terms of what amount of fossil fuel they can extract or refine into the future.

So it doesn't implicate the same interest that's set out here, because this interest that the Second Circuit is talking about is rooted in that public nuisance claim and what it would require a court to do to resolve that public nuisance claim. And it's similarly what was required by the federal common law that existed prior to the Clean Air Act. It required federal courts to set standards that wherever the defendants in that case were would have to follow, and those were standards that would apply across state borders.

THE COURT: The Climate Act applies to greenhouse gas emissions attributable to all fossil fuel extraction and refining worldwide, it's not limited to such emissions within the state, isn't that correct?

MS. KRISHNAN: That's correct, yeah.

THE COURT: So when the founders put together a

list, approximate list of covered companies, they have entities all over the world on their approximate list of covered companies. So isn't this Act, doesn't it implicate the conflicting rights of states and our relations with foreign nations?

MS. KRISHNAN: Your Honor, the threshold that's in the Climate Act that the Department of Environmental Conservation will determine which responsible parties meet that threshold, that threshold is just a way to determine the responsible parties; it doesn't set any standards going forward.

To the extent there are entities on that list that your Honor is referring to that have a connection to foreign nations, I'm going to defer to my colleague who is going to address the foreign affairs preemption, if that's all right with your Honor.

THE COURT: All right. Let's assume I disagree with your limited explanation of the holding of *City of New York* with respect to it only applies to a common law claim that sets the standards, then what is New York State's argument?

MS. KRISHNAN: As I said at the outset in response to your question, if the Court finds there is no meaningful distinction between the public nuisance claim in the City's case and the Climate Act, that essentially what the New York

legislature did was to implement that claim as a statute, then we answer those questions by that there is no facts for the Court to find that the Climate Act is constitutional and there is no additional preemption analysis that would need to be done.

But my first point was, yes, that the Climate Act and the city's public nuisance claim are significantly and meaningfully different. And then I'm going to turn to my second point if you don't have any more questions.

THE COURT: Okay.

MS. KRISHNAN: I do want to make one more point. The Second Circuit also determined that the standards set by the city's public nuisance claim would regulate greenhouse gas emissions in an indirect and roundabout way, and it relied on the fact that nuisance standards and the ongoing liability that they create would compel producers to change their behavior and develop new means of pollution control. This was undisputed in that case because the city had conceded that its public nuisance claim would lead to production side changes. This is at page 93.

But here the Chamber of Commerce associations, they admit that the Climate Act will not compel them to change their conduct because changing their production will not change their liability. This is in their complaint.

And they offer declarations from many fossil fuel

executives. Not one of those executives says that they will need to reduce production or implement new technology or implement production controls or pollution controls. Those are plaintiffs' own facts. And consistent with those facts New York offered the testimony of Professor Fullerton that consistent with that the Climate Act will not lead fossil fuel producers to make changes to their production or changes to their investment in fossil fuel supply.

So the *City of New York* held only that a public nuisance claim that sought to impose nuisance standards on fossil fuel companies and enforce them through a damages award could only be asserted through federal law, but that federal law was displaced by the Clean Air Act. The *City of New York* does not control the outcome here because the Climate Act does not impose any standards or reflect any judgment about the appropriate overall level of greenhouse gas emissions.

That leads to my second point. The Second Circuit relied on decades of Supreme Court precedent holding that the city's public nuisance claim could only be asserted through a specialized federal common law of nuisance, but that federal common law of nuisance does not apply here to the Climate Act which is not a nuisance claim.

Instead, we think the Court has to look at whether the Clean Air Act field preempts or conflict preempts the

Act. Express preemption is not an issue here, no one claims that. The Second Circuit did not do that analysis in *City of New York* because of the long-established principle that the city could not assert its claim under state law, so there was no need to consider whether federal law, the Clean Air Act, preempted a state law.

As we have discussed, the Clean Air Act and the Climate Act operate in different fields so there is no field preemption. The Climate Act seeks to raise revenue from fossil fuel companies, it does not impose any standards or limits on the emissions of any stationary source or motor vehicle.

Plaintiffs rely on the Supreme Court's decision in *Ouellette*. This is a case that both parties cited and discussed. But the Supreme Court did not address field preemption there. And in that case the Vermont plaintiffs sought to impose discharge standards on a New York point source. That was the entire point of their claim, to place limits on discharge from a point source in another state. So that suit was clearly within the same field as the Clean Water Act.

And turning to conflict preemption, plaintiffs also have not identified a single provision of the Clean Air Act that fossil fuel companies cannot comply with while also responding to any cost demand they may receive. The Climate

Act is also not an obstacle to the Clean Air Act's objectives because it does not set standards for greenhouse gas emissions.

There are many state laws that impact fossil fuel companies. For example, many states seek to raise revenue through gas taxes. Consumers pay those taxes, but of course higher costs lead to lower demand, which leads to lower production, and of course thereby indirectly lowers greenhouse gas emissions. But no one claims that those gas taxes conflict with the objectives of the Clean Air Act because of those impacts on greenhouse gas emissions.

And I think the only argument that plaintiffs really make about conflict is their assertion that if New York's law is allowed to proceed, other states will pass similar laws and then fossil fuel companies will be faced with different standards based on different state laws. But the Climate Act does not impose standards, so plaintiffs are asking the Court to speculate about what other states might do and how those other statutes might set standards that somehow interfere with the objectives of the Clean Air Act.

But even if it's true that other states may in the future pass those kinds of laws, we think that that's something that is better addressed by Congress rather than by courts being forced to speculate about what other states might do in the future.

THE COURT: Do you agree that if I grant summary judgment to the plaintiffs, essentially because I don't find that this case is distinguishable from *City of New York* and I do have to follow the Second Circuit law, you would agree that essentially that would resolve this case?

MS. KRISHNAN: It would resolve the claims that the parties are seeking summary judgment on, yes.

THE COURT: Would there be anything left of the case? And I'll ask plaintiffs that too.

MS. KRISHNAN: Well, there are other claims that the plaintiffs have asserted, but I don't think -- I think with the decision on the two claims that have been -- that the plaintiffs have moved for partial summary judgment on, I think that would resolve the issue of whether the Climate Act is preempted, which would be the end of it.

THE COURT: Thank you, Counsel. And I'll hear from your co-counsel.

MS. MIRMAN-HESLIN: Good afternoon, your Honor.

THE COURT: Good afternoon. Let me ask a preliminary question. What is the applicable test here under the foreign affairs preemption?

MS. MIRMAN-HESLIN: There are two tests. The foreign affairs doctrine, it could conflict preempt or field preempt, and under conflict preemption there are two requirements. First, the foreign policy must have the effect

of domestic law. Executive action can preempt only if it was taken pursuant to Article II of the Constitution, such as a statute or ratified treaty, or was a systemic, unbroken, executive practice, long pursued to the knowledge of Congress. And the second requirement for conflict preemption is that a state law must stand in the way of that foreign policy.

And then in terms of field preemption, it will only be field preempted if it does not fall within a state's traditional responsibility and it takes a position on actions by foreign nations or inquires into their affairs.

THE COURT: And let me ask you, in this case if I find that the Climate Act is not a traditional state responsibility because it is involved in interstate and foreign, impacts interstate and foreign interests, then I assume I would apply the field preemption test, and doesn't it intrude on the field of foreign affairs?

MS. MIRMAN-HESLIN: Your Honor, we do not believe that it intrudes on the field of foreign affairs. First, we would disagree about the traditional state responsibility because we do believe this is the state's police powers and it's using to raise revenue and to protect New York's property and its residents from harm, which is a traditional power. And second, we don't think it invades the field because it doesn't criticize any foreign governments or

instruct the Department of Environmental Conservation to inquire into the affairs of other countries. In fact, the Act applies the same objective criteria to domestic and foreign corporations and only corporations with sufficient contacts will receive cost demands. Courts have upheld state laws imposing obligations on foreign companies operating in those states as well as addressing traditional state concerns such as pollution that may impact foreign trade.

In *Barclays Bank v. Franchise Tax Board of California*, a Supreme Court case from 1994, the Court upheld a state tax methodology challenged by foreign companies because Congress is aware of the issue and declined to preempt that methodology. In another example, in *Portland Pipe Line Corporation v. City of South Portland*, the Court rejected a challenge to a city ordinance that had the practical effect of preventing the import of Canadian oil, but that law did not explicitly target any particular foreign country.

Here while the Deputy Secretary Landau raises concerns that the Climate Act would impact relations between U.S. and foreign countries where fossil fuel producers are located, that's pure speculation on his part. At this time DEC has not even determined that any foreign state owned companies have sufficient contacts with New York to be held liable under the Act. It has not enacted any regulations to

determine what sufficient contacts will be, for example. So that's why we believe the law is not field preempted, your Honor.

THE COURT: I see. Thank you, Counsel.

MS. MIRMAN-HESLIN: I was also going to speak to the extraterritoriality regulation claims. Would you like me to do that?

THE COURT: Yes.

MS. MIRMAN-HESLIN: First, as my colleague Ms. Krishnan just discussed, the Climate Act does not regulate emissions. However, even if it did, the structure of the constitution does permit it extraterritorial regulation. Three months ago in *Hencely v. Fluor Corporation*, the Supreme Court explained that, "there is no federal preemption in vacuo, without a constitutional text or a federal statute to assert it." For this reason, plaintiffs are unable to produce any case law holding that the constitution structure or the equal sovereignty of states creates a per se ban on extraterritorial regulation.

Instead, plaintiffs rely on cases that address specific clauses of the constitution, such as the dormant commerce clause and the due process clause. Since plaintiffs are not seeking summary judgment on their commerce clause or due process clause claims, the court need not look any further to deny plaintiffs' unsupported constitutional

pollution claim.

Unless your Honor would like me to speak more specifically to those clauses, I end my argument.

THE COURT: Okay. Thank you, Counsel. And now I'll hear from counsel for the State of West Virginia.

MR. DAVID: Thank you, your Honor.

Your Honor, I'll start at standing just as New York did. Alpha Metallurgical clearly has standing in this case. As the Second Circuit explained in the *Antonyuk* case, there only needs to be a credible threat of enforcement, and here Alpha meets that standard in spades. The New York legislature included Alpha's predecessor Contura on a list of covered companies. They attributed more than 4 billion tons of greenhouse gas emissions to Contura. The Carbon Majors Database, which is also being used by the legislature to identify these responsible parties, lists Contura as producing well over 4 billion tons of greenhouse gas emissions. So all of that not for the truth of the matter, but it just shows that there is a credible threat of enforcement against Alpha, so Alpha has standing, and because they have standing. We don't need to talk about anyone else's but I will briefly mention that the states have standing as sovereigns.

THE COURT: And you can move on, Counsel, because I agree with you if Alpha has standing, there is no need to

address another plaintiff.

MR. DAVID: Thank you, your Honor.

The *City of New York* case is just simply indistinguishable. And we now know that New York concedes that if it is indistinguishable, then we win, the case is over, and we agree with that, we don't need to worry about any of the other claims that we haven't moved for summary judgment on. But I want to explain why the *City of New York* is not distinguishable here.

THE COURT: I take it you also agree with New York that if the Court finds it not distinguishable, the Court doesn't need to engage in any additional preemption analysis, foreign affairs analysis?

MR. DAVID: Yes, your Honor. If the Court finds that it's not distinguishable under the facts of *City of New York*, can rely just on *City of New York's* analysis, we don't need to worry about traditional preemption, whether it's field or conflict, or extraterritoriality or foreign affairs.

THE COURT: Thank you.

MR. DAVID: Your Honor, this case and *City of New York* are indistinguishable. Both involve strict liability schemes. And just as New York State is doing now, New York City argued that they weren't regulating anything, this was just a revenue raising measure. They were trying to

seek compensation for climate harms.

But the Second Circuit held that the federal common law and the Clean Air Act preempted the City of New York's tort suit, and the reason for that really is straightforward, imposing liability for global greenhouse gas emissions is a potent method of governing conduct in controlling policy. In other words, a strict liability scheme based on global greenhouse gas emissions regulates interstate and international emissions. That regulatory power has always resided with the federal government and New York can't usurp that power through the Climate Change Superfund Act.

I want to start with the idea that there is a difference between a tort suit and a statute. A supremacy clause doesn't care whether the law is written or not. It uses the word laws in two places. It uses laws when it's describing the federal law is supreme and it uses laws when it's describing a contrary state law, including state constitutions and state laws are preempted if they are contrary.

So doesn't matter if we're talking about the United States Constitution, federal common law, or federal statutes, they are supreme. And it doesn't matter if we're talking about state constitution, state statutes or state common law, if they are contrary to the federal law, then they are preempted. So there is no difference if it's written down or

not. And there are unfortunately not a whole lot of things that are directly on point, but the Supreme Court has at least, and some circuit courts have at least made statements, including the Supreme Court in *Illinois versus City of Milwaukee*, that's Milwaukee I. They said that the question of apportionment of interstate waters is a question of federal common law upon which state statutes or decisions are not conclusive. In *Lowry versus Baltimore and Ohio Railroad*, the Third Circuit said federal common law, not state statutes or decisional law, governs whether causes of action under the federal securities laws run with the affected securities. Again, federal common law can preempt state statutes.

Third Circuit had another case, *New Jersey Retail Merchants Association versus Sidamon-Eristoff*, where they explained that state law can be preempted by federal common law. And the Sixth circuit in *Gaff versus FDIC* said when they were deciding a substantive rule of federal common law, it applied and preempted state regulation in a commercial law case. So there the statement from the Supreme Court dealing with interstate waters I think is particularly instructive because interstate waters and interstate air have always been kind of going together, that's why the Clean Water Act and the Clean Air Act had very similar structures. Defendants have not pointed to a single case where federal common law was deemed to not have a preemptive effect of a contrary

state statute, those laws just don't exist.

Moving to the point of *City of New York* and its general framework of how it gets to preemption in this case, the federal common law we know controls and it controls as the Second Circuit said in the *City of New York*, it exists because state law cannot be used. It exists in an area of such uniquely federal interest that you simply can't use state law, and that's what we have here when we're talking about interstate air pollution.

So federal common law exists, it ensures that states do not regulate interstate air pollution, and then the Clean Air Act comes in and federal common law remains a backdrop for the Clean Air Act. The Clean Air Act therefore would allow a state to regulate interstate air pollution only if it explicitly gives it permission to. And there is simply nothing in the Clean Air Act that does that. Instead, the Clean Air Act cabins what states are able to do. It allows them to comment on proposed EPA rules or on state implementation plans. It allows them, if they do have a concern that a source in another state is causing a problem with an implementation plan, they can petition EPA and EPA then has the investigative and enforcement authority. But the states can't go it alone, they don't have the authority under the Clean Air Act to take regulation into their own hands.

And the savings clause and the citizens suit clause don't authorize New York statute either. The Second Circuit in again *City of New York* said that those clauses permit only state lawsuits brought under the law of the pollution source state. And I believe my friend on the other side said that that's similar to the case in *Ouellette* where they were talking about Vermont suing a New York source and that they can't do that and that conflicts with the Clean Water Act. But that's exactly what New York is trying to accomplish here, is that they are suing sources entirely outside of New York and some of them outside of the United States under New York law. There is no effective difference just because they wrote it down in the statute.

Last on this point of *City of New York*, this is somehow different, there's no regulation occurring. The Second Circuit made it very clear that imposing damages awards is a potent method of regulation, so it doesn't matter that we're looking at retroactive strict liability. The only option for anyone who's subject to enforcement here is to stop producing greenhouse gas emissions going forward.

The statute only requires two things for someone to be held strictly liable. You extract coal, oil, or natural gas or you refine oil, and you produce at least a billion tons of emissions in a given period. If both of those are met, you are strictly liable. So companies that are facing

that threat of enforcement are going to have to consider whether they're going to face that threat of enforcement in the future.

It's the same thing as any tort suit when a judgment comes in and they have to pay out compensatory damages. These are compensatory damages, that's how they're even characterized within the statute. So there really is no difference between the tort suit and between this being a statute, and it still regulates in the exact same way that the Supreme Court has said, compensatory damages regulate in the same way that the Second Circuit has said that compensatory damages regulate.

Your Honor, unless you would like to hear about the other theories, I'll end it there. Unless you have any further questions, then we would ask that you grant the states' and our coalition's summary judgment.

THE COURT: Thank you, Counsel. Now I'll hear from counsel for the Chamber of Commerce plaintiff.

MR. LEHOTSKY: Thank you. Steve Lehotsky for the Chamber coalition plaintiffs.

I agree with everything that counsel for West Virginia, the coalition, said. I'll try to be brief. I'll focus on three points.

First is I'll start with standing. If your Honor has any questions with respect to standing, we agree that at

least two of the members of our plaintiff coalition are injured. We would submit that all seven of the members that we've identified by name and have submitted declarations are all injured. But unless your Honor has any questions with respect to standing, I'll move on to the merits.

THE COURT: You refer to two. Which two are you referring to?

MR. LEHOTSKY: Your Honor, you said Exxon and Chevron, you thought at least those two. We would certainly agree with you that at least Exxon and Chevron, but we also think the other Shell and BP and the three coal companies that are members of the National Mining Association are also all injured by the Act, under the standard that we think that both your Honor and New York had correctly identified what the standard is for establishing Article III standing.

THE COURT: Okay, thank you, Counsel.

MR. LEHOTSKY: So with respect to the merits, I'll focus on only two points. New York concedes, as I think they had to, that if the *City of New York* decision applies, then the Act is unconstitutional in all of its applications, it lacks any plainly legitimate sweep, that's because on its face it very clearly applies to worldwide emissions and to emissions that are outside the State of New York. And indeed the 1 billion ton threshold in the statute can only be reached by emissions outside the State of New York.

So then the whole question is whether the *City of New York* decision binds this Court. If it does, then there is no circumstances which this Act is constitutional, we would ask the court to enter judgment.

The state seems to hang its distinction as to why *City of New York* does not apply on two grounds. One is that there is a distinction between public nuisance claims and strict liability claims; and two, that it's compensatory damages and that that's somehow different from what the *City of New York* was seeking in its previous case. I think both points are wrong.

I think the first point about the difference between public nuisance liability that the city was seeking and the strict liability that the state is seeking through the Act is belied by *City of New York* itself. And here I read from page 93, quote, "While the city is not expressly seeking to impose a standard of care or emission restrictions on the producers, the goal of its lawsuit is perhaps even more ambitious; to effectively impose strict liability for the damages caused by fossil fuel emissions no matter where in the world those emissions were released or who released them."

And of course the statute itself says repeatedly that they are seeking strict liability, strictly liable, and the State of New York said today that's exactly what they're

seeking to impose. There is no distinction. In the *City of New York* it was de facto essentially a strict liability regime, which is exactly what the State of New York is trying to do now through the Act, and that's this Act is really just a tort suit disguised as a statute. The legislature is trying to do what the Second Circuit has said the judiciary may not do, and the Act is simply a repackaging of the same arguments that the *City of New York* tried and failed to succeed with in the Second Circuit.

I would point the Court to a couple of places in the *City of New York* decision where it refers to state law without qualification or limitation. So, for instance, at page 92 the *City of New York* decision says that the claims sought by the city were, quote, "simply beyond the limits of state law." That's because, as West Virginia correctly argued, they're all governed by federal law.

Likewise, other places in the opinion where they refer to state law, such as relying on the Milwaukee I decision, which we've heard about today from counsel for New York, which referred to federal common law being the law that applied rather than any state law.

And here I think it's important to recognize that there really is no distinction between the exact theory of liability, whether it's a public nuisance standard, a negligence standard, a strict liability standard. What

matters is that the state is attempting to impose monetary liability, financial consequences upon emissions of greenhouse gases that are otherwise lawful under the Clean Air Act. And that's what the conflict is. The conflict is that our member companies, the plaintiffs' member companies are allowed to engage under the Clean Air Act of these types of emissions and they're allowed to do it around the world, and now the State of New York sort of taking matters into its own hands to impose financial consequences upon those otherwise lawful emissions, and that's what creates the conflict, as your Honor noted, with other states, with other foreign nations without foreign policy and with the policy of the United States.

With respect to the second distinction that the state has offered that it's not regulation because the state is not imposing through the Act any standard of abatement or emissions control technology or anything like that. Again, this is an argument that was tried and rejected in the *City of New York* already. And we also think it's based on a false premise that whether there is abatement or a regulation is not what is determinative for the claims in Counts One and Counts Two in our complaint, because again our argument is that New York has no authority as a matter of law to impose financial consequences upon those emissions. And so whether you think there is a regulation or not has no bearing on the

outcome of our claim.

So again, unless your Honor has further questions with respect to any of the other issues in the case, we would urge you to grant summary judgment in favor of the Chamber coalition plaintiffs on Counts One and Two and to issue an injunction against the enforcement of that law.

THE COURT: Let me ask you a question. In your motion papers you also ask for a permanent injunction, but I'm assuming if the Court granted summary judgment on Counts One and Two, that would not be necessary.

MR. LEHOTSKY: I think that's right, your Honor, assuming there is a declaration that the law is unconstitutional and the injunction against an enforcement, then yes.

THE COURT: I don't know what you mean by declaration. A decision ruling that the Counts One and Two summary judgment in your favor?

MR. LEHOTSKY: Yes, your Honor.

THE COURT: Thank you, Counsel.

MR. LEHOTSKY: Thank you, your Honor.

THE COURT: Now I'll hear from counsel for the United States. Let me ask you, with respect to field preemption, if you could focus your argument on that. Does this law intrude on the field of foreign affairs without addressing a traditional state responsibility? I assume you

agree that's the standard.

MR. SWENSON: Absolutely, your Honor, we agree that is the standard. I think the *City of New York* answers the question whether this is a traditional use of state authority, so that's easy, and it is an area of ongoing foreign policy.

The United States has been in engaged in diplomatic negotiations about greenhouse gas emissions for several decades now, and the papers in this case have mentioned the Framework Convention, mentioned the negotiations of the Kyoto Protocol, the Paris Climate agreement. We've been in these agreements, we've out of these agreements, it's an ongoing area of active negotiation for our foreign policy, it's an active area of foreign policy concerns, absolutely, your Honor.

THE COURT: What about New York State's argument that the United States pulled out of the Framework Convention, pulled out of the Paris agreement?

MR. SWENSON: Well, withdrawing from those agreements is still a conscious choice of foreign policy. Entering into an agreement is a choice. Exiting an agreement is a choice. And here the United States has a unified policy trying to promote domestic energy production, you can see that in the withdrawal from the agreements we just mentioned.

You can also see it in actions by the federal

government for our domestic policy. So, for example, the President has declared a national energy emergency in Executive Order 14,156. There the President has stressed that a secure, reliable, diversified and affordable supply of domestic energy is necessary to drive our economy and is necessary for national security. The President also has an Executive Order 14,154, where he has directed federal agencies to streamline the permitting process for domestic energy projects and has directed federal agencies to suspend, revise, or rescind all federal agency actions that unduly burden domestic energy.

So in our foreign affairs we are trying to promote energy production and in our domestic affairs we're trying to promote domestic energy production.

THE COURT: Thank you, Counsel. Anything further?

MR. SWENSON: Your Honor, we agree with the parties as to the State of New York and the Court can stop its analysis there. If you would like to hear about the federal policy concerns in this case, I can speak to that and how the Clean Air Act is a unified federal policy, but it seems like the Court has heard enough of that matter already, unless you would like to hear more.

THE COURT: No, I think I have it. Thank you, Counsel.

I will give New York State an opportunity for a

brief rebuttal if you would like, not necessary, but you may.

MS. KRISHNAN: Do you mind if we take a moment to confer?

THE COURT: Absolutely, you can have a moment.

(Short pause.)

MS. KRISHNAN: I want to make one brief point and then I think my colleague is going to make another point as well.

I think I heard counsel for West Virginia say that the fossil fuel companies, their only option to avoid liability is to stop producing going forward. But I think the facts in this record reflect that, one, the Chamber of Commerce Associations have conceded that there is nothing they can do to change the liability under the Act, and we have declarations from a number of fossil fuel company executives, not one of them said that the result of this Act or any potential act that might be passed by another state in the future, that the impact of those things would be that they would have to make different decisions about production, they would have to invest in pollution control or anything like that, so that was the one point that I wanted to make.

THE COURT: Thank you, Counsel.

MS. MIRMAN-HESLIN: I just wanted to respond to the points that the United States made on foreign affairs.

I would like to say that plaintiffs failed to

identify any foreign policy with which the Act conflicts. Within international climate negotiations, the United States has opposed liability and compensation schemes under which developed nations provide financial assistance to developing nations. These negotiations do not concern fossil fuel companies' liability for climate damages. In particular, because the UN Framework Convention and the agreements under it bind only countries and regional entities like the EU and not corporations.

The United States speculates that the Climate Act will interfere with various executive interests related to energy, but the executives preference for a certain policy approach without more does not invalidate a state law and generalized remarks about energy costs and availability are not a basis for conflict or field preemption.

Treating hypothetical market effects as a clear conflict would allow the Executive branch to preempt any state law that may influence energy production, from work place safety to consumer protection law. The Constitution delegates that law-making authority to Congress, not the Executive.

I would also like to distinguish *City of New York* in terms of its foreign affairs analysis. In that case the court, the Second Circuit, did not apply the foreign affairs doctrine or find that the law was precluded, the tort suit

was precluded under it. It was a decision about whether federal common law can be applied against foreign emissions. And that difference is significant because the court was deciding whether it should expand federal common law to foreign emissions, and it found that quote, "Federal courts must proceed cautiously when venturing into the international arena so as to avoid unintentionally stepping on the toes of the political branches." So that was a matter of judicial restraint.

Here the Court would not be expanding federal common law because the case concerns statutory law, and the New York State legislature chose to apply its statute to international emissions. So the same concerns about judicial restraint do not apply. And Congress can always enact legislation to stop the Climate Act if it thinks that is necessary.

Thank you, your Honor.

THE COURT: Thank you, Counsel.

Thank you to all counsel. The oral arguments were very helpful to the Court, I will take this under submission and issue a written decision. Thank you. And safe travels to everyone who traveled here.

(2:14 p.m.)

* * *

C E R T I F I C A T I O N

I, EILEEN MCDONOUGH, RPR, CRR, Federal Official Realtime Court Reporter, in and for the United States District Court for the Northern District of New York, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

s/ Eileen McDonough

EILEEN MCDONOUGH, RPR, CRR
Federal Official Court Reporter