UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

UNITED STATES OF AMERICA and the UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

Plaintiffs,

-against-

STATE OF NEW YORK; KATHLEEN HOCHUL, in her official capacity as Governor of New York; LETITIA JAMES, in her official capacity as New York Attorney General; and AMANDA LEFTON, in her official capacity as Commissioner of the New York Department of Environmental Conservation,

Defendants.

-----------------------------------------------------------x

25-cv-3656 (PKC)

OPINION AND ORDER

CASTEL, U.S.D.J.

The United States and the United States Environmental Protection Agency ("EPA") (collectively, the "United States") bring this action challenging the constitutionality of New York's Climate Change Superfund Act (the "Climate Act" or the "Act"). The Act establishes a $75 billion fund for infrastructure projects in New York intended to mitigate the effects of climate change. To fund these projects, the Act imposes strict liability on businesses that engaged in fossil fuel extraction and oil refining from 2000 to 2024. The Act apportions the liability among such businesses based on the calculated share of global greenhouse gas emissions attributable to their products.

The United States moves for summary judgment on its claims that the Climate Act is violative of the Commerce Clause and the Due Process Clause and that it is preempted by the Clean Air Act and the federal government's authority to regulate foreign affairs. The State of

New York, Governor Kathleen Hochul, Attorney General Letitia James and Commissioner of the Department of Environmental Conservation Amanda Lefton (collectively, "New York") oppose the motion and contend that the United States lacks standing to bring this suit and, on the merits, has failed to establish any entitlement to relief.

The Court concludes that the United States has standing to assert its core claims that New York's Climate Act impinges on its sovereign authority (1) to create laws relating to the emission of greenhouse gases and to enforce those laws against violators; and (2) to declare and promote its interests in foreign affairs. The Court also concludes that the United States has demonstrated that New York's Climate Act intrudes upon these interests and is therefore preempted. Summary judgment will be granted to the United States declaring the Climate Act to be unconstitutional and permanently enjoining its enforcement.

New York's Climate Change Superfund Act

In December 2024, New York enacted the Climate Change Superfund Act, N.Y. Env't Conserv. Law §§ 76-0101 to -0105. The Act establishes "a climate change adaptation cost recovery program" intended "[t]o secure compensatory payments from responsible parties based on a standard of strict liability to provide a source of revenue for climate change adaptive infrastructure projects within the state." N.Y. Env't Conserv. Law § 76-0103(1), (2)(a).

"Responsible parties" under the Act—i.e., those obligated to make payments—are those "which, during any part of [the period from January 1, 2000 to December 31, 2024], w[ere] engaged in the trade or business of extracting fossil fuel or refining crude oil and [are] determined . . . to be responsible for more than one billion tons of covered greenhouse gas emissions." Id. § 76-0101(9), (21). Entities that "lack[] sufficient contacts with the state to

satisfy the due process clause of the United States Constitution" are not liable under the Act. Id. § 76-0101(21).

"Covered greenhouse gas emissions" under the Act are "the total quantity of greenhouse gas emissions . . . attributable to the total amount of fossil fuels extracted by that entity . . . as well as the total amount of crude oil refined by that entity" from 2000 to 2024. Id. § 76-0101(8). The statute reaches not just emissions emanating from New York but any "emissions attributable to all fossil fuel extraction and refining worldwide" by the responsible party. Id.

Payments to the fund reflect each fossil fuel producers' respective contribution to global greenhouse gas emissions and "shall be equal to an amount that bears the same ratio to the [$75 billion] cost recovery amount as the responsible party's applicable share of covered greenhouse gas emissions bears to the aggregate applicable shares of covered greenhouse gas emissions of all responsible parties." Id. § 76-0103(3)(b). The New York Department of Environmental Conservation ("DEC") is mandated to issue notices to producers of their calculated payment amount, so-called "cost recovery demands," no later than June 30, 2028. Id. §§ 76-0101(7), -0103(4)(a)(iv). "Payment of a cost recovery demand shall be made in full on the applicable payment date" but the DEC is empowered to permit an emitter to spread payments over a 24-year period, provided it pays 8% of the total in the first year. Id. § 76-0103(3)(e)(i). The parties agree that no notices of cost recovery demands have been issued to any fossil fuel companies, nor have any payments been made by any fossil fuel companies pursuant to the Act.

Procedural History of this Action

The United States filed this action on May 1, 2025. (ECF 1.) It pleads distinct claims for relief: the Climate Act is (a) preempted by the Clean Air Act (b) an unconstitutional extraterritorial regulation by New York, (c) violative of the dormant interstate Commerce Clause, (d) violative of the dormant foreign Commerce Clause and (e) preempted by the foreign affairs doctrine. The relief sought on each claim is common to all claims. The Complaint seeks a declaration that the Climate Act is unconstitutional and unenforceable and a permanent injunction prohibiting defendants from taking any action to implement or enforce the Act. (Compl't at 29.)

The United States sought to file a summary judgment motion before the start of discovery. (ECF 33 & 36.) The Court ordered briefing on the appropriate timing of a motion for summary judgment and was ultimately satisfied that the issues asserted in this facial challenge to the Climate Act could be resolved on a summary judgment motion without discovery. (ECF 50.) See Rule 16(c)(2)(E), Fed. R. Civ. P. (the Court may "determin[e] the appropriateness and timing of summary adjudication").

After the conclusion of the initial round of summary judgment briefing, the parties submitted supplemental briefs to address the implications of the United States' withdrawal from the United Nations Framework Convention on Climate Change and the EPA's rescission of an earlier finding that greenhouse gas emissions endanger human health and welfare. The parties also have advised the Court of certain supplemental authority. The City of New York (the "City") has submitted an amicus curiae brief in support of New York's position.

Summary Judgment Standard

Under Rule 56(a), Fed. R. Civ. P., summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The party seeking summary judgment bears the burden of demonstrating there is no genuine dispute of material fact. Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir. 2005). A fact is "material" when it "might affect the outcome of the suit under the governing law . . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). There is a genuine issue of fact if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

In reviewing a summary judgment motion, a court "must resolve all ambiguities and draw all reasonable inferences in the non-movant's favor." Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996). However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." Anderson, 477 U.S. at 247–48. The nonmoving parties "must do more than simply show there is some metaphysical doubt as to the material facts and they may not rely on conclusory allegations or unsubstantiated speculation." Jeffreys, 426 F.3d at 554 (internal citations and quotation marks omitted).

## I. THE UNITED STATES HAS ARTICLE III STANDING TO VINDICATE ITS SOVEREIGN INTERESTS.

"Under Article III of the U.S. Constitution, '[t]he judicial Power of the United States' extends only to certain 'Cases' and 'Controversies.'" Lacewell v. Office of Comptroller

of Currency, 999 F.3d 130, 141 (2d Cir. 2021) (quoting U.S. Const. art. III, §§ 1–2). "To satisfy the Constitution's 'case-or-controversy requirement,' a plaintiff in federal court 'must establish that they have standing to sue.'" Id. (quoting Clapper v. Amnesty Int'l USA, 568 U.S. 398, 408 (2013)). Standing is a "jurisdictional requirement" and "must be assessed before reaching the merits." Calcano v. Swarovski N. Am. Ltd., 36 F.4th 68, 72, 74 (2d Cir. 2022) (internal quotation marks omitted) (quoting Byrd v. United States, 584 U.S. 395, 410–11 (2018)).

A. The Claimed Basis for Standing.

The United States has narrowed its claim of standing to the vindication of its "sovereign interests" in "ensuring that State laws like the [Climate] Act do not interfere with federal law, including the Clean Air Act, or with the federal government's exclusive authority over interstate and foreign commerce, greenhouse gas regulation, and national energy policy." (Compl't ¶ 10; see also ECF 99 at 10–13; ECF 49 at 5 (stating that, at the summary judgment stage, "the United States will rely solely on its sovereign interest in upholding the supremacy of federal law.").) The United States has thus abandoned its arguments in favor of standing premised on its purported proprietary and *parens patriae* interests. See, e.g., Palmieri v. Lynch, 392 F.3d 73, 87 (2d Cir. 2004) (a party who does not "raise [an] argument in his opposition to summary judgment" has waived that argument); see also Antonyuk v. James, 120 F.4th 941, 1007 n.63 (2d Cir. 2024) ("Although parties cannot waive arguments against jurisdiction, they are more than free to waive (or forfeit) arguments for it." (emphasis omitted)). The Court only considers whether the United States has standing based upon purported injury to its sovereign interests.

The Court concludes that the United States has standing to vindicate its sovereign authority to create and enforce a regulatory scheme pursuant to the Clean Air Act and its exclusive authority to conduct foreign affairs. On the merits of these claims, the Court concludes

that the Climate Act is preempted by the Clean Air Act and that the Climate Act intrudes on the exclusive right of the federal government to conduct foreign affairs. Because the grant of summary judgment to the United States on these two claims will afford it all the relief that it could obtain on any other claim asserted, it is not necessary to reach the constitutional standing or merits questions on any other claim. "If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable." Jean v. Nelson, 472 U.S. 846, 854 (1985) (quoting Spector Motor Service v. McLaughlin, 323 U.S. 101, 105 (1944)).[1]

The Court will first address its finding of standing to vindicate its sovereign interest in creating and enforcing the regulatory scheme under the Clean Air Act and in conducting foreign affairs. It will then address the merits of each of these claims.

B. Legal Standard for Standing.

"[T]he party invoking federal jurisdiction bears the burden of establishing the elements of Article III standing." Calcano, 36 F.4th at 74 (quoting Carter v. HealthPort Techs., LLC, 822 F.3d 47, 56 (2d Cir. 2016)). The plaintiff must show that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016). "[A] plaintiff must demonstrate standing for each claim he seeks to press." DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 352 (2006).

At the summary judgment stage, "the plaintiff can no longer rest on . . . 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' which for

[1] Similar principles are applied in pure statutory or rule-based claims. See, e.g., Field v. Trump, 850 F.2d 938, 946 n.3 (2d Cir. 1988) ("Because full relief is available to plaintiff under Section 14(d)(7), we need not address the claim asserted under Rule 10b–13.").

purposes of the summary judgment motion will be taken to be true." Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992) (citation omitted); see also Lugo v. City of Troy, 114 F.4th 80, 88 (2d Cir. 2024) (at summary judgment, "the plaintiff must produce evidence showing the presence of a genuine issue regarding standing that would warrant resolution by trial." (emphasis omitted)). But when the issue of standing presents purely a question of law, the Court is not required to consider record evidence even at the summary judgment stage. See Miller v. Lamanna, 169 F.4th 118, 127–31 (2d Cir. 2026).

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Spokeo, 578 U.S. at 339 (quoting Lujan, 504 U.S. at 560). A concrete injury is one that is "real and not abstract." Food & Drug Admin. v. Alliance for Hippocratic Medicine, 602 U.S. 367, 381 (2024). An injury is "particularized" if it "affect[s] the plaintiff in a personal and individual way." Lujan, 504 U.S. at 560 n.1. To be "actual or imminent," the injury must have "actually happened" or be "certainly impending." Soule v. Connecticut Ass'n of Schs., Inc., 90 F.4th 34, 46 (2d Cir. 2023) (quoting Clapper, 568 U.S. at 409). When a plaintiff is seeking prospective relief, such as an injunction or declaratory judgment, it "must show a likelihood that [it] will be injured in the future." Carver v. City of New York, 621 F.3d 221, 228 (2d Cir. 2010) (quoting Shain v. Ellison, 356 F.3d 211, 215 (2d Cir. 2004)).

"[G]eneral legal, moral, ideological, and policy concerns do not suffice on their own to confer Article III standing to sue in federal court." Alliance for Hippocratic Medicine, 602 U.S. at 386. Nonetheless, "the injury-in-fact necessary for standing need not be large; an identifiable trifle will suffice." In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.,

725 F.3d 65, 105 (2d Cir. 2013) (brackets omitted) (quoting LaFleur v. Whitman, 300 F.3d 256, 270 (2d Cir. 2002)).

The question of standing is "resolved irrespective of the merits of the substantive claims." Soule, 90 F.4th at 45 (quoting United States v. Vazquez, 145 F.3d 74, 81 (2d Cir. 1998)); see also E.M. v. New York City Dep't of Educ., 758 F.3d 442, 450 (2d Cir. 2014) ("Whether a plaintiff has suffered an injury in fact" does not turn on "the merits of the plaintiff's contention that particular conduct is illegal." (internal quotation marks omitted)). Accordingly, "[f]or standing purposes, [courts] accept as valid the merits of [the plaintiff's] legal claims . . . ." Fed. Election Comm'n v. Cruz, 596 U.S. 289, 298 (2022).

C. The United States Has Standing to Assert Its Clean Air Act Preemption Claim.

The United States argues that the authority to regulate interstate and global air emissions is delegated exclusively to the federal government by the Clean Air Act, a federal enactment entitled to recognition under the Supremacy Clause. It urges that it will suffer an injury because New York's Climate Act intrudes on its authority to regulate in an exclusively federal area. New York responds that the United States has not shown that the Climate Act will interfere with its enforcement of the Clean Air Act, because the statute only redresses past contributions to greenhouse gas emissions.

A sovereign may sue to protect "the exercise of sovereign power over individuals and entities within the relevant jurisdiction," which includes "the power to create and enforce a legal code." Alfred L. Snapp & Son, Inc. v. Puerto Rico, 458 U.S. 592, 601 (1982). The United States and the states, as sovereigns, may assert standing to vindicate their interests. For example, Massachusetts was found to have standing to assert a petition to compel EPA rulemaking to regulate greenhouse gas emissions from motor vehicles under the Clean Air Act. Massachusetts

v. E.P.A., 549 U.S. 497 (2007). The Court found the risk of harm to the state from climate change was "actual" and "imminent," concrete, fairly traceable to the action of the EPA and redressable by the relief sought.[2] Id. at 519, 521–26. Indeed, the limited authority of Massachusetts to regulate emissions was a reason that counselled in favor of the finding that it had standing to petition a court to compel the EPA to issue regulations. Id. at 519 ("These sovereign prerogatives are now lodged in the Federal Government, and Congress has ordered EPA to protect Massachusetts (among others) by prescribing standards applicable to [emissions].").

According to the United States, the Climate Act will interfere with the EPA's authority to set and enforce a regulatory scheme that applies nationwide and is based on a federally-directed balancing of environmental, energy and economic considerations. The Court concludes that the harm asserted by the United States is concrete because New York's Climate Act provides for the levying of substantial fees on entities without regard to the manner in which the federal government has chosen to balance those competing interests and for a time period when those emissions were regulated by the EPA.

The harm is particularized because the United States, alone, will suffer an impairment of its sovereign "power to create and enforce" the regulatory scheme under the Clean Air Act and the implementing authority granted to the EPA. This injury is actual and imminent because the Climate Act provides that New York's DEC "shall issue notices of cost recovery demand to all responsible parties" "no later than" June 30, 2028. N.Y. Env't Conserv. Law § 76-0103(3)(e)(i), (4)(a)(iv); see Marcavage v. City of New York, 689 F.3d 98, 103 (2d Cir. 2012) ("To obtain prospective relief, such as a declaratory judgment or an injunction, a plaintiff . . .

[2] In Massachusetts v. EPA, the state's assertion of standing was premised on its quasi-sovereign interests as parens patriae, a basis of standing not at issue here. Massachusetts, 549 U.S. at 518–20.

must demonstrate a certainly impending future injury." (emphasis and internal quotation marks omitted)).

The purported harms to the United States' sovereign interests are fairly traceable to defendants, who are required to enforce New York's Climate Act. See N.Y. Env't Conserv. Law § 76-0103(1) (the "climate change adaptation cost recovery program [will] be administered by the [DEC]"). Finally, the United States' requested injunction would redress this harm by preventing any enforcement of the Climate Act. See Alliance for Hippocratic Medicine, 602 U.S. at 381 ("If a defendant's action causes an injury, enjoining the action . . . will typically redress that injury."). Thus, as to its Clean Air Act preemption claim, the United States has established standing.

D. The United States Has Standing as to Its Foreign Affairs Preemption Claim.

The United States has also established standing as to its foreign affairs preemption claim. The Supreme Court has recognized that a sovereign may sue to enforce "the demand for recognition from other sovereigns," which "most frequently . . . involves the maintenance and recognition of borders." Snapp, 458 U.S. at 601. Relatedly, the Second Circuit has held that the United States suffers a concrete injury sufficient to confer standing when a defendant's actions interfere with its interest in "protecting its authority to conduct foreign affairs" and "ensuring that the United States does not violate its treaty obligations," pursuant to the President's Article II powers "to make Treaties." Tachiona v. United States, 386 F.3d 205, 212–14 (2d Cir. 2004) (citing U.S. Const. art. II, § 2, cl. 2).

According to the United States, the Climate Act, if enforced, would interfere with the work of the federal government in forging international agreements consistent with national policy addressing climate change and greenhouse gas emissions. For instance, the United States

asserts that enforcement of the Climate Act would interfere with its obligations under the Global Climate Protection Act of 1987, Pub. L. No. 100–204, Title XI, 101 Stat. 1407 (codified at 15 U.S.C. § 2901 note). That statute "directed EPA to propose to Congress a 'coordinated national policy on global climate change,' and ordered the Secretary of State to work 'through the channels of multilateral diplomacy' and coordinate diplomatic efforts to combat global warming." Massachusetts, 549 U.S. at 508 (citations omitted) (quoting Global Climate Protection Act § 1103(b)–(c)). To the United States, the state-imposed liability scheme of the Climate Act would obstruct such a coordinated national policy.

The United States also asserts that New York's imposition of monetary liability on foreign fossil fuel companies is contrary to, and therefore would undermine, its longstanding foreign policy position against liability and compensation schemes for emissions. As explained by a then American envoy, the federal government "[does not] accept the idea[] of compensation and liability and never accepted" it. Todd Stern, Special Envoy for Climate Change, Special Briefing (Oct. 28, 2015), https://2009-2017.state.gov/s/climate/releases/2015/248980.htm, cited in City of New York v. Chevron Corp., 993 F.3d 81, 103 n.11 (2d Cir. 2021).

Under the foreign affairs preemption theory advanced by the United States, those harms would amount to an "interfer[ence] in a direct, articulable way" with "the executive's constitutional authority to conduct foreign affairs." Tachiona, 386 F.3d at 214. This is a cognizable and concrete injury sufficient to confer standing.

Because the conduct of foreign affairs is delegated to the executive under Article II, that injury is particularized to the United States. And again, such an injury is actual and imminent given the timeline set out in the Climate Act for its enforcement. This purported harm to the United States is fairly traceable to defendants, and the United States' requested injunction

would redress this claimed harm. The United States has therefore established standing as to its foreign affairs preemption claim.

Having determined that the United States has standing to raise its Clean Air Act preemption claim and foreign affairs preemption claim, as an aspect of its sovereign interest in vindicating its authority, the Court now turns to the merits of those claims.

## II. THE CLEAN AIR ACT PREEMPTS NEW YORK'S CLIMATE ACT.

The United States asserts that New York's Climate Act is preempted by the Clean Air Act, 42 U.S.C. § 7401 et seq. The United States, relying on the Second Circuit's decision in City of New York v. Chevron Corp., 993 F.3d 81, urges that the field of regulation of interstate greenhouse gas emissions is occupied by federal law. It argues, therefore, that New York's attempt to enforce compliance under its own laws is not permitted by the Clean Air Act. The United States further contends that the Climate Act is preempted because it conflicts with the objectives of the Clean Air Act that delegated responsibility for regulation (or non-regulation) of interstate greenhouse gas emissions to the EPA.

New York, in response, argues that the Climate Act does not regulate greenhouse gas emissions but instead merely provides for a compensatory remedy to address the harms of past emissions. True, the Climate Act does not set a numerical standard for future emissions, but it does impose liability on entities whose historical emissions exceeded a 24-year aggregate standard, retroactively imposed. Specifically, the Climate Act imposes strict liability on a "[r]esponsible party," who is defined as "any entity (or a successor . . .), which, during any part of the covered period, was engaged in . . . extracting fossil fuel or refining crude oil and is determined by the [DEC] to be responsible for more than one billion tons of covered greenhouse gas emissions." N.Y. Env't Conserv. Law § 76-0101(21). The Climate Act's covered period,

2000 to 2024, encompasses the period when such entities' activities were governed by EPA regulations.

As discussed more fully, the Court agrees with the United States that, under decisions binding on this Court, the Climate Act impermissibly regulates interstate greenhouse gas emissions and is thus preempted. The Court will therefore grant summary judgment in favor of the United States on its Clean Air Act preemption claim.

The Supreme Court has acknowledged the need in a "few and restricted" areas to recognize or formulate "federal common law." Texas Indus., Inc. v. Radcliff Materials, Inc., 451 U.S. 630, 640 (1981) (quoting Wheeldin v. Wheeler, 373 U.S. 647, 651 (1963)). It exists where it is "necessary to protect uniquely federal interests." Id. (quoting Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 426 (1964)). When such "uniquely federal interests" are at play, "state law is pre-empted and replaced, where necessary, by federal law of a content prescribed . . . by the courts." Starr Int'l Co. v. Fed. Rsrv. Bank of New York, 742 F.3d 37, 40 (2d Cir. 2014) (quoting Boyle v. United Techs. Corp., 487 U.S. 500, 504 (1988)).

Generally, courts may only resort to federal common law to the extent that "Congress has not spoken to a particular issue." City of Milwaukee v. Illinois, 451 U.S. 304, 313 (1981) (Milwaukee II); see also Hencely v. Fluor Corp., 146 S. Ct. 1086, 1094 (2026) (federal common law is "fashioned by federal courts in the absence of congressional action"). In turn, when a statute enacted by Congress "speaks directly to the question at issue," any applicable federal common law rule is displaced. American Electric Power Co. v. Connecticut, 564 U.S. 410, 424 (2011) (AEP) (brackets and internal quotation marks omitted) (quoting Mobil Oil Corp. v. Higginbotham, 436 U.S. 618, 625 (1978)).

The Supreme Court has recognized that "a federal common law" governed suits "deal[ing] with air and water in their ambient or interstate aspects." Illinois v. City of Milwaukee, 406 U.S. 91, 103 (1972) (Milwaukee I); see also City of New York, 993 F.3d at 91 ("For over a century, a mostly unbroken string of cases has applied federal law to disputes involving interstate air or water pollution."). It observed that "[f]ederal common law and not the varying common law of the individual States" could provide a "uniform standard [for] the environmental rights of a State against improper impairment by sources outside its domain." Milwaukee I, 406 U.S. at 107 n.9 (quoting Texas v. Pankey, 441 F.2d 236, 241 (10th Cir. 1971)). This was "imperative in the present era of growing concern on the part of a State about its ecological conditions and impairments of them." Id. (quoting Pankey, 441 F.2d at 241–42). "[T]he implicit corollary" to such recognition that federal common law governed interstate air and water pollution "was that state common law was preempted." Int'l Paper Co. v. Ouellette, 479 U.S. 481, 488 (1987) (citing Milwaukee I, 406 U.S. at 107 n.9).

In 1963, Congress enacted the Clean Air Act, which established "an intricate regulatory regime intended to 'protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population.'" New York Public Interest Research Group v. Whitman, 321 F.3d 316, 319–20 (2d Cir. 2003) (quoting 42 U.S.C. § 7401(b)(1)). Then, in 1970, the EPA was established to "implement programs to regulate pollution . . . under the Clean Air Act and other related statutes." City of New York, 993 F.3d at 87.

The modern Clean Air Act "regulates pollution-generating emissions from both stationary sources, such as factories and powerplants, and moving sources, such as cars, trucks, and aircraft." Utility Air Regulatory Group v. E.P.A., 573 U.S. 302, 308 (2014). The statute

"envisions extensive cooperation between federal and state authorities" and takes a so-called "cooperative federalist" approach to tackling air pollution. City of New York, 993 F.3d at 87–88 (brackets omitted) (quoting New York Public Interest Research Group, 321 F.3d at 320). Indeed, the statute explains that Congress envisioned "air pollution control at its source" to be "the primary responsibility of States and local governments" guided by "Federal . . . leadership." 42 U.S.C. § 7401(a)(3)–(4).

As to stationary sources, the Clean Air Act provides that the EPA "shall . . . publish . . . a list of categories of stationary sources" that it determines "cause[], or contribute[] significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. § 7411(b)(1)(A). For new sources within each category, the EPA is required to "establish[] Federal standards of performance" that "reflect[] the degree of emission limitation achievable through the application of the best system of emission reduction which (taking into account the cost of achieving such reduction and any nonair quality health and environmental impact and energy requirements) the [EPA] determines has been adequately demonstrated." Id. § 7411(a)(1), (b)(1)(B). States are permitted to develop their own procedures for enforcing these standards. Id. § 7411(c)(1). For existing stationary sources within each category, except those regulated by other provisions,[3] the Clean Air Act requires "each State [to] submit to the [EPA] a plan which [] establishes standards of performance" for those existing sources, the enforcement of which is subject to federal approval. Id. § 7411(d)(1)–(2); City of New York, 993 F.3d at 88. Regardless of the actions the states do or do not take with respect to enforcement, the EPA "retains the power to inspect and monitor regulated sources, to impose

[3] Section 7411(d) does not apply to existing sources that are regulated under the national ambient air quality standard program or the hazardous air pollutants program. 42 U.S.C. § 7411(d)(1) (citing id. §§ 7408(a), 7412); see AEP, 564 U.S. at 424 n.7.

administrative penalties for noncompliance, and to commence civil actions against polluters in federal court." AEP, 564 U.S. at 425 (citing 42 U.S.C. §§ 7411(c)(2), (d)(2), 7413, 7414).

The question of whether greenhouse gas emissions are within the EPA's authority under the Clean Air Act has been resolved. The Supreme Court construed that the Clean Air Act's definition of "air pollutant," as used in section 7521's provisions governing air pollution from motor vehicles, to encompass greenhouse gas emissions. Massachusetts, 549 U.S. at 528–32 (interpreting 42 U.S.C. § 7602(g)). Following that decision, the EPA promulgated a regulation (the "endangerment finding") pursuant to section 7521 that concluded that "the combined emissions of these greenhouse gases from new motor vehicles and new motor vehicle engines contribute to the greenhouse gas air pollution that endangers public health and welfare." 74 Fed. Reg. 66496 (Dec. 15, 2009). The EPA subsequently promulgated regulations as to greenhouse gas emissions from stationary sources that were premised on the EPA's earlier endangerment finding. See 80 Fed. Reg. 64510, 64529–31 (Oct. 23, 2015); 81 Fed. Reg. 35824, 35833 (June 3, 2016).

The Supreme Court has considered the continued viability of the federal common law as applied to the regulation of greenhouse gas emissions. In AEP, the Court held that "the Clean Air Act and the EPA actions it authorizes displace any federal common-law right to seek abatement of carbon-dioxide emissions from fossil-fuel fired powerplants." 564 U.S. at 424. The Court reasoned that the Clean Air Act, by requiring the promulgation of standards of performance for emissions and methods of enforcement of those standards, "speaks directly to emissions of carbon dioxide from [fossil-fuel fired] plants" and "provides a means to seek limits on emissions of carbon dioxide from domestic powerplants." Id. at 424–25 (internal quotation marks omitted). The Court also explained that "Congress delegated to EPA the decision whether

and how to regulate carbon-dioxide emissions from powerplants" and therefore assigned to it the authority to make "informed assessment[s] of competing interests" including "the environmental benefit potentially achievable, our Nation's energy needs and the possibility of economic disruption" from such regulations. Id. at 426–27. Thus, the Court held that there was "no room for a parallel track" for federal common law actions to halt greenhouse gas emissions. Id. at 425. The Court, however, left open the question of "the availability *vel non*" of such suits premised on state, rather than federal, common law. Id. at 429.

The Second Circuit addressed the availability of a state common law remedy for greenhouse gas emissions in City of New York. There, the City brought a state law nuisance suit against five oil companies for their role in producing and selling fossil fuels. 993 F.3d at 86. The Court first determined that the suit, the object of which was "to hold the [defendants] liable, under New York law, for the effects of emissions made around the globe," "would effectively regulate the [defendants'] behavior far beyond New York's borders" and therefore could only be brought under the federal, and not state, common law. Id. at 92, 95. The Court, relying on AEP, then held that the Clean Air Act preempted the City's claims when brought under the federal common law because "Congress ha[d] already spoken directly to th[e] issue by empowering the EPA to regulate" greenhouse gas emissions. Id. at 96 (brackets and internal quotation marks omitted). Finally, the Court rejected the City's argument that the displacement of federal common law permitted the City to bring its claims under state law; instead, the City's state law claims could proceed "only to the extent authorized by" the Clean Air Act. Id. at 98–99 (brackets and internal quotation marks omitted). Concluding that they were not so authorized, the Court held that the City's state law nuisance claims were barred. Id. at 100.

In sum, controlling precedent teaches that (1) federal common law, not state law, traditionally governed the regulation of interstate air pollution; (2) the Clean Air Act has displaced attempts to abate greenhouse gas emissions under federal common law; and (3) state common law suits seeking to regulate interstate greenhouse gas emissions are also barred. It is against this backdrop that the Court must assess whether the Clean Air Act preempts New York's Climate Act.

The Supremacy Clause of the Constitution provides that the "Constitution, and the Laws of the United States . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. "Consistent with that command, . . . state laws that conflict with federal law are without effect." Altria Grp., Inc. v. Good, 555 U.S. 70, 76 (2008) (internal quotation marks omitted).

Under a traditional preemption analysis, courts recognize three species of preemption: "(1) express preemption, where Congress has expressly preempted local law; (2) field preemption, where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law; and (3) conflict preemption, where local law conflicts with federal law such that it is impossible for a party to comply with both or the local law is an obstacle to the achievement of federal objectives." National Shooting Sports Foundation, Inc. v. James, 144 F.4th 98, 108 (2d Cir. 2025) (internal quotation marks omitted) (quoting N.Y. SMSA Ltd. Partnership v. Town of Clarkstown, 612 F.3d 97, 104 (2d Cir. 2010)).

"Because the States are independent sovereigns in our federal system, courts start with the assumption that the historic police powers of the States were not meant to be superseded by [federal statutes] unless that was the clear and manifest purpose of Congress." New York State Telecommunications Ass'n, Inc. v. James, 101 F.4th 135, 147 (2d Cir. 2024) (brackets and

internal quotation marks omitted) (quoting Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996)). This presumption against preemption applies with particular force where "Congress has legislated in a field which the States have traditionally occupied." Wyeth v. Levine, 555 U.S. 555, 565 (2009) (internal quotation marks and ellipsis omitted). In light of the presumption against preemption, "the party asserting that federal law preempts state law bears the burden of establishing preemption." MTBE Prods., 725 F.3d at 96.

The challenge to the Climate Act in this action is a facial one. (See ECF 99 at 40–41.) "[W]hen plaintiffs bring a facial preemption challenge to a state law, they 'must demonstrate that there is no possible set of conditions under which the challenged state regime could be constitutional.'" Restaurant Law Center v. City of New York, 90 F.4th 101, 117 (2d Cir. 2024) (internal brackets omitted) (quoting Goodspeed Airport LLC v. E. Haddam Inland Wetlands & Watercourses Comm'n, 634 F.3d 206, 210 (2d Cir. 2011)); see also Antonyuk, 120 F.4th at 983 ("To mount a successful facial challenge, the plaintiff must establish that no set of circumstances exists under which the law would be valid, or show that the law lacks a plainly legitimate sweep." (internal quotation marks and brackets omitted)).

The parties disagree over the appropriate preemption test. New York argues that the traditional preemption test used by courts when determining whether a federal statute preempts state law—i.e., conflict and field preemption—should be applied. The United States in its initial brief relies primarily on the traditional test as well, but also submits that the Court may apply the same analysis as that in City of New York: in short, because the Climate Act treads on the same ground as the federal common law governing interstate air pollution disputes, the Court need only determine that the Clean Air Act does not authorize the Climate Act to find the latter

preempted. (See ECF 99 at 14 (advocating for a "preempted-unless-authorized rule"); id. at 21–22 (arguing that "the 'traditional statutory preemption analysis' does not apply").)

The analysis in City of New York controls here. The Second Circuit concluded that the City's nuisance claims were the province of the historical federal common law that governed interstate air pollution disputes and could only proceed if authorized by federal statute. The application of this analysis leads to the conclusion that, because the Clean Air Act has not authorized states to adopt legislation of the sort challenged here, New York's Climate Act is preempted.

The Second Circuit observed that the City's suit was, when "[s]tripped to its essence," one to "recover damages for the harms caused by global greenhouse gas emissions . . . under New York law." City of New York, 993 F.3d at 91. Thus, the suit was squarely a dispute over interstate and global air pollution that "implicat[ed] the conflicting rights of [s]tates" and if successful would "undermine important federal policy choices." Id. at 92–93. Such a suit, therefore, "must be brought under federal common law." Id. at 95.

The Second Circuit held that the City's damages claims, if brought under federal common law, were displaced by the Clean Air Act and therefore "barred." Id. at 96. Such claims "would operate as a de facto regulation on greenhouse gas emissions," as to which "Congress has already spoken directly . . . by empowering the EPA to regulate those very emissions." Id. (brackets and internal quotation marks omitted) (quoting Native Village of Kivalina v. ExxonMobil Corp., 696 F.3d 849, 857–58 (9th Cir. 2012)).

Finally, the Second Circuit rejected the City's argument that its state law tort claims were effectively revived by the Clean Air Act's displacement of federal common law. The Clean Air Act did not "vaporize[] any preemptive effect that federal common law had on

state law" and thus the traditional preemption analysis did not apply; as the Court explained, "state law does not suddenly become presumptively competent to address issues that demand a unified federal standard simply because Congress saw fit to displace a federal court-made standard with a legislative one." Id. at 98. Therefore, because federal common law has previously preempted the type of state law claims brought by the City, those claims could proceed "only to the extent authorized by" the Clean Air Act. Id. at 98–99 (internal quotation marks and brackets omitted) (quoting Illinois v. City of Milwaukee, 731 F.2d 403, 411 (7th Cir. 1984)).

The Clean Air Act contains two savings clauses that were addressed in City of New York and are potentially relevant here. First, the statute contains a states' rights savings clause that specifically permits states to adopt and enforce their own air pollution emissions standards, so long as those standards are not "less stringent" than those set by federal law. 42 U.S.C. § 7416. Second, it includes a citizen-suit savings clause that provides that "[n]othing in this section shall restrict any right which any person . . . may have under any statute or common law to seek enforcement of any emission standard or limitation or to seek any other relief . . . ." Id. § 7604(e).

Reviewing the two savings clauses, the Second Circuit concluded that those provisions did not contain any such authorization for state law nuisance suits against interstate greenhouse gas emissions. City of New York, 993 F.3d at 99–100. The savings clauses only permit states to create and enforce their own emissions standards for in-state polluters; state lawsuits therefore may only be brought "under the law of the pollution's source state." Id. (brackets, emphasis and internal quotation marks omitted) (quoting Ouellette, 479 U.S. at 497).

Because the Clean Air Act did not authorize the City's state law tort suits, those claims were foreclosed.

New York and amicus the City of New York contend that City of New York is distinguishable from this case and its preemption analysis is therefore inapplicable. Defendants' primary argument against applying City of New York to the Climate Act is that the New York statute merely provides for compensation for the harms caused by global greenhouse gas emissions and thus does not regulate or control greenhouse gas emissions. Specifically, defendants argue that the Climate Act will have no effect on fossil fuel producers' emission-generating activities because it requires payments to the state based on past fossil fuel production and only imposes a one-time fixed cost without instituting any ongoing legal obligations. (See generally ECF 85, Fullerton Decl.) Thus, they contend, the Act falls squarely within the state's traditional police powers to "protect the health and safety of [its] citizens." (ECF 84 at 32 (quoting Medtronic, 518 U.S. at 475).) In other words, New York argues that the Climate Act does not implicate the area of interstate air pollution regulation that was traditionally governed by federal common law.

A similar argument was unsuccessfully raised in City of New York. There, the City argued that its state-law tort claims for damages concerned "only the production, promotion, and sale of fossil fuels, not the regulation of emissions," and that because it sought "damages rather than abatement . . . its claims w[ould] not result in the regulation of global emissions." 993 F.3d at 91 (internal quotation marks omitted). The Second Circuit rejected that attempt at "[a]rtful pleading." Id. The Court explained that "regulation can be effectively exerted through an award of damages." Id. at 92 (quoting Kurns v. R.R. Friction Prods. Corp., 565 U.S. 625, 637 (2012)). Therefore, "a substantial damages award like the one requested by the City would

effectively regulate the [defendants]' behavior far beyond New York's borders" because emission-generating activities anywhere in the world contribute to climate change. Id. The imposition of strict liability for the historical sale and production of fossil fuels was a de facto regulation of those activities:

> [W]hile the City is not expressly seeking to impose a standard of care or emission restrictions on the Producers, the goal of its lawsuit is perhaps even more ambitious: to effectively impose strict liability for the damages caused by fossil fuel emissions no matter where in the world those emissions were released (or who released them). If the Producers want to avoid all liability, then their only solution would be to cease global production altogether. And even if some level of ongoing liability were deemed palatable, a significant damages award would no doubt "compel[]" the Producers to develop new "means of pollution control."

Id. at 93 (quoting Ouellette, 479 U.S. at 495, 498 n.19.)

The Climate Act works much the same way as the tort claims in City of New York. Like those tort claims, the Climate Act is aimed at fossil fuel producers and not downstream emitters. N.Y. Env't Conserv. Law § 76-0101(21). The Act seeks to "secure compensatory payments from [those producers] based on a standard of strict liability." Id. § 76-0103(2)(a). And, on the face of the Act, those producers are liable for "emissions attributable to all fossil fuel extraction and refining worldwide . . . not limited to such emissions within the state." Id. § 76-0101(8).

That the Climate Act is backward-looking and assigns liability based only on emissions between 2000 and 2024 is not a controlling difference. The tort claims in City of New York sought inherently backward-looking damages but those damages encompassed the City's future costs. See City of New York v. BP P.L.C., 325 F. Supp. 3d 466, 470 (S.D.N.Y. 2018) (Keenan, J.) (explaining that the plaintiffs in the suit in City of New York sought "compensatory damages for past and future costs incurred by the City to protect its infrastructure and property,

and to protect the public health, safety, and property of its residents from the impacts of climate change." (emphasis added)). New York's Climate Act seeks to apply the $75 billion maximum recovery amount for both remediation projects and "projects designed . . . to assist communities, households, and businesses in preparing for future climate change-driven disruptions." N.Y. Env't Conserv. Law § 76-0101(3)(a) (definition of "[c]limate change adaptive infrastructure project"). Indeed, the statute does not expressly tether those "future climate change-driven disruptions" to emissions occurring in the 2000–2024 period.

Defendants' expert opines that the fixed costs imposed by the "one-time retroactive assessment" in the Climate Act would have no impact on the national or global energy markets and "it will not change any fossil fuel company's behavior." (ECF 85, Fullerton Decl. ¶¶ 31, 38.) The expert's opinion is premised upon the expected future actions of yet-to-be-identified actors, including actors who are owned or controlled by foreign governments, and do not necessarily follow the patterns of rational economic actors. It also does not endeavor to provide meaningful differentiation of strict liability under the Climate Act from the type of damage award sought in City of New York. As the Second Circuit noted, "regulation can be effectively exerted through an award of damages, and the obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy." 993 F.3d at 92 (internal quotation marks omitted) (quoting Kurns, 565 U.S. at 637).

Nor does it matter that the Climate Act is a state statute rather than a suit for damages under state common law. Any preemptive effect of federal common law and the Clean Air Act applies equally to either. See Milwaukee I, 406 U.S. at 105 ("The question of apportionment of interstate waters is a question of 'federal common law' upon which state statutes or decisions are not conclusive."); Geier v. American Honda Motor Co., 529 U.S. 861,

869 (2000) (noting that "ordinary pre-emption principles" may "instruct us to read [federal] statutes as pre-empting state laws (including common-law rules)").

The Climate Act also raises the same concerns as the City's tort claims in City of New York. It "implicate[s] two federal interests that are incompatible with the application of state law: (i) the 'overriding . . . need for a uniform rule of decision' on matters influencing national energy and environmental policy, and (ii) 'basic interests of federalism.'" City of New York, 993 F.3d at 91–92 (quoting Milwaukee I, 406 U.S. at 105 n.6). More specifically, the Act "effectively impose[s] strict liability for the damages caused by fossil fuel emissions no matter where in the world those emissions were released (or who released them)" and does so "all without asking what the laws of . . . other states (or countries) require." Id. at 92–93. "To permit [the Climate Act's 'cost recovery demands'] to proceed under state law would . . . risk upsetting the careful balance that has been struck between the prevention of global warming, a project that necessarily requires national standards and global participation, on the one hand, and energy production, economic growth, foreign policy, and national security, on the other." Id. at 93.

In City of New York, the Second Circuit explained that the City's state tort claims were "permissible only to the extent authorized by" the Clean Air Act. Id. at 99 (brackets and internal quotation marks omitted). Concluding that they were not so authorized, the Court held that those claims were preempted. Id. at 100. Here, New York makes no argument that the Clean Air Act authorizes a state to adopt a law imposing strict liability upon fossil fuel producers for historical emissions. The Court concludes that City of New York controls and the Climate Act is preempted.

Nothing in the Supreme Court's recent decision in Hencely v. Fluor Corp., 146 S. Ct. 1086 (2026), undermines this Court's conclusion that the Climate Act is preempted. There,

the Supreme Court assessed "whether a state-law suit premised on a military contractor's activities in a war zone is preempted even when the contractor was not required or authorized to take the action at issue." 146 S. Ct. at 1093. In holding that such a suit was not preempted, the Court reaffirmed that there are "a few areas, involving uniquely federal interests, [that] are so committed by the Constitution and laws of the United States to federal control that state law is pre-empted and replaced, where necessary, by federal law, fashioned by federal courts in the absence of congressional action"—i.e., that some areas are governed by federal common law. Id. at 1094 (internal quotation marks omitted). The Court further elaborated that such areas are "rare" and state law is only preempted "when there is a significant conflict between an identifiable federal policy or interest and the operation of state law, or when specific objectives of federal legislation would be frustrated." Id. (brackets and internal quotation marks omitted).

New York contends that the United States has failed to identify any such "significant conflict." But as the Court has already explained, City of New York exhaustively described why federal interests and federal law must govern disputes over interstate greenhouse gas emissions. There is an "'overriding . . . need for a uniform rule of decision' on matters influencing national energy and environmental policy," City of New York, 993 F.3d at 91–92 (quoting Milwaukee I, 406 U.S. at 105 n.6), and a "real risk that subjecting [fossil fuel producers]' global operations to a welter of different states' laws could undermine important federal policy choices." Id. at 93.

Nor does the United States' rescission of its endangerment finding as to greenhouse gas emissions from motor vehicles have any effect on the Court's analysis. See 91 Fed. Reg. 7686 (Feb. 18, 2026) (determining that section 7521 of the Clean Air Act does not supply EPA with the legal authority to regulate greenhouse gas emissions from motor vehicles).

City of New York did not rely on the EPA's conception or use of the regulatory powers delegated to it by the Clean Air Act. Again, because the Climate Act operates in an area traditionally governed by federal common law, the principal issue in the preemption analysis set out in City of New York is whether the statutory text of the Clean Air Act affirmatively authorizes the application of state law in the way that the Climate Act prescribes. As the Second Circuit explained, the Clean Air Act does not contain any such authorization.

The Court notes that its conclusion here is in accord with a recent and well-reasoned decision of Chief Judge Sannes of the Northern District of New York in a case challenging the Climate Act brought by several states and business associations. See West Virginia v. James, 25-cv-168 (BKS), 2026 WL 2568355 (N.D.N.Y. Aug. 31, 2026). Like the Court here, Judge Sannes held that the tort claims in City of New York and the Climate Act's imposition of strict liability against fossil fuel producers were indistinguishable. Id. at *21. And, as here, Judge Sannes concluded that, because the Clean Air Act does not authorize New York's enforcement of the Climate Act, the Climate Act is preempted. Id. at *24.

The Court will grant summary judgment in favor of the United States on its Clean Air Act preemption claim.

## III. THE FEDERAL GOVERNMENT'S EXCLUSIVE AUTHORITY IN FOREIGN AFFAIRS PREEMPTS NEW YORK'S CLIMATE ACT.

"[T]he Constitution entrusts foreign policy exclusively to the National Government." American Insurance. Association v. Garamendi, 539 U.S. 396, 419 n.11 (2003). Indeed, "the historical gloss on the 'executive Power' vested in Article II of the Constitution has recognized the President's 'vast share of responsibility for the conduct of our foreign relations.'" Id. at 414 (quoting Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 610–11 (1952)

(Frankfurter, J., concurring)). Accordingly, state laws "must give way if they impair the effective exercise of the Nation's foreign policy." Zschernig v. Miller, 389 U.S. 429, 440 (1968); see also United States v. Belmont, 301 U.S. 324, 331 (1937) ("[T]he external powers of the United States are to be exercised without regard to state laws or policies.").

In deciding whether a state law is preempted by the federal government's foreign affairs powers, courts apply the doctrines of conflict preemption and field preemption. See Garamendi, 539 U.S. at 419 n.11. A state law is conflict-preempted "where there is evidence of clear conflict between the policies adopted by" the state and the federal government. In re Assicurazioni Generali, S.P.A., 592 F.3d 113, 117–18 (2d Cir. 2010) (internal quotation marks omitted) (quoting Garamendi, 539 U.S. at 420–421). "Yet, even in absence of a treaty" or other express foreign policy, "a State's policy may disturb foreign relations." Zschernig, 389 U.S. at 441. Thus, "the Supreme Court has made clear that, even in the absence of any express federal policy, a state law still may be [field-]preempted . . . if it intrudes on the field of foreign affairs without addressing a traditional state responsibility." Movsesian v. Victoria Versicherung AG, 670 F.3d 1067, 1072 (9th Cir. 2012); see also Garamendi, 539 U.S. at 419 n.11.

The United States contends that, regardless of whether the Court applies conflict preemption or field preemption, the Climate Act is preempted. In particular, the United States argues that the Climate Act conflicts with a variety of statutory provisions—including those in the Clean Air Act and the Global Climate Protection Act of 1987, Pub. L. No. 100–204, Title XI, 101 Stat. 1407 (codified at 15 U.S.C. § 2901 note), as well as longstanding positions taken by the federal government as to climate change such as opposing liability and compensation schemes. See City of New York, 993 F.3d at 103 n.11. The United States also contends that the Climate Act is field-preempted because its requirement that fossil fuel producers pay for global

greenhouse gas emissions intrudes into foreign affairs without implicating any traditional state interests.

New York, in turn, argues that the United States has failed to identify any specific non-speculative conflict between American foreign policy and the Climate Act. It maintains that the Climate Act invokes the traditional state interest in compensating in-state injuries caused by global emissions, foreclosing the application of field preemption.

In City of New York, the Second Circuit acknowledged that the Clean Air Act does not have extraterritorial effect and "regulates only domestic emissions." 993 F.3d at 100–01 (citing 42 U.S.C. § 7415 (contemplating that the EPA would only act to mitigate air pollution affecting other nations if those nations implemented reciprocal actions in favor of the United States)). But despite the Clean Air Act's non-displacement of federal common law as to emissions outside the United States, the Second Circuit concluded that the federal common law also could not be extended to regulate such emissions. The Court reasoned that federal common law claims as to such emissions would raise foreign policy concerns by "bypass[ing] the various diplomatic channels that the United States uses to address" climate change and "circumvent[ing] Congress's own expectations and carefully balanced scheme of international cooperation." Id. at 103. Accordingly, the preemptive effect of the Clean Air Act and the federal common law does not foreclose the Climate Act's de facto regulation of greenhouse gas emissions abroad. The United States, to satisfy its burden in showing that the Climate Act is unconstitutional in all of its applications, thus points to the foreign affairs doctrine as the source of field preemption.

As the Ninth Circuit has observed, "field preemption [in the realm of foreign affairs] is a rarely invoked doctrine." Movsesian, 670 F.3d at 1075. However, two decisions of the Supreme Court shed light on the applicable rule. In Zschernig, the Supreme Court

considered a challenge to an Oregon probate statute that permitted inheritance by foreign heirs on condition that they could demonstrate that their country of residence provided reciprocal rights of inheritance to Oregonians. 389 U.S. at 430–31. The Court noted that "the several States . . . have traditionally regulated the descent and distribution of estates." Id. at 440. Nonetheless, the Court precluded the probate statute's application. It reasoned that, in applying the statute, Oregon courts—informed by the "attitudes of the '[C]old [W]ar'"—performed "minute inquiries concerning the actual administration of foreign law" and "into the credibility of foreign diplomatic statements." Id. at 435. Such matters, the Court held, were those "which the Constitution entrusts solely to the Federal Government." Id. at 436. In so holding, the Court did not identify any specific treaty or other express statement of foreign policy with which the Oregon statute conflicted. It instead explained that "a State's policy may disturb foreign relations" "even in absence of a treaty." Id. at 441.

In Garamendi, the Court applied the foreign affairs doctrine to California's Holocaust Victim Insurance Relief Act, which required insurers to disclose to the state certain information about insurance policies sold in Europe before and during the Second World War. 539 U.S. at 401, 409. In doing so, the Court briefly outlined when courts should apply conflict and field preemption. It explained that where "a State has acted within . . . its traditional competence but in a way that affects foreign relations, it might make good sense to require a conflict, of a clarity or substantiality that would vary with the strength or the traditional importance of the state concern asserted." Garamendi, 539 U.S. at 419 n.11 (citation and internal quotation marks omitted). However, "field preemption might be the appropriate doctrine" "[i]f a State were simply to take a position on a matter of foreign policy with no serious claim to be addressing a traditional state responsibility . . . ." Id.

Accordingly, Zschernig and Garamendi support the proposition that a court should apply the doctrine of field preemption "when a state law (1) has no serious claim to be addressing a traditional state responsibility and (2) intrudes on the federal government's foreign affairs power." Movsesian, 670 F.3d at 1074. And a court should not accept at face value the purported state interest invoked by a state defending its statute from a foreign affairs preemption challenge; instead, a court must discern "the state interest actually underlying" the at-issue statute. Garamendi, 539 U.S. at 426; see also Von Saher v. Norton Simon Museum of Art at Pasadena, 592 F.3d 954, 964 (9th Cir. 2010) ("Courts have consistently struck down state laws which purport to regulate an area of traditional state competence, but in fact, affect foreign affairs.").

The Court concludes, consistent with City of New York, that the Climate Act does not regulate an area of traditional state responsibility. The harm caused by global warming "presents a uniquely international problem" that is "not well-suited to the application of state law." City of New York, 993 F.3d at 85–86. The issue "implicates the conflicting rights of states and our relations with foreign nations," and so "poses the quintessential example" of when state law does not apply. Id. at 92 (brackets and internal quotation marks omitted). Accordingly, the Court comfortably concludes that New York has "no serious claim to be addressing a traditional state responsibility" through the Climate Act. Garamendi, 539 U.S. at 419 n.11.

The Climate Act also intrudes on the federal government's foreign affairs powers. As the Second Circuit explained in City of New York, "global warming . . . is a global problem that the United States cannot confront alone." City of New York, 993 F.3d at 88. Addressing that issue requires that "the United States . . . work[] cooperatively with foreign governments

through diplomatic channels to coordinate a global response to climate change and greenhouse gas emissions." Id.

Both Congress and the executive have long recognized such a "national position" favoring cooperation and diplomacy with other nations to address the issue of global warming. Garamendi, 539 U.S. at 421. For instance, Congress passed the Global Climate Protection Act of 1987 which "ordered the Secretary of State to work 'through the channels of multilateral diplomacy' and coordinate diplomatic efforts to combat global warming." Massachusetts, 549 U.S. at 508 (quoting Pub. L. No. 100–204, Title XI, § 1103, 101 Stat. 1407 (codified at 15 U.S.C. § 2901 note)). President George H.W. Bush signed and the Senate unanimously ratified the United Nations Framework Convention on Climate Change (the "Framework Convention"), a non-binding agreement among nations to work together "to reduce atmospheric concentrations of carbon dioxide and other greenhouse gases." Id. at 509 (citing S. Treaty Doc. No. 102–38, Art. 2, p. 5, 1771 U.N.T.S. 107 (1992)). The United States has announced its intention to withdraw from the Framework Convention, but that withdrawal does not make the regulation of greenhouse gases emitted from extraterritorial sources any less a matter falling within the sphere of the foreign policy of the United States.

Because addressing global greenhouse gas emissions is the subject of foreign policy, New York's application of the Climate Act to emissions-generating activity that occurred outside of the United States intrudes on that policy. "To hold [fossil fuel] [p]roducers accountable for purely foreign activity (especially [] [f]oreign [p]roducers) would . . . bypass the various diplomatic channels that the United States uses to address this issue . . . ." City of New York, 993 F.3d at 103. "Such an outcome would obviously sow confusion and needlessly complicate the nation's foreign policy." Id. Permitting New York to enforce the Climate Act

and levy cost recovery demands on fossil fuel companies for their foreign activities "would not only risk jeopardizing our nation's foreign policy goals but would also seem to circumvent Congress's own expectations and carefully balanced scheme of international cooperation on a topic of global concern." Id. The Constitution does not permit such an "intrusion by the State into the field of foreign affairs." Zschernig, 389 U.S. at 432.

The Court concludes that the Climate Act, as applied to foreign activities of fossil fuel producers, is field-preempted under the foreign affairs doctrine.[4] The Court will grant summary judgment in favor of the United States on its foreign affairs preemption claim.

CONCLUSION

The motion of the United States for summary judgment is GRANTED as to its Clean Air Act preemption claim (Count I) and foreign affairs preemption claim (Count V). The Court has not found it necessary to reach the other claims of the movant.

The Clerk is respectfully requested to enter judgment for plaintiffs on Counts I and V, dismissing Counts II, III and IV without prejudice, declaring New York's Climate Change Superfund Act to be unconstitutional and permanently enjoining defendants in their official capacities from enforcing it. The Clerk is also requested to terminate the motions at ECF 73 & 100.

[4] Chief Judge Sannes also concluded that the Climate Act is field-preempted under the foreign affairs doctrine. See West Virginia v. James, 2026 WL 2568355, at *26–28.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
September 23, 2026